**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MARTIN SCOTT** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **3:25-cv-_____** |
| | ) | |
| **METRO. GOV'T. OF NASHVILLE** | ) | **JURY DEMAND** |
| **AND DAVIDSON COUNTY,** | ) | |
| | ) | |
| **TRACKING SOLUTIONS, INC.,** | ) | |
| | ) | |
| **MALLORY WITHERS,** | ) | |
| *in her individual capacity* | ) | |
| | ) | |
| **BRIAN CAVALIERE,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| **TYLER LEWIS,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| Defendants. | ) | |

---

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983) AND SUPPLEMENTAL STATE-LAW CLAIMS**

---

Plaintiff, by and through undersigned counsel, for his Complaint against Defendants states as follows:

**<u>INTRODUCTION</u>**

1. Plaintiff brings this action under 42 U.S.C. § 1983 to redress violations of his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, and

1

to obtain declaratory, injunctive, and monetary relief. He also asserts related supplemental state-law claims under Tennessee law.

2.     Defendants, acting individually and in concert, used false reports, fabricated evidence, retaliatory prosecutions, and unconstitutional bail and pretrial-monitoring procedures to deprive Plaintiff of liberty and to punish him for engaging in protected whistleblower activity, including lawful IRS reporting and petitioning courts and federal authorities.

## PARTIES AND JURISDICTION

3.     Plaintiff, Martin Scott, is an adult male who is a resident of Tennessee and a United States citizen.

4.     Defendant Metropolitan Government of Nashville and Davidson County ("Metro") is a political subdivision of the State of Tennessee, subject to suit under 42 U.S.C. § 1983 for its customs, policies, and practices and operates the Metropolitan Nashville Police Department ("MNPD"), the Davidson County Night Court, and related pretrial services.

5.     Defendant Tracking Solutions, Inc. is a private corporation that conducts business in Tennessee and administers GPS monitoring for pretrial defendants under color of state law and at all relevant times provided GPS monitoring services for Metro and Davidson County criminal courts.

6.     Defendant Mallory Withers is an individual who, acting jointly with law enforcement personnel, initiated and sustained malicious prosecutions against Plaintiff.

7.     Defendant Brian Cavaliere is a sworn law enforcement officer employed by the Metropolitan Nashville Police Department and is sued in his individual capacity for acts taken under color of law.

2

8. Defendant Tyler Lewis is a sworn law enforcement officer employed by the Metropolitan Nashville Police Department and is sued in his individual capacity for acts taken under color of law.

9. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil-rights enforcement).

10. Supplemental jurisdiction exists over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

11. This Court also has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202.

12. Venue lies in this District under 28 U.S.C. § 1391(b), because the events giving rise to these claims occurred in Nashville, Davidson County, Tennessee.

**STATEMENT OF FACTS**

13. Beginning in late 2024 and continuing through 2025, Plaintiff became the target of a series of escalating criminal accusations, arrests, and pretrial restrictions that were the product of (1) fabricated or misleading reports by Defendant Mallory Withers; (2) the knowing or reckless adoption of those falsehoods by MNPD Detectives Brian Cavaliere and Tyler Lewis; and (3) Metro's longstanding customs and practices—some of which are reflected in MNPD's operational procedures—of accepting complainant narratives without corroboration, treating protected speech as criminal conduct, and exerting police influence over access to judicial decisionmakers.

14. Plaintiff and Defendant Withers had engaged in a compensated arrangement throughout 2023 and 2024. On August 28, 2024, during a brief argument initiated by Defendant

3

Withers, she threatened to call the police—a dispute she did not report at the time and after which the parties continued communicating and transacting for weeks. On October 10, 2024, Plaintiff lawfully notified Defendant Withers that he intended to issue IRS Forms 1099-NEC reflecting more than $200,000 in compensation paid to her. Only after receiving this notice—and expressing fear that the IRS might "audit [her] for $200,000"—did Defendant Withers begin submitting criminal reports.

15.     Every accusation she later made corresponded to 1099-related mailings or rising concerns about tax exposure, rather than any contemporaneous conduct by Plaintiff. Plaintiff continues to communicate with federal authorities regarding Defendant Withers's unreported income and intends to file any future required IRS documents or complaints with federal agencies notwithstanding the retaliation described herein.

16.     On December 3, 2024—approximately thirty-seven minutes after Plaintiff was served with an ex parte Order of Protection—Defendant Withers, acting in concert with MNPD officers, obtained warrants for harassment and stalking. The allegations underlying these warrants were indisputably stale, as the only conduct identified occurred more than three months earlier during the August 28 argument. Defendant Withers omitted that she initiated that argument by threatening to call the police, that the calls she complained of lasted only seconds, and that the parties exchanged over 200 mutual text messages immediately afterward while continuing their relationship for weeks.

17.     Despite the obvious staleness of the claim and the readily verifiable exculpatory context, MNPD officers accepted her selective narrative without obtaining call logs, reviewing text-message threads, or examining her continued voluntary contact—an approach consistent with Metro's routine practice of crediting complainant assertions without corroboration. This

4

pattern of accepting unverified narratives, particularly in domestic-related cases, is consistent with MNPD's operational procedures and contributed to the foreseeability of the constitutional violations suffered by Plaintiff.

18. Plaintiff's first 1099 was mailed by INFOSEND, at the request of a third-party IRS vendor, Tax1099.com, on November 27, 2024. The envelope clearly stated "Presorted First Class Mail – Postage Paid – INFOSEND." Once Plaintiff elected to file IRS Forms 1099-NEC, federal law required him to furnish Defendant Withers with a copy of each form, and the IRS vendor automatically mailed those copies pursuant to federal regulations. The second 1099 was mailed on December 17, 2024. Neither was mailed by Plaintiff personally, and both were mailed before any bond conditions imposing a no-contact prohibition were signed.

19. Despite this, Defendant Withers reported on December 10 and again on December 23, 2024, that receiving a federally required 1099 form was a violation of an Order of Protection and caused her "significant emotional distress." Her distress plainly centered on fear of tax consequences, not communication from Plaintiff. MNPD officers again did no independent verification—such as checking mailing dates, envelope markings, or the federal requirements governing 1099 distribution—and instead adopted Defendant Withers's accusations wholesale.

20. MNPD's refusal to evaluate objective evidence, and its practice of equating federally protected reporting with criminal conduct, reflect inadequate training and a longstanding custom of allowing complainant speculation to substitute for probable cause. Upon information and belief, Metro officers routinely rely solely on complainant narratives in domestic-related warrant applications and frequently consult Night Court commissioners in advance of warrant review, demonstrating that the practices applied to Plaintiff were longstanding and widespread rather than isolated.

5

21.     When Defendant Withers realized that her tax-form allegations were weakening—and that officers were beginning to question whether a 1099 could constitute "contact" or "harassment"—she began supplying MNPD with new accusations designed to keep the criminal machinery moving. The timing, nature, and evidentiary emptiness of these allegations all reflect intentional manufacture rather than legitimate reporting.

22.     First, Defendant Withers alleged that Plaintiff created a "fake Instagram account" for the purpose of harassing her, claiming the profile contained details that "only he would know." The allegation was wholly speculative. Defendant Withers located the account herself while searching Instagram; she had never received a message, notification, or interaction from the account; and she supplied no evidence linking Plaintiff to its creation, login credentials, or operation. MNPD conducted no technical investigation—no metadata review, no IP inquiry, no username-analysis, no device examination—and simply accepted her assumption as fact. Despite the total lack of evidence, officers adopted the claim and treated it as affirmative proof of a new, separate criminal act.

23.     Second, Defendant Withers asserted that she saw Plaintiff "one mile from her home" on a dating application and that this proximity indicated he was "following" or "pursuing" her. She omitted that dating-app proximity readings are algorithmic, imprecise, and frequently inaccurate—even when both users are stationary. She also failed to disclose that the "one-mile" radius encompassed heavily populated areas of downtown Nashville that Plaintiff frequently visited. MNPD officers made no effort to verify the accuracy of the app's geolocation, did not obtain any underlying app data, and did not consider that Plaintiff's bond conditions contained no geographic restrictions. As a result, nothing Defendant Withers described—accurate or not—was prohibited conduct.

24.     Rather than examine whether the allegations met any statutory definition of "harassment," "contact," or "stalking," MNPD officers incorporated the new claims wholesale into warrant applications. These allegations, unsupported by evidence and legally insufficient on their face, were then repackaged into charges, one being a felony, that significantly escalated Plaintiff's criminal exposure.

25.     MNPD's uncritical acceptance of these manufactured allegations—combined with its failure to conduct even basic investigative verification—allowed Defendant Withers to sustain a cycle of criminal accusations long after the original claims had lost viability. The resulting warrants were the foreseeable product of fabricated allegations and investigative omissions, not legitimate law enforcement judgment.

26.     On January 29, 2025, Plaintiff was arrested on the final set of charges. A General Sessions commissioner imposed GPS monitoring as a bail condition by checking a box on the form, without making the individualized findings required by Tenn. Code Ann. § 40-11-150(a)—including any assessment of threat, consultation with the alleged victim, or determination of ability to pay. The order identified no exclusion zones or boundaries and provided no notice of the restrictions that would govern Plaintiff's liberty.

27.     To obtain release, Plaintiff was required to secure a GPS device from one of the two vendors operating inside the Davidson County booking area—Tracking Solutions or Nationwide. Officers told him he could not be released until a vendor physically attached a monitoring device to his person. Because Tracking Solutions was the first available, Plaintiff was compelled to proceed with that company. Before attaching the device, Tracking Solutions required him to sign its "Monitoring Agreement and Release," which imposed undefined exclusion zones, sweeping liability waivers, and other restrictions never ordered by the court. In

7

practice, execution of this private contract—and acceptance of its unauthorized terms—became a mandatory condition of regaining his liberty. Tracking Solutions had no written agreement with Metro as required by Tenn. Code Ann. § 40-11-152(k), meaning Metro had delegated liberty-restricting authority to an unapproved and unauthorized private vendor.

28.     On March 3 and March 27, 2025, Plaintiff's legal team presented exculpatory evidence to the assigned prosecutor. The prosecutor admitted that most charges lacked probable cause but refused to dismiss them, proceeding instead on all of the charges, even those tied to the 1099s.

29.     At the preliminary hearing on March 27, 2025, the prosecutor argued—contrary to federal law—that IRS Forms 1099 are "not legal documents." Despite clear exculpatory evidence, the judge bound over three charges to the grand jury, all of which were tied directly to the 1099 filings. State authorities, however, continued to pursue the charges while declining to act on Defendant Withers's demonstrably false reports. This selective enforcement deprived Plaintiff of his constitutional rights and amplified Defendant Withers's retaliatory scheme.

30.     In April 2025, Plaintiff attempted to submit sworn Rule 3 affidavits to initiate prosecution against Defendant Withers for false reporting and harassment. Plaintiff's Rule 3 affidavits set forth multiple sworn false statements by Defendant Withers that, if presented to a magistrate, would have established probable cause for felony false reporting under Tenn. Code Ann. § 39-16-502. Rather than allow those affidavits to be reviewed by a neutral magistrate—as Tenn. R. Crim. P. 3 requires—Cavaliere notified the General Sessions ADA. The ADA responded that she "would not prosecute" Defendant Withers and instructed Cavaliere not to "entertain" Plaintiff's evidence. When Plaintiff personally attempted to submit affidavits to a judicial commissioner, Cavaliere again alerted the ADA, who responded: "If his attorney is

unable to get him to stop [reporting her], I will contact you about pursuing more warrants." Cavaliere then informed the ADA that he had contacted Night Court and ensured that Plaintiff was "on their radar … to ensure that no warrants will be obtained on Ms. Withers."

31.     MNPD policy manuals expressly recognize ongoing communication channels between officers and Night Court regarding warrant matters, and that officers frequently consult judicial commissioners in real time regarding warrants. In practice—consistent with Metro custom—officers used these channels to influence whether Rule 3 affidavits would be accepted at all. As a result, clerks and officers later refused to accept Plaintiff's affidavits, citing informal instruction rather than judicial decisions.

32.     Because of Defendants' actions, Plaintiff was repeatedly arrested, subjected to continuous GPS surveillance, deprived of firearm rights, threatened with additional prosecution for attempting to exercise his Rule 3 rights, stigmatized as a violent felony offender, and burdened with substantial financial and emotional injuries.

33.     All criminal charges were dismissed in October 2025, shortly after Plaintiff and his counsel issued subpoenas to Defendant Withers, Tracking Solutions, Tax1099, and other third parties whose records and testimony would have exposed the factual falsity of the allegations. The timing of the State's dismissal—on the eve of compelled production—confirmed that the prosecutions were baseless from the outset and that the warrants had been issued on fabricated or unverified claims and unconstitutional enforcement practices. Further, Plaintiff's requests for clarity through a bill of particulars and related motions were ignored or denied, reinforcing that the prosecutions could not withstand scrutiny once the factual record was forced into the open.

9

## COUNT I – MALICIOUS PROSECUTION
### (42 U.S.C. § 1983 – Fourth Amendment)
### DEFENDANTS MALLORY WITHERS, BRIAN CAVALIERE, AND TYLER LEWIS

34. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

35. This claim challenges the initiation and continuation of six criminal prosecutions based on fabricated, misleading, and incomplete information supplied by Defendant Withers and adopted without investigation by Defendants Cavaliere and Lewis, resulting in Plaintiff's unlawful seizures in violation of the Fourth Amendment.

36. Defendants Cavaliere and Lewis were, at all relevant times, MNPD officers acting under color of state law. Defendant Withers, a private individual, acted jointly with them by knowingly providing false and misleading information that she understood would be used to initiate criminal process.

37. A Fourth Amendment malicious prosecution claim arises when a defendant initiates or influences criminal proceedings without probable cause, causes a deprivation of liberty pursuant to those proceedings, and the prosecution terminates in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010). A defendant "influences" a prosecution under § 1983 when he knowingly or recklessly includes falsehoods or omits material exculpatory information from a warrant affidavit, or when he launders a complainant's fabricated narrative into formal criminal process. See *King v. Harwood*, 852 F.3d 568, 580–82 (6th Cir. 2017).

INITIATES OR INFLUENCES CRIMINAL PROCEEDINGS

38. The events forming the basis of this claim began on December 3, 2024, when Defendant Withers presented MNPD with affidavits alleging that Plaintiff had harassed her by placing nine phone calls during an argument on August 28, 2024—an incident occurring more than three months earlier. In making her accusations, Defendant Withers withheld critical

10

context. She failed to disclose that she initiated the argument by threatening to "call the police," that the calls lasted only seconds as part of that same heated exchange, that the parties exchanged more than 200 text messages immediately afterward, and that she voluntarily continued both communication and their paid arrangement for weeks thereafter. By omitting this information, Defendant Withers manufactured a false impression that she was being pursued by Plaintiff, when the evidence showed a consensual and ongoing arrangement. Her decision to resurrect this months-old argument only after Plaintiff notified her on October 10, 2024, that he would be issuing IRS Forms 1099 strongly indicates that her purpose was retaliatory rather than protective. Acting on her incomplete and distorted narrative, MNPD obtained warrants, resulting in Plaintiff's December 20, 2024 arrest.

39.     On December 23, 2024, Defendant Withers again sought criminal charges, this time claiming that Plaintiff violated an ex parte Order of Protection by "sending" her a Form 1099 on December 10, 2024. She knew that was untrue. The envelope she received was plainly marked "Presorted First Class Mail – Postage Paid – INFOSEND," identifying a third-party IRS vendor rather than Plaintiff. She also knew that he had told her in writing more than two months earlier that the 1099s would be sent. None of these facts were shared with MNPD. Instead, Defendant Withers knowingly misrepresented the mailing as intentional "contact," leading officers to believe a crime had occurred. That misrepresentation contributed directly to Plaintiff's arrest and to the eventual imposition of GPS monitoring.

40.     When her narrative began to weaken, Defendant Withers supplied new allegations in January 2025. After receiving the second Form 1099 for tax year 2024, she again approached MNPD, this time asserting that the mailing violated Plaintiff's bond conditions. She concealed that she had been notified in October that 1099s for both 2023 and 2024 would issue and that the

mailings again originated from INFOSEND, not Plaintiff. Defendant Lewis accepted her narrative without verifying any aspect of it. He did not seek to discover when the mail was sent to determine if the mailing date was within the no-contact period. If he had, he would have learned that the mail was authorized to be sent before Plaintiff was ever under bond conditions. His failure to conduct even a rudimentary investigation constituted reckless disregard for the truth under *King*.

41.     On January 20, 2025, Defendant Withers presented yet another set of accusations, claiming that Plaintiff had created a "fake Instagram account" to harass her and that a dating application showed him "one mile away" from her home. She did not disclose that she located the Instagram account independently without receiving any message from Plaintiff, that she could not provide any evidence linking him to the account, or that Plaintiff had no geographic restrictions in his bond conditions. Defendant Cavaliere swore to these allegations without verifying authorship, without reviewing the conditions of bond, without performing any technical inquiry, and without assessing whether proximity generated by a dating-app algorithm—particularly in a densely populated city—could constitute "contact" or "harassment" under Tennessee law. His omissions likewise reflect reckless disregard for the truth.

LACK OF PROBABLE CAUSE

42.     For each of the six charges, probable cause was entirely absent. The conduct alleged never met the statutory elements of harassment or stalking, and the facts known—or easily discoverable—by Defendants would have negated any reasonable belief that Plaintiff committed a crime. Four of the six charges collapsed before ever reaching the grand jury, confirming the absence of probable cause on their face. Nor do the remaining two charges survive scrutiny simply because a grand jury returned indictments. A grand jury finding does not

12

cleanse a prosecution that was set in motion by fabricated or materially misleading evidence. Here, the indictments rested on affidavits irreparably tainted by Defendant Withers's deliberate falsehoods and by the officers' reckless omissions—precisely the type of causative misconduct that satisfies the "influenced the decision to prosecute" element under *Sykes* and *King*. Defendant Withers, as the originator of the false narrative, cannot invoke the grand jury presumption at all; she knowingly manufactured the very fabrications that misled both officers and judicial officers. And because Detectives Cavaliere and Lewis adopted those fabrications uncritically, their reliance on the indictments provides no shield from liability. The prosecutions were invalid from the outset, not because of a later judicial ruling, but because the process initiating them was corrupted at its foundation.

DEPRIVATION OF LIBERTY

43.     As a direct result of these actions, Plaintiff was arrested twice, detained, subjected to continuous GPS monitoring at his own expense, stripped of his right to possess firearms, required to abstain from alcohol, and publicly labeled a felony defendant. He incurred monitoring fees, attorney's fees, and substantial reputational and employment harm. He also suffered humiliation, emotional distress, and ongoing privacy invasion resulting from electronic tracking. These consequences amount to a prolonged seizure under the Fourth Amendment. *Grady v. North Carolina*, 575 U.S. 306, 310 (2015).

TERMINATION IN PLAINTIFF'S FAVOR

44.     On October 29, 2025, the Davidson County Criminal Court dismissed all remaining charges at the State's request, terminating the prosecution in Plaintiff's favor.

45.     Defendants' conduct directly and proximately caused Plaintiff's unlawful seizure and all resulting damages.

13

RELIEF REQUESTED

46.     Plaintiff seeks compensatory damages for economic losses, emotional distress, reputational injury, and liberty restraints; punitive damages for Defendants' reckless disregard of constitutional rights; and attorney's fees under 42 U.S.C. § 1988.


## COUNT II – FABRICATION OF EVIDENCE
### (42 U.S.C. § 1983 – Fourth and Fourteenth Amendments)
### DEFENDANTS MALLORY WITHERS, BRIAN CAVALIERE, AND TYLER LEWIS

47.     Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

48.     This claim arises from Defendants' use of knowingly false statements and material omissions to manufacture probable cause, tainting the warrant process and causing Plaintiff to be arrested and detained based on fabricated evidence in violation of the Fourth and Fourteenth Amendments.

49.     It has long been clearly established in the Sixth Circuit that a police officer violates the Constitution when he knowingly or recklessly includes false statements, omits material exculpatory facts, or relies on fabricated evidence to initiate or continue a criminal prosecution. *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006); *Spurlock v. Satterfield*, 167 F.3d 995, 1005–07 (6th Cir. 1999). A seizure based on deliberately falsified information violates the Fourth Amendment, and the use of fabricated evidence to deprive a person of liberty also violates the Due Process Clause of the Fourteenth Amendment. Id. These constitutional protections apply regardless of the existence of formal legal process if the process itself is tainted by deliberate falsification. *Gregory*, 444 F.3d at 737.

50.     Defendant Brian Cavaliere was, at all relevant times, a law enforcement officer acting under color of state law. Defendant Tyler Lewis was, at all relevant times, a law

14

enforcement officer acting under color of state law. Defendant Mallory Withers acted jointly with, and knowingly induced, Defendant Brian Cavaliere and Defendant Tyler Lewis to submit false information to judicial officers to initiate and sustain criminal proceedings against Plaintiff.

FABRICATIONS SUPPLIED BY DEFENDANT WITHERS

51.     The affidavits and supplemental statements submitted by Defendants contained multiple falsehoods or material omissions attributable to Defendant Withers, including but not limited to:

(1) False claim that Plaintiff personally mailed IRS Forms 1099: Defendant Withers represented that Plaintiff intentionally mailed her 1099 forms in violation of an Order of Protection or bond conditions. She omitted that the forms were mailed by a third-party IRS vendor and that the envelopes plainly indicated the mail was sent "Presorted First Class Mail – Postage Paid – INFOSEND." Defendant Withers knew or should have known these facts when she reported the mailings as "unlawful contact."

(2) False claim that federally required tax documents constituted "harassment" or "illegal communication": Defendant Withers asserted that receiving a Form 1099 was a criminal act, despite having been notified on October 10, 2024, that the filings would occur, and despite knowing or should have known the filings were mandated once Plaintiff elected to report her income. No Tennessee statute criminalizes such conduct, and Defendant Withers knew the filings were not communications directed by Plaintiff for any purpose other than tax reporting.

(3) Fabrication regarding an alleged "fake Instagram account": Defendant Withers told officers that Plaintiff created a fictitious Instagram account "containing

15

information only he would know." She had no message from that account, no proof of authorship, and she located the profile herself. There was no evidence the account had any connection to Plaintiff. These assertions were speculative and knowingly misleading.

(4) <u>Misrepresentation of dating-app proximity as evidence of "stalking"</u>: Defendant Withers claimed a dating application showed Plaintiff "one mile away" from her home. At the time, she lived in downtown Nashville—a densely populated area where thousands of people routinely fall within the same one-mile radius. She omitted that dating-app proximity readings are algorithmic estimates, frequently inaccurate, and often reflect nothing more than a general geographic radius rather than movement or intent. She further omitted that Plaintiff's bond conditions imposed no geographic restrictions whatsoever, meaning even an accurate proximity reading could not constitute prohibited conduct. Taken together, her allegation could not reasonably support any inference of "contact," pursuit, or stalking.

52. These false statements and omissions were material: without them, no magistrate could reasonably have found probable cause for any of the six warrants issued between December 2024 and January 2025.

<u>RECKLESS USE OF FABRICATED EVIDENCE BY CAVALIERE AND LEWIS</u>

53. Despite the obvious inconsistencies in Defendant Withers's allegations, Defendants Cavaliere and Lewis incorporated her falsehoods into sworn affidavits without performing basic verification. Among other things, they swore that Plaintiff violated an Order of Protection or bond conditions by mailing 1099s even though due diligence would have revealed

16

the envelopes, dates, and metadata showed Plaintiff played no role in their mailing and that the mailings pre-dated service of any order. They failed to review the hundreds of mutual text messages that contradicted Defendant Withers's "unwanted contact" narrative. They swore to criminal significance based solely on a dating-app proximity display, without verifying location data or considering the absence of any geographic restriction. Lastly, they attributed an Instagram profile to Plaintiff without IP records, forensic review, or any evidence of authorship.

54.     Under *Gregory* and *Spurlock*, constitutional recklessness is established when an officer (1) ignores obvious red flags, (2) declines to investigate readily available exculpatory evidence, or (3) relies on allegations that cannot, as a matter of law, establish probable cause. Defendants Cavaliere and Lewis committed all three forms of misconduct. They overlooked inconsistencies apparent on the face of Defendant Withers's reports, failed to review the most basic corroborating records, and swore to criminal significance that no reasonable officer could have believed satisfied Tennessee's harassment or stalking statutes.

CAUSATION

55.     The fabricated and misleading evidence was the but-for and proximate cause of Plaintiff's seizures. He was arrested on December 20, 2024, and arrested again on January 29, 2025. He was placed on pretrial bail restrictions and continuous GPS monitoring. He was deprived of his ability to possess firearms, and he was subjected to months of reporting requirements, costs, and restrictions on liberty.

56.     Under *Sykes v. Anderson*, *Gregory*, and *King v. Harwood*, officers and private individuals acting jointly can be held liable under § 1983 where fabricated or materially false evidence causes the initiation or continuation of criminal process.

TERMINATION IN PLAINTIFF'S FAVOR

17

57. On October 29, 2025, all criminal charges were dismissed in Plaintiff's favor. The dismissals confirm that the prosecutions lacked legitimate evidentiary foundation once the fabricated and misleading statements were exposed or threatened to be.

INJURY

58. As a direct and proximate result of Defendants' fabrication of evidence, Plaintiff suffered:

      A. unlawful arrests and loss of liberty;

      B. months of electronic monitoring at his expense;

      C. deprivation of his Second Amendment rights during the pendency of charges;

      D. attorney's fees and litigation costs;

      E. reputational harm; and

      F. emotional distress, humiliation, and stigma.

RELIEF REQUESTED

59. Plaintiff seeks compensatory and punitive damages, together with attorney's fees and costs under 42 U.S.C. § 1988.

### COUNT III – MALICIOUS PROSECUTION
**(Tennessee Common Law – Supplemental Jurisdiction, 28 U.S.C. § 1367)**
**DEFENDANT MALLORY WITHERS**

60. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

61. This count asserts that Defendant Withers maliciously initiated and perpetuated criminal proceedings she knew lacked factual or legal basis, motivated by retaliation for Plaintiff's lawful tax reporting, and culminating in favorable termination.

18

62.     Under Tennessee law, a plaintiff must show that the defendant (1) instituted or continued a judicial proceeding, (2) without probable cause, (3) with malice, and (4) that the proceeding terminated in the plaintiff's favor. *Christian v. Lapidus*, 833 S.W.2d 71, 73 (Tenn. 1992); *Roberts v. FedEx Corp.*, 842 S.W.2d 246, 248 (Tenn. 1992).

63.     Defendant Withers initiated and repeatedly continued six criminal proceedings against Plaintiff between November 2024 and January 2025 (initiation) and October 29, 2025 (dismissal in criminal court), each arising from circumstances she knew did not constitute criminal conduct. Her accusations followed a consistent pattern: they were filed only after Plaintiff informed her of his intent to and then did lawfully reported Withers's income to the IRS, and each was based either on (a) months-old interactions taken out of context, (b) federally mandated tax communications, or (c) assertions she fabricated or embellished to maintain pressure on Plaintiff.

STALE AND MISCHARACTERIZED CONDUCT (AUGUST 2024 "HARASSMENT")

64.     On December 3, 2024, Defendant Withers filed harassment and stalking charges based on a brief argument that occurred more than three months earlier, during which Plaintiff placed a short sequence of calls after Defendant Withers threatened to "call the police." Defendant Withers omitted that immediately afterward she and Plaintiff exchanged more than 200 voluntary text messages that same day and continued communicating regularly for weeks, including accepting payments and benefits as part of their arrangement. She knowingly withheld this exculpatory context when presenting the allegations as "unwanted contact."

FALSE CHARACTERIZATION OF 1099 MAILINGS

65.     After Plaintiff notified Defendant Withers on October 10, 2024, that he would be issuing IRS Forms 1099 reporting more than $200,000 in payments, Defendant Withers began

19

reframing those lawful filings as "harassment." She knew the forms were not mailed by Plaintiff as the envelopes bore "Presorted First Class Mail – Postage Paid – INFOSEND," confirming Plaintiff did not personally mail them. Despite this knowledge, she swore out more warrants claiming that receipt of the 1099s constituted criminal "contact" and "violation" of the Order of Protection. Her own prior statements reveal her true motive: she feared IRS scrutiny of unreported income, not Plaintiff.

FABRICATED ALLEGATIONS (INSTAGRAM PROFILE AND DATING APP)

66.     When her earlier claims began to falter, Defendant Withers supplied new allegations to sustain police involvement. She asserted that Plaintiff created a "fake Instagram account," yet she received no messages from it, had to search it out herself, and provided no evidence linking Plaintiff to it. She also reported that a dating application displayed Plaintiff "one mile from her home," despite knowing that (a) such proximity displays are algorithmic, not communicative, and (b) Plaintiff was under no geographic restrictions except to stay away from Defendant Withers's home. These allegations were unsupported, misleading, and incapable of establishing any criminal offense.

MALICE

67.     The timing, content, and evolution of Defendant Withers's accusations demonstrate malice. Each report followed immediately after a triggering event related to her tax exposure—receipt of the W-9 notice, receipt of the 1099s, or discovery that Plaintiff had reported her to federal authorities and provided evidence of false reporting. She repeatedly omitted exculpatory facts, selectively presented stale incidents as new threats, and supplied new accusations only after prior ones lost traction. Her purpose was to retaliate against Plaintiff for

20

reporting her income, coerce him into retracting the IRS filings, and subject him to ongoing criminal jeopardy.

LACK OF PROBABLE CAUSE

68.     No reasonable person could have believed that federally mandated tax notices constituted criminal harassment, that months-old mutually engaged communications constituted stalking, or that algorithmic proximity on a dating application constituted "contact." Several MNPD officers refused to bring charges at various points. Half of the charges did not make it through General Sessions, and the half that did (those pertaining to receiving 1099s) made it through only "barely," as the General Sessions judge put it in her ruling. Defendant Withers nonetheless persisted, knowing her assertions were false or misleading.

FAVORABLE TERMINATION

69.     All charges initiated by Defendant Withers were ultimately dismissed in October 2025. Although a grand jury returned probable cause on two of the six charges, that finding does not immunize Defendant Withers: the grand jury acted based on her false narrative. Defendant Withers knew—unlike the officers and magistrates relying on her—what the true facts were, and that her representations were materially false. Grand jury action does not provide probable cause where the complainant's lies induced the prosecution. *Christmas v. Kington*, No. E2022-00699-COA-R3-CV, 2023 Tenn. App. LEXIS 346, at *22 (Ct. App. Aug. 25, 2023).

INJURY

70.     As a direct and proximate result of Defendant Withers's malicious prosecution, Plaintiff suffered: arrest and detention; months of coerced GPS monitoring; financial losses including attorney's fees, monitoring costs, and lost income; reputational damage; and severe emotional distress.

21

RELIEF REQUESTED

71.    Plaintiff requests:

    A.  compensatory damages,

    B.  punitive damages,

    C.  prejudgment interest,

    D.  costs, and

    E.  all other relief the Court deems just and proper.

## COUNT IV – UNREASONABLE SEARCH & SEIZURE
### (42 U.S.C. § 1983 - Fourth Amendment)
### DEFENDANTS METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY (*Monell*) AND TRACKING SOLUTIONS, INC. (State Actor Under Color of Law)

72.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

73.    This claim challenges the warrantless and unsupported imposition of continuous 24/7 GPS monitoring, a physical search under the Fourth Amendment, imposed without individualized findings, probable cause, or statutory compliance and enforced jointly by Metro and Tracking Solutions.

74.    The Fourth Amendment prohibits unreasonable searches and seizures. Attaching a GPS monitoring device to a person—thereby tracking his movements 24 hours a day—constitutes a search. *Grady*, 575 U.S. at 310. A GPS search is reasonable only if it is supported by individualized findings and imposed through constitutionally adequate procedures. Id.; see also *United States v. Jones*, 565 U.S. 400, 404–05 (2012) (physical intrusion for purpose of tracking constitutes a search); *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (long-term electronic monitoring invades a reasonable expectation of privacy).

22

75.     Here, Defendants Metro and Tracking Solutions conducted and enforced a continuous 24/7 GPS search of Plaintiff's person without probable cause, without individualized judicial findings, and without the procedural safeguards required by the Fourth Amendment and Tennessee law.

## USE OF A GPS MONITORING DEVICE WITHOUT INDIVIDUALIZED FINDINGS

76.     On January 29, 2025—only hours after Plaintiff's arrest—he appeared by video before the Night Court commissioner. During that brief teleconference, the commissioner read the warrants aloud at Plaintiff's request. When Plaintiff pointed out that one warrant placed him "within one mile" of Defendant Withers at a time when he was verifiably outside Davidson County—a fact later proven in open court—the commissioner responded, "Well, nobody believes you," and added, "You should get a good attorney." These remarks were made before any evidence had been tested and reflected no effort to evaluate the accuracy of the allegations or the presumption of innocence.

77.     Despite the statutory requirements governing liberty restrictions in domestic-related cases, the commissioner conducted no hearing, allowed Plaintiff no meaningful opportunity to be heard, and made none of the individualized findings required under Tenn. Code Ann. § 40-11-150(b) or (c). That statute mandates that, before imposing enhanced bail conditions, a magistrate must make on-the-record determinations regarding threat assessment, the sufficiency of less restrictive alternatives, victim consultation, and ability to pay. The commissioner did not address any of these factors. Instead, he simply marked the boilerplate boxes on the standard Order Granting Bail for Abuse Cases, which recites that "the court reviewed the facts of the arrest" but contains no fact-specific analysis whatsoever.

23

78.     The commissioner then set bail at $10,000 and imposed continuous GPS monitoring as a condition of release—again without making the individualized findings required by § 40-11-150 and without complying with the gateway requirement of § 40-11-152(c), which expressly mandates that the court consult with the alleged victim and establish any exclusion zones before monitoring may be ordered. No such consultation occurred, and no exclusion zones appeared anywhere in the judicial order.

79.     Because the court imposed GPS monitoring without specifying any zones, the tracking vendor later created its own unilateral "exclusion areas" without judicial approval and without Plaintiff's knowledge. This unlawful delegation of authority became particularly prejudicial at the preliminary hearing on March 27, 2025, when the prosecutor introduced GPS-related evidence suggesting Plaintiff had violated restrictions that were never ordered by a judge. Plaintiff remained on the GPS monitor for two months, enduring continuous location tracking, reduced privacy, restricted movement, and the threat of arrest for violating zones that had never been lawfully imposed.

80.     This physical attachment of a GPS device to Plaintiff's body—implemented without probable cause, without individualized judicial findings, and without statutory compliance—constitutes an unreasonable search under the Fourth Amendment. *Grady*, 575 U.S. at 310; *Jones*, 565 U.S. at 404–05; *Carpenter*, 138 S. Ct. at 2217. The warrantless, suspicionless, and procedurally defective imposition of continuous 24/7 surveillance was therefore unconstitutional.

TRACKING SOLUTIONS' ROLE AS A STATE ACTOR

81.     Tracking Solutions acted under color of state law within the meaning of *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937–39 (1982). It:

A.  administered the GPS device from inside the Davidson County booking area;

B.  required Plaintiff to sign a coercive "Monitoring Agreement and Release" containing terms never ordered by a judge;

C.  unilaterally imposed undefined "exclusion zones," movement restrictions, and reporting obligations;

D.  monitored Plaintiff's location data on Metro's behalf; and

E.  reported alleged violations to law enforcement as the basis for arrest or detention.

82.    Tennessee law expressly integrates monitoring vendors into the enforcement of liberty restrictions, and Tracking Solutions functioned as Metro's de facto pretrial-supervision arm even though it lacked the required written contract under Tenn. Code Ann. § 40-11-152(k). Its actions therefore constitute state action.

UNREASONABLE SEARCH AND SEIZURE

83.    The GPS device subjected Plaintiff to continuous, warrantless government tracking; compelled participation in an invasive surveillance regime; enforced movement restrictions; potential arrest based on zones and rules never ordered by a judge; and deprivation of privacy far exceeding that permitted for a pretrial defendant absent individualized judicial findings. Under *Grady*, *Jones*, *Carpenter*, and Sixth Circuit precedent, this level of physical intrusion, precision tracking, and prolonged monitoring is a search—and a highly intrusive one.

84.    Because the monitoring was imposed without probable cause, without individualized justification, without required findings, or through a system that delegated liberty-restricting authority to a private, uncontracted vendor, the search was unreasonable under the Fourth Amendment.

MONELL LIABILITY (METRO)

25

85.     A municipality is liable under § 1983 when a constitutional violation results from an official policy, custom, or failure to train. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Metro is liable under *Monell* because the constitutional violation resulted from its policies, customs, and failures to train. Upon information and belief, Metro routinely imposes GPS monitoring without individualized findings, hearings, or ability-to-pay determinations; utilizes form orders that check a box but provide no factual basis for surveillance; permits private vendors to enforce liberty restrictions not contained in judicial orders; maintains a booking process in which counsel cannot meaningfully participate in the imposition of monitoring; and fails to train judicial commissioners, pretrial personnel, and law-enforcement officers on the constitutional limits of GPS monitoring. These practices were the moving force behind the Fourth Amendment violation.

STANDING FOR DECLARATORY AND INJUNCTIVE RELIEF

86.     Plaintiff has standing to seek declaratory and injunctive relief because the challenged GPS-monitoring practices are capable of repetition yet evading review. Plaintiff continues to communicate with federal authorities regarding Defendant Withers's unreported income, and her history of retaliatory accusations—including fabricated charges timed to immediately follow tax-related developments—creates a realistic likelihood that she will again seek criminal process against him. Any future arrest will automatically return Plaintiff to Metro's initial-appearance system, where the same unconstitutional GPS-monitoring procedures remain in place. Because initial-appearance determinations occur rapidly and cannot be litigated before they recur, and because Plaintiff faces an ongoing, non-speculative risk of being subjected again to warrantless GPS monitoring without judicial findings, he satisfies the requirements for

26

prospective relief under *Weinstein v. Bradford*, 423 U.S. 147 (1975), and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).

<u>INJURY</u>

87.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered: (1) continuous involuntary GPS tracking and invasion of privacy; (2) loss of liberty through government-imposed movement restrictions; (3) reputational stigma associated with placement on a GPS-monitoring regime; (4) financial losses, including monitoring fees; (5) emotional distress and anxiety; and (6) exposure to arrest for alleged "zone violations" arising from terms never ordered by a judge.

<u>RELIEF REQUESTED</u>

88.    Plaintiff respectfully requests:

A.    A declaration that Metro's and Tracking Solutions' GPS-monitoring practices violate the Fourth Amendment;

B.    Injunctive relief prohibiting imposition or enforcement of GPS monitoring absent individualized judicial findings and lawful contracting;

C.    Compensatory damages;

D.    Punitive damages against Tracking Solutions;

E.    Attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

F.    All further relief the Court deems just and proper.


**COUNT V – RIGHT TO COUNSEL**
**(42 U.S.C. § 1983 - Sixth Amendment)**
**DEFENDANT METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY (*Monell*)**

89.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

90.    This claim alleges that Metro deprived Plaintiff of his Sixth Amendment right to counsel at a critical stage—his initial appearance and the imposition of GPS monitoring—when the State altered his legal relationship and restricted his liberty without allowing his attorney to participate.

91.    The Sixth Amendment guarantees the right to assistance of counsel at all "critical stages" of a criminal prosecution—any proceeding where "substantial rights of the accused may be affected." *Coleman v. Alabama*, 399 U.S. 1, 7–10 (1970); *Rothgery v. Gillespie County*, 554 U.S. 191, 212–13 (2008). A stage is "critical" when the defendant faces decisions or consequences that alter the legal relationship between the accused and the State. See *United States v. Wade*, 388 U.S. 218, 226–27 (1967).

DENIAL OF COUNSEL AT A CRITICAL STAGE

92.    On January 29, 2025, immediately following Plaintiff's arrest on the final round of charges, a judicial commissioner imposed continuous GPS monitoring as a condition of pretrial release. The commissioner did so without providing Plaintiff notice, without allowing Plaintiff to be heard, and without permitting his attorney to be present. Instead, the commissioner checked a box on a preprinted form and refused to hear Plaintiff, responding only, "Nobody believes you."

93.    The imposition of a GPS monitoring condition constituted a "critical stage" under the Sixth Amendment. It significantly altered Plaintiff's relationship with the State by subjecting him to 24/7 surveillance, imposing movement restrictions enforced by threat of detention, requiring ongoing reporting, compelling him to enter into a contractual monitoring regime,

28

exposing him to criminal penalties for undefined "violations," and materially increasing the consequences of the prosecution.

94.     These restrictions were substantial restraints on liberty and directly affected the course of the criminal case. Under the principles espoused in *Rothgery* and *Coleman*, Plaintiff had the constitutional right to counsel at this stage. Despite this, Metro's practices prevented counsel from participating in the decision to impose monitoring or in any review of the conditions attached to it.

MONELL LIABILITY

95.     Metro is liable under *Monell*, 436 U.S. at 694, because these Sixth Amendment violations were caused by Metro's policies and customs. Upon information and belief, Metro:

> A.  Routinely imposes GPS monitoring at initial appearance without conducting hearings, without allowing counsel to participate, and without making individualized findings;
>
> B.  Utilizes form orders and processes that do not provide space, procedure, or opportunity for counsel to speak or object;
>
> C.  Fails to train judicial commissioners and pretrial personnel regarding Sixth Amendment requirements at critical stages involving liberty restrictions;
>
> D.  Delegates the substantive imposition of monitoring terms to private vendors outside any judicial process; and
>
> E.  Maintains booking procedures in which counsel cannot meaningfully participate in the determination or negotiation of monitoring conditions.

96.     These policies and practices foreseeably and directly result in the denial of counsel during a constitutionally protected stage.

STANDING FOR DECLARATORY AND INJUNCTIVE RELIEF

97.     Plaintiff has standing to seek declaratory and injunctive relief because the denial of counsel at his initial appearance—and Metro's policies that caused it—are capable of repetition yet evading review. Plaintiff expects to again be subjected to Defendant Withers's retaliatory use of the criminal process in response to his continued reporting of her unreported income to federal authorities. Her history of filing fabricated or misleading police reports immediately following tax-related developments, her efforts to prompt new warrants when Plaintiff attempted to file Rule 3 affidavits, and her threats of future allegations demonstrate a realistic likelihood of recurrence.

98.     Metro's challenged customs—imposing GPS monitoring without hearings, preventing counsel from participating, utilizing form orders devoid of findings, and delegating substantive liberty-restricting decisions to private vendors—remain in place and will govern any future arrest or initial appearance. Because Plaintiff faces a concrete, non-speculative risk of once again being subjected to these procedures, and because initial-appearance determinations are too short in duration to be litigated fully before they recur, Plaintiff satisfies the requirements for prospective relief under *Weinstein v. Bradford*, 423 U.S. 147 (1975), and *SBA List v. Driehaus*, 573 U.S. 149 (2014).

INJURY

99.     As a direct and proximate result of Metro's violation of Plaintiff's Sixth Amendment rights, Plaintiff suffered:

     A.  significant restraints on liberty without the benefit of counsel,

     B.  months of invasive 24/7 monitoring,

     C.  financial burdens and fees,

D.  exposure to arrest for undefined "zone" violations,

E.  reputational harm,

F.  emotional distress, and

G.  deprivation of the constitutional right to counsel at a critical stage.

RELIEF REQUESTED

100.    Plaintiff respectfully requests:

A.  A declaration that Metro's practices violate the Sixth Amendment;

B.  Injunctive relief requiring Metro to allow counsel participation before imposing GPS monitoring or comparable liberty restrictions;

C.  Compensatory damages;

D.  Attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

E.  All further relief the Court deems just and proper.


**COUNT VI – PROCEDURAL DUE PROCESS & RIGHT TO A HEARING**
**(42 U.S.C. § 1983 - Fourth, Sixth, & Fourteenth Amendments)**
**DEFENDANTS METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY (*Monell*)**
**AND TRACKING SOLUTIONS, INC. (State Actor Under Color of Law)**

101.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

102.    This count challenges Metro's and Tracking Solutions' joint deprivation of Plaintiff's Fourteenth Amendment right to notice and a meaningful opportunity to be heard before the government imposed substantial liberty restraints, including GPS monitoring, via a process devoid of hearings, findings, and statutory safeguards.

103.    This claim is brought under 42 U.S.C. § 1983 for violations of Plaintiff's Fourteenth Amendment rights to notice and a meaningful opportunity to be heard before

31

government-imposed restrictions on his liberty. Plaintiff alleges that Metro and Tracking Solutions deprived him of due process by imposing GPS monitoring as a condition of pretrial release without a hearing including the assistance of counsel, without statutory findings, without disclosure of the monitoring terms, without an ability-to-pay determination, and pursuant to a Metro custom of delegating liberty-restricting decisions to a private vendor that was not under contract as required by Tennessee law.

NATURE OF THE FOURTEENTH AMENDMENT VIOLATION

104.    The Fourteenth Amendment prohibits the State from imposing restraints on liberty without providing constitutionally adequate procedures, including notice, a meaningful opportunity to be heard, individualized findings, and—in proceedings affecting substantial rights—the assistance of counsel. *Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 557–58 (1974); *Vitek v. Jones*, 445 U.S. 480, 491–92 (1980). Pretrial release is a fundamental liberty interest, and conditions that significantly restrain a defendant's movement—such as continuous GPS monitoring—implicate the Due Process Clause. *United States v. Salerno*, 481 U.S. 739, 750 (1987). The Supreme Court has long held that some form of hearing is required before the State may impose restraints on liberty. *Wolff*, 418 U.S. at 557–58; *Vitek*, 445 U.S. at 491–92.

105.    In determining what process is due, courts balance three considerations: (1) the private interest at stake; (2) the risk of erroneous deprivation of that interest under the existing procedures, and the likely value of additional safeguards; and (3) the government's countervailing interests, including the function at issue and the fiscal or administrative burdens of providing greater protections. *Mathews*, 424 U.S. at 335.

106.    Metro and Tracking Solutions jointly deprived Plaintiff of these rights.

32

IMPOSITION OF GPS MONITORING WITHOUT REQUIRED PROCESS

107.    On January 29, 2025, a Metro judicial commissioner imposed continuous GPS monitoring as a condition of Plaintiff's pretrial release. The commissioner conducted no hearing, allowed Plaintiff no opportunity to present evidence or argument, excluded Plaintiff's attorney, made none of the individualized findings required by Tenn. Code Ann. § 40-11-150, and issued an order devoid of exclusion zones or factual justification. Instead, the commissioner marked a box on a preprinted form and refused to hear Plaintiff, stating: "Nobody believes you." These actions deprived Plaintiff of notice, counsel, and an opportunity to be heard before the State imposed a significant liberty restraint, violating the Fourteenth Amendment.

TRACKING SOLUTIONS' DIRECT ROLE IN THE DUE-PROCESS DEPRIVATION

108.    Tracking Solutions is equally liable because it acted under color of state law and directly participated in the unconstitutional deprivation of liberty. Plaintiff could not be released until a monitoring vendor attached a GPS device to his person. Tracking Solutions—operating inside the jail and functioning as Metro's de facto pretrial-supervision arm—required Plaintiff to sign its "Monitoring Agreement and Release," which: (1) imposed exclusion zones never ordered by any judge, (2) added new liberty restrictions without judicial authorization, (3) required indemnification and waivers of rights as a condition of release, (4) threatened enforcement, detention, and violation reports based on those unauthorized terms, and (5) operated without the written municipal contract required by Tenn. Code Ann. § 40-11-152(k).

109.    By creating and enforcing the actual terms governing Plaintiff's physical liberty—and by conditioning freedom on acceptance of a coercive, extra-judicial contract—Tracking Solutions jointly participated in the deprivation of liberty without due

33

process. This makes it a state actor under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937–39 (1982), and *Brentwood Academy v. TSSAA*, 531 U.S. 288, 295–96 (2001).

MONELL LIABILITY

110.    A municipality is liable under § 1983 when a constitutional violation results from an official policy, custom, or failure to train. *Monell*, 436 U.S. at 694. Metro is liable because the constitutional violation was caused by its policies, customs, and failures to train. The deprivation here was not an isolated error but the foreseeable result of Metro's established practices in its pretrial-monitoring system.

111.    Upon information and belief, Metro routinely:

(1) imposes GPS monitoring without required statutory findings or notice;

(2) lacks written contracts with monitoring vendors, despite statutory mandates;

(3) requires detainees to sign broad, unauthorized release forms as a condition of liberty;

(4) permits vendors to impose restrictions not ordered by any judicial officer; and

(5) provides no training to magistrates or pretrial personnel on due-process requirements or the statutory safeguards governing GPS monitoring.

112.    These customs are corroborated by Metro's recurring use of form orders that omit required findings, its approval of vendors operating without contracts, and its reliance on monitoring companies advertised inside Davidson County Sheriff's Office ("DCSO") booking who control the process of obtaining release. MNPD's policies governing officer–commissioner contact and warrant processing make no provision for review of pretrial-monitoring conditions and reinforce a system in which liberty restrictions are implemented informally and without procedural safeguards.

34

113.     Under *City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989), and *Rayfield v. City of Grand Rapids*, 768 F. App'x 495, 502–03 (6th Cir. 2019), Metro's failure to train and supervise magistrates, pretrial officers, and monitoring vendors in this recurring, high-stakes area reflects deliberate indifference. Officers, magistrates, and vendors regularly participate in the imposition of monitoring conditions, and the constitutional need for proper training is obvious. Metro's failures—including allowing uncontracted vendors to dictate monitoring terms—were the moving force behind Plaintiff's unlawful loss of liberty.

INJURY

114.     As a direct and proximate result of the actions of Metro and Tracking Solutions, Plaintiff was:

      A.  deprived of pretrial liberty without due process;

      B.  forced to sign a coercive adhesion contract to obtain release;

      C.  subjected to undefined and unauthorized exclusion zones;

      D.  compelled to pay monitoring fees without an ability-to-pay determination;

      E.  exposed to potential "violations" of terms he was never told existed; and

      F.  stigmatized and publicly treated as dangerous despite the absence of judicial findings.

STANDING FOR DECLARATORY AND INJUNCTIVE RELIEF

115.     Plaintiff has standing because he remains at risk of being subjected to the same unconstitutional GPS-monitoring process if Defendant Withers retaliates again—an outcome that is not speculative but predictable given her established pattern. Each time Plaintiff engaged in protected activity—filing 1099s, contacting federal agencies, or seeking Rule 3 process—Withers immediately retaliated with new accusations, and Metro imposed GPS

35

monitoring without statutory findings or procedural safeguards. Because Plaintiff has now filed this federal action directly against Withers, and because her past conduct shows she reliably responds to legal or tax-related developments with new reports, Plaintiff faces a credible threat that she will file new complaints. Metro's monitoring practices remain unchanged, meaning any future accusation would trigger the same unconstitutional process. This satisfies the "capable of repetition yet evading review" doctrine and establishes a continuing, imminent injury traceable to Metro's policies, redressable through declaratory and injunctive relief. See *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498 (1911).

RELIEF REQUESTED

116.    Plaintiff requests:

A.  A declaratory judgment that Defendants' GPS-monitoring practices violate the Fourteenth Amendment and Tenn. Code Ann. §§ 40-11-150 and -152;

B.  Injunctive relief requiring Metro to:

1.  execute written agreements with monitoring vendors;

2.  ensure exclusion zones are specified in written orders;

3.  make statutory findings on the record;

4.  determine ability to pay before imposing monitoring; and

5.  prohibit the use of private vendor contracts that add unauthorized terms;

C.  Compensatory damages against Metro;

D.  Compensatory and punitive damages against Tracking Solutions;

E.  Attorney's fees and costs under 42 U.S.C. § 1988; and

F.   All other relief the Court deems just and proper.

## COUNT VII – FIRST AMENDMENT RETALIATION
### (42 U.S.C. § 1983 - First Amendment)
### DEFENDANT METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY (*Monell*)

117.   Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

118.   This claim asserts that Metro retaliated against Plaintiff for engaging in protected petitioning and speech—IRS reporting, Rule 3 filings, and communications with federal authorities—by initiating criminal charges, imposing restrictive conditions, and chilling further protected activity.

119.   This action is brought under 42 U.S.C. § 1983 for violations of Plaintiff's First Amendment rights to speak, petition, and report suspected wrongdoing to government authorities. The First Amendment protects communications with government agencies and courts, including tax reporting and citizen-initiated complaints. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). Under *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc), Plaintiff must show (1) protected conduct, (2) an adverse action that would deter a person of ordinary firmness, and (3) a causal connection between the two. Where the adverse action takes the form of criminal prosecution or arrest, the absence or pretext of probable cause is also required. See *Hartman v. Moore*, 547 U.S. 250, 252 (2006); *Nieves v. Bartlett*, 587 U.S. 391 (2019).

PROTECTED CONDUCT

120.   Plaintiff engaged in several protected First Amendment activities. On October 10, 2024, he mailed Defendant Withers written notice that IRS Forms 1099 would be issued, as

37

required once he elected to report her income under Treas. Reg. § 1.6041-1. On November 22, 2024, he caused the Forms 1099-NEC for tax years 2023 and 2024 to be electronically filed through an authorized IRS vendor. Between April 21 and 28, 2025, he attempted to file Rule 3 affidavits reporting Defendant Withers's false police statements. In April 2025, he sent written complaints to the FBI, TIGTA, and the U.S. Department of Justice documenting retaliatory local prosecution and tax-related misconduct. Each of these actions constitutes protected speech and petitioning.

RETALIATION BY METRO

121.    After Plaintiff engaged in this protected activity, Metro officers and pretrial-services personnel undertook a series of retaliatory measures. They swore or executed warrants that recast lawful IRS filings as "harassment," treated federally required tax notices as prohibited "contact," and imposed GPS monitoring without statutory findings or notice. Metro personnel also coordinated internally to block Plaintiff's Rule 3 affidavits and threatened additional charges if he pursued them. These actions resulted in multiple arrests, liberty restrictions, financial costs, stigma, and ongoing fear of prosecution—harms that would deter any reasonable person from continuing to communicate with federal authorities.

MONELL LIABILITY

122.    Metro is liable under *Monell*, 436 U.S. at 694, because these retaliatory actions were the product of municipal policy, custom, and deliberate indifference in training and supervision.

123.    Under *City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989), and its application in *Rayfield v. City of Grand Rapids*, 768 F. App'x 495, 502–03 (6th Cir. 2019), Metro's liability

38

arises where a municipality's failure to train reflects deliberate indifference to recurring constitutional risks and where that failure is the moving force behind the injury.

124. Metro officers routinely perform tasks requiring constitutional judgment—evaluating alleged harassment, distinguishing protected speech from unlawful contact, assessing retaliatory motives, and determining whether conduct satisfies Tennessee's stalking, harassment, or domestic-abuse statutes. Despite the obvious need for guidance in these recurring contexts, Metro failed to train its officers on:

     A.  the constitutional distinction between protected speech and unlawful contact;

     B.  the prohibition against treating federally required IRS filings as criminal conduct;

     C.  the need for objective evidence rather than reliance on a complainant's subjective interpretation;

     D.  the First Amendment constraints on retaliatory arrests and prosecutions; and

     E.  the statutory requirements governing imposition of GPS monitoring.

125. MNPD's Night Court and warrant-processing procedures, as reflected in the MNPD Policy Manual, also structure routine and direct lines of communication between officers and judicial commissioners. These procedures place officers—not citizens—in control of initiating, presenting, and coordinating warrant matters, effectively making officers the gatekeepers of judicial access. When Metro officers coordinated internally to block Plaintiff's Rule 3 filings and contacted the Night Court commissioners to place Plaintiff "on their radar," they acted within a system that institutionalizes officer control over access to magistrates. This municipal structure enabled and amplified the retaliation.

126. Metro's deliberate indifference is further demonstrated by its long-standing practice of permitting officers to rely solely on complainants' subjective interpretations of

communications when drafting warrants; its ratification of the unconstitutional theory that IRS forms can constitute criminal contact; and its absence of any training instructing officers that lawful tax filings cannot form the basis of criminal charges. The prosecutor's statements at the preliminary hearing—although immune—underscore how deeply this unconstitutional rationale permeated Metro's enforcement apparatus.

CAUSATION AND INJURY

127.    Metro's failures were closely related to, and the direct cause of, Plaintiff's constitutional injuries. Metro officers initiated and swore retaliatory warrants premised on protected speech, arrested Plaintiff, imposed GPS monitoring without statutory findings, and suppressed Plaintiff's Rule 3 complaints. As a result, Plaintiff suffered loss of liberty, pretrial restrictions, financial losses, emotional distress, reputational injury, and a chilling of whistleblower activity.

STANDING FOR DECLARATORY AND INJUNCTIVE RELIEF

128.    Plaintiff has standing because he faces a credible and imminent threat of renewed retaliation for engaging in protected speech. See *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). Every previous instance of protected activity—filing IRS forms, communicating with the FBI/TIGTA/DOJ, or filing Rule 3 affidavits—was immediately followed by Withers's retaliatory accusations, which Metro officers and pretrial-services personnel converted into criminal charges and GPS monitoring. Filing this lawsuit is protected petitioning activity directly adverse to Withers's interests, and her history demonstrates she reliably retaliates when Plaintiff takes such actions. Because Metro continues to maintain the same customs and training failures that previously turned her retaliatory reports into state action, Plaintiff faces a realistic threat of

40

renewed enforcement. This ongoing deterrent effect is a present injury-in-fact, fairly traceable to Metro's policies, and fully redressable by injunctive relief.

RELIEF REQUESTED

129. Plaintiff respectfully requests:

A. A declaration that Metro's retaliatory practices violated the First and Fourteenth Amendments;

B. Injunctive relief requiring Metro to implement training addressing protected speech, prohibiting officers from treating lawful IRS filings as criminal contact, and prohibiting officers from blocking Rule 3 affidavits without judicial review, and ensuring that GPS monitoring is imposed only after proper statutory findings;

C. Compensatory damages;

D. Attorney's fees and costs under 42 U.S.C. § 1988; and

E. All further relief the Court deems just and proper.

**COUNT VIII – SELECTIVE / VINDICTIVE PROSECUTION**
**(42 U.S.C. § 1983 -**
**DEFENDANTS METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY AND**
**BRIAN CAVALIERE**

130. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

131. This count alleges that Metro and Defendant Cavaliere selectively enforced the law and pursued criminal charges against Plaintiff while shielding Defendant Withers from judicial review, acting with discriminatory and retaliatory motive in violation of the Equal Protection and Due Process Clauses.

STANDARDS GOVERNING SELECTIVE AND VINDICTIVE PROSECUTION

41

132.     This claim arises under 42 U.S.C. § 1983 and is grounded in the Fourteenth Amendment guarantees of equal protection and due process, including the right to be free from prosecutions brought to punish protected conduct. The Equal Protection Clause prohibits "selective enforcement of the law based on considerations such as race, religion, or other arbitrary classification," and also forbids prosecution driven by impermissible motives, including retaliation for the exercise of First Amendment rights. *Wayte v. United State*s, 470 U.S. 598, 608 (1985); *United States v. Armstrong*, 517 U.S. 456, 464 (1996). A prosecution is vindictive—and violates due process—when it is undertaken "to punish a person because he has done what the law plainly allows him to do," such as asserting statutory or constitutional rights. *United States v. Goodwin*, 457 U.S. 368, 372 (1982); *United States v. Lanham*, 617 F.3d 873, 888 (6th Cir. 2010). To state a claim for selective or vindictive prosecution under these principles, a plaintiff must show both (1) that similarly situated individuals were not prosecuted for similar conduct, and (2) that the prosecution was motivated by retaliation or other illegitimate considerations. *Wayte*, 470 U.S. at 608; *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997).

SELECTIVE / VINDICTIVE ENFORCEMENT

133.     After Plaintiff provided Detective Cavaliere with evidence that Defendant Withers knowingly submitted false police reports, Cavaliere reported Plaintiff's efforts to the General Sessions Assistant District Attorney ("ADA"). The ADA informed Cavaliere that she "would not prosecute" Withers and instructed him not to "entertain" Plaintiff's reports. This instruction was not a neutral prosecutorial decision made after review of Plaintiff's sworn evidence; it was an administrative directive delivered before a magistrate ever had the opportunity to consider Plaintiff's allegations.

42

134.    When Plaintiff personally attempted to submit Rule 3 affidavits to a judicial commissioner, Cavaliere again notified the ADA. The ADA then threatened that if Plaintiff "did not stop," she would "contact you about pursuing more warrants." Cavaliere agreed to monitor Plaintiff's attempts and report them. He subsequently contacted the Night Court Commissioners and had Plaintiff's name "put on their radar for any warrants," expressly for the purpose of preventing any warrant from issuing against Defendant Withers. This step exceeded any legitimate police function and attempted to influence judicial officers in advance of the presentation of evidence—contrary to MNPD's own Night Court policies requiring neutrality, independence, and non-interference in commissioners' warrant decisions.

135.    These events reflect deliberate obstruction of Plaintiff's attempts to seek judicial redress, but they also demonstrate selective and vindictive enforcement. Plaintiff continued to face aggressive pursuit of charges that lacked probable cause, while Defendant Withers—against whom Plaintiff had produced concrete evidence of false reporting—was categorically shielded from even having her conduct reviewed by a magistrate. Cavaliere expressly told Plaintiff that Withers could not be prosecuted "while your charges are pending," signaling that Plaintiff's pending charges were being used not as evidence, but as a pretextual barrier to protect Withers.

136.    The discriminatory purpose became unmistakable on September 23, 2025, when the Criminal Court ADA offered to dismiss Plaintiff's charges only if he would "withdraw the 1099s," and warned that "fraud charges" were being explored if he refused. Although the prosecutor is immune, these statements are highly probative of retaliatory motive—motive that Metro personnel, including Cavaliere, adopted and acted upon. The ADA's threats supply direct evidence of the discriminatory intent underlying Metro's enforcement.

SIMILARLY SITUATED INDIVIDUALS

137.     Upon information and belief, other citizens who seek to initiate Rule 3 process or submit sworn false-report affidavits are permitted to present those affidavits directly to a magistrate—as Tenn. R. Crim. P. 3 expressly allows—without being blocked by officers, threatened with additional charges, or pre-screened by prosecutors. Plaintiff alone was denied access to a magistrate, placed "on the radar" in advance to prevent warrant issuance, and threatened with further prosecution for attempting to invoke the same judicial process available to all other citizens. This is classic "class-of-one" treatment under the Equal Protection Clause as recognized in *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam), which holds that a plaintiff states an equal-protection claim by showing that government officials "intentionally treated [him] differently from others similarly situated and that there is no rational basis for the difference in treatment." See also id. at 563–64 (describing "intentional and arbitrary discrimination"). Plaintiff's exclusion from the ordinary Rule-3 process, coupled with the retaliatory motive demonstrated in the record, places him squarely within the class-of-one framework and establishes a textbook violation of the Equal Protection Clause.

MONELL LIABILITY

138.     Metro is liable because these constitutional violations were the result of an established policy, custom, or practice—not isolated acts. MNPD's Night Court procedures, as reflected in the MNPD Policy Manual, establish structured and routine channels of communication between officers and judicial commissioners. These procedures place officers—not citizens—in the position of presenting affidavits, initiating warrant review, and coordinating directly with commissioners, thereby giving officers practical control over access to the warrant process even though Tennessee law expressly authorizes citizens to submit Rule 3 affidavits directly to a magistrate. Metro also maintains a consistent practice of conditioning

44

citizen access to judicial review on prosecutorial approval, despite Tennessee Rule of Criminal Procedure 3 expressly providing citizens direct access to a magistrate. These intertwined practices constitute a municipal policy or custom that foreseeably results in arbitrary, discriminatory, and retaliatory obstruction of the warrant process.

139.    Further, Metro failed to train officers on the constitutional limitations governing selective enforcement, the impropriety of using pending charges to disqualify counter-complaints, and the requirement that Rule 3 affidavits be submitted directly to a magistrate without police interference. The risk of unconstitutional enforcement in this recurring context was obvious, and the failure to train exhibits deliberate indifference under *City of Canton v. Harris*, 489 U.S. 378 (1989).

INJURY

140.    As a direct and proximate result of Defendants' selective and vindictive prosecution, Plaintiff suffered arrests, GPS monitoring, restrictions on liberty, reputational injury, emotional distress, legal expenses, and ongoing fear of further retaliatory charges. Plaintiff was denied equal protection and due process under the Fourteenth Amendment.

STANDING FOR DECLARATORY AND INJUNCTIVE RELIEF

141.    Plaintiff has standing because he faces a concrete and imminent risk of being subjected to the same selective and vindictive enforcement described in this Count. Every time Plaintiff previously engaged in protected activity—filing IRS forms, reporting misconduct to federal authorities, or attempting Rule 3 affidavits—Defendant Withers retaliated with new accusations, and Metro personnel converted those accusations into criminal charges while blocking Plaintiff's counter-complaints. Filing this federal lawsuit is itself protected activity directly adverse to Withers's interests, and her established pattern makes renewed retaliation not

45

speculative but expected. Metro's customs and practices that enabled the prior selective enforcement remain unchanged, meaning any new retaliatory report by Withers would again trigger discriminatory prosecution. This credible threat of recurrence, combined with the short duration of initial charging decisions that evade full judicial review, satisfies Article III's injury-in-fact, causation, and redressability requirements for prospective relief under *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), and *Weinstein v. Bradford*, 423 U.S. 147 (1975).

RELIEF REQUESTED

142.   Plaintiff respectfully requests a judgment:

A.   Declaring that Metro's selective and retaliatory enforcement practices violate the Equal Protection and Due Process Clauses;

B.   Enjoining Metro and its agents from conditioning prosecution decisions on waiver of federal rights or from obstructing Rule 3 filings;

C.   Awarding Plaintiff compensatory damages for emotional, reputational, and liberty injuries;

D.   Awarding attorney's fees and costs under 42 U.S.C. § 1988; and

E.   Granting all further relief the Court deems just and proper.


**COUNT IX – § 1983 DENIAL OF ACCESS TO COURTS**
**DEFENDANTS METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY AND BRIAN CAVALIERE**

143.   Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

46

144.    This claim challenges Metro's and Cavaliere's obstruction of Plaintiff's Rule 3 filings and interference with his ability to reach a neutral magistrate, thereby denying him meaningful access to judicial process under the First and Fourteenth Amendments.

FRAMEWORK GOVERNING PLAINTIFF'S ACCESS-TO-COURTS CLAIM

145.    The Constitution guarantees meaningful access to the courts under the First Amendment right to petition and the Fourteenth Amendment right to due process. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (1st Amendment); *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388–89 (2011) (1st Amendment); *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (14th Amendment); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (14th Amendment). This right includes the ability to invoke legal process, present evidence, and seek judicial redress without arbitrary governmental obstruction. *Christopher v. Harbury*, 536 U.S. 403, 413–15 (2002); *Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir. 1997).

146.    Tennessee law expressly grants citizens the statutory right to initiate criminal process by submitting a sworn affidavit to a magistrate. Tenn. R. Crim. P. 3. This is a state-created procedural right closely tied to the First Amendment right to petition and the Fourteenth Amendment right to meaningful access to the courts. Government officials may not arbitrarily obstruct this process or threaten retaliation for invoking it.

147.    An access-to-courts claim requires a showing that Plaintiff had a "nonfrivolous, arguable underlying claim." *Christopher*, 536 U.S. at 415. Here, Plaintiff attempted to file sworn Rule 3 affidavits establishing felony false reporting by Defendant Withers—an unquestionably valid underlying claim.

FACTUAL BASIS FOR THE ACCESS-TO-COURTS CLAIM

148.    In late April 2025, while Defendant Withers's charges against Plaintiff were awaiting grand jury presentation, Plaintiff attempted to file Rule 3 affidavits to initiate his own prosecution against Defendant Withers for knowingly submitting false police reports. Plaintiff first reported the false-report evidence to Detective Cavaliere. Rather than allow the matter to be presented to a magistrate, Cavaliere emailed the General Sessions ADA advising her that Plaintiff sought warrants. The ADA instructed Cavaliere that she "would not prosecute" Defendant Withers and directed him "not to entertain" Plaintiff's reports. Cavaliere complied immediately, blocking Plaintiff from presenting evidence to a judicial officer.

149.    After Plaintiff personally attempted to submit Rule 3 affidavits to a judicial commissioner, Cavaliere again notified the ADA. The ADA instructed Cavaliere, "If his attorney is unable to get him to stop [reporting her], I will contact you about pursuing more warrants." Cavaliere affirmatively agreed to notify the ADA of any further attempts.

150.    Beyond passively refusing to take a complaint, Cavaliere sent a further email stating: "I had just called our Night Court Commissioners office, and his name was put on their radar for any warrants to try and ensure that no warrants will be obtained on Ms. Withers." This demonstrates intentional, affirmative obstruction—not merely deference to prosecutorial preference.

151.    Cavaliere attempted to pre-influence commissioners in advance to prevent any warrant issuance regardless of the substance of Plaintiff's sworn evidence. This is exactly the type of pre-filing obstruction held actionable in *Swekel*. See *Swekel*, 119 F.3d at 1262 (finding actionable claim where officials obstructed plaintiff's resort to courts).

152.    After Cavaliere's interference, clerks and officers refused to accept Plaintiff's Rule 3 filings, stating they were "following instructions" or that the matter "must go through the

48

ADA." These refusals were not judicial determinations by a magistrate. They were administrative barriers erected by Metro personnel pursuant to an unconstitutional practice. The result: no magistrate ever reviewed Plaintiff's evidence.

153.    In essence, Plaintiff attempted to exercise: (1) a state statutory right (Rule 3 affidavits), (2) a First Amendment right (petition for redress), and (3) a Fourteenth Amendment right (meaningful access to judicial process).

154.    Metro personnel responded with: (1) threats of additional criminal charges, (2) coordination with the ADA to prevent filings, (3) preemptive communication with commissioners to block warrants, and (4) physical and logistical barriers to reaching a magistrate. This practice is unconstitutional under *Swekel*, where the Sixth Circuit held that officers violate the Constitution by preventing a plaintiff from reaching the courts before a case can even begin. *Swekel*, 119 F.3d at 1262.

155.    Although the ADA enjoys absolute immunity and is not a Metro employee, her statements are relevant because they reveal the retaliatory purpose motivating the directive that Metro personnel carried out. The sequence is critical: Cavaliere first proposed that additional warrants should be pursued if Plaintiff continued attempting to submit Rule 3 affidavits. Rather than rejecting this unlawful suggestion, the ADA expressly endorsed it, stating that if Plaintiff "did not stop," she would "contact [him] about pursuing more warrants." Acting on the ADA's approval of his own proposal, Cavaliere then took the next step by contacting Night Court and placing Plaintiff "on their radar" to ensure that "no warrants will be obtained on Ms. Withers." Thus, while the prosecutor herself is immune from suit, her acceptance of Cavaliere's retaliatory idea—and her expressed willingness to pursue additional charges—provides powerful evidence of the unconstitutional retaliatory purpose that Metro officers adopted and executed. This

49

evidence is directly relevant to Metro's Monell liability because it illuminates the retaliatory motive driving Cavaliere's obstruction of Plaintiff's Rule 3 access.

MONELL LIABILITY

156.    Metro is liable under *Monell* because Cavaliere's conduct was not isolated. MNPD maintains a practice whereby officers require ADA approval before allowing Rule 3 affidavits to reach a magistrate. Also, MNPD's Night Court procedures give officers direct, informal lines of communication with commissioners, which officers used to influence judicial outcomes. Lastly, upon information and belief, the pattern of refusing citizen affidavits without judicial review is widespread although it may not be readily documented. Metro's policy or custom conditions judicial access on prosecutorial approval, contrary to Tennessee law and the Constitution.

157.    Metro also failed to train its officers on the constitutional and statutory requirements governing citizen-initiated Rule 3 affidavits. Officers were not instructed that a Rule 3 affidavit must be presented directly to a magistrate without police gatekeeping; that such affidavits cannot lawfully be blocked or diverted based on "cross-warrant" concerns or prosecutorial preferences; or that the Rule 3 process is an established state-created mechanism intertwined with the First Amendment right to petition. By omitting such essential training in an area where officers routinely encounter citizens attempting to invoke this process, Metro acted with deliberate indifference to the risk that its personnel would obstruct judicial access in violation of the Constitution. Such systemic failures fall squarely within the framework of *City of Canton v. Harris*, 489 U.S. 378 (1989), which recognizes municipal liability where inadequate training reflects a deliberate policy choice that foreseeably results in constitutional injury.

INJURY

50

158. As a direct and proximate result of Cavaliere's actions and Metro's unconstitutional practice:

   A. Plaintiff was denied access to a neutral magistrate under Tenn. R. Crim. P. 3;

   B. Plaintiff lost the opportunity to vindicate the underlying false-reporting claim;

   C. Plaintiff suffered ongoing criminal jeopardy and inability to counter false accusations;

   D. Plaintiff endured emotional distress, humiliation, and reputational harm; and

   E. Plaintiff's speech was chilled by threats of additional prosecution.

## STANDING FOR DECLARATORY AND INJUNCTIVE RELIEF

159. Plaintiff has standing because Metro's Rule-3 obstruction practices remain in place and continue to block his ability to invoke criminal process in the future. Under *Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997), pre-filing obstruction constitutes a present, independent injury. Plaintiff attempted to file Rule 3 affidavits supported by substantial evidence of false reporting, but Metro personnel—at the ADA's direction—blocked him from reaching a magistrate and even placed him "on the radar" to prevent neutral review. Because the same customs remain in effect, Plaintiff reasonably fears that if (or when) Withers retaliates again—a pattern demonstrated by every previous act of protected activity—Metro will again prevent him from presenting affidavits to a magistrate. This ongoing barrier to judicial access is a current injury and one redressable by declaratory and injunctive relief.

## RELIEF REQUESTED

160. Plaintiff respectfully requests that this Court:

   A. Declare that Defendants' obstruction of citizen Rule 3 filings violates the First and Fourteenth Amendments;

B. Enjoin Metro from requiring ADA approval before Rule 3 affidavits may reach a magistrate;

C. Enjoin Metro from communicating with commissioners for the purpose of influencing warrant decisions;

D. Award compensatory damages against Metro and Detective Cavaliere;

E. Award punitive damages against Detective Cavaliere in his individual capacity;

F. Award attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

G. Grant such further relief as the Court deems just and proper.


## COUNT X – DECLARATORY JUDGMENT
### (Supremacy Clause / Preemption)
### DEFENDANT METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY

161. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

162. This count seeks declaratory and injunctive relief because Metro enforced criminal laws in a manner that directly conflicts with federal tax statutes and petitioning rights, penalizing conduct that federal law expressly governs and protects.

163. This claim is brought under 42 U.S.C. § 1983, in conjunction with 28 U.S.C. §§ 2201–2202, to obtain declaratory and injunctive relief. The Supremacy Clause, U.S. Const. art. VI, cl. 2, provides the substantive rule that state or local policies conflicting with federal law are preempted and unenforceable. Although the Supremacy Clause does not itself create an independent cause of action, § 1983 authorizes relief against municipalities that, under color of state law, enforce policies that conflict with federal law. See *Golden State Transit Corp. v. City of L.A.*, 493 U.S. 103, 107–08 (1989).

52

164.    Plaintiff's conduct at issue—(1) filing IRS Forms 1099-NEC, (2) furnishing the required payee copies, and (3) communicating with federal agencies regarding suspected tax violations—constitutes both (a) activity expressly governed and required by federal tax law, and (b) petitioning and speech protected by the First Amendment. See *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388–89 (2011).

165.    Metro's response created a direct conflict with these federal rights. By treating Plaintiff's federally required tax filings as "harassment," "illegal contact," or "stalking," Metro converted protected federal compliance and petitioning into state criminal offenses. This placed Plaintiff in a constitutionally impermissible position: exercising his First Amendment right to report suspected tax violations and complying with federal law exposed him to arrest, prosecution, and GPS monitoring. Such state action conflicts simultaneously with federal statutory requirements and with the First Amendment protections for reporting and petitioning activity.

166.    This conflict is precisely the type that triggers preemption, because a state or municipal policy that penalizes federally governed or federally protected conduct "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." See *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Arizona v. United States*, 567 U.S. 387, 399 (2012).

TAX FILING OBLIGATIONS

167.    Federal law requires individuals who file IRS Forms 1099-NEC to provide the payee with a copy of each form. See 26 U.S.C. § 6041(a); Treas. Reg. § 1.6041-1. Failure to furnish an accurate payee statement exposes the filer to civil penalties and, in some circumstances, criminal liability. See 26 U.S.C. §§ 6721, 7206.

53

168. Although Plaintiff was not affirmatively required to report these payments, once he chose to file voluntarily, he became federally obligated to send the payee her copy of each form.

169. On November 22, 2024, Plaintiff submitted IRS Forms 1099-NEC for tax years 2023 and 2024 through an authorized IRS e-filing vendor (Tax1099.com). Those forms were mailed to Defendant Withers on November 27 and December 17, as federally required.

TREATMENT OF IRS FILINGS AS CRIMINAL CONDUCT

170. Despite Plaintiff's compliance with federal law, Metro officials treated the federally required mailings as "harassment," "illegal contact," "violation of the Order of Protection," and "violation of bond conditions."

171. This treatment caused Plaintiff to be arrested, charged, monitored, and subjected to criminal process solely because he complied with federal tax-reporting obligations.

CONFLICT WITH FEDERAL LAW

172. Local policies that penalize federally required conduct are preempted when they "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67; *Arizona*, 567 U.S. at 399.

173. Federal law requires that a payee copy of each IRS Form 1099 be mailed to the recipient. Metro, however, treated the mailing of that federally required copy as criminal conduct. As a result, Plaintiff was forced into a constitutionally impermissible dilemma: he could either comply with federal tax law and risk state prosecution, or avoid prosecution by violating his federal reporting obligations.

54

174. Such conflict triggers preemption under the Supremacy Clause. See *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001).

MONELL LIABILITY

175. Under *Monell*, 436 U.S. at 690–94, a municipality is liable where a constitutional violation results from: (1) an official policy, (2) a widespread custom or practice, or (3) the actions of final policymakers.

176. Plaintiff alleges that Metro maintained and applied a policy or custom of: (1) accepting criminal complaints that recharacterized federally required IRS mailings as harassment; (2) failing to train officers, magistrates, and pretrial personnel on the federal regulatory scheme governing IRS Form 1099 filings; and (3) pursuing prosecution based on conduct that federal law expressly regulates and requires. These policies and customs resulted in Plaintiff's arrest, prosecution, GPS monitoring, and other injuries.

STANDING FOR DECLARATORY AND INJUNCTIVE RELIEF

177. Plaintiff has standing because Defendant Withers has demonstrated a consistent and predictable pattern of retaliatory accusations whenever Plaintiff takes any action adverse to her interests, regardless of whether it involves tax reporting. Every prior development that threatened her—from the October 10 notice, to the W-9 dispute, to the 1099 mailings, to Plaintiff attempting Rule 3 affidavits, to Plaintiff producing exculpatory evidence—triggered a new round of accusations, each immediately adopted by Metro into criminal enforcement. Filing this federal lawsuit directly challenges Withers's conduct, exposes her to civil liability, and threatens the narrative she used to secure prior warrants. Based on her past behavior, Plaintiff faces a realistic and imminent threat that she will again retaliate with new reports. Metro's unchanged

55

customs—including accepting her accusations without verification and converting them into warrants, monitoring, and prosecutions—create a credible risk that future retaliatory reports will again result in unconstitutional enforcement. This ongoing threat of renewed retaliation and enforcement constitutes a present, non-speculative injury-in-fact, satisfies causation because Metro's practices previously transformed her retaliation into state action, and is redressable by declaratory and injunctive relief. See *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).

RELIEF REQUESTED

178.    Pursuant to 28 U.S.C. §§ 2201–2202 and 42 U.S.C. § 1983, Plaintiff seeks:

A.   A declaration that Metro may not treat federally required IRS Form 1099 mailings as harassment, stalking, or illegal contact.

B.   A declaration that Metro's policies, customs, and practices criminalizing federal tax-reporting obligations are preempted and void under the Supremacy Clause.

C.   An injunction prohibiting Metro and its agents from initiating or maintaining criminal charges based on conduct federally governed by 26 U.S.C. § 6041 and Treas. Reg. § 1.6041-1.

D.   An injunction requiring Metro to train officers and magistrates on the preemptive effect of federal tax law.

E.   Attorney's fees and costs under 42 U.S.C. § 1988.

F.   All other appropriate relief.

**COUNT XI – ABUSE OF PROCESS**
**(Tennessee Common Law – Supplemental Jurisdiction, 28 U.S.C. § 1367)**
**DEFENDANT MALLORY WITHERS**

179.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

56

180.     This claim asserts that Defendant Withers misused legal process—after it issued—for the improper purpose of retaliating against Plaintiff for reporting her income, using the criminal system as leverage to silence, punish, and coerce him.

181.     Under Tennessee law, a claim for abuse of process requires the existence of an ulterior motive and an improper act in the use of process after its issuance. *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 400 (Tenn. 2002); *Priest v. Union Agency*, 125 S.W.2d 142, 143 (Tenn. 1939).

182.     The tort is distinct from malicious prosecution because malicious prosecution concerns the wrongful initiation of proceedings, whereas abuse of process concerns the misuse of legal process after it has been issued, employed for a purpose the process was never designed to serve. *Bell by Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 555 (Tenn. 1999).

ULTERIOR MOTIVE

183.     Beginning in October 2024, immediately after Plaintiff lawfully informed Defendant Withers that she would be receiving IRS Forms 1099 reporting more than $200,000 in payments from their arrangement, Defendant Withers began a series of escalating legal accusations. Each report corresponded with moments when she experienced increased fear of tax exposure or suffered personal or financial repercussions related to her unreported income.

184.     Every accusation she advanced fell into one of three categories: (1) conduct that occurred months earlier and had long since ceased; (2) conduct she knew was lawful federal tax reporting, not illegal "contact"; or (3) conduct she fabricated or subjectively attributed to Plaintiff without evidentiary basis.

STALE CONDUCT

185.     On December 3, 2024, Defendant Withers filed harassment and stalking complaints based on an argument that occurred over three months earlier, on August 28, 2024. During that argument, Defendant Withers herself escalated the conflict by threatening to "call the police." Plaintiff made nine rapid calls during the heat of that discussion—calls lasting seconds, not minutes. Immediately afterward, Defendant Withers and Plaintiff exchanged more than 200 text messages throughout the same day and evening, and they continued their paid arrangement for months thereafter.

186.     Defendant Withers omitted all of this context. She concealed the fact that she initiated the argument, that she continued voluntarily communicating with Plaintiff, and that she continued accepting money and benefits from him for months. Reporting these events three months later, only after receiving Plaintiff's October 10, 2024, notice of impending IRS Form 1099 filings, strongly evidences a retaliatory motive.

MISCHARACTERIZATION OF IRS FILINGS

187.     After Plaintiff notified Defendant Withers on October 10, 2024, that he would be issuing IRS Forms 1099 as required by Treas. Reg. § 1.6041-1, Defendant Withers repeatedly attempted to convert those lawful federal filings into criminal "contact."

188.     The first 1099 was mailed November 27, 2024, by Tax1099.com—before Plaintiff was served with any Order of Protection and before any bond conditions existed. The envelope plainly read "Presorted First Class Mail – Postage Paid – INFOSEND."

189.     Despite knowing that Plaintiff did not send the forms personally and that the filings were required by federal law, Defendant Withers swore on December 10 and December 23, 2024, that the mere receipt of the 1099 constituted "harassment," "illegal communication," and a violation of the Order of Protection. Her own text messages confirm the true source of

58

distress: she feared the IRS would "audit [her] for $200,000," not that Plaintiff was communicating with her.

<u>FABRICATIONS USED TO SECURE WARRANTS</u>

190. When her earlier charges began to weaken, Defendant Withers supplied detectives with new allegations to keep the criminal machinery moving. She claimed that Plaintiff created a "fake Instagram account" containing information "only he would know"—even though she located the account herself, received no message from Plaintiff, and produced no evidence connecting him to it. She also alleged that a dating application displayed Plaintiff "one mile from her home," despite the fact that proximity on such apps is algorithmic and often inaccurate, and Plaintiff's bond conditions contained no geographic restrictions whatsoever.

191. None of these claims constituted criminal conduct. Their timing—each arising only after prior allegations lost traction—further demonstrates intentional misuse of process.

<u>RETALIATION THROUGH CRIMINAL PROCESS</u>

192. Abuse of process focuses on misuse after issuance, and Defendant Withers repeatedly engaged in improper acts once process issued.

193. After obtaining an ex parte Order of Protection on November 14, 2024, Defendant Withers coordinated with detectives so that, just 37 minutes after Plaintiff was served on December 3, 2024, officers would be waiting to arrest him on new charges. She then repeatedly returned to police to press for additional warrants, each time supplying new claims designed to keep Plaintiff under arrest or under heightened supervision.

194. Her persistent efforts were aimed at coercing Plaintiff to withdraw federal tax filings and punishing him for reporting her income to the IRS. She used each issued warrant not for its intended protective purpose, but as leverage to retaliate, silence, and intimidate.

59

195.    Such conduct constitutes "a willful act in the use of the process not proper in the regular conduct of the proceeding." *Bell*, 986 S.W.2d at 555.

<u>INJURY</u>

196.    As a direct and proximate result of Defendant Withers's abuse of legal process, Plaintiff suffered:

A.  Loss of liberty, including multiple arrests and months of GPS monitoring;

B.  Emotional distress, humiliation, fear, and anxiety;

C.  Financial losses, including bond costs, attorney's fees, and monitoring fees; and

D.  Reputational harm, including being publicly portrayed as a stalker, harasser, and violent offender.

197.    Defendant Withers's conduct was intentional, malicious, and undertaken with reckless disregard of Plaintiff's rights, warranting punitive damages. See Tenn. Code Ann. § 29-39-104(a)(1).

<u>RELIEF REQUESTED</u>

198.    Plaintiff respectfully requests:

A.  Compensatory damages for economic, emotional, and reputational injury;

B.  Punitive damages for willful and malicious conduct;

C.  Reasonable attorney's fees and costs; and

D.  All such other and further relief as the Court deems just and proper.


**COUNT XII – NEGLIGENCE AND NEGLIGENCE PER SE**
**(Tennessee Common Law – Supplemental Jurisdiction, 28 U.S.C. § 1367)**
**DEFENDANT TRACKING SOLUTIONS, INC.**

199.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

60

200. This count alleges that Tracking Solutions breached statutory and common-law duties—including operating without the contract required by Tennessee law and imposing unauthorized liberty restrictions—causing foreseeable harm to Plaintiff as a monitored pretrial defendant.

201. Under Tennessee law, a negligence claim requires proof of (1) a duty of care owed by the defendant; (2) breach of that duty; (3) causation in fact; (4) proximate causation; and (5) damages. *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998).

202. Negligence per se applies when: (1) a statute prescribes a standard of conduct, (2) the plaintiff is within the class the statute is intended to protect, and (3) the injury is of the type the statute seeks to prevent. *Whaley v. Perkins*, 197 S.W.3d 665, 672–73 (Tenn. 2006).

STATUTORY AND COMMON LAW DUTIES

203. Tennessee law divides responsibility for GPS monitoring between the judiciary and the monitoring vendor. Under Tenn. Code Ann. § 40-11-150(c)(1)–(2), a magistrate must issue a written order specifying exclusion zones, notice requirements, and ability-to-pay findings. Separately, Tenn. Code Ann. § 40-11-152(k) requires that any private entity providing GPS monitoring services "shall have a written agreement with the county or municipality." That provision exists to ensure lawful supervision of private vendors and to protect pretrial defendants from arbitrary or unlawful restraint.

STATUTORY AND COMMON LAW BREACHES

204. Tracking Solutions breached its statutory and common-law duties in several ways. First, at the time it equipped Plaintiff with a GPS device on January 29, 2025, Tracking Solutions had no written agreement with Metro or Davidson County, in violation of § 40-11-152(k).

Plaintiff was therefore subjected to monitoring by a vendor that lacked legal authorization to supervise him.

205.    Second, the judicial order required no exclusion zones, contained no ability-to-pay findings, and did not authorize the imposition of any additional conditions.

206.    Despite this, before permitting Plaintiff to obtain the monitoring device required for release from custody, Tracking Solutions compelled him to sign a "GPS Monitoring Agreement and Release" that:

    A.  Imposed undisclosed and undefined "exclusion zones" that were not contained in the magistrate's order and were never communicated to Plaintiff in any official capacity;

    B.  Shifted all operational, legal, and financial liability to Plaintiff, including indemnification for Tracking Solutions' own mistakes, malfunctions, or errors;

    C.  Contained sweeping release, waiver, and covenant-not-to-sue provisions extending to Plaintiff's family members, heirs, and representatives;

    D.  Shortened the statute of limitations for any claim against the company to one year; and

    E.  Conditioned Plaintiff's release from custody on execution of this adhesion contract, despite the lack of any statutory or judicial authorization for such terms.

207.    Third, Plaintiff encountered Tracking Solutions because, while in DCSO booking, only two GPS companies were represented—Tracking Solutions and Nationwide—and Tracking Solutions prominently advertised its services on signage displayed inside the booking area. Plaintiff had no practical ability to obtain release unless he contracted with one of the two

companies present, and Tracking Solutions required execution of its agreement as a prerequisite to providing the device.

208.　These facts plausibly allege that Plaintiff was coerced into signing the "Monitoring Agreement and Release" in order to secure his liberty, and that Tracking Solutions imposed restraints and obligations beyond those ordered by any judicial officer.

209.　The unauthorized and undefined "exclusion zones" created a risk that Plaintiff would be perceived as violating conditions he did not know existed. By imposing obligations not present in the court's order, and by operating absent statutory authorization, Tracking Solutions created the appearance of violations out of conditions that did not lawfully exist.

NEGLIGENCE PER SE UNDER TENN. CODE ANN. § 40-11-152(k)

210.　Tracking Solutions' operation without a valid written contract with Metro or Davidson County constitutes negligence per se. Plaintiff, as a monitored pretrial defendant, is within the class of persons the statute was designed to protect, and the injuries alleged—arbitrary liberty restrictions, lack of oversight, compelled fees, reputational harm, and exposure to alleged "zone violations"—are the precise harms the statutory framework seeks to prevent.

CAUSATION

211.　Tracking Solutions did not create the underlying monitoring requirement, but it independently caused and exacerbated Plaintiff's injuries by:

A.　Implementing monitoring services without statutory authorization;

B.　Imposing exclusion zones that were never ordered by a court;

C.　Requiring Plaintiff to sign an unlawful release and indemnification agreement as a condition of liberty;

63

D. Operating as Metro's de facto pretrial-supervision arm despite the lack of a required governmental contract; and

E. Reinforcing the appearance that Plaintiff was subject to heightened supervision or dangerousness designations unsupported by any judicial findings.

212. These actions foreseeably caused additional loss of liberty, compelled financial payments, emotional distress, reputational harm, and the ongoing risk that Plaintiff would appear to be violating restrictions of which he had no notice.

<u>INJURY</u>

213. As a direct and proximate result of Tracking Solutions' statutory violations and negligent conduct, Plaintiff suffered:

A. Economic losses, including monitoring fees and associated costs;

B. Emotional distress, anxiety, and reputational injury arising from unauthorized liberty restrictions;

C. Heightened exposure to accusations of "zone violations" and related legal jeopardy; and

D. Loss of liberty through coercive adherence to conditions never imposed by the judiciary.

<u>RELIEF REQUESTED</u>

214. Plaintiff requests:

A. Compensatory damages for economic, emotional, and liberty-based injuries;

B. Punitive damages for reckless disregard of statutory duties;

C. Declaratory judgment that Tracking Solutions' practices and contract violations contravene Tennessee law;

64

D.  Reasonable attorney's fees and litigation costs; and

E.  All other relief the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff respectfully requests that this Court:

215.  Grant the relief requested in each count above;

216.  Award compensatory damages in an amount to be determined at trial;

217.  Award punitive damages where permitted by law;

218.  Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

219.  Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

MARTIN SCOTT

s/Cody Johnson/
CODY JOHNSON, #037568
Attorney for Plaintiff
102 East Main St., Suite A
Lebanon, TN 37087
(629) 200-7774
cody@turklaylaw.com

65