# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARTIN SCOTT,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:25-cv-01393 |
| | ) | JUDGE TRAUGER |
| **METRO. GOV'T. OF NASHVILLE** | ) | **JURY DEMAND** |
| **AND DAVIDSON COUNTY,** | ) | |
| | ) | |
| **TRACKING SOLUTIONS, INC.,** | ) | |
| | ) | |
| **MALLORY WITHERS,** | ) | |
| *in her individual capacity* | ) | |
| | ) | |
| **BRIAN CAVALIERE,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| **TYLER LEWIS,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| Defendants. | ) | |

---

## MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY'S MOTION TO DISMISS

---

Plaintiff, by and through undersigned counsel, respectfully submits this Response in opposition to Metropolitan Government of Nashville and Davidson County's ("Metro") Motion to Dismiss, filed on February 4, 2026, titled **METRO NASHVILLE'S MOTION TO DISMISS AND MEMORANDUM OF LAW** (hereafter "Metro's Mot., ECF No. 20"), pursuant to Local Rule 7.01(a)(3). In support thereof, Plaintiff states as follows:

## BACKGROUND

1. Plaintiff commenced this action by filing his Complaint on December 2, 2025.

2. On December 8, 2025, a copy of the Complaint and Summons was served on Defendant Metro, by Deputy Robert Harris of the Davidson County Sheriff's Office ("DCSO").

3. Defendant Metro requested an extension of time by which to file its responsive pleading on January 28, 2026, through its UNOPPOSED MOTION FOR EXTENSION OF TIME. The motion for extension of time was granted by the Court on January 28, 2026.

4. Defendant Metro then filed its Motion to Dismiss on February 4, 2026.

5. On February 18, 2026, Plaintiff filed his UNOPPOSED MOTION FOR EXTENSION OF TIME AND CONTINUANCE OF CASE MANAGEMENT CONFERENCE seeking until March 20, 2026, to file Plaintiff's response to Metro's Motion to Dismiss. The motion for extension of time was granted by the Court on February 18, 2026.

## SUMMARY OF DEFENDANT'S MOTION AND PLAINTIFF'S RESPONSE

6. Metro Nashville's opening paragraph mischaracterizes both Plaintiff's claims and the procedural posture of this case. Plaintiff does not rely on speculation to impose municipal liability. Rather, the Complaint alleges that Plaintiff was subjected to arrest, prolonged electronic monitoring, and criminal prosecution through a series of decisions made within Metro's criminal justice system—including decisions by Metro police officers, a judicial commissioner, and Metro's pretrial monitoring system. Those allegations plausibly support municipal liability under 42 U.S.C. § 1983.

7. Metro's motion is also directed to a pleading that is in the process of being superseded. Plaintiff has prepared a Proposed First Amended Complaint, which will be filed

pursuant to Federal Rule of Civil Procedure 15(a)(2), either by written consent or, if necessary, by motion for leave.[1] That amendment includes detailed factual allegations regarding Metro's policies, practices, and training deficiencies, including the operation of Metro's pretrial GPS monitoring program, the procedures governing judicial commissioners, and the manner in which Metro officers handle citizen-initiated criminal complaints.[2] These allegations directly address the purported deficiencies identified in Metro's motion and further confirm that Plaintiff has stated viable claims for relief.

8.     Finally, Metro's argument that Plaintiff seeks to vindicate a nonexistent constitutional right misunderstands the nature of Plaintiff's Claim IX. Plaintiff was not asserting a constitutional right to compel prosecution of another person. Rather, Plaintiff alleged that Metro officers and prosecutors interfered with his access to neutral judicial review of a sworn Rule 3 affidavit while simultaneously using the criminal process against him. Those allegations implicate the First Amendment right to petition the courts and the Fourteenth Amendment guarantee of access to judicial processes—not a private right to compel prosecution. In any event, Plaintiff has omitted Claim IX from his Proposed First Amended Complaint.[3]

9.     For these reasons, and for the reasons set forth below, Metro's motion should be denied.

## DISMISSAL IS INAPPROPRIATE WHERE PLAINTIFF SEEKS LEAVE TO AMEND AND ANY PLEADING DEFICIENCIES CAN BE CURED

10.     Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend should be "freely give[n] when justice so requires." Because Plaintiff will file an amended complaint—or,

---

[1] Plaintiff's Proposed First Amended Complaint (attached as Exhibit B) ("Proposed Am. Compl.").
[2] See generally, Proposed Am. Compl.
[3] See Proposed Am. Compl.

if necessary, a motion for leave to amend accompanied by a proposed amended complaint—that adds additional factual allegations regarding Metro's policies, training, and practices, dismissal at this stage would be inconsistent with Rule 15's liberal amendment standard.

11.     Plaintiff's Proposed Amended Complaint is attached as Exhibit B.


## STATEMENT OF FACTS

12.     Plaintiff incorporates by reference the well-pleaded factual allegations set forth in the Proposed First Amended Complaint attached as Exhibit B, which are accepted as true for purposes of this Response.

13.     Metro's Motion to Dismiss begins with a characterization of the parties' relationship that is materially incomplete. Metro states that Plaintiff and Defendant Mallory Withers were involved in a "relationship."[4] The factual allegations incorporated from the Proposed First Amended Complaint establish that Plaintiff and Withers were not in a romantic relationship.[5] Rather, they were engaged in a paid sexual arrangement contemplated from the inception of their association.[6] The payments made during that arrangement later became the subject of federal tax reporting that formed the centerpiece of the criminal allegations against Plaintiff.[7]

14.     Federal law did not require Plaintiff to report the payments at issue. However, once a payer elects to report compensation paid to another individual as non-employee compensation, the Internal Revenue Code requires the payer to furnish a Form 1099 to the

---

[4] (Metro's Mot., ECF No. 20, P. 2).
[5] Proposed Am. Compl.,   14.
[6] *Id*.   14.
[7] See generally, Proposed Am. Compl., ¶¶ 14-31.

4

recipient reflecting the reported payments.[8] Thus, once Plaintiff elected to report the payments made to Withers during the arrangement, federal law required that the corresponding Form 1099s be furnished to Withers.[9]

15.     Consistent with that requirement, Plaintiff notified Withers in advance that the tax reporting would occur.[10] Plaintiff mailed a letter to Withers requesting a completed IRS Form W-9 and detailing the payments that would be reported.[11] Postal records reflect that Withers received that correspondence on October 18, 2024.[12] At that time, no protective order existed and no court had imposed any communication restrictions between the parties. Withers did not seek an ex parte order of protection until several weeks later, on November 11, 2024.[13]

16.     The timeline is therefore significant. Withers was informed in advance that tax reporting would occur, received documentation identifying the payments that would be reported, and only later sought an ex parte order of protection. These events preceded the criminal warrants that were later obtained by Withers.[14]

17.     After filing her petition for an order of protection, Withers contacted the Metropolitan Nashville Police Department (MNPD) while service of the ex parte protection order was still pending and sought criminal warrants against Plaintiff.[15] Plaintiff was ultimately served with the order of protection on December 3, 2024.[16]

---

[8] See 26 U.S.C. § 6041(a) (requiring information reporting for certain payments); 26 U.S.C. § 6041(d) (requiring the furnishing of written statements to recipients of reported payments).
[9] *Id.*
[10] (Ex. G – October Letter).
[11] *Id.*
[12] (Ex. H – Proof of Delivery of October Letter).
[13] (Ex. T – Order of Protection).
[14] (Ex. N - Criminal Warrants).
[15] *Id.*
[16] (Ex. T).

18.     Between December 2024 and January 2025, Withers obtained six separate criminal warrants against Plaintiff.[17] The procedural history of those charges is materially different from the impression conveyed in Metro's motion.[18] Only three of the six charges were bound over at the preliminary hearing stage in General Sessions Court.[19] Of those three charges, only two survived review by the Davidson County Grand Jury.[20]

19.     The two charges that were ultimately returned by the grand jury were both tied to the same factual predicate: the alleged receipt of IRS Forms 1099 by Withers.[21] One charge alleged harassment based on receipt of a Form 1099, and the other alleged violation of bond conditions arising from the same mailing.[22]

20.     While those criminal charges were still pending, Plaintiff attempted to initiate criminal complaints of his own against Withers.[23] In April 2025—while the charges against Plaintiff were still pending in bind-over status—Plaintiff sought to present sworn affidavits alleging false reporting and fabrication of evidence by Withers.[24] Detective Brian Cavaliere intervened in that process and communicated with prosecutors regarding Plaintiff's attempts to obtain warrants.[25]

21.     As a result of those interventions, Plaintiff's sworn affidavits of complaint were never presented to a judicial officer for probable-cause review. Consequently, to this day no judge or magistrate has evaluated Plaintiff's allegations against Withers to determine whether probable cause exists to issue criminal process.

---

[17] (Ex. N).
[18] (Metro's Mot., ECF No. 20, P. 2).
[19] (Ex. N, P. 3-5).
[20] (Ex. CC – Indictment).
[21] (Ex. N, P. 4-5).
[22] *Id*.
[23] Proposed Am Compl., ¶¶ 41-42.
[24] *Id*.
[25] Id. at ¶¶ 44-45.

<u>**STANDARD OF REVIEW**</u>

22.     A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint, not the merits of the case. To survive dismissal, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."[26] In evaluating a Rule 12(b)(6) motion, the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor.[27] Dismissal is appropriate only where the complaint's factual allegations, assumed true, fail to raise a right to relief above the speculative level.[28]

23.     Finally, supplemental jurisdiction over state-law claims is governed by 28 U.S.C. § 1367. Even where § 1367(a) is satisfied, the Court "**<u>may</u>** decline to exercise supplemental jurisdiction" under § 1367(c), including when it "has dismissed all claims over which it has original jurisdiction."[29] Whether to retain supplemental jurisdiction is a discretionary decision guided by the familiar considerations of judicial economy, convenience, fairness, and comity.[30]

---

[26] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

[27] Ashcroft, 556 U.S. at 678–79; Twombly, 550 U.S. at 555–56.

[28] Twombly, 550 U.S. at 555.

[29] 28 U.S.C. § 1367(c)(3) (emphasis added).

[30] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); see also *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012). "Such supplemental jurisdiction does not disappear when the federal claim that gave rise to original jurisdiction in the first place is dismissed. *Carlsbad Tech., Inc. v. HIF Bio*, Inc., 556 U.S. 635, 129 S. Ct. 1862, 1866-67, 173 L. Ed. 2d 843 (2009). Following such a dismissal, the district court in its discretion may properly choose whether to exercise § 1367(a) jurisdiction over the supplemental state-law claims; however, such a decision is 'purely discretionary.'" *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

## ARGUMENT

a) **PLAINTIFF PLAUSIBLY ALLEGES MUNICIPAL LIABILITY UNDER MULTIPLE *MONELL* THEORIES, AND A PATTERN OF PRIOR VIOLATIONS IS NOT REQUIRED.**

24.     Plaintiff's claims against Metro—specifically Count IV (Fourth Amendment unreasonable search and seizure), Count V (Sixth Amendment right to counsel), and Count VI (Fourteenth Amendment procedural due process)—are supported by multiple, independent theories of municipal liability under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). As alleged in the Proposed First Amended Complaint, these constitutional violations arise from Metro's administration of its pretrial system, including the imposition and enforcement of GPS monitoring through standardized procedures and delegated private enforcement.[31]

25.     Plaintiff plausibly alleges that Metro is liable because: (1) it adopted and implemented an official policy—most notably its standardized "Order Granting Bail for Abuse Cases" form and related bail-processing procedures—that affirmatively facilitates unconstitutional decision-making; (2) it maintained a widespread custom or practice of disregarding even the minimal procedural safeguards reflected in those forms, including the routine failure to document exclusion zones, individualized findings, and statutory prerequisites; and (3) under the logic of *City of Canton v. Harris*, 489 U.S. 378 (1989), it designed and operated a system for imposing pretrial liberty restrictions that is so structurally deficient that constitutional violations are the predictable and inevitable result. Each of these theories independently supports municipal liability, and together they provide a cohesive and well-pleaded basis for holding Metro responsible for the deprivations alleged in Counts IV, V, and VI.

---

[31] (Ex. B - Proposed First Amended Complaint).

26.     The use of Metro's standardized "Order Granting Bail for Abuse Cases" form itself constitutes an official policy sufficient to support municipal liability. A municipality may be held liable under § 1983 where the constitutional violation results from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[32] This includes not only formal legislation, but also official procedures and tools that govern how decisions are made.[33]

27.     Here, Plaintiff alleges that Metro designed and/or implemented a standardized bail form that governs how judicial commissioners impose conditions of release in abuse cases.[34] That form is not a neutral administrative tool. As alleged, it is structured in a manner that substitutes preprinted, check-box legal conclusions for individualized factual findings and provides no space for recording the facts necessary to justify the imposition of liberty-restricting conditions such as continuous GPS monitoring.[35] In this way, Metro's bail form for abuse cases affirmatively channels the judicial commissioners toward outcomes unsupported by documented findings and eliminates the mechanism by which constitutionally required determinations would ordinarily be made, namely the recording of findings of fact. As to individualized findings of fact, this is not a case of deviation from policy—the absence of findings is itself the policy.

28.     Courts have repeatedly recognized that municipal liability may arise where official policies or procedures affirmatively sanction or direct unconstitutional conduct.[36] Here,

---

[32] Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).
[33] See Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986); City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).
[34] (Ex. U – Order Granting Bail).
[35] See *Id*.
[36] See *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364–65 (6th Cir. 1993); *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507-08 (6th Cir. 1996).

9

Metro's standardized bail form for abuse cases operates in precisely that manner. As alleged, the form instructs judicial commissioners to justify the imposition of significant liberty restrictions—including pretrial GPS monitoring—through the selection of preprinted legal conclusions, while providing no space for recording the individualized findings of fact necessary to support those conclusions.

29.    This design stands in tension with Tennessee law, which contemplates that decisions regarding bail conditions be supported by written reasoning.[37] These provisions reflect a broader legal principle that decisions affecting a defendant's liberty must be grounded in articulated, reviewable reasoning. Metro's form, however, omits any mechanism for recording such reasoning at the critical moment when conditions are first imposed.

30.    A municipality cannot insulate itself from liability by embedding constitutional deficiencies into the very forms and procedures through which official decisions are made. Where the structure of the system itself prevents or discourages compliance with constitutional requirements, the resulting violations are properly attributable to the municipality.

31.    Metro may argue that the form is merely a tool and that judicial commissioners remain free to make individualized findings notwithstanding its format. But that argument fails at the pleading stage. Plaintiff alleges that the form provides no mechanism for such findings and that, in practice, individualized determinations are neither made nor recorded. Plaintiff possesses 1,300 forms to corroborate that fact.

32.    A policy need not explicitly command unconstitutional conduct to give rise to liability; it is enough that it creates a predictable risk of constitutional violations.[38] Where Metro

---

[37] See Tenn. Code Ann. § 40-11-118(b)(2) (requiring a written statement of reasons for conditions of release); Tenn. Code Ann. § 40-11-143 (requiring written motions and written findings when bail conditions are modified).

[38] See *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

uses or adopts a standardized decision-making instrument, i.e. the Order Granting Bail for Abuse Cases, that omits the very features necessary for constitutional compliance—such as factual findings and notice of conditions—it is reasonable to infer that the resulting violations are not incidental but systemic.

33. Metro may further contend that the Constitution does not require written findings in every bail determination. That misses the point. Plaintiff's claim is not that written findings are always required, but that Metro's form and procedures eliminate any meaningful mechanism for ensuring that individualized determinations are made at all. The absence of space for findings, combined with the use of check-box legal conclusions, the lack of adversarial process, and the subsequent imposition of undisclosed restrictions, plausibly establishes that the system has not been designed to produce and, in fact, does not produce constitutionally adequate bail decisions. At the Rule 12(b)(6) stage, Plaintiff need only allege facts permitting a reasonable inference that Metro's policies caused the deprivation—and he has done so.

### *Metro's Widespread Custom or Practice.*

34. To establish municipal liability based on a custom of tolerance or acquiescence, a plaintiff must satisfy the framework articulated by the Sixth Circuit in *Thomas v. City of Chattanooga*. Under that standard, a plaintiff must plausibly allege: "(1) the existence of a clear and persistent pattern of [unconstitutional conduct]; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that its deliberate indifference in failing to act amounts to an official policy of inaction; and (4) that the custom was the moving force or direct causal link in the constitutional deprivation."[39] At the

---

[39] *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507–08 (6th Cir. 1996)).

pleading stage, a plaintiff need only allege facts permitting a reasonable inference that each of these elements is satisfied.[40]

35.     Plaintiff plausibly alleges a widespread custom of disregarding even the limited requirements reflected on the face of Metro's bail form for abuse cases. While the form provides designated spaces for exclusion zones, ability-to-pay determinations, and victim notification, Plaintiff's analysis of approximately 1,300 bail orders requiring GPS monitoring issued between July 2024 and September 2025—spanning time both before and after Plaintiff's case—reveals that those portions of the form are routinely left blank, with only approximately 35 of those orders containing any recorded exclusion zones. These allegations satisfy the first requirement articulated in *Thomas v. City of Chattanooga*, namely the existence of a "clear and persistent pattern" of unconstitutional conduct.[41]

36.     Second, Plaintiff's allegations support a reasonable inference of notice—at minimum, constructive notice—on the part of Metro. Id. The pattern spans more than a year and includes approximately 1,300 cases processed through the same system, using the same form, before the same commissioners. Such a pervasive and enduring practice permits the inference that Metro policymakers either knew or should have known that judicial commissioners were routinely failing to complete required portions of the form and were imposing liberty-restricting conditions without recording the necessary information.

37.     Third, Plaintiff plausibly alleges Metro's tacit approval and deliberate indifference. Despite the frequency and consistency of these omissions, Metro has taken no corrective action to ensure compliance with its own procedures or to require completion of the form's essential components. A municipality's failure to act in the face of repeated, similar

---

[40] See *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993) (rejecting heightened pleading standard for § 1983 municipal liability claims).
[41] *Thomas*, 398 F.3d at 429.

constitutional violations may support an inference of a custom of acquiescence where the pattern is sufficiently widespread to place policymakers on notice and no corrective action is taken.[42] Here, the absence of any remedial measures in the face of a persistent pattern supports the inference that Metro has effectively endorsed the practice.

38. Finally, Plaintiff has plausibly alleged that this custom was the moving force behind the constitutional deprivation.[43] The routine failure to document exclusion zones, ability-to-pay determinations, and other conditions directly resulted in Plaintiff being subjected to undisclosed and unreviewable restrictions on his liberty, including GPS monitoring and vendor-imposed exclusion zones not reflected in any judicial order. The absence of recorded conditions and findings prevented meaningful notice, review, or challenge, thereby causing the very constitutional injury at issue.

39. Taken together, Plaintiff's allegations satisfy each element required to establish municipal liability under a custom-of-acquiescence theory. Moreover, these same facts independently support liability under Plaintiff's parallel theory that Metro's official policies—particularly the design of the bail form itself—fail to require constitutionally sufficient determinations. Under *Monell*, either theory is sufficient to state a claim at the pleading stage.

### *Metro's Liability Under the Logic of City of Canton v. Harris.*

40. Metro's argument that Plaintiff must plead prior constitutional violations to establish deliberate indifference misstates both the governing law and the nature of the constitutional defect alleged here. Under *City of Canton*, the focus is not on whether a municipality maintains a training program in the abstract, but whether the system it has created is

---

[42] See *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 495 (6th Cir. 2020); *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).
[43] *Thomas*, 398 F.3d at 429.

adequate to the duties it assigns.[44] Under *City of Canton*, Metro is liable not because an individual commissioner made a bad decision, but because Metro's system is structured in a way that predictably produces unconstitutional results. The relevant inquiry, therefore, is whether Metro designed and maintained a process for imposing pretrial liberty restraints that is capable of producing constitutionally compliant decisions. Plaintiff plausibly alleges that it did not.

41. The Sixth Circuit expressly recognizes that a pattern of prior violations is not always required where the risk of constitutional harm is obvious.[45] Metro's argument that the involvement of a "licensed attorney" defeats obviousness turns *Canton* on its head. The question is not whether the decisionmaker had legal training in the abstract, but whether the system in which that decisionmaker operates ensures constitutional compliance.

42. The task Metro assigns to its judicial commissioners is constitutionally significant: the imposition of pretrial liberty restrictions, including continuous GPS monitoring—a recognized Fourth Amendment search.[46] That task requires individualized findings, meaningful process, and notice of the conditions imposed. Yet, the system Metro provides omits each of those safeguards. The standardized "Order Granting Bail for Abuse Cases" form does not provide space for findings of fact and instead invites the selection of preprinted legal conclusions.[47] Commissioners are not required to make individualized factual determinations based on an adversarial presentation, and Plaintiff was afforded no meaningful opportunity—through counsel or otherwise—to contest the allegations or the need for GPS

---

[44] *City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989).
[45] See, e.g., *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) ("[I]n a narrow range of circumstances, a plaintiff may prove deliberate indifference without showing a pattern of constitutional violations, where the unconstitutional consequences of failing to train are so patently obvious."); *Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018) (same).
[46] *Grady v. North Carolina*, 575 U.S. 306, 309–10 (2015).
[47] (Ex. U - Order Granting Bail, P. 1).

monitoring before that condition was imposed. In this way, Metro's procedures do not merely risk constitutional error—they preclude the process necessary to avoid it.

43. The deficiencies extend beyond the initial bail determination. Plaintiff alleges that exclusion zones—geographic restrictions carrying the force of criminal sanction—were not specified in the bail order, but instead were later created and implemented by a private vendor, Tracking Solutions. Those restrictions were not disclosed to Plaintiff—by any Metro employee, by the judicial commissioner, or by the vendor enforcing them—and Tracking Solutions refused to provide them absent a court order, asserting that they constituted confidential victim information. As a result, Metro's system permitted liberty-restricting conditions to be imposed, modified, and enforced without judicial findings and without notice to the person bound by them.[48] A system that subjects a defendant to undisclosed geographic restrictions, enforceable by criminal sanction, is not merely inadequate—it is constitutionally defective.

44. Under *City of Canton*, deliberate indifference may be established where "the need for more or different [procedures] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that policymakers can be said to have disregarded that risk.[49] That standard is satisfied here. The imposition of continuous GPS monitoring without individualized findings, without adversarial testing, and without notice of the restrictions imposed creates an obvious and substantial risk of unconstitutional searches and deprivations of liberty. Indeed, where a municipality structures its process such that constitutionally required findings are never made and critical conditions are never recorded or disclosed, constitutional violations are not accidental—they are the predictable and inevitable result of the system itself.

---

[48] (Ex. U - Order Granting Bail, P. 1-3).
[49] 489 U.S. at 390.

45.     Finally, Plaintiff's allegations confirm that these are not isolated defects but features of Metro's system. The analysis of approximately 1,300 bail orders issued between July 2024 and September 2025—spanning periods both before and after Plaintiff's case—reveals that individualized findings are routinely absent and that exclusion zones are almost never documented in judicial orders, with only approximately 35 of those 1,300 orders containing any recorded exclusion zones. This pattern reinforces what the structure already demonstrates: Metro has implemented and maintained a process that does not produce constitutionally sufficient determinations. Under *City of Canton*, that is more than enough to plausibly allege deliberate indifference and municipal liability at the pleading stage.

### b) METRO'S RELIANCE ON JUDICIAL COMMISSIONERS' LEGAL TRAINING DOES NOT DEFEAT PLAINTIFF'S "OBVIOUS CASE" MONELL CLAIM.

46.     Metro's argument fails because it mischaracterizes both the nature of Plaintiff's claim and the role of the judicial commissioner in the unconstitutional deprivation. Plaintiff does not allege that a licensed attorney, acting in isolation, made a negligent or mistaken legal judgment. Rather, Plaintiff alleges that Metro designed and/or implemented and maintained a structurally deficient pretrial system in which constitutional violations are the predictable result—regardless of the professional credentials of the individual decisionmaker.

47.     First, Metro's reliance on *Connick v. Thompson* is misplaced because this case does not involve the type of discretionary, case-specific legal judgment at issue in *Connick*. There, the Supreme Court emphasized that prosecutors are trained to apply legal principles in varied factual contexts, such that a single *Brady* violation does not make unconstitutional conduct "obvious."[50] Here, by contrast, Plaintiff challenges a mechanized, policy-driven process that strips judicial commissioners of meaningful discretion and replaces individualized

---

[50] 563 U.S. at 64–67.

decision-making with standardized outcomes. As alleged, the commissioner imposed GPS monitoring by simply checking a box on a preprinted form, without conducting a hearing, without making individualized findings, and without identifying the terms of the restraint. Unlike the prosecutorial decision-making in *Connick*, this process does not depend on nuanced legal judgment—it is a mechanized system that affirmatively facilitates constitutional violations. In lawyer speak, the constitutional adequacy of the process does not turn on the credentials of the decisionmaker, but on whether the system itself provides the safeguards the Constitution requires. In layman's terms, just because the commissioner is smart doesn't mean all is well for defendants and their constitutional rights.

48. Second, Metro's argument ignores that the constitutional injury flows not from the commissioner's status as an attorney, but from the absence of constitutionally required procedures embedded in Metro's system. As alleged, GPS monitoring is imposed without notice of the very conditions that govern a defendant's liberty. Judicial commissioners do not make or record individualized findings of fact to support the imposition of such monitoring, and exclusion zones are not included in their orders. Instead, those zones are created and enforced by a private vendor in consultation with the alleged victim, and the vendor refuses to disclose those restrictions to the defendant. At the same time, no hearing is conducted in what is plainly an adversarial setting, and the defendant is afforded no opportunity—through counsel or otherwise—to contest the imposition or scope of these liberty-restricting conditions.

49. These are not errors of legal interpretation; they are systemic procedural deficiencies. The Supreme Court has long held that due process violations arise when the State fails to provide basic procedural safeguards—not merely when officials misunderstand the law.[51] No amount of legal training cures a system that imposes ongoing restraints on liberty without a

---

[51] See *Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976).

hearing, without individualized findings of fact, and without disclosing the terms of those restraints to the person bound by them.

50.     Third, this case fits squarely within the "obvious case" framework recognized in *City of Canton*, properly understood. The "obviousness" inquiry does not turn on whether the decisionmaker is educated; it turns on whether the risk of constitutional violation is a plainly foreseeable consequence of the system the municipality allows. *City of Canton*, 489 U.S. at 390. Under Metro's system, the risk of erroneous deprivation of liberty is not speculative—it is inevitable. Indeed, Plaintiff's allegations that approximately 1,300 bail orders where GPS monitoring was ordered overwhelmingly lacked individualized findings or exclusion-zone specifications underscore that this is not a one-off mistake, but the predictable product of Metro's chosen procedures.

51.     Finally, Metro's position would effectively immunize municipalities whenever a constitutional violation passes through a legally trained official, a rule the Supreme Court has never adopted. Municipal liability under *Monell* attaches where the policy or system itself is the moving force behind the violation, even if a judicial officer is the immediate actor.[52] Here, the commissioner's role does not break the causal chain because he operated within—and implemented—the very system Metro created or adopted. The absence of hearings, findings, notice, statutory compliance, and contractual safeguards was not the commissioner's independent choice; it was the product of Metro's policies, customs, and failures to train and supervise.

52.     In short, Plaintiff's claim does not depend on the proposition that trained attorneys are likely to violate the Constitution. It rests on the far more straightforward—and well-pleaded—allegation that Metro built or allowed a system to be built in which constitutional violations are the predictable result. That is precisely the type of "obvious case" contemplated by

---

[52] See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

*Canton*, and Metro's attempt to recast it as a *Connick*-type professional-judgment case should be rejected.

### c) METRO'S ARGUMENT IN SECTION III OF ITS MOTION TO DISMISS IS DIRECTED TO PLAINTIFF'S ORIGINAL COMPLAINT AND NOT THE PROPOSED FIRST AMENDED COMPLAINT PLAINTIFF INTENDS TO FILE.

53. Metro's argument in Section III of its motion to dismiss is directed to Plaintiff's original Complaint and, as such, does not reflect the operative allegations in Plaintiff's Proposed First Amended Complaint.[53] To the extent Metro contends that Plaintiff failed to include sufficient factual detail regarding Metro's policies, customs, and training deficiencies, Plaintiff has addressed those concerns through the Proposed First Amended Complaint, which will be filed as soon as practicable pursuant to Federal Rule of Civil Procedure 15(a)(2), either by written consent or, if necessary, by motion for leave. Counsel for Plaintiff is currently awaiting responses to requests for consent to amend.

### d) METRO'S ARGUMENT REGARDING CLAIM IX IS RENDERED MOOT BY PLAINTIFF'S PROPOSED AMENDED COMPLAINT.

54. Plaintiff's Proposed First Amended Complaint omits Claim IX from the original Complaint, and, upon its filing—whether by consent or leave of Court—Metro's arguments directed to that claim in Section IV of its Motion to Dismiss will be rendered moot.[54]

### CONCLUSION

55. For all of the foregoing reasons, Defendant Metropolitan Government of Nashville and Davidson County's Motion to Dismiss should be denied. Plaintiff has plausibly alleged constitutional violations arising from Metro's policies, customs, and systemic practices

---

[53] See Metro's Mot., ECF No. 20, P. 9-10; Plaintiff's Compl., ECF No.1; Proposed Am. Compl.
[54] See Hayward v. Cleveland Clinic Found., 759 F.3d 601, 617 (6th Cir. 2014).

governing pretrial detention and GPS monitoring, and those allegations independently support municipal liability under multiple recognized Monell theories.

56.    In addition, Plaintiff has prepared a Proposed First Amended Complaint that further clarifies and expands the factual basis for these claims, directly addressing the arguments raised in Metro's motion. Under Federal Rule of Civil Procedure 15(a)(2), dismissal at this stage would be inconsistent with the liberal standard governing amendment of pleadings.

57.    Accordingly, Metro's Motion to Dismiss should be denied in its entirety, and this case should proceed on the merits.

Date filed: March 20, 2026.

Respectfully submitted,

s/Cody Johnson/
Cody Johnson, Esq.
BPR No. 037568
Turklay Law, PLLC
Attorney for Plaintiff
102 E Main Street Suite A
Lebanon, TN 37087
P: (629) 200-7774
Cody@TurklayLaw.com

20