IN THE GENERAL SESSIONS COURT OF DAVIDSON COUNTY
STATE OF TENNESSEE


MALLORY WITHERS,



                Petitioner,

v.                              GS 1054865

MARTIN SCOTT,                   1054866

                Respondent.     1056823

                                1056824

STATE OF TENNESSEE,             1059179

                Petitioner,     1059484

v.

Martin Scott,

                Respondent.

_____


        The above-captioned cause came on for
hearing, on this, the 27th day of March, 2025, before
the Honorable Allegra Walker, when and where the
following proceedings were had, to wit:


_____




                Janie W. Garland
             BRIGGS & ASSOCIATES
               P.O. Box 290512
             Nashville, TN 37229
                (615)714-5350



             Briggs & Associates

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 1 of 165 PageID #: 433

A P P E A R A N C E S


For the Petitioner: ERIN SNELLING
                    Assistant District Attorney
                    222 2nd Avenue North
                    Suite 500
                    Nashville, TN 37201




For the Respondent: RICHARD MCGEE
                    LISA NAYLOR
                    Attorneys at Law
                    1308 Rosa L. Park Blvd
                    Nashville, TN 37208
                    richardmcgeelaw@gmail.com
                    lisanaylor@comcast.net



Also present:       LODY POWERS
                    Legal Powers
                    235 3rd Avenue North
                    Franklin, TN 37064
                    lody@legalpower.com

                    I N D E X

MALLORY WITHERS

Direct Examination by General Snelling  . .  Page  11

Cross-examination by Mr. McGee  . . . . . .  Page  40

Redirect Examination by General Snelling  .  Page  88

Recross-examination by Mr. McGee  . . . . .  Page  90


DIANA HUTSON

Direct Examination by Ms. Naylor  . . . . .  Page  92

Cross-examination by General Snelling . . .  Page 121

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 3 of 165 PageID #: 435

E X H I B I T S

Ex. 1 Phone calls 8/28 . . . . . . . . . . . . Page  20

Ex. 2 Text message "leave me alone"  . . . . Page  26

Ex. 3 1099 . . . . . . . . . . . . . . . . . . Page  32

Ex. 4 Letter . . . . . . . . . . . . . . . . . Page  34

Ex. 5 (Collective) . . . . . . . . . . . . . . Page  84

Ex. 6 Picture Coco Chanel bag  . . . . . . . . Page  88

Ex. 7 Order of protection  . . . . . . . . . . Page  88

Ex. 8 Collective - Covert Results report . . Page 121

Ex. 9 Text messages  . . . . . . . . . . . . . Page 128

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 4 of 165 PageID #: 436

* * *

P R O C E E D I N G S

(WHEREUPON, the following proceedings were had in open court:)

THE COURT: Let me know when you're ready.

MR. MCGEE: There is one matter I want to address.

THE COURT: What general is going to be handling this case?

GENERAL SNELLING: Me.

MR. MCGEE: Just for the Court's information, prior to the hearing, we had submitted a written motion to dismiss as relates to the charges in this case. It's more in the way of a, this will be our position at the completion of proof, and we previously supplied the district attorney with a copy of the motion, and just for the Court's edification, we'll be raising the issue formally at the completion of the State's case.

THE COURT: Okay.

MR. MCGEE: If I could make a brief statement in the case, I think it might be of assistance to the Court.

THE COURT: All right.

MR. MCGEE: Your Honor, this is not your

typical case in that the parties came together in a business arrangement.

GENERAL SNELLING:  Objection, Your Honor. This is irrelevant to the incident at hand.  I believe that we should wait to get into the matters and the issues of this case when I present proof.  I have the burden of proof in this case, and I believe that this information is irrelevant to me putting on my case.  If they want to speak about it after we have put on our proof, I believe that is more appropriate than at the beginning.

THE COURT:  All right.  What's your response to that?

MR. MCGEE:  I was just trying to give you an overview, Judge.  This is not the typical case. This is not a situation that I've seen, candidly. The warrants are all based upon allegations of events that occurred because of a relationship between the parties.

THE COURT:  Let me do this.  So let me go ahead and rule.  I'm going to overrule your objection.  It's just an opening statement he's making, and, typically, with opening statements, it's just based upon what your theory is.  The State is more than welcome to do an opening statement or

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 6 of 165 PageID #: 438

they can waive the opening statements.  At that time, then everybody can get into the proof.

MR. MCGEE:  Thank you, Your Honor.

THE COURT:  Uh-huh.  Go ahead.

GENERAL SNELLING:  In November and December of 2023, the parties entered into a, quote, arrangement.  And the arrangement candidly was very simply; it was money for sex.

This arrangement continued at least through the summer and early fall of 2024. Mr. Scott informed Ms. Withers, the alleged victim in this case, in October of 2024, that he intended on filing 1099s because of the legal requirements for the payment of taxes for the activity that Ms. Withers had been involved in.  That also included -- and that was to the tune of $82,000.

THE COURT:  He's filing a 1099 on her based on their sexual arrangement?

MR. MCGEE:  Yes.  And that included also in excess of $80,000 of merchandise which was part of the arrangement that had been suggested by Ms. Withers, put together by her, and implemented over the course of the months.

Now, why is that important?  In October, he sent a letter to Ms. Withers notifying her that a

1099 would be filed. The very next day, there was an ex parte order of protection taken out against him. That order of protection was served approximately two weeks later, and that order of protection was ultimately dismissed by Your Honor upon motion on behalf of Mr. Scott, because it had not been set within the statutory timeframe.

Your Honor informed Ms. Scott -- I'm sorry, Ms. Withers she had the right to seek another order of protection. That was not done, in part because three hours after the order of protection had been served, she secured two new warrants that no one knew anything about. We came to court for the order of protection; it was dismissed and he was arrested.

Following -- and the allegations were basically the allegations that were found in the ex parte order of protection with the addition of the mention that this is all about the 1099s. Since that day on two other occasions, she has sought and received additional warrants against Mr. Scott. And we come to court, and he goes to jail. That's happened on at least one other occasion, because she keeps going and getting more warrants.

Our positions is simply this: What this

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 8 of 165 PageID #: 440

case is about, it's about efforts of Ms. Withers to silence when, to have him labeled a criminal because of the serious claims that she knows she is facing as a result of the lifestyle that she has been pursuing for many, many, many years.

Criminal conduct includes, obviously, prostitution, but it also potentially includes promoting of prostitution, tax evasion, money laundering and tax fraud.

We all know the expression, don't shoot the messenger if you don't like the message. Well, that's exactly what this situation is about.

For those reasons, at the completion of the State's case, we will be seeking a dismissal of all of the charges in this case. But as Your Honor can see, is a little bit different than what we normally see with an ex-boyfriend, ex-girlfriend, because they never were, and this was merely a business arrangement that went south.

THE COURT: Let me interject one minute and let me get Mr. Bartlett taken care of before we start.

(Off-the-record discussion held.)

THE COURT: General, do you want to make an opening statement?

GENERAL SNELLING: Yes. Your Honor, I'll just say something short to the statements that Mr. McGee made. There is no -- you heard the arrangement between the two individuals; however, there is no proof at this time that Mr. Scott informed her that he was sending her 1099s. We -- our position is that sending her those 1099s was part of his control and part of his manipulation in this situation. We -- whatever their relationship is is irrelevant to the fact that Ms. Withers has a right to stop communication with this person when asked, and that's exactly what she did.

Our position is that she asked for this communication to stop. He neglected to follow her request and this has led us her today. So we just ask that you keep that in mind.

THE COURT: All right. First witness. Are you requesting the Rule?

MR. MCGEE: The only witness -- does the State have any witnesses other than --

GENERAL SNELLING: The officer.

MR. MCGEE: We'd ask for the Rule as to the officer. We have one witness, Your Honor. She is an expert witness and I don't believe she would be covered by the Rule. Diane Hudson, investigator

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 10 of 165 PageID #: 442

with Covert.  She will be testifying regarding the
messages between the parties' 29,000 messages.

THE COURT:  Glad I brought my lunch today.

MR. MCGEE:  Yes, ma'am.

MS. POWERS:  Judge, before we start, I
represent Ms. Withers in case she needs me.

THE COURT:  Okay.

GENERAL SNELLING:  For the record, this is
State of Tennessee versus Martin Scott, GS Numbers
1054865, 866, GS1056823, 824, GS1059179 and GS
1059484.  The Honorable Judge Allegra Walker
presiding.  Erin Snelling for the State of
Tennessee.  Rich McGee and Lisa Naylor for the
defense.  Today is March 27.  It is the 9:00 docket
in Courtroom 4C.

MALLORY WITHERS,
having been first duly sworn, testified as follows:
DIRECT EXAMINATION BY GENERAL SNELLING:

Q.  Good morning.  Will you please state your
name for the record?

A.  Mallory Withers.

Q.  Will you please spell your last name?

A.  It's W-I-T-H-E-R-S.

Q.  Are you familiar with Martin Scott?

A.  Yes.

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 11 of 165 PageID #: 443

Q. Did you see him in the courtroom today?

A. Yes, ma'am.

Q. Will you please describe what he's wearing and where he's seated for the record?

A. Gray suit and on the right between his attorneys.

Q. Okay.

GENERAL SNELLING: Let the record reflect that the witness has accurately identified the defendant.

THE COURT: Certainly.

BY GENERAL SNELLING:

Q. Okay. How long have you known Mr. Scott?

A. We had an arrangement dating for around nine months, I believe.

Q. And when did this relationship become sour, so to say?

A. Around March of 2024.

Q. What happened in March of 2024?

A. I had an issue with my ex-boyfriend and I reached out to Martin and he basically tried to investigate my situation with my ex and became very insecure and causing a lot of arguments and always accusing me of lying.

Q. Okay. After March 2024, did you continue

the relationship with Mr. Martin?

A.   Yes.

Q.   And when was the next time you had a problem with Mr. Martin?

A.   I don't remember the exact date, but I remember the scenario.

Q.   Explain what happened in this scenario.

A.   Martin was stalking my sister's Instagram, and my sister does not post very often.  She happened to post a story where it was something where she was in another state, whereas I told him she was with me, and he accused me of lying.  So after that, I broke contact with him I think for about a month.

Q.   Do you remember what month this was in?

A.   I don't.  If I had to guess, I would say May, but I'm really not sure.

THE COURT:  General, what warrants are we --

GENERAL SNELLING:  We're giving background before the first warrant, Your Honor.

THE COURT:  Okay.  Just make sure you let me know what warrants, because there is several.

GENERAL SNELLING:  Yes, Your Honor.

THE COURT:  Go ahead.

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 13 of 165 PageID #: 445

BY GENERAL SNELLING:

Q. After May, when was the next time you had an issue with Mr. Martin?

A. He reached out to me and wanted to see me. Things were good for a little while towards, I will say August, maybe.

Q. Okay.

A. It was kind of rocky from once we started talking again up until the end anyways.

Q. And in August --

GENERAL SNELLING: Your Honor, this is going to be concerning 865 and 866.

BY MR. MCGEE:

Q. What happened in August?

A. My friend's birthday was around I think August 24th, and he got upset that I wanted to spend the evening with her. Or maybe it was August 27th. I don't remember the exact date. But, yeah, he got mad that I wanted to spend the day with her, and the next day he messaged me and said, who's in your guest bedroom? He said, I turned the TV off while you were asleep. The next day, I told him I was going to work, and he told me I was lying. He turned my TV on at least three times and blasted the volume. And, yeah, he said I got caught in a lie.

Then he proceeded to call me nine times after that. I think from that moment forward to September 14th is when I started asking for space.

Q. Okay. Let's go back to him turning your TV on. Did you give him permission to work your TV at that time?

A. My living room TV and my bedroom TV, I had given him access to. I did not know he was using it to spy on me. And then when I let him sleep in my guest bedroom, I guess he went behind my back and connected to that one, but I did not allow it.

Q. You did not allow it at that time. And how many times did you say he turned on the TV?

A. Three times.

Q. And how did you know that he did this?

A. He admitted to it.

Q. When did he admit to it?

A. The same day.

Q. And then after he worked your TV without your permission, he called -- you said he called you over nine times?

A. Uh-huh. He also sent me a video of him disconnecting from all three TVs.

Q. And how -- in the time that he called you, did you ever answer the phone?

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 15 of 165 PageID #: 447

A.   No.

Q.   Did you tell him to leave you alone?

A.   Yes.

Q.   How did his contact make you feel when he called?

A.   I was -- that was the first time I felt scared.

THE COURT:  Could I just stop for a moment?  I'm not really tech savvy, but I'm at a loss on this whole television situation.  Can you ask her -- and I'm just trying to understand like with respect to this warrant.

BY GENERAL SNELLING:

Q.   When he stayed in your guest bedroom, how did he connect to your TV?

A.   This is something I am not good with, as well.  I don't know how you do it, but I think it's like a -- I don't even know how to explain it.

Q.   What type of TV do you have?

A.   I have a Samsung.

Q.   Is it a smart TV?

A.   Yes.

Q.   Can you connect to your TV with your cellular device?

A.   Uh-huh.

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 16 of 165 PageID #: 448

Q. Can you operate the TV with the cellular device when you're not in the room?

A. Yes.

Q. Was he in your room at this point?

A. No. He was nowhere near from what I believe.

Q. So he was using his cellular device to operate your TV?

A. Yes.

Q. From a different location?

A. Yes.

Q. Without your permission?

A. Correct.

GENERAL SNELLING: Does that help, Your Honor?

THE COURT: So she's just saying he's remotely cutting her TV on.

GENERAL SNELLING: And turning the volume up.

THE COURT: Not necessarily using it to spy or see?

GENERAL SNELLING: Right. He is not looking inside her apartment or anything.

THE COURT: Okay. Got it.

THE WITNESS: I believe that he did that

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 17 of 165 PageID #: 449

to see when somebody was staying in my guest
bedroom.

MR. MCGEE:  Your Honor, I'm going to
object to speculation on her part.

THE COURT:  Sustained to speculation.

BY GENERAL SNELLING:

Q.    So after August and after the incident
with your television, what happened next?

A.    We communicated I believe up until
September 15th.  I did ask for space.  I think our
communication was less than it had been previously.
There was a lot of long text messages he would send
me where he was -- I don't even know how to explain
it.  Assuming that I was lying about a lot.  I did
ask for him to leave me alone, and then I think
September 15th was -- I had sent leave me alone
several times.

Q.    Okay.

A.    I will say he did offer me more than he
had to see him, and I gave him the runaround.

Q.    Okay.  Was there any other communication
that you received from Mr. Scott that was not from
his number?

A.    There was a lot of indirect things that I
believe were him.

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 18 of 165 PageID #: 450

MR. MCGEE:  Your Honor, object to speculation.

THE COURT:  Sustained to speculation.

GENERAL SNELLING:  Give me one second, Your Honor.

THE COURT:  Uh-huh.

BY GENERAL SNELLING:

Q.  We talked about some calls that you received earlier.  I'm going to hand you a picture, okay?  The calls that you received when you received them, did you take a picture of them or screen shot them?

A.  Yes.

Q.  Did you show that screen shot to officers?

A.  Yes.

Q.  And would you look at that picture I just handed you?

A.  Yes.

Q.  Does that picture seem to be the same screen shot you showed officers?

A.  Correct.

Q.  Does the picture look like it's been tampered with in any way or do any of the calls look different?

A.  No.

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 19 of 165 PageID #: 451

GENERAL SNELLING:  Your Honor, at this time, the State would like to admit this into evidence as 1.

MS. NAYLOR:  Any objection?

MR. MCGEE:  No, Your Honor.

THE COURT:  All right.

(WHEREUPON, the previously-mentioned document was marked as Exhibit Number 1.)

BY GENERAL SNELLING:

Q.  So those were the calls, and then you had some communication with him after a trip where -- well, we'll get to that in a second.  After you received these calls and the TV happened, what happened next?

A.  September 15th, after I had asked to be left alone, it became to the point where I was saying like eff off, if you contact me again, I will get an attorney involved.  He told me that is a can of worms I don't want to open, and immediately started contacting my friends sending pictures of my text message to them that were about them.  He did that directly and indirectly from fake accounts. Later, I was on vacation, and I got a call from Delta HR --

MR. MCGEE: Your Honor, I'm going to object to any hearsay.

THE COURT: What says the State?

GENERAL SNELLING: Your Honor, this isn't anything used for the matter asserted, it's used for her state of mind at the time. That she received these communications.

MR. MCGEE: I'll withdraw the objection, Your Honor.

THE COURT: Go ahead.

THE WITNESS: So Delta HR contacted me and said that they received an anonymous e-mail and the e-mail was Jimmy Kelce (phonetic) and some numbers at gmail.com. Jimmy Kelce is also one of the Instagram account names where my friends were contacted with text messages from between Martin and I.

MR. MCGEE: Judge, that's double hearsay. I'm going to object to the second part of that.

THE COURT: Sustained.

GENERAL SNELLING: Yes, Your Honor, we'll move on.

BY GENERAL SNELLING:

Q. What communication did you receive from your job?

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 21 of 165 PageID #: 453

A.   My job told me that there were three e-mails to them stating I was having intercourse with passengers and crew members for money, and put me under investigation three times.  Also said that they received a transcript of all the money Martin had spent on me, and Martin and I, like our text messages.

Q.   Okay.  I'm going to show you a picture.

A.   Okay.

MR. MCGEE:  Judge, I've not seen this.  If I could have a second, please.

THE COURT:  Uh-huh.

MR. MCGEE:  I would object to this, Your Honor, it's clearly hearsay.  It's a written response by the witness to the complaint that were to the notice that she had received from Delta Airlines about the conduct.  Now, the reason I withdrew the objection, the State has now open the door to the previous issues that Delta Airlines, who was her employer, by the way, so Your Honor knows, Delta had opened an investigation into Ms. Mallory following her arrest for an assault, a domestic assault that was an unrelated individual.  Since the State wants to go there, I'm prepared to question her about it and we can talk about it.  I wasn't

going to get into it, but the State did.  But as relates to her answer and any more information regarding Delta, I object.  They shouldn't have done there, but they wanted to and they can, but I am going to object to any written response that this witness has made to Delta.

GENERAL SNELLING:  Your Honor, this communication has to do with -- with an allegation brought against Ms. Withers with her relation to her job.  This is just showing proof that she received notification from her job that somebody had reported her.  This has nothing to do with any criminal charges that she received herself.

MR. MCGEE:  Well, it's hearsay, because it's a written statement by a witness that was the State's attempting to introduce.  I'll object on those grounds.

THE COURT:  Yeah, I guess that was your response to hearsay is that correct?

GENERAL SNELLING:  Yes, Your Honor.

THE COURT:  It's hearsay.

GENERAL SNELLING:  We'll move on.

BY GENERAL SNELLING:

Q.   After hearing from your job, what happened next with Mr. Scott?

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 23 of 165 PageID #: 455

A.   On Telegram, because this has been going on for several months, I know my timeframe is off, but on Telegram, he began posting stories, and on these stories it was saying things about filing a 1099, embarrassing photos of me, basically indirect contact, and once I stopped viewing -- once I stopped viewing them, he did message me on WhatsApp and say, like, are you okay.  I said, leave me alone several times and contact with him during that time.  There was also a fake Instagram account that came up under my name so when you would search my name, it said Mallory --

MR. MCGEE:  I'm going to object unless the witness has specific evidence that this was a product of Mr. Scott's, but more importantly, it's the characterization of the, quote, false Instagram.  We're going to be introducing specific evidence as relates to the Instagram account.  It's not a false account.  It's an abandoned account.  But I don't want to belabor that.  We can get into that with the expert testimony.

THE COURT:  Okay.  Next question.

GENERAL SNELLING:  Give me one second.  Or may I have one second?

BY GENERAL SNELLING:

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 24 of 165 PageID #: 456

Q.   Let's go to October, okay?  In October, your leasing office called you.  What did you receive in October?

A.   They said I had some certified mail sent to me and I had to go to the Post Office to pick it up.  It was a letter from Martin stating that he would be sending me a 1099 for our arrangement and he also sent me a W-9.

Q.   Okay.  And did you do anything or did you say anything to Martin after he sent you this?

A.   Through Telegram, I was basically saying, like, why would I do this.  And when he contacted me directly, he stated we were in a contract, and I said, no, we were not.

Q.   Okay.  At this point, I'm going to show you another message.

THE COURT:  General, this message that you're passing, what month is this?

GENERAL SNELLING:  This is October, Your Honor.

THE COURT:  This is still associated with the warrants ending in 865 and 866?

GENERAL SNELLING:  Yes, Your Honor.  And this also has to do with warrants ending in -- yes, just 865, 866.  We're heading towards warrants 823.

THE COURT: Just let me know when you get there.

BY GENERAL SNELLING:

Q. Do you recognize this screen shot?

A. Yes.

Q. What is that a screen shot of?

A. Texts between Martin and I.

Q. Does it look any different from the messages that you provided to the DA's office?

A. No.

Q. Okay.

GENERAL SNELLING: At this point, Your Honor, the State would like to enter this as Exhibit 2.

MR. MCGEE: No objection, Your Honor.

GENERAL SNELLING: Just that page.

THE COURT: Okay.

(WHEREUPON, the previously-mentioned document was marked as Exhibit Number 2.)

BY GENERAL SNELLING:

Q. After October, what kind of correspondence did you receive from Mr. Scott in November?

A. There was some fake -- or some text messages from the fake number saying, like, I saw

you at a game.  And then that night, I received a lot of text messages from different numbers, phone calls.  One of those numbers he later claimed was his.  And the name on that number was S. Wilson.

Q.  Okay.  Then after November, did you receive anything else from Mr. -- did you file something with the Court?

A.  I don't remember the dates of everything.

Q.  Was there an order that you sought from the Court?

A.  Yes.

Q.  What kind of order did you seek from the Court?

A.  The order of protection.

Q.  When did you seek this order of protection?

A.  I have no clue.  I've been to Family Safety Center so many times at this point.

Q.  If I give you a picture with the date on it, would that help refresh your memory?

A.  Yes.

Q.  All the way at the top.

A.  Yes.

Q.  Okay.  When did you file the order with the Court?

A.    November 14, 2024.

Q.    And what did this order do?

A.    It took three weeks to serve him, and once we got to court, it did not hold up, because it was one day too late, but the fake Instagram account was taken down the day after he was served and I did not receive any texts from fake numbers.

Q.    Okay.  Why did you file this order of protection?

A.    The harassment was getting so far out of hand.  He just always knew where I was.  He had posted what I was wearing, what I was drinking.  The stuff with my job, I didn't work for three months.  It was just my -- I was living in fear and I needed something to like take my power back.

Q.    Okay.  And then in December, did you receive anything from Mr. Scott through the mail?

A.    Another 1099.

Q.    Okay.  And was this before or after Mr. Scott was served with the order of protection?

MR. MCGEE:  Your Honor, the witness may not be aware of dates, and specific dates are important here, so I'd ask for specification with the question and specification with the answer.  The witness has had a difficult time so far remembering

dates.  I want to make certain that she actually knows the actual dates.

BY GENERAL SNELLING:

Q.  What date did you receive this 1099?

A.  I do not recall what date it was.  There is 300 screen shots.  There is so many things to go through that I do not recall specific dates.

Q.  If I showed you a picture of the warrant that you sworn out, would that help you refresh your memory?

A.  Yes.

Q.  Okay.  Look at the paragraph.

A.  Yes.  Okay.

Q.  Okay.  What date did you receive the 1099?

A.  I think it said November 14.

MR. MCGEE:  I'm sorry, I --

THE WITNESS:  Okay, I'm sorry, December 23rd.

BY MR. MCGEE:

Q.  What day did you receive the first 1099?

THE COURT:  December 23rd.  Were you questioning her about the date?

MR. MCGEE:  Yes.  I couldn't hear her last answer.

THE COURT:  December 23rd, I do believe

MALLORY WITHERS vs GS 1054865 MARTIN SCOTT
HEARING, on 03/27/2025                                    Page 30

she said.

THE WITNESS:  Yes.

BY GENERAL SNELLING:

Q.   If it was to -- if the warrant said December 10, would that surprise you?

A.   No.

Q.   On December 10th, when you received this piece of mail --

MR. MCGEE:  She didn't say she got a piece of mail on December 10th, she just said she got it on December 23rd.

THE COURT:  I agree.  I'm confused.  Restate your question, General, so we're clear.

BY GENERAL SNELLING:

Q.   I want you to --

GENERAL SNELLING:  May I refresh?

THE WITNESS:  Sorry.  There was two I received within a few weeks, so I don't know.

GENERAL SNELLING:  Your Honor, there were two that she received.  I'm just trying to refresh her memory on the first one.

THE WITNESS:  It says December 23, 2024 for this one, and then --

MR. MCGEE:  Judge, she's reading off the document, she's not refreshing her recollection.

*Briggs & Associates 615/482-0037*
*Nashville, Tennessee*

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 30 of 165 PageID #: 462

BY GENERAL SNELLING:

Q.  Don't read the document.  Just don't read the document out loud, just read it to yourself.  Did you read the entire thing to yourself?

A.  No, I did not.  I just say it says I walked into the Family Safety Center in December.

Q.  Okay.  Look at the second paragraph and don't read it out loud.

A.  Okay.  Got it.  It was December 10, 2024 I receive another 1099.

Q.  Okay.  And what did you do with this 1099?

A.  I took it to the Family Safety Center.

Q.  Okay.  And was this 1099, you said December 10th was when you received the first 1099.

A.  Yes.

Q.  Okay.  I'm going to show you a picture.  The 1099 you received, did you take a picture of it?

A.  Yes.

Q.  Did you provide that picture to the prosecutor's office?

A.  Yes.

Q.  Would you take a look is that, is that the picture that you provided?

A.  Yes.

Q.  Okay.  And does it look any -- does the

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 31 of 165 PageID #: 463

paper in that picture look any different from what you showed the district attorney's office?

A. No.

GENERAL SNELLING: Your Honor, at this time, I would like to admit this as Exhibit 3.

THE COURT: Any Objection? Okay.

(WHEREUPON, the previously-mentioned document was marked as Exhibit Number 3.)

MR. MCGEE: Your Honor, Exhibit 3, I believe?

THE COURT: Exhibit 3.

MR. MCGEE: Thank you.

BY GENERAL SNELLING:

Q. Then the order that you received that you said you filed on November 14th, how long did it take to serve Mr. Scott?

A. Three weeks.

Q. Were you notified when he was served with this?

A. Yes. I actually had to sit with the detective and him call the county to make sure that he was going to be served that day.

Q. Okay.

MR. MCGEE: Just a second, Your Honor.

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 32 of 165 PageID #: 464

Your Honor, I'm going to -- I guess the State is trying to introduce the ex parte order for the purpose of establishing when service was made, but my position is, without the person who actually can attest to the fact that service was made that day, the document itself is inadmissible.

GENERAL SNELLING:  Your Honor, the witness has personal knowledge that service was made.  She was also provided a copy that service was made herself.  And frequently we admit order of protections through the person who signed them and --

THE COURT:  Until a defense attorney objects to it.  Yeah.  We do frequently do it, but nobody ever objects to it, so it's usually not a problem until somebody objects to it and makes it an issue, and then you have to get into other things.

GENERAL SNELLING:  Your Honor, the witness has already said she was provided notice through the telephone when he was served.  This is also a document with his signature on it showing that he was served.  It's a business --

MR. MCGEE:  We don't know -- sorry.  I didn't mean to cut you off.

GENERAL SNELLING:  We'll move on.

BY GENERAL SNELLING:

Q.   After you received that first 1099, what else did you receive from Mr. Martin?

A.   The fake Instagram was reactivated.  I'm not sure of the date, but I also received another 1099 from him weeks later.

Q.   And the second 1099, did it also come through mail?

A.   Uh-huh.

Q.   Okay.

MR. MCGEE:  Your Honor, they're showing her a document, we can give it to the Court, but the document speaks for itself.  It's an attempt to serve I guess a registered letter, certified letter, but it was not served.

BY GENERAL SNELLING:

Q.   Does the document you have in front of you; do you recognize that document?

A.   Yes.

Q.   Did you provide it to the district attorney's office?

A.   Yes.

GENERAL SNELLING:  The State would like to admit that as Exhibit 4.

(WHEREUPON, the

previously-mentioned document was

marked as Exhibit Number 4.)

THE COURT: Are you --

MR. MCGEE: I don't have any objection to the actual 1099.

BY GENERAL SNELLING:

Q. When did you receive the second 1099?

A. Was that the one on December 3rd or 14? I don't know.

Q. But it was after the one you got from December 10?

A. Yes.

Q. Okay. How did all of -- receiving all of this communication make you feel?

A. I had major anxiety because he's putting my social security number down without my consent. I also -- I felt like that's auditing me to the IRS for $200,000, which is also extremely stressful. I've had to see a psychiatrist because I cannot sleep and afraid to go in and out of my apartment. I've had to get additional cameras, I've had people move in with me for a month at a time. I just have been really afraid, and it's -- I didn't work for three months because I was just so scared.

Q. Okay. And did you ever get any

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 35 of 165 PageID #: 467

notifications about Mr. Scott being near you?

A.  Yes, I did, on our last court date.

Q.  What did you receive?

A.  It was the night before court.  The tracker on my phone just notified me twice that he was by my apartment.

Q.  And --

MR. MCGEE:  Your Honor, I'm going to object to the words, near my apartment.

THE COURT:  We're talking about GPS?

GENERAL SNELLING:  Yes, Your Honor.  She got a notification on her GPS monitor.  He has a tracking device.

THE COURT:  Any objections near --

MR. MCGEE:  The word "near."

GENERAL SNELLING:  Your Honor, the tracking device has locations on it and it shows within the mile within the range where this person is, so I think she can testify to where "near" means.  A reasonable person can say where "near" means.

THE COURT:  Rephrase your question.  Ask her to expound on it.

BY GENERAL SNELLING:

Q.  How far did it say Mr. Scott was away from

your location?

A.   On the app, it doesn't specify, but I know that Steve --

MR. MCGEE:  Objection, Your Honor.

BY GENERAL SNELLING:

Q.   What did the app tell you?

A.   The app said Martin Scott is in your location and -- I don't know how many yards he was supposed to be away from me, but on the app, there is two places that he's not supposed to be by; one of them is my home.

Q.   Okay.  And you were at home when you got this notification?

A.   Yes.

Q.   Okay.  Was there any time before the tracking device was put on that you were notified that he was near you?  Through an app?

A.   Yes.  On a dating app, it said he was negative one mile from my apartment at 2:00 a.m.

Q.   When was that?

A.   I think this was December, maybe January. I'm not sure of the exact date.

Q.   Okay.  Give me one second.  How many times did you ask Mr. Martin to leave you alone before you filed a police report?

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 37 of 165 PageID #: 469

A.   With the fake numbers included, it's got to be like at least 50 times, but I couldn't tell you exactly.  I just know from texting him directly, each time at least like ten times.

Q.   Okay.  And did Mr. Martin contact any of your friends?

A.   He did.

MR. MCGEE:  Your Honor.  Hearsay. Objection.

THE WITNESS:  There is screen shot proof.

THE COURT:  Sustained.  I mean -- let's --

GENERAL SNELLING:  I didn't ask what they said or if they communicated, I just asked if he contacted --

MR. MCGEE:  Judge, even how we say someone contacts someone, yes.  Well, how would you know that unless you were told?

GENERAL SNELLING:  Or she could have been in their presence when they were contacted.

THE COURT:  Well, if her answer is yes, follow up, then with that next question so you can get that out of the way.

BY GENERAL SNELLING:

Q.   How did you figure out that your friends were contacted?

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 38 of 165 PageID #: 470

A.    They contacted me and sent me screen shots.

MR. MCGEE:  Objection, Your Honor.

THE COURT:  Sustained to that objection.

GENERAL SNELLING:  Nothing further, Your Honor, at this moment.

BY GENERAL SNELLING:

Q.    One more question for you.  When you received all these communications, were you in Nashville, Davidson County?

A.    Yes, except for one of the communications. It was Thanksgiving.  I was in Louisiana and he contacted me from a fake number.

Q.    And when you received these 1099s, did they go to your Davidson County address?

A.    Yes.

GENERAL SNELLING:  Okay.  Nothing further.

THE COURT:  General, I know you're finishing up your direct, but did you talk about these other four warrants?

GENERAL SNELLING:  Yes, Your Honor, we did.

THE COURT:  Okay.  Got it.  Cross?

MR. MCGEE:  One second, Judge.

CROSS-EXAMINATION BY MR. MCGEE:

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 39 of 165 PageID #: 471

Q.   Ms. Withers, you met Mr. Scott for the first time in November of 2023; is that correct?

A.   Yes, sir.

Q.   That was as a result of your posting on an app that's called, WhatsYourPrice?

A.   Yes, sir.

Q.   WhatsYourPrice is not the type of app similar to Tender where you meet someone for a one-night hookup?

A.   Correct.

Q.   WhatsYourPrice is an app where businesswoman like yourself seek relationships that you call arrangements with men; is that right?

A.   Correct.

Q.   How long have you been participating in the WhatsYourPrice --

GENERAL SNELLING:  Objection, Your Honor.

THE COURT:  What's your objection?

GENERAL SNELLING:  How is this relevant to the relationship between --

THE COURT:  I don't know.  How is it relevant, Mr. McGee, as to how long she's been participating on the app?

MR. MCGEE:  Because of the fact that the 1099 has put her on notice that all of her activity

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 40 of 165 PageID #: 472

of criminal nature is apt to be investigated by the

IRS, and therefore other entities.

GENERAL SNELLING:  Your Honor --

MR. MCGEE:  Let me finish, Counsel.  This

is under Withers -- I'm sorry, under Reynolds, the

relationships of the parties is important in order

to understand the whole story.  I know Your Honor is

familiar with the Reynolds case.  But what we think

is very important for the Court to understand is the

timeline, and the timeline is, October, she receives

the letter, 1099 is coming your way.  The last thing

this lady wants is the IRS and any other

organizations involved with law enforcement

investigating her background.  Because what we

already know is WhatsYourPrice is an app that

enabled her to engage in very criminal conduct.  Now

putting the prostitution aside, we're talking about

promoting prostitution, and I'll get into that, that

she would have known about -- everything is what was

in her head when she started the legal process.

What's in her head is prostitution -- promoting

prostitution, money laundering, tax evasion, tax

fraud, for starters.

Under 616, her motivation is critical to

be exposed as relates to her statements that he was

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 41 of 165 PageID #: 473

involved in any kind of criminal conduct as related to her. So that's where we're going with this. She knows how long she has -- if she has reported all of her activity to the IRS for the year '23, '22, '21, '20, then she doesn't have anything to worry about. But if she hasn't, and she knows she hasn't, I submit, she's got a real motive to come in here and try to paint this guy as a terrible human being. She's got to kill the messenger so she can be a victim and hopefully use that as a sword when the boulder gets dropped on her head because of all of her criminal conduct, which is now being exposed.

GENERAL SNELLING: Your Honor, the question was, how long has she been on this website. How long she's been participating in this website doesn't have any relevancy as to whether or not she was harassed by his client. He said, no. It doesn't have to do with her motive. That's a very big stretch. He doesn't know when she found her -- he's just assuming this is her motive based off of --

THE COURT: Is that website a whole business enterprise?

MR. MCGEE: It would be a business enterprise.

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 42 of 165 PageID #: 474

GENERAL SNELLING:  It's illegal, Your Honor.  You can't claim illegal business on taxes.

MR. MCGEE:  Actually that's not correct.  Under the IRS code there is a requirement to record income based -- that's generated from certain illegal conduct, including drug dealing, not relevant in this case, but prostitution, which is obviously an issue in this particular case, and for every year that --

THE COURT:  I don't think prostitution is the whole relevant part.  I kind of agree with the General.  The relevant part is whether or not your client, more probable than not has engaged in these criminal activities.  I mean, the relationship is what it was, a business relationship.

GENERAL SNELLING:  We've already established the relationship, Your Honor.  I believe that point has been made.  I don't understand how her activity outside of this relationship is relevant to the fact of not harassed.

THE COURT:  I'll sustain the motion on going into how long she's been on this app.  I think the only thing that's relevant, they -- I'm assuming they met through the app?

MR. MCGEE:  They did.  That's where we're

going.

THE COURT: But they met through the app, and then the relationship went from there, so how long she's been, I don't find relevant.

MR. MCGEE: Okay. That's fine.

BY MR. MCGEE:

Q. So let's move along, Ms. Withers. So you meet Mr. Scott on the WhatsYourPrice, and you all meet in November, I believe it is, for coffee?

A. Correct.

Q. Now, that cost $200 for a cup of coffee with you, and that's what happened, you all had a cup of coffee, and then you discussed with him the terms of the arrangement that you were proposing; is that correct?

A. Lody?

MS. POWERS: Your Honor, may I approach?

THE COURT: Sure.

THE WITNESS: That is right.

BY MR. MCGEE:

Q. Excuse me?

A. That is right.

Q. Okay. Now, let's talk about what you did afterwards. Because as you have noted, and by the way, I think in this seven or eight-month

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 44 of 165 PageID #: 476

relationship, do you have any idea how many messages you guys sent back and forth to each other?

A. From my understanding, I believe it was like 122,000.

Q. Yeah, you guys basically lived on -- y'all communicated constantly back and forth on the internet, right?

A. Through text.

Q. Right. Through texts. You've got some of them, you've seen them, right?

A. Yes.

Q. And you've been told by your attorney that counsel for Mr. Scott, we got them, too, right?

A. Yes.

Q. Okay. So I'm not going to be asking you anything that's not backed up by documents; do you understand that?

A. Yes, sir.

Q. So here we are in November, first meeting, and you're wearing your businesswoman's hat, and one of the things you had to determine was whether or not Mr. Scott had any money, right?

GENERAL SNELLING: Objection, Your Honor. How is this relevant, again, to the actual incident? We've already established their business

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 45 of 165 PageID #: 477

relationship.  It's been established what they were conducting themselves as.  I understand how much she paid, how much she was paid, how much she was given, I don't understand how that's relevant to whether or not she was harassed.

THE COURT:  How is it relevant, Mr. McGee?

MR. MCGEE:  Your Honor, the more she got paid, the more incentive she has to exaggerate, the more incentive she has to create a scenario which paints Mr. Scott in the worst possible light in order to protect herself.  This is about self-preservation, and one of the -- and it's preservation of your lifestyle.  That's the word that she used; is that right?

GENERAL SNELLING:  Your Honor, it's already been admitted that she asked him to leave her alone.  I don't understand, again, her motivation.  I don't see how that comes from how much she was paid or how much she was given or what the price of the date was.  That's not relevant to whether she was harassed.  She said, leave me alone, and that's what we need to be focused on.

THE COURT:  Well, it goes I guess into his theory, her motive.

MR. MCGEE:  It does, Your Honor.

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 46 of 165 PageID #: 478

THE COURT: He's saying, from what I heard in the opening, part of the basis of the defense's theory is, she is not telling the truth and she's using these things to get back at him for whatever -- I guess you-all's theory clearly is much different, that it's what it was, and she wanted it to be over, and she told him to stop and he would not and there's been repetitive contact, which you all are prosecuting. Your theories are different, I get it.

MR. MCGEE: Thank you, Your Honor. And the extent of the relationship is very important, because we're not talking about, oh, you're going to threaten me with the IRS because you paid me $100, you paid me $1,000, you bought me a set of shoes. We're talking over $80,000 in cash for sex, let alone another $80,000 of merchandise as part of the arrangement. I mean, it is what it is. This was the arrangement that this witness --

GENERAL SNELLING: Objection, Your Honor, is there going to be a question here? He's just testifying.

MR. MCGEE: I'm addressing Your Honor, I'm not addressing the witness.

THE COURT: I've already ruled. I'll

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 47 of 165 PageID #: 479

allow the questions now, Mr. McGee, I'm not going down a rabbit hole on it. I don't think for a minute that these two got into this arrangement with the purposes of he was going to be reporting her a 1099. Now, nothing but a fool is going to go into that kind of arrangement, because it's clearly just for sex. And that's where it is, so I don't think for a minute that that was part of the arrangement that she would get a 1099 for sex and some gifts. I think that came into play later, but I'll allow the questions --

MR. MCGEE: Thank you.

THE COURT: -- but I'm not going to go too far down the rabbit hole with it.

BY MR. MCGEE:

Q. When you entered into the arrangement that you established with Mr. Scott, honestly, you didn't think you'd ever wind up in a situation where your income would be reported to the IRS?

A. That is correct, yes, sir.

Q. Okay. And, likewise, all of the 80-plus thousand dollars' worth of merchandises, part of this arrangement, you never thought that was going to be reported to the IRS, did you?

A. I didn't --

GENERAL SNELLING: Objection, Your Honor, she hasn't filed taxes yet, so, again, how is this relevant. It's going down a rabbit hole about her taxes.

THE COURT: Well, it's not that far down yet. I know it can get there, but it's not gotten there yet. I'll allow her to answer the question.

BY MR. MCGEE:

Q. You never thought that the 80-plus thousand dollars' worth of merchandise that you secured from Mr. Scott was ever going to be reported to the IRS as income; is that right?

A. I did not think that about the gifts; however, I did speak with an accountant about the money.

Q. Okay. Good. But, again, my question is, you never thought that you would have 1099 with $160,000 --

GENERAL SNELLING: Speculation, Your Honor.

MR. MCGEE: Speculation? It goes to her state of mind. She never thought that she would ever be looking at a 1099.

GENERAL SNELLING: It goes to his state of mind because he filed the 1099.

THE COURT: Just answer the question, we can move on. I think the answer is probably going to be no, but I'll allow her to answer the question.

BY MR. MCGEE:

Q. You never thought you'd be looking at the IRS and this issue with unreported income, did you?

A. No. But I'd like to elaborate. I was given a 1099 for flowers, dinners, hotels that I did not stay in, so, no, I did not expect to receive a 1099 for those things.

Q. We're not talking here about flowers.

A. Well, that's included in the 1099.

Q. When you received -- in fact, you testified that you received a letter in October. I don't think you identified --

MR. MCGEE: May I approach, Your Honor?

THE COURT: Yes.

BY MR. MCGEE:

Q. I'm handing you a copy of the actual letter that you received back in October of '24, okay? Do you recognize that letter?

A. Yes, sir.

Q. And you testified that you did, in fact, receive that letter, right?

A. Yes, sir.

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 50 of 165 PageID #: 482

Q.   Why don't you go to the second page, and third, fourth, fifth, and sixth, those itemizations were also attached to the letter that you received; is that correct?

A.   That is correct.

MR. MCGEE:  Your Honor, I'd ask that be made an exhibit.

THE COURT:  Any objection to that?

GENERAL SNELLING:  Yes, Your Honor.  It's hearsay.  I believe if it needs to come in, it needs to come in by the person who sent the letter, not the person who received the letter.

MR. MCGEE:  Number one, the State introduced the testimony that she had received a letter.  The Rule of Completion enables me to ensure that the tryer of fact gets all of the information, particularly as it relates to the exhibit.

GENERAL SNELLING:  Your Honor, we didn't admit exhibits to the 1099, we didn't admit anything about the letter.

MR. MCGEE:  They introduced evidence regarding the letter.  I'm entitled, therefore, to question the witness about the very evidence the witness discussed on direct.  I was just --
candidly, I was surprised when the State said that

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 51 of 165 PageID #: 483

about the letter.

GENERAL SNELLING:  We didn't talk about the contents of the letter, Your Honor, we just said she received something from him.

THE COURT:  Yeah, when you talk about the contents of the letter -- well, when you talk about the letter she received in December of 2024, he can -- you opened up the door.  Now, whether or not you opened it all the way up or cracked it, you opened it up through that crack and he's opening it all the way up and bringing in this letter.

GENERAL SNELLING:  But it's still hearsay, Your Honor.

THE COURT:  Okay.  That's your objection, it's still hearsay.

MR. MCGEE:  Not being offered for proof, it's being opened that this is the information that the witness received in October and it sets up where we're going next.  Where we're going next is a conversation between her and Mr. Scott in November, the day before the order of protection was issued.

GENERAL SNELLING:  That's not a hearsay exception, Your Honor.

MR. MCGEE:  It's not being offered for the truth of the matter asserted.  It may be that only

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 52 of 165 PageID #: 484

$75,000 -- but that doesn't matter, what matters is the witness received the document, the document had this information in it, and the witness is looking at it going gulp.  How am I going to explain $40,000 purses, how am I going to explain some of the merchandise, how am I going to explain this, how am I going to explain that?

GENERAL SNELLING:  Your Honor --

MR. MCGEE:  Let me finish, Counsel.  Which I think is so important, is the timing.  The timing. It's not as if she already got an order of protection.  She hadn't.  Oh, I was in fear, I needed help.  Well, you know what, that's interesting.

BY MR. MCGEE:

Q.   Because in September, you didn't seek an order of protection, did you?

A.   No.

Q.   In fact, you never sought an order of protection from the -- until the one you received?

GENERAL SNELLING:  Your Honor, you have not ruled on the objection yet.

THE COURT:  I've not ruled on the objection yet.

MR. MCGEE:  Okay.  Sorry.

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 53 of 165 PageID #: 485

THE COURT: You're fine. So the objection was the letter, and you're saying it's not for the truth of the matter asserted, but just the fact that she received the letter.

MR. MCGEE: Correct.

GENERAL SNELLING: We've already established that, Your Honor.

MR. MCGEE: Right. They introduced the evidence that, yeah, I did get a letter. So I'm saying, you're right, this is the letter, right? Open the door, expect it's coming in, as Your Honor pointed out. The attachment is important, because the attachment demonstrates the amounts of merchandise --

GENERAL SNELLING: Then that's for the truth of the matter asserted, Your Honor.

MR. MCGEE: -- and the amounts of merchandise and the services. The services are also noted.

THE COURT: I just want -- I don't want this hearing to be all about the whole 1099 situation. It's really just taking legs and running off, just away. And really what we're here on are these six warrants. Now, I do recognize that we get here because of this relationship, but we're putting

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 54 of 165 PageID #: 486

way too much emphasis on whether or not she was

given a 1099, and it was 70,000 or for 80,000, and

it was for flowers and a Birkin bag and some hotels

that she may or may not have stayed in.  Like we're

getting all off base, and we still have to come

around to some of this.  I mean, I know it's about

her motive to lie and to create this stuff.  So part

of it, I know we have to get into, but it just feels

like we're going down a rabbit hole with all of it,

the 1099s.

MR. MCGEE:  Yes, ma'am, I understand, but,

unfortunately, when you look at the warrants, on at

least three of the six warrants, taxes are

mentioned.  I mean, that the part.

GENERAL SNELLING:  Your Honor, it's

because they came after the order of protection, not

because of the amount that was argued was on them

and not because of the service.  That has nothing to

do with it.  It's whether she received it and

whether when she received it that are issues here.

MR. MCGEE:  Well, we disagree.  Those

warrants require that I respond, and so I put the

warrants themselves in the proper context.

GENERAL SNELLING:  Can we take a break?

She has to use the restroom.

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 55 of 165 PageID #: 487

THE COURT:  That's fine.  Five minutes.

(Brief break observed.)

THE COURT:  Back on the record.

MR. MCGEE:  Your Honor, I'm not going to argue any further, but I am going to ask that the letter and the attachment are introduced as an exhibit.

GENERAL SNELLING:  Your Honor, my objection still stands that it is hearsay.

THE COURT:  You want the letter to be introduced because?

MR. MCGEE:  The State talked about the fact that she received the letter and that it put her on notice that the issue, and, again, the time is going to be important.  I want the attachment to show the extent of the motive for the witness to attempt to paint the defendant in the worst light possible.

GENERAL SNELLING:  Your Honor, and our position is that the contents of this letter are not important, it's the timing of which the letter was received, and you don't need the contents for that. It also is important to note that the extent of the money that was exchanged between the two are irrelevant to the actual incident and the issue why

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 56 of 165 PageID #: 488

we're here.  It doesn't have anything to do with proof in this matter.

THE COURT:  I'm going to leave out the letter.  Her testimony is provided in the fact that she did receive a letter about the issue.  The letter would be hearsay.

MR. MCGEE:  Your Honor, if we could have that marked for identification purposes, please.

THE COURT:  That's fine.

BY MR. MCGEE:

Q.   Ms. Withers, you testified -- let's talk about fear for a while, okay?  You testified that you were scared of Mr. Scott as early as March of 2024; is that correct?

A.   Correct.

Q.   And part of -- so the Court understands the real context of what was going on, I believe it was on March 2nd, you were arrested for domestic assault?

GENERAL SNELLING:  Objection, Your Honor.

MR. MCGEE:  Let me finish my question, Counsel.

BY MR. MCGEE:

Q.   And you called Mr. Scott and asked if he'd come post your bond?

A.   Correct.

Q.   And he did that, didn't he?

A.   Yes, sir.

THE COURT:  What's the objection?  Is there still an objection?

GENERAL SNELLING:  Yes.  I was going to say that her criminal charge is irrelevant to this matter.

THE COURT:  What's your response to that, Mr. McGee?

MR. MCGEE:  I don't care about the charge. What's important is she reached out to him, the man she is claiming she was scared of, to have him come and post her bond.

THE WITNESS:  Can I correct something?

THE COURT:  I'll overrule the objection.

BY MR. MCGEE:

Q.   Thank you.  So you called Mr. Scott, he posted the bond, right?

A.   Correct.

Q.   And one of the -- in fact, he even paid for your lawyer, didn't he?

A.   Yes.

THE COURT:  When was this assault, Mr. McGee?

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 58 of 165 PageID #: 490

MR. MCGEE: It was a domestic assault charge that was dis -- it (inaudible) by the State when the case came up. The victim was her ex-boyfriend and was at the same location.

THE COURT: What date?

MR. MCGEE: March.

THE COURT: Of this year?

MR. MCGEE: '24.

THE COURT: '24. Okay.

BY MR. MCGEE:

Q. Now, what the -- really, from the first time you guys had a dispute, you all have had a relationship going since the middle of December, we're now in the middle of March, not going to get into it, we know what it was, okay, but he wanted to look at the body cam, didn't he, that the police officer had when he was arrested?

A. Yes, sir.

Q. And you did -- and you were opposed to him looking at body cam?

A. Yes, sir.

Q. You even said, you're invading my privacy by looking at the body cam.

A. Correct.

Q. Okay. You then -- and that argument is

the basis of your, quote, I was scared of him beginning in March, right?

A.   I will clarify that.  I didn't have any issues until after I was arrested, and that's when he became insecure.  So after.

Q.   That's fine.  But we're in March.

A.   Yeah, but after the arrest.

Q.   Right.  And that's what triggers this, quote, I'm scared, right?

A.   Uh-huh.

Q.   Ma'am, between March -- do you agree with me that oftentimes actions speak louder than words?

A.   Yes.

Q.   Okay.  Kind of a universal truth, right?

A.   Correct.

Q.   All right.  Between March, when you said you were, quote, scared of him and the end of August of 2024, five months, you had sex with him for money on more than two or three dozen occasions; did you not?

A.   I will say that, by that time, our relationship was more dating, and I was afraid of him in a mental sense, but not a physical sense, and I still did like him at that time.

Q.   So the answer to my question is, yes, even

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 60 of 165 PageID #: 492

though you used the -- you say you were, quote, scared of him, between the middle or end of March and the end of August, you had sexual relations with him for money on more than three dozen occasions, correct?

A. I'm not going to admit to that. When we met, again, he asked me what I was looking for, and I said, sex, freedom and money; not, I will have sex for money at that point. And we were basically dating, texting, talking every day, so it was more of a relationship at that point.

Q. Dating. That's an interesting word. You know, you talked about your ex parte order of protection that you got. You know what was really interesting, what jumped off the pages was that you never described him as your boyfriend or someone you were dating. Remember the word you used at the very top of your ex parte order of protection, your affidavit; do you remember?

A. I do.

Q. It was ex sex partner?

A. Correct. Because there is text messages stating we're not dating, when he would cross my boundaries.

Q. Yes, ma'am.

A.   However, those texts were taken out of context.  We were basically dating.  If we were going on dates, I see that as dating.

Q.   Let me --

A.   The detective --

Q.   Let me ask you a question.  If you're quote, unquote, dating, why is he paying for sex?

GENERAL SNELLING:  Objection, Your Honor.  We're getting into an irrelevant matter.

THE COURT:  What's your question, Mr. McGee?  I'm sorry, I was reading.

MR. MCGEE:  That's okay.  She said, well, even though she'd put ex sex partner, by the time we get to I guess April, they are, quote, dating.  I was asking her if, in the truth, that what she put on the ex parte order of protection in November was she described him as her, quote, ex sex partner, and she said, yes.

BY MR. MCGEE:

Q.   Is that right?

A.   The detective determined that we were not.

Q.   Ma'am, you filled out the affidavit.

A.   I agreed to it, but that is not the term I chose.  That is the term that he chose.

Q.   Ma'am, let's talk about why you need to

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 62 of 165 PageID #: 494

have -- are you saying he was your boyfriend?

A.   I wouldn't say he was boyfriend, but we were dating.

Q.   Ma'am, you can't say he was your boyfriend, because we literally have dozens of messages where you said to him, you are not my boyfriend.

A.   Correct.  And I would say that when he would cross my boundaries to put him back in his place.

Q.   Correct.  So he was never your boyfriend?

A.   But we were dating.

Q.   You were, quote, dating?  The reason you want to be able to say you were, quote, dating -- let me stop for a second.  The question in the last objection, if you're, quote, dating in the sense that you all have a true relationship, why is he paying you money for sex?

GENERAL SNELLING:  Objection, Your Honor.  We've established the relationship between these two.  Asked and answered, as well, he's asked her questions about being paid for sex multiple times now.  We have established what was the relationship.  I think it's time for us to move on.

MR. MCGEE:  If the witness would admit

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 63 of 165 PageID #: 495

that what this attorney said was not true, and not trying to now create this false idea that we dated. They didn't date, they had sex for money. I'll accept the district attorney's statement, as long as the witness will accredit what the district attorney just said.

GENERAL SNELLING: Your Honor, she stated that she also went on dates with him, texted him throughout the time that they were involved. She also stated that because they went on dates, that's why she said that they were dating. But she has not stated that he was her boyfriend. I believe that's asked and answered.

THE COURT: I'm going to rule it as asked and answered, I mean.

MR. MCGEE: That's fine.

BY MR. MCGEE:

Q. Let me really get to the hard part of why we're here. No, I'm going to save that. Let's come back to the, quote, dating, even though he's not a boyfriend; you'd agree with that? He was never your boyfriend?

A. Correct.

Q. Okay. We'll come back to, quote, dating, in a minute. One other thing I wanted to get into

with you, before we do, you told this Judge that on multiple occasions you said to him, quote, leave me alone, right?

A. Yes.

Q. And you did, according to the documents, right?

A. Yes.

Q. But you're telling half the story, aren't you, Ms. Withers?

A. I'm not sure what you mean by that.

Q. How many times did Mr. Scott say to you, leave me alone, we are done?

GENERAL SNELLING: Objection, Your Honor.

THE COURT: What's the objection?

GENERAL SNELLING: It's irrelevant. This has to do with the time that happened before this incident, and Mr. Scott never filed any charges for harassment or stalking himself.

THE COURT: Give me timeframes, Mr. McGee, so I'm sure.

MR. MCGEE: Be happy to.

THE COURT: Yeah.

MR. MCGEE: 3/31/24, 3/31/24, 4/13/24, 4/22/24.

GENERAL SNELLING: All are outside.

THE COURT:  I'm just trying to get a timeframe.  You started from March that we're talking about, leave me alone.

MR. MCGEE:  I'm going to give you specifics, Judge, I have them right here.  You can see the pattern.

BY MR. MCGEE:

Q.  Okay.  You're blocking him; he's blocking you.  You leave me alone; you leave me alone.  That's what's going on, right?

A.  I will disagree with that.  I blocked him on social media and I never unblocked him.

Q.  We'll get to that right now.

A.  Okay.

Q.  Ma'am, on September 14 of 2024, okay, approximately one month before you received the letter that you talked about, about the 1099, and about 60 days before you got the order of protection, okay?  Keep that date in mind, September 14th.  Because in your ex parte order of protection and in the criminal warrant, you say he's been harassing you since September, right?

A.  Yes.

Q.  You sent a message to him on September 14, 2024.  You ignored my last two texts, and he

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 66 of 165 PageID #: 498

responded, I blocked you on all platforms and numbers, and yet you're still trying to reach me. Take a look at that document, ma'am.

MR. MCGEE: The district attorney has seen it, Judge. Everything that we -- that I'm testifying from, we have shared with the district attorney's office.

THE COURT: So that letter was what date?

MR. MCGEE: September 14, Judge. She's sending a message.

BY MR. MCGEE:

Q. Do you recognize that document?

A. I do.

Q. You sent him a message on September 14th saying, quote, you've ignored my last two texts. Why?

A. Because we were still cordial. We were talking up to August 28th until September 14th.

Q. That's coincidental, it's the same date. On September 13th, here we go, same thing. Take a look at that document. Do you recognize that document?

A. I am -- yes, I do.

Q. Same thing. Now, that's September 13th --

MR. MCGEE: And I'd ask both of those be

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 67 of 165 PageID #: 499

admitted as an exhibit, Your Honor.

BY MR. MCGEE:

Q.   On September 13th and September 14th, you sent messages to Martin saying, why are you ignoring me, right?

A.   Yes.

Q.   Okay.  You wanted to talk to him?

A.   Correct.

Q.   This is the same person that you say, as early as March, you were, quote, scared of him, right?

A.   Yes.  And I also stated we were still seeing each other.  I was fearful of him in a mental state, not a physical state.

Q.   We'll get to that, as well.

MR. MCGEE:  All right.  Judge, you asked the question about the pattern of blocking me; you block me, I block you, and we were -- I can -- our investigator will testify as to the number.  I can give you the dates, because we've got them all here.

THE COURT:  Just give me a timeframe. From March through --

MR. MCGEE:  Okay.  We start as early as March 31 all the way through -- we're got April, here's May.  May, here is August.  Here -- August --

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 68 of 165 PageID #: 500

August 26th, August 28th, September 6th, as an example.

BY MR. MCGEE:

Q.   And as an example, Martin sends you a note on September 6th, please just leave me alone.  I already have enough anxiety and I don't need any more.  Moments later, I'm blocking you, I can't handle this nonsense.  And your response was, unblock my Venmo so I can request money.  Do you remember all those?

A.   Not verbatim like that.

Q.   Well, let's see if this refreshes your recollection.

MR. MCGEE:  You want more, Judge? September 8th, September 13th.

BY MR. MCGEE:

Q.   September 13th, goodbye, Mallory, wishing you the best.  You're responding, tell me your butt hurt without letting me -- you're butt hurt blocking on things like Venmo.  September 13th, Martin, got it.  Will allow me to block you now.  Remember all those?

A.   I do.

Q.   Do you remember what your response on September 13th was?

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 69 of 165 PageID #: 501

A.  No.

Q.  You paid me, sex.

A.  What is it?

Q.  You heard me.

A.  No, I didn't.

THE COURT:  I didn't get that, Mr. McGee.

BY MR. MCGEE:

Q.  Pay me, sex.

A.  I don't think so.

Q.  All of those messages that I've just talked to the Judge about establish a pattern as early as March going all the way to the middle of September; do they not?

A.  Yes.

Q.  And the pattern is, you say I'm breaking up with you, leave me alone.  He says, no, I'm breaking up with you, you leave me alone.

Do you have any idea how many messages you two went back and forth on --

A.  Yes.

Q.  -- between March when you said I was, quote, in fear of him, and September.  How many?  Give us an estimate?

A.  The guy's already say 122,000.

Q.  Thousand?

A. Right. Because we text and talk all day every day.

Q. But this is the guy you're, quote, unquote, scared of. Now, let's talk about May, because in May, from looking at all these documents, May is the first time you accuse him of engaging in stalking activity, right?

A. Uh-huh.

Q. You didn't like the fact that he was looking at the public pages of people that you knew, right?

A. Correct.

Q. And they were public pages. You know the difference, don't you?

A. Yes.

Q. I mean, you certainly, just from looking at those documents, block, unblock. You block somebody that can't look at your public, you unlock somebody that can look at your public, correct?

A. Correct.

Q. Can we agree that you sent hundreds of photographs on your public and private exchange, right?

A. I -- I guess. I'm not sure. I don't know how many photos I've sent.

Q.    Hundreds.  Do you agree?  I'm talking about to him.  I'm not going to talk about photographs to other people.  What about all the photographs you sent to him?

A.    Within nine months, I'm sure it's a lot.

Q.    Are you telling this judge -- in May, you say, oh, you're stalking me, and I'm sure if we went through it, I'm breaking -- I'm blocking you, you're blocking me, right?

A.    Correct.

Q.    And then at the same time, what are you doing?  You're sending him photographs of you in the nude, right?

A.    I don't know.

Q.    Wrong answer.

A.    I don't know the specific dates of things.

Q.    Do you remember July 4th photographs with you and another girl?

GENERAL SNELLING:  Objection, Your Honor.

MR. MCGEE:  Well, Judge, if she's going to say, I don't know, I have the right to refresh her recollection.

GENERAL SNELLING:  My objection is that the dates that he's referring to, all of these dates are outside of the dates of the warrant.  They don't

go to proof.  If he's trying to establish motive, I believe he's done that.

THE COURT:  What dates are we talking about, Mr. McGee?

MR. MCGEE:  Oh, we've got --

GENERAL SNELLING:  He's been talking about dates from March to April, May of 2024.  The first warrant we have on our docket today is from August.

MR. MCGEE:  Okay.  How about July?  You know, she's claiming that this man --

GENERAL SNELLING:  That's still outside of the warrants, Your Honor.

MR. MCGEE:  Under Reynolds, Judge, the relationship has to be flushed out.  I have a copy of Reynolds.

GENERAL SNELLING:  And we've flushed out the relationship.

MR. MCGEE:  You know what Reynolds says, that the rest of the story had to be told.  Judge, here's the key right now, I'm beyond the relationship, but for her to sit there and say, oh -- on direct, oh, in March, I was scared of him, and yet she continued to have this relationship which included sex, included getting merchandise, included sending him nude photographs.  You know,

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 73 of 165 PageID #: 505

it's kind of, I would suggest, inconsistent with the testimony on direct, oh, I'm scared of him in March, but, you know what, I'm going to sleep with you. Even if she wants to call it dating now, I could care less what she wants to call it.

GENERAL SNELLING:  Your Honor --

MR. MCGEE:  Let me finish, Counsel.

THE COURT:  Let him finish and you can respond.

MR. MCGEE:  You see my point, actions do speak louder than words.  I appreciate her candor on that point.  So don't tell me you're scared of somebody in March and then you engage for the next six months, at least, in the kind of conduct that she had.  Don't tell me he's a, quote, stalker, and you're engaged in stalk-ish behavior and then lo and behold, you're maintaining the relationship which includes money, sex, merchandise, photographs. Don't tell me that, on direct, oh, I said leave me alone, and not tell the whole story.  Because there are so many messages where this man is saying, lady, leave me alone.

But she was smart, she knew how to hook the fish.  That's the reality.  That's the reality. I don't want to introduce these photographs.  What's

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 74 of 165 PageID #: 506

the point?  But I've got them.  I'm not making it up.  If Your Honor wants to look at them, you can have them.  We've shown them to the district attorney.

THE COURT:  Your Honor has (inaudible) the photos today.  What's your response, General?

GENERAL SNELLING:  Your Honor, like I stated before, all of these dates that he's been mentioning are outside the scope of these warrants.  She stated that she was scared, she also stated that she was scared when these warrants were taken out.  I believe that that is true.  She stopped communication when these warrants were taken out, and that's the only time that should matter for proof at this moment.

The things that happened in July, if he felt as though he was being harassed and wanted to be left alone, he had the option to go take out a warrant himself.  But this individual asked that she stop being contacted.  She blocked him and asked to be left alone.  When these warrants were taken out, which is December -- one in August, one from December to May -- I mean, December to January, and -- or three from December to January, so these are the times that we should be talking about.  What

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 75 of 165 PageID #: 507

happened six months prior to what's going on in this matter shouldn't be relevant.

MR. MCGEE: As the Tennessee Supreme Court in the Reynolds decision said, you've got to put cases in the proper --

GENERAL SNELLING: And as far as fleshing out --

MR. MCGEE: Let me finish, please, Counselor. That's for the Judge, I've previously give the DA.

You've got to put it in the proper contextual contact. That's all I'm doing.

Again, Judge, on direct, they're opening -- they're not opening doors, they're establishing the relationship. I'm not doing anything the State didn't do. I'm just pointing out the one thing to say, I'm scared of somebody. Well, okay, but is it okay to not tell the Court, well, you say that, but let's look at your actions all the months. You say that -- I said, leave me alone, and therefore the fact that you didn't means you harassed me. Well, guess what? Now we found out, this has been going on for months and months and months and months. Talking out of both sides of her mouth.

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 76 of 165 PageID #: 508

THE COURT: Go ahead, General. You were about to respond.

GENERAL SNELLING: Yes. I was just going to say that the relationship has been fleshed already. The arrangement that was started, the communication between them months prior to these warrants taken out, and also the ending of that relationship, everything has been fleshed out already. There is no more context to bring in. At this point, he's just using this context to embarrass and try to attack the victim.

MR. MCGEE: We're not going there.

GENERAL SNELLING: We should, because that's all that we're doing, we're just reminding her of the relationship that she has tried to end over and over.

THE COURT: I think the -- I agree that context in relationships are things presented to the Court. Needs to be established. Clearly, the Court knows people get to a place and there is some background to it. I think we probably fleshed out the background through Mr. McGee. I think that's been done. I think when she said she initially got scared in March, we've got from March through the end of the year to where they're back and forth and

forth and back, and you leave me alone, you leave me alone. I'm going to block you, I'm going to block you. Can I get some money; well, can I get some sex.

I mean, we've done all those things that suggest that these parties have gone back and forth and forth and back and back again.

So I think that context has been provided to the Court about the relationship.

Mr. McGee, next question.

MR. MCGEE: Okay. I will move on from that.

BY MR. MCGEE:

Q. You mentioned a couple of times about being uncomfortable with him or whatever, but you even made a comment about, well, yeah, I was scared in March, but, you know, our relationship, the arrangement -- that's what it is, it's an arrangement, right?

A. If that's what you want to call it.

Q. No, ma'am, that's what you called it.

A. In texts, yes, but as I stated, the texts were taken out of context. When he would cross my boundaries, I would remind him that, but we were dating towards the end. Regardless of what the

texts say, that is what it was.  If he is telling me he loves me, that is dating, that is not me being his call girl.

Q.   Well, being paid to have sex is prostitution; is it not?

A.   As I stated, we were dating, and after March is whenever it became spoiling, not that foundation.

Q.   So you're saying you stopped dating in March?

A.   No.  I'm saying from March forward, it became more of a dating or -- I don't know the specific date, but towards -- I don't know, May.  I don't know the dates, but it did become where we were closer talking every day, him saying he loved me.  There was those, and that was more of a dating relationship than a sexual arrangement.

Q.   And the reason it needs to be a dating relationship, you'd love to say he was your boyfriend, but you can't because you've got too many messages where you tell him he never was?

A.   No.  I never saw him as a boyfriend because I didn't want to be with him long-term.

Q.   I get you.  It would be great if you could, though, because that would be a defense to

all of the issues you've got coming down the road, because you --

GENERAL SNELLING: Objection, Your Honor.

MR. MCGEE: Let me finish.

BY MR. MCGEE:

Q. Because you could say --

GENERAL SNELLING: I object when he's asking a question that's inappropriate, and we've already established that -- we've already established that asking about the subject is irrelevant, and we fleshed out the relationship already.

MR. MCGEE: She's the one --

GENERAL SNELLING: It's asked and answered, the arrangement that they were dating. It's been published.

THE COURT: I think Mr. McGee was chiming in on the income tax situation --

MR. MCGEE: Yes.

THE COURT: -- is what he was chiming in on.

BY MR. MCGEE:

Q. If he's someone you're dating, okay, then the money is because he is a good guy and the merchandise is because he just a good guy. That's a

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 80 of 165 PageID #: 512

nice defense perhaps in the tax world, but if the truth is, okay, and you've already acknowledged it, he was paying you for sex; merchandise was part of the arrangement, your words, not his, that blows your position and the IRS at the door, doesn't it?

A.   At this point, I'm not worried about the IRS, I'm worried about being left alone.

Q.   Yes, ma'am, I understand that.

A.   I don't care about the --

Q.   You need to be -- you need -- well, let's talk about that, okay?  That's what you claim you want.

In September, we'll start in September, did you see Martin Scott, in the month of December, face-to-face, did you see him?

A.   December 2023?

Q.   Excuse me?

A.   Are you saying December 2023?

Q.   '24.

A.   No.

Q.   October, face-to-face?

A.   No.

Q.   November?

A.   No.

Q.   December?

A.    I just said no.

Q.    Okay.  January, February, March of '25?

A.    No.

Q.    Has he come to your apartment, September, October, November, December of '24?

A.    I will say no, but he has I think sat outside my apartment and followed me.

Q.    Well, we'll get into that with some people who really know about that material.  But you've not seen him at the apartment?

A.    Correct.

Q.    No one has come up to you and said, we saw Martin Scott, you know that guy you had the arrangement with, at the apartment, that didn't happen, did it?

A.    Correct.

Q.    January, February, March of '25 same answer, correct?

A.    Correct.

Q.    So, again, the Judge understands the context of the relationship.  There was never any physical violence?

A.    Correct.

Q.    None, nada, no the entire time from November of '23 until the present time, which is now

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 82 of 165 PageID #: 514

March of '25, he has never put his hands on you in an aggressive manner, has he?

A.   No.

Q.   He has never threatened you with any kind of physical violence, has he?

A.   No.

Q.   One last area I want to talk to you about, okay?  Again, we go back to that expression of actions speak louder than words.

MR. MCGEE:  One second, Your Honor.  I'm looking for one particular photograph I want to show the witness.

BY MR. MCGEE:

Q.   I'm going to hand you a photograph and see if you recognize it.  What's the date on that photograph?

A.   September 12th.

Q.   That was the day before you sent the message, why are you ignoring me, right?

A.   Correct.

Q.   You sent him that photograph because he had been ignoring you because he didn't want anything to do with you, so you sent him that photograph?

A.   That is incorrect.  We were cordial, and

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 83 of 165 PageID #: 515

whenever I sent him this photograph and he ignored it, that's when this argument started that ended, if you contact me again, I'll go to the police or hire an attorney, so we were still in contact and cordial up until this date and this was the start of everything.

Q.   So you sent him the photograph I guess just to say, hey, it's me, and why are you ignoring me?

A.   Yes, because we were in contact the day before and the day before that, we were cordial and talking still.

Q.   Why don't you go ahead and give that to the -- I'll park that as an exhibit.

THE COURT:  Any objection to the exhibit?

GENERAL SNELLING:  No objection, Your Honor.

THE COURT:  We are on Exhibit 5, Collective.

(WHEREUPON, the previously-mentioned documents were marked as Collective Exhibit Number 5.)

BY MR. MCGEE:

Q.   Do you recognize that photograph?

A.    I do.

Q.    Can you tell me approximately when it was taken?

A.    It says November 2024.

Q.    Do you remember when it was taken?  It's a Christmas picture, because you can see the Christmas tree in the background, right?

A.    Yes.  I have the exact date on my cell phone.

Q.    Okay.  So it's late November, because the Christmas trees were up?

A.    Okay.

Q.    And this is after you are telling this judge you were having such emotional trauma, right?

A.    Yes.

Q.    By the way, I've got to ask, the purse --

A.    Yeah, what about it?

Q.    -- who gave it to you?

A.    Martin.

Q.    How much is that purse worth?

GENERAL SNELLING:  Objection, Your Honor.

THE COURT:  Sustained.  Mr. McGee.

MR. MCGEE:  Okay.  What kind of purse is it, can I at least ask that?

GENERAL SNELLING:  Objection, Your Honor.

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 85 of 165 PageID #: 517

THE WITNESS: The kind of purse?

GENERAL SNELLING: What does that have to do with the proof of --

THE COURT: It doesn't.

MR. MCGEE: Wait. No, it does. Wait for the next question.

THE COURT: How is it relevant? I mean, we did talk about gifts.

MR. MCGEE: Right.

THE COURT: How is it relevant?

MR. MCGEE: Well, she has said that, oh, I was just so traumatized, so here's my question:

BY MR. MCGEE:

Q. Looking at the photograph, you didn't look very traumatized in that photograph; is that a fair statement?

A. No.

GENERAL SNELLING: Objection, Your Honor.

BY MR. MCGEE:

Q. No? Okay. Why would you go out to some kind of event, because you're on the roof of one of the clubs, I guess, or hotels, with a purse that this evil man had given you?

GENERAL SNELLING: Objection, Your Honor. That's irrelevant, again, to the issue why we're

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 86 of 165 PageID #: 518

here.  It has nothing to do with proof, has nothing to do with motive, has nothing to do with anything, and she can take a picture with any of her belongings that she wants because they're her belongings.

MR. MCGEE:  Goes to credibility, pure --

GENERAL SNELLING:  She never lied and said --

MR. MCGEE:  -- pure and simple.  This man is so evil and he is engaged in all this terrible conduct that she would do out at a Christmas event carrying the very purse that he gave her.  Come on.

GENERAL SNELLING:  Your Honor, and he's putting words in the witness's mouth.  She never said that he was evil and that just didn't come out of her mouth.  She says she didn't want to be contacted, she wanted to be left alone.  That has nothing to do with her carrying her purse to anything.

THE COURT:  Not that anybody asked, but I still have all my ex husband's gifts, and I'm going to wear them from time to time.  That has nothing to do -- that has nothing to do with nothing.  She is entitled to possess and carry and relish anything she was given from him or Mickey Mouse.

I'll rule that the bag is irrelevant as the value of the bag is not relevant.

MR. MCGEE: I don't care about the value of the bag, I have the records and we all know what the value of the bag is. That's -- my point has been made on this issue of, quote, emotional distress. If I can have one moment, Your Honor, and we ask if we can introduce this as an exhibit, please.

(WHEREUPON, the previously-mentioned document was marked as Exhibit Number 6.)

GENERAL SNELLING: No objection.

THE COURT: All right, Mr. McGee, Exhibit Number 6.

MR. MCGEE: I have no further questions, Your Honor. Thank you.

REDIRECT EXAMINATION BY GENERAL SNELLING:

Q. We've talked about an order previously --

GENERAL SNELLING: I want to admit that order into evidence.

MR. MCGEE: Your Honor, I don't have any objections to -- that's fine. That's fine. What exhibit number would that be, please?

THE COURT: Seven.

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 88 of 165 PageID #: 520

(WHEREUPON, the previously-mentioned document was marked as Exhibit Number 7.)

THE COURT:  Go ahead, General.

BY GENERAL SNELLING:

Q.  When you were -- when you got notification that he had been served with this order, when did you receive the 1099, was it before or after he was served?

A.  It was after.

Q.  Both 1099s?

A.  Yes.

Q.  And were you notified when Mr. Scott was originally arrested?

A.  Yes.

Q.  Were you notified of any conditions that he had when he was arrested on contact with you?

A.  Yes.

Q.  What were your told?

A.  I remember no contact.

Q.  Okay.  And I'm going to show you --

GENERAL SNELLING:  Your Honor, I would also like to submit these bond conditions certified when he was first arrested.

THE COURT:  That arrest was when?

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 89 of 165 PageID #: 521

GENERAL SNELLING: As Exhibit 8.

(WHEREUPON, the previously-mentioned document was included in Exhibit Number 7.)

GENERAL SNELLING: That arrest was -- he was served with order of protection on December 3rd, he was arrested December 20th.

BY GENERAL SNELLING:

Q. Did you receive any other contact from Mr. Scott after he was served with order of protection, other than the 1099?

A. He did reactivate the Instagram, but I'm not sure the exact dates without seeing the paper. I think that was after he was arrested the first time.

Q. What did he do with his Instagram?

A. He put, get ready for that clap back, e-class on the way. He put numbers, which was a code for promoting prostitution. There was a post that said, everything I love is blonde, illegal and expensive, and it says, don't open a can of worms that you can't close.

Q. Okay. Thank you.

GENERAL SNELLING: Nothing further, Your Honor.

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 90 of 165 PageID #: 522

RECROSS-EXAMINATION BY MR. MCGEE:

Q.   Was that actually sent to you or was it posted in a public domain that you went and --

GENERAL SNELLING:  Your Honor --

MR. MCGEE:  I'm sorry, Judge, I thought she said she was done.  I apologize.

THE COURT:  Are you done?

GENERAL SNELLING:  I'm done.

BY MR. MCGEE:

Q.   My question for you was, was that message sent specifically to you or was it posted in the public domain and you found it, you went looking for it?

A.   No, I didn't look for it.  He tried to follow my friends on the social media account under my name, but, yes, it was a public platform that I did view.

Q.   Okay.  I'm not trying to be rude and interrupt you, but I don't want you telling us what somebody else said, okay?  My question for you was --

A.   I just answered yes.

Q.   -- that it was sent on the public domain and you looked at it; is that correct?

A.   I said yes.

Q. So it was not sent directly to you?

A. No. It was an Instagram post.

Q. Thank you.

GENERAL SNELLING: Nothing further, Your Honor.

THE COURT: Who is your next witness?

GENERAL SNELLING: That's the State's proof.

MS. NAYLOR: We would call Diana Hutson.

THE COURT: Okay.

MS. NAYLOR: Your Honor, may I see the exhibit -- the exhibit of the text messages regarding the blocking. I think it was Exhibit --

THE COURT: The collective exhibit.

MS. NAYLOR: Yes, ma'am. If I could have that for a moment. Judge, if I can have one moment. I want to make sure the general has seen these, to make sure she knows what I'm going to ask about.

DIANA HUTSON,
having been first duly sworn, testified as follows:
DIRECT EXAMINATION BY MS. NAYLOR:

Q. Would you please state your name and spell your name?

A. Yes. D-I-A-N-A, H-U-T-S-O-N.

Q. And, Ms. Hutson, you all have hired a

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 92 of 165 PageID #: 524

private investigator to assist us in the defense of
Martin Scott?

A.    That's correct.

Q.    And how long have you worked on this case?

A.    I'd say at least 90 days.

Q.    And the Court may or may not be familiar
with you, so could you please tell us a little bit
about your background and who you officially work
for?

A.    Sure.  My official title is a private
investigator, and I work for a company called Covert
Results as an independent contractor and advisor, an
investigator or have worked for the State of
Virginia for -- since 1996.  I've been doing loss
prevention investigations, asset recovery, digital
recovery, forensic analysis, Google analytics, a
variety of digital asset tracking.

Q.    And would it be accurate to say that you
have pretty much a specialty in IT examinations?

A.    That's very broad, a very broad statement.
I can -- I data mine, and I can find anything
digitally, and if I can't find it via the device, I
can find it through data recovery searches;
warrants, digital manipulation, whatever it takes to
get to the information.

Q. And did you have an opportunity to do that at our request in this case?

A. I did.

Q. Can you please explain to the Court what information did you look in basically preparing your report for us?

A. Sure. The method of communication that both of the parties used were text message. It was text message and digital transmissions between their cell phones and multiple media platforms, so we had instant messages, we had Instagram messages, Telegram messaging, a variety of the different platforms of social media.

Q. Were you able to download those images, whether photographs or text messages or Venmo, for example, and print those out for us so we could have it for the Court today?

A. Yes. All the platforms combined, I was able to pull all the information and make a timeline of events for this particular case.

Q. And I'm going to hand you up some of the work that you've done on the case, and I'm going to ask you a couple of specific questions, please. If you can take a look through those documents and let the Court know if they look familiar and if you

recognize them.

A.   I don't know what this is.

Q.   I think that was maybe marked as an exhibit.

A.   Yeah.  This is my work.

Q.   Okay.  Does it appear as to how you turned it over to us?

A.   Yes.

Q.   Okay.  Great.  Can we start with the very beginning, the first -- Page 2 and Page 3.  There has been an allegation -- oh, by the way, did you have the opportunity to look at the copies of all the warrants in this case?

A.   I did.

Q.   Okay.  As to Pages 2 and 3, it applies to Warrants GS1054865 and 866; is that accurate?

A.   Yes, ma'am.

Q.   Can you please explain to the Court what is the difference between a private post and a public post, to start with?

A.   Sure.  So on media platforms, the user or the owner of the account has the opportunity to either share something that they post for the entire world to see or anybody else on the app or the platform, or to one -- pardon me, one specific

person.  You can do that through a direct message or you can do that by posting on that other user's page as a private post.

Q.   And if someone -- if it's a private post, is there any way for a public -- anybody that's not in that parameter of private, is there any way they can get to that information?  That wasn't a very good question.  I'm sorry.  Do you understand what I'm asking?

A.   Yeah.  I can clarify that a little bit for you.  So you're saying if I post something and I'm friends with somebody, but I'm not friends with somebody else, could that other else get that information, and the answer is, yes, they could. The friend of mine, who is say person number two, could copy, could share something that I posted, and if person number two's page is public, then person number three can then see that post.

Q.   So in other words, if a person that's in the private group, if they choose to post it publicly, then it's open to everybody.

A.   Yes.  The platform, it becomes a variation of the post, becomes a share, and it becomes a public access point.  Anybody can see it.  And there is parameters where other people might actually even

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 96 of 165 PageID #: 528

be shown that just by walking into the same area, the same geo area, like a geo fence area. Like you and I are at the same club, we don't know each other, but my friend has shared this, and then you walk in and we are both in the same area now, so our phones are going to suggest, hey, you might know this person.

Q. And when you say the same area, you mean the same physical proximity?

A. It could be -- a geo fence could be whatever the platform sets, so it could be the same city, same town, same country, same state, same club.

Q. I want to ask you specifically about Page 2 and 3, did you have an opportunity to look at those documents specifically, and specifically the Instagram account?

A. Yes.

Q. Can you explain a little bit more about that, and what you were able to determine?

A. Okay. So there was multiple references to a fake account. So to make it clear, there is no such thing as a fake account. An account exists or it doesn't exist. And you can name an account whatever you want. If you can see the name of the

account, I think we can all agree it exists. You can make anything digitally what you want to name it. For instance, my phone right now, if anybody needs a hotspot, it's set to Diana's watermelon. I think we all agree that a watermelon is not a legitimate hotspot, but you can change the title of that device to that name. You can change it to Diana's watermelon.

Q. As it relates to the first two pages, can you explain how that's relevant as to your investigation to the allegations in the warrants?

A. Sure. So this one, this account that was created, it's a real account. It had an owner and operator, and it's a public account, so anything that's put on there can be seen by anyone.

Q. Is it the type of public account that if I wanted to look at it, would I have to go to that site to log on and see it?

A. Yes. You would have to -- yes, you would have to have your own account and look at the site. You'd have to look for it specifically.

Q. What did you actually see on that account?

A. So the two things that I saw, it has the title, it says Mal Withers, and then the -- it says, happy birthday, and then the post says, our new

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 98 of 165 PageID #: 530

constitution is now established, everything seems to promise it will be durable, but in this world nothing is certain except death and taxes.  And that's a quote, and it's directed at anyone.  And additionally, the profile is pictures of rocks, so it doesn't really reference anyone or anything, it's just a picture of rocks.

Q.  I'd like to ask you, you were talking about public versus private a moment ago, when someone shares something in a public forum, it becomes open to everybody, right?

A.  That's correct.

Q.  So did you see any evidence -- or describe what you saw from Mr. Scott's phone and how you were able to pull up information and posts, private posts from Ms. Withers' account?

A.  So anybody that's friends with you can share something that you've posted, and as soon as that happens and that person's account is an open public account, anyone can see it.  You may have posted something privately, but if I then share it, you can now see it, anybody can see it from anyone else's account, as long as it's a public account.

Q.  And as it relates to the warrants I just mentioned ending in 865 and 866, were you able to

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 99 of 165 PageID #: 531

determine whether Mr. Scott had viewed public posts of Ms. Withers, in other words, was there any evidence of hacking her private account?

A.   No.

Q.   Was there any -- well, what did you find?

A.   I can tell you how he got -- yeah.

Q.   Please tell us how you were able to conclude that it was ultimately shared by the public.

A.   Sure.  So Ms. Withers has a friend named Kay Maps.  Kay Maps was sharing pictures of her and Ms. Mallory, Ms. Withers, pardon me, was sharing posts that involved both of them.  Kay Maps' account is public, so anybody who knows her or is anywhere near a field that she may be in or has any sort of relationship with her, the metrics on that app, on that platform, are going to allow that person to see, hey, those are people you might know.

Most of us are familiar with Facebook. I'll just use Facebook as an example to explain Instagram a little bit better, because on Facebook, you can actually see what the app is trying to get you to do.  When you go to Facebook and the -- those stream comes up underneath your post, it will say, people you may know.  That is a metric.  Those are

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 100 of 165 PageID #: 532

analytics working to get you to click on them. They're click bait, so to speak. And you'll, oh, I actually do know this person, and you can click it and become their friend or you can go, oh, I do know that person, but I don't want to -- and then you can hide it.

So these metrics, even if he is not friends with Kay Maps on Instagram, because her posts are public, and at some point, they crossed paths, because their phones or computers or anything were near each other, it's going to say to him, hey, you may know this person and he can look at those posts. The point of this entire Instagram issue is Ms. Maps' posts are all public, so whatever she shares from anything, it doesn't matter if she shared a public or a private post, it's going to show up so everyone else using the app can see it. There's no looking for it, it just pops up.

Q.   As it relates to the warrants I just mentioned, for example, if Ms. Withers is out with Ms. Kay Maps, there would be -- could be private information from Ms. Withers' account, but it appears to be public because Ms. Maps has shared it; is that -- am I saying that accurately?

A.   Yes.  Absolutely.  So this is one of the

things when we do skip tracing and we try to find where somebody is located, you know, it's very obvious on Kay Maps' account that she has shared a post where her and Ms. Withers are in France, because the Eiffel Tower is behind them.  This is called a geo location.  This isn't hard.  Anybody looking at this picture will understand, this is France, this is where she's located at this point.

If Kay Maps shared this picture, which she did, that's how I got it, if she shares this picture, the entire world knows exactly where Kay Maps and Ms. Mallory Withers are at that moment.

Q.    What page are you referring to?

A.    It's Page 3.

Q.    Page 3.

A.    Yes, ma'am.

Q.    What's depicted on Page 4?

A.    Page 4 is a share on somebody's story. Its on Kay Maps' account, as well.  It's shared directly, and you can actually see the name -- pardon me, on the top of Page 4, that picture that's here, you can actually see the name, Mallory Elaine with an underscore, so that was from Ms. Maps' account, she shared that on her story, and even if Ms. Mallory -- pardon me, Ms. Withers, posted that

privately, Ms. Maps shared it publicly.

Q.   Is that in the middle of the page on Page 4, is that your writing, Kay's account is public and we're not friends on Instagram?  That's your -- that's what you did to help us --

A.   That's what I did.  When I was looking for -- it's called geo locating, and so I went in to Ms. Maps' account, because she has everything open to the public, with my own personal Instagram account, and I was able to see exactly where she was and could geo locate her at multiple points in time over the last several years.

Q.   Okay.  As it relates to the first two warrants that were taken, there is an allegation that Mr. Scott was basically physically stalking her or cyber stalking her.  In relation to what you've just explained to us, were you able to draw any conclusions to that?

A.   Cyber stalking is incredibly difficult to do, especially if it's a closed account if someone has a private account.  All of the stuff that was known was put out there by Ms. Maps, and if I can find it just taking a little look, you know, in two seconds' time, anybody can.  This is not cyber stalking, this is just going to somebody's open

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 103 of 165 PageID #: 535

profile public account and looking.

Q. And just so we're clear, there's no evidence of hacking?

A. Correct.

Q. And it's not illegal, because it's a public account?

A. It's a public account, it is not illegal. It's the purpose of the account, is for people to see, look what I'm doing.

Q. To share?

A. Right.

Q. Could we move on to Page 5?

A. Yes, ma'am.

Q. There's an allegation on January 16 of 2025, that Mr. Scott was with within a mile of Ms. Withers' home here in Nashville. Can you explain what you did in breaking that down and analyzing that?

A. Sure. So one of the things that I look for when I look at these documents is exact date and time, and when I've given that, that's a really great starting point, it's a focal spot in an entire day that I go right to that moment. So in that moment, it is said that Mr. Scott was near a certain location. The program that was used was called --

pardon me.  Okay.  So this is from a Tender app, and the screen shot that we received was that Mr. Martin was in travel mode.  Mr. Martin Scott was in travel mode.  On these apps, there's two modes that you can be in; one, you could be real person, you say, hey, I'm right here at this location and you send your location.  The other thing you can do is you can let another location know you're coming there.  So if you live in Nashville and you're going to Chicago, say I'm going April 1st to the 3rd, I can set the app to let all the other people on that app know, hey, on April 1st to the 3rd, I'm going to be in Chicago and I'd love to go out on a date with somebody.

So you set this up in travel mode to let people know you're coming there.  Some people leave it in travel mode to let people know, I can be in this city at any point, just let me know, reach out to me on the app.

So this particular day that this screen shot was sent was 1/16/25.  Mr. Scott was in travel mode on the app, but we -- all I got was a screen shot of travel mode on the app, so I was able to tell exactly what this was.  So what I did was, I asked Mr. Scott if I could have the Google movements

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 105 of 165 PageID #: 537

of his phone for Jan 16, 2025, and so what I did was, I tried to simplify this as best I could, this is the direct screen shot from the Google Map tracking on Mr. Scott's phone.  This is Nashville here.  So on 1/16/25, Mr. Scott never came to Nashville.  As a matter of fact, he went north and east of Nashville, and those were all time checked throughout the day.  There's a dot for every time Google pings him, and this is Nashville all the way over here.

Q.   So you're pointing -- just for the record, you're pointing to basically the image on the left side on Page 5, Nashville is way up to the left, and he's not even close to Murfreesboro --

A.    Correct.

Q.    -- on that date, is that --

A.    Yeah.  He never even passed Murfreesboro. He is all the way east and all the way north.

Q.    But what's confusing is the app which is right next to it, says he's in Nashville a mile away, but you're saying people can leave it in travel mode and it really doesn't mean anything, you've examined his Google information from his phone and he was nowhere near Nashville?

A.    Yes.  This is realtime exactly where he

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 106 of 165 PageID #: 538

was, and this is, hey, I can meet you, give me a
call, reach out on the app, I can get to Nashville,
I'll be around that area if you want me to come
there.

Q.    Thank you very much for clarifying that.
If we could go to Page 8 now, which should be the
next.  There is -- I'm sorry, that last one I
mentioned to you, you did look at all the warrants,
and I believe this pertains to the Google Map to the
Warrant GS1509484.  I know you don't have the
warrants in front of you, but you were given very
specific information in the warrants and that's what
you used to investigate that?

A.    Yes.  Every pinpoint in the warrant is
what I pinpointed in my report.

Q.    Thank you.  And collectively, if you could
look at Page 8, 11 and 13, there's been an
allegation in Warrant GS1059484 that Mr. Scott
either stole, took or used Ms. Withers' social
security number without her permission.  So did you
investigate that, and could you address that,
please?

A.    Sure.  I absolutely did.  There was an
inference of fraud pertaining to credit cards and
her social security number.  That was a misleading

statement, and, Ms. Withers, during the course of a conversation in February of 2024, asked for a card. She actually asked for a specific credit card. So that conversation was as such that she asked Mr. Scott for the card, and then he said, I'll get you a card then, I'll need your social, though. And so then Ms. Withers then said, you might want to call me for that. L-O-L. And he did, and he got her social security number, and then I was thinking -- pardon me, Ms. Withers then says this to Mr. Scott six days later, I was thinking about what you said on the credit card thing. It would have to be your credit card and just add me as an authorized user and it will be on my credit but it won't be an account opened by me and I would get a card with my name on it and you'd have yours, too, to the same account. And then she asked specifically for this Revolute Trader 931. It's a metal card. And she requested that -- I would love it in pink, so she asked for a particular card.

Q. You're referring to Page 9?

A. Yes, ma'am.

Q. The photograph of the actual card?

THE COURT: What day are we talking about, Ms. Naylor?

A.    I'm sorry --

THE WITNESS:  2/26/2024.

BY MS. NAYLOR:

Q.    Okay.  2/26/24, and it was at 2:21:01 p.m.

A.    Yes, ma'am.

Q.    So he sent her a picture of the Visa used to describe Trader 931 in his name.  She said, I want it, but I want it in pink.

A.    Correct.

Q.    And then on the previous page, Page 8, there is a whole conversation, he's saying, I'll get you the card, I'll get you the credit card, but I'm going to have to have your social security number, and so -- but she even said, you have to call me for that, because she didn't want that out floating?

A.    Smartly.

Q.    Right.  Got it.  And then on Page 11 and 13, could you explain the significance of those in your investigation?

A.    Sure.  So she's clearly gotten the card. She's asked, hi, good morning, I'm heading to get stuff for my apartment, can I use your card for my nails, and he says, sure.  And she says -- so on 3/30 of 2024, Ms. Scott used -- pardon me. Mr. Withers uses Mr. Scott's credit card as her

Apple Pay card, and it is her card on his account now because it has her name on it.

Q. You're referring to the card -- let's see, picture on Page 13?

A. Yeah. So there's the original texts itself, is what I was able to pull, and you can see the card there, but I wanted to make sure that you could see the name on it, so I increased the picture, and it's her name.

Q. So Page 11 is basically the whole conversation, at least a portion of the messages between them, but then you just zeroed in so you can see the card was placed in Ms. Withers' name?

A. Correct.

Q. And that picture, that was downloaded looks like April 28 of last year at around 9:42:29 a.m.; is that right?

A. Correct. So he -- Mr. Scott sent her a picture to let her know that he had gotten this card in her name and her -- Ms. Withers' replay was, nice.

Q. Okay. That was in response to her providing the social security number to him, because clearly he didn't have it --

A. Correct.

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 110 of 165 PageID #: 542

Q.    -- or he wouldn't have asked for it?

A.    Yes.

Q.    Okay.  I want to switch gears now.  I want to talk to you about Page 21, a TV purchase.

A.    Sure.

Q.    Did it become apparent to you that Mr. Scott had brought Ms. Withers a TV sometime in March of last year?

A.    Yes.

Q.    Can you describe that a little bit and tell us a little bit more about that?

A.    Yes.  So in March of 2024, Mr. Scott bought a TV, and his phone is connected to that TV.  When he stayed with Ms. Withers, the phone was used as a remote control.  You had -- a question was brought up earlier about how it works.  Basically it's an app, and you can connect your TV to the app on your phone, and when you open it up, your phone basically turns into the remote control, so instead of having an analogue device, you have a digital device on the app that can control the TV.

Q.    Let me ask you this.  If -- is there any way somebody who is outside the residence, is there any way somebody could hack into that TV or any TVs in the house to get access to them?

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 111 of 165 PageID #: 543

A.   No.   Because you download the app and you try to share with the -- you try to share the app with the television, you get a two-factor authentication, is what it's called.  You guys have done it, you try to buy a movie on Amazon, it says put this code in your phone, and then your movie will come on your TV.  It's the same thing.  You get a confirmation code from the TV to your phone, and then you put it in the app and you can then control the TV.  But you have to be on the same WiFi.

Q.   So we have proof that Mr. Scott bought at least one television for Ms. Withers, right?

A.   Yes.

Q.   And he would not have been able to access any of her TVs at her home without basically permission, because he would have had to physically log in; is that right?

A.   Yes.

Q.   Okay.  I want to switch gears with you now, and I want to talk about on Page 53, and that's regarding -- the allegation regarding on August 28th of 2024 in which Mr. Scott is alleged to have called -- literally called her on the phone, meaning he's dialing the phone, we're not texting or Venmo'ing or anything, nine times within eight

minutes.  Did you have an opportunity to review that, as well?

A.   I did.

Q.   Can you please tell the Court about that?

A.   Sure.  So that's actually what Page 54 is documenting, so Ms. Withers and Mr. Scott started texting each other at 1:56 a.m.  From 10:56 a.m. to 8:26 p.m., they texted each other 200 times.  During the course of those text messages, they got into a disagreement.  During that disagreement, Ms. Withers tells Mr. Scott that she is going to call the police on him for stalker-ish behavior.  So as soon as she says that, he's trying to figure out what she's talking about and he's trying to call her.  She just didn't accept the call.  He tried to call nine times during this critical event that's happening where she's telling him that she's calling the cops.

Q.   And just so we're clear for the record, so you're talking about on Page 54, those are text messages between the two of them, and in the middle of the page, Ms. Withers had said, calling the police, I never gave you permission.  Those are the actual messages between the two of them?

A.   Yes, ma'am.  And this started the very first text at the top of the page, started because

Ms. Withers was upset that Mr. Scott was making her pay for her hair on Friday, and she didn't want to cancel it, but she also couldn't afford it. So this is what started the argument.

Q. So they argue over who's going to pay for the hair.

A. Yes, ma'am.

Q. And she says, I'm going to call the police. Can you explain Page 53 so the Court understands how you broke that down?

A. Sure.

THE WITNESS: Your Honor, would it be all right if I just read this instead of paraphrasing?

THE COURT: What day are we talking about, this argument about --

MS. NAYLOR: This would have been August 28th of last year, Your Honor.

THE WITNESS: Mallory gets mad at Scott, and Scott attempts to call nine times between 11:20 and 11:28 a.m. Here is why: Mallory wanted Scott to pay for her hair and rent for the next month, so she started a text argument that led her to tell Scott she was calling the police on him for stalking her. This is common in their text thread. Mallory needs money or merchandise so she either tempts

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 114 of 165 PageID #: 546

Scott with a naked photo or creates a reason why she is mad at him. As he conceded to her anger prices, roughly 2K to 3K via Venmo, the price goes up for disrespect. At 11:20 a.m., Mallory says in the middle of the text argument that she's calling the cops. That is when the nine phone calls were attempted. Mallory and Scott texted 200 times from 10:56 a.m. until 8:26 p.m. During that time, both of them texted back and forth. In the end, Scott agreed to pay for Mallory's nails, couch, and leave his credit card on for her to continue to use her 2K per month limit.

THE COURT: This is on what date?

THE WITNESS: 8/28.

THE COURT: Okay. Where she said he's called nine times.

THE WITNESS: Yes, ma'am.

BY MS. NAYLOR:

Q. And you essentially documented that. This is your report on Page 53, so it's very clear to the Court when those calls, attempted calls were made.

A. Correct.

Q. And it says for context, he wasn't going to pay for the salon trip and she got upset and said she's calling the police, so then he reacts and

starts to try to get her on the phone saying, let's talk about this.

A. Yes. Because he is clearly confused, and he's trying to figure out in texts why she won't talk to him, why she's saying this and why she won't pick up the phone.

Q. And after those eight or nine attempted phone calls were made Mr. Scott to Ms. Withers, did she continue to message him?

A. Yes.

Q. Can you please tell the Court about that?

A. Sure. So the last -- which, for the record, it was 12 seconds, is how long these nine phone calls lasted. 12 seconds in total, so that was dial the number, it hung up.

Q. So there was never actually any contact when --

A. Correct.

Q. -- it was just redial, just hitting redial?

A. Correct.

Q. You actually noted that in your documentation here so the Court can look to see how short -- I mean, there are literally at least one, two, three, four, five, six, seven, eight of the

calls were one second, and one was four seconds?

A. Right.

Q. Is that right?

A. Correct.

Q. I'm sorry, approximately how many messages did Ms. Withers send to Mr. Scott shortly after those attempted phone calls were made?

A. So the last attempted phone call was made at 11:28, and they continued texting until 8:26 p.m., so cumulatively after that point was about 100 text messages.

Q. So she threatened to call the police because he wasn't going to pay for the hair appointment, he tried to call her and get her on the phone to talk to her, and she continues to message him repeatedly throughout the day?

A. Correct.

THE COURT: In August, correct?

MS. NAYLOR: Yes, ma'am.

BY MS. NAYLOR:

Q. Now, you have -- I want to switch gears. I think I covered that. You have the actual exhibit that Mr. McGee just introduced a few moments ago about the blocking, and, I'm going to block you if you don't put me back on Venmo and all that stuff,

do you have that document in front of you?

A.   I do.

Q.   Were you able to pull that up, and can you explain how you were able to verify what is, in fact, in that exhibit, and that exhibit number again, is it marked on the front?

A.   Yes, ma'am.  It's marked Collective Exhibit Number 5.

Q.   Could you please tell the Court about how you were able to pull that information and how it played a part in your investigation?

A.   Sure.  So this is from a direct phone download, and I was able to pull -- I pulled the entire event so the Court can see exactly what was said and what time, and then, of course, the picture that came in.  This is on 9/13 of 2024.  Mallory sent the following picture via text, and Mr. Scott did not reply.  She then sent him the following question through Venmo.  You have to request money to send a note on Venmo, and so she sent a one-dollar Venmo request, but the purpose of sending the one-dollar request was to send a message to him, and the message was sent first on Venmo -- pardon. First on her cell phone, and then she said, you ignored my text, two hours later.  And then she sent

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 118 of 165 PageID #: 550

him a message through Venmo asking him again why he ignored her picture.

Q.   And what was the date of that exchange?

A.   9/12 of 2024.

MS. NAYLOR:  Your Honor, can I have a minute, please?

THE COURT:  Sure.

BY MS. NAYLOR:

Q.   Ms. Hutson, I know there is a lot of information and a lot of messages between these two individuals, but in your investigation, did we ask you to review or attempt to determine how many times Mr. Scott either blocked Ms. Withers or tried to shut her down by saying, I don't want to talk to you anymore, if you can off the top of your head, because it goes throughout -- beginning in March up until the end of last year.

A.   So I actually did put it in the report.  I don't know the number offhand.

Q.   Can I hand up the report to you?

A.   Yes, ma'am.

Q.   You should be able to locate it a lot faster than I can.

A.   I think, also, if I may, if you give me an example of the Venmo that we just discussed from the

9/13 on 9/14, but I don't think you --

Q.    I think that was part of the exhibit.  I think -- yeah, that may just be an extra -- just leave it.

A.    Okay.

THE COURT:  All that is your report?

THE WITNESS:  Yes, ma'am.  It was a lot. Trying to get the highlights for Your Honor.  One more second.  I apologize.

BY MS. NAYLOR:

Q.    There's a lot of information.  I should have had it ready for you, I'm sorry.

A.    31 times.

Q.    So 31 times over the course from when to when?

A.    31 times from 3/31/2024 until 9/14/2024.

Q.    Did you actually search that by blocking, by the use of the words "block" or "blocking", how did you do that actual search?

A.    Sure.  The root words was "block."  The additional root word was "goodbye".  The third root word I used was "alone".  That's it.

Q.    Okay.  So between March of last year to September of last year, Mr. Scott used that kind of language, goodbye, we're done, I'm blocking you,

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 120 of 165 PageID #: 552

tell me again how many times?

A.   31.

Q.   31 times, and is that all documented in those pages?

A.   Yes, ma'am.

Q.   And what are the pages, because we'll want to make that an exhibit, please, just for the record, if you can make it clear for our court reporter.

A.   It's a section titled, relationship, goodbyes and blocks, Page 108 to Page 121.

Q.   If you would please, we'll make that an exhibit.

MS. NAYLOR:  Those are all my questions, Ms. Hutson.  I imagine the General is going to have some questions for you.

THE COURT:  This is Collective Exhibit Number 8.

(WHEREUPON, the previously-mentioned document was marked as Exhibit Number 8.)

CROSS-EXAMINATION BY GENERAL SNELLING:

Q.   How are you doing?

A.   I'm good.  Yourself?

Q.   I'm good.

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 121 of 165 PageID #: 553

A.   Good.

Q.   Just a few questions for you.  When we talked about the private versus the public sector, is there a way on Instagram for you to limit your story to only where one person can view it?

A.   You can send it directly to one person, but if you're putting something on your story, there is two metrics you can use; you can use a public metric or you can use a private metric.  There is not assigning it to one person unless you post it to them or you invite them to the post privately.

Q.   I posted on my story, but I only wanted five people to see it, could I only make the story where those five people could see it and the rest of my followers couldn't?

A.   You could.  You could tag those five people, and that would make it a private post.

Q.   Okay.  And then you talked about geo fences, meaning when I'm around somebody else, my phone connects to their phone?

A.   Right.  Well, it's not your phones connecting, it's your digital footprint, so you and I, we know who each other are, but we're not friends on social media, but when I walk out in the hallway and I check my Facebook, and you may come up as

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 122 of 165 PageID #: 554

somebody I might know.  The phone metrics will ask me, the app metrics will ask me, hey, do you want to be friends with this person.

Q.   Can you guarantee that those metrics will happen?

A.   I didn't write the programs.  So if --

Q.   But like there's no guarantee that when we walk out here our phones would have connected.

A.   Correct.  Because you might not even be on Facebook.  You might be on -- you might just only be on SnapChat.  It's the app creator that can answer that question.  I'm not an app creator and I've not created a social media platform, so I can't tell you what the metrics are.

Q.   So right now we're guessing that his metrics could have found Ms. Withers' metrics.

A.   We are not guessing.  We don't do guesswork.  We're saying there is a possibility that any account that he looked at was an account that came up on his phone, but even if it didn't come up as somebody you might know and he went to that person's account, if it's public, he can see it.

Q.   Right.  But he would have to find that person's account, if it didn't pop up on his metrics?

A.   Not necessarily.  It could pop up on his metrics.  Theoretically, I can't answer that question.  That's an insurmountable question.

Q.   Okay.  So you can't guarantee that Mr. Scott found Mr. Withers' friends through metrics?  We can just --

A.   I can't tell you how somebody found something.  That's impossible for me to do.

Q.   Right.  Could we -- but he could possibly search these people himself?

A.   That would be a question for him.  I don't know how the information was found.  I just know that the information that was presented, I was also able to find.

Q.   Okay.  And then do you have to turn on travel mode?  We talked about, you said you'd have to turn it on.  Does -- when you turn it on, are your friends notified when you turn it on?

A.   It depends on which app.  I do not use Tender.  A lot of people do turn it on to let people know that they are in that area or they could be in that area.  It's kind of a waste of time to leave it on if you're not looking for a date.

Q.   Okay.  So you have to turn on travel mode to show somebody, I'm in that location?

A.   Not that you're in that location, that you will be.  So if we're breaking it down to the smallest possibility, if your phone is in travel mode and it's showing Nashville, Tennessee, and then you show up in Nashville, Tennessee, travel mode disappears because the app understands that you're there.

Q.   Okay.  Gotcha.  Now, I want to talk about the report that you did.  So on your report, you took all the correspondence and communication from Mr. Scott's phone?

A.   Correct.

Q.   Did this information also include the spoofing numbers that he used to communicate with Mallory?

MS. NAYLOR:  Judge, I'm going to object.  The Court's already ruled on this.  She couldn't say, an unknown number is calling her.  There's no basis for foundation.

GENERAL SNELLING:  Well, Your Honor, she had his phone, she could see what communication he sent from his phone out from his number or a spoofing number.

THE COURT:  Ask her if she knows that.

BY GENERAL SNELLING:

Q.   Do you know if he used spoofing numbers to Ms. Withers?

A.   I don't know the numbers that he used, but there was one or two, perhaps, Telegram -- I'd have to look, Telegram messages what were sent, but there were no other messages sent from his phone that had a spoofing number, or a spoofed number, I should say.

Q.   But he did send communication out not from his original number to Ms. Withers?

A.   Through Telegram, yes.  I think there was two, but that was the only outgoing from his phone. There was no other spoofed numbers.

Q.   Okay.  Then we talked about Instagram, and we said that there can't be fake Instagram profiles, somebody could take over an Instagram profile?

A.   Well, you can't take over a profile.  If a domain is left unused or expired, somebody could just take it and then make it their own, but you have to associate an e-mail or phone number to it, and then you can name it whatever you want.

Q.   Did Ms. Scott use his phone and e-mail and associate an account that was not Martin Scott, that was Mal Withers?

A.   That was one that was not titled Martin

Scott?

Q.   Yes.

A.   Yes.

Q.   Was it titled Mal Withers?

A.   Yes.  That was the name on the account, but there was no face or recognizable feature for any of the posts.

Q.   It just showed that Martin use Mal Withers' profile?

A.   Correct.

Q.   And --

A.   Not Mal Withers' profile.  I think we're -- I don't really want to use semantics with you, it's an account that has the name, Mal Withers, but it's his account, and it's not fake.

Q.   Right.  It's connected to him but it wasn't his name on the account?

A.   Correct.

Q.   It was Mal Withers.  Okay.  And when was the last time that Mr. Scott communicated with Ms. Withers?  Or tried to communicate?

A.   Can I look?

Q.   Yeah.

A.   Okay.  I have it.  So the last date of contact between Mr. Scott and Ms. Withers was

11/27/2024.

Q.   And what was that communication?

A.   Last contact, 8:30 p.m.  Mallory knows it's Martin and says, he can tell her somebody nicely and then she tells him to -- pardon eff off, which he did.  This was his last contact.

Q.   Okay.

GENERAL SNELLING:  May I have a moment, Your Honor?

THE COURT:  Uh-huh.

GENERAL SNELLING:  Nothing further, Your Honor.

MS. NAYLOR:  Judge, I'd ask if we could have that page marked as an exhibit so Your Honor can look at it.

(WHEREUPON, the previously-mentioned document was already marked as Exhibit Number 9.)

MS. NAYLOR:  Those are all our questions. Thank you, Ms. Hutson.

MR. MCGEE:  That's our proof.

THE COURT:  Let's be clear, I want to get it right.  So Number 1 is going to be the phone calls, 8/28.

Number 2 is the text message, leave me alone.

Number 3 is the tax -- the 1099 is Number 3.

Number 4 is the actual letter, the 1099.

GENERAL SNELLING:  The second 1099.

THE COURT:  The second 1099.

Number 5 was taken away from me and where did it go?  This is Number 5.  I saw her take the note off, the sticky note, which is fine, but that is Number 5, so we're on track.  This is Number 5.

Number 6 is the Coco Chanel bag.

Number 7 is the order of protection, Number 7.

Collective Number 8 is covert results report.

And then Number 9 is what we just -- what you just entered by Ms. Naylor, the text messages.

All right.  So there are not 10, there are 9, and we're all on board.

All right.  Is there another witness for the defense?

MR. MCGEE:  No, Your Honor.

GENERAL SNELLING:  Your Honor, did you also -- I handed you the order of protection and the

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 129 of 165 PageID #: 561

bond conditions, were those also in there?

THE COURT:  Uh-huh, it was a collective exhibit.

GENERAL SNELLING:  Okay.

THE COURT:  All right.  Have we got arguments?

GENERAL SNELLING:  Yes.  Your Honor, I believe that it's important to focus on the days that matter here.  In August, the victim filed a warrant for harassment.  She was called or tried -- or attempted to be called nine times -- eight times over a nine-minute period.

MR. MCGEE:  General, I don't mean to interrupt, there was no warrant issued on 8/28.  The warrant that we're talking about, and I know you unintentionally misspoke, you just said the warrant was issued on 8/28.  That in incorrect.  The warrant that's referencing the August 28th call is 12/3 of '24.  Big difference.  Sorry to interrupt you, Counsel, you just misspoke.

GENERAL SNELLING:  Your Honor, so in April -- August 28th, the victim received eight phone calls within a nine-minute -- nine phone calls within an eight-minute period.  I'm sorry about that.  Which is harassment.  Harassment doesn't

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 130 of 165 PageID #: 562

require fear either.  She said she was scared, but also harassment requires annoyance, and I believe that that is what happened August 28.  They still were cordial, but she still says she was in fear.

We get to September when the relationship became very sour, she was still scared, she didn't do anything yet.  She asked to be left alone.  She wasn't left alone.  So this continued until November 14th, where she decided finally, okay, I'm just going to get an order of protection on November 14th.  On November 14th, she got an order of protection.  On --

THE COURT:  Go ahead.

GENERAL SNELLING:  On December 3rd, he was served with an order of protection.  On December 10th is when she received the first 1099 after him being served with the order of protection.  He was arrested for violating that order of protection on the 20th.  After being arrested on the 20th, he sent another 1099 on December 26th after being released and signing bond conditions, which you also have.

Your Honor, throughout this time, he was creating profiles that you heard the investigator testify to that were Mal Withers while he used his

phone number and his e-mail account, but still created a page pretending to be her, posting things to harass her.

He also created whether it be one, two or three, he created two or three, from their investigator, Telegram numbers to harass her, as well, which he did that.  So he did that -- the last communication was November 27th, so after the order of protection was filed.

Of course, he wasn't served with it, but I would just like to say that there has been no proof of lying on behalf of the witness.  All of the dates that they brought up about the relationship between them are outside the dates of these warrants.

He called over nine times against the victim's permission.  He sent a 1099 twice after being served with an order or protection, and after being arrested and signing bond conditions.  And he did all of this to harass this victim.

I am aware of their relationship.  I am aware of the history of their relationship, but the time she says no, no means no.  So, Your Honor, I would ask that you bind these cases over as charged.

MR. MCGEE:  I told Your Honor on the front end this case was somewhat unique, and that for

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 132 of 165 PageID #: 564

whatever reason, these two adults engaged in a relationship that was illegal and was going nowhere, and it's resulted in a really ugly situation for both of them.

I do think it's important that we consider first the timeline, because actions do speak louder than words. The first legal document that we have is the order of protection filed on November 14th, and what do we know happened which triggered that order of protection.

THE COURT: Their argument on 13th.

MR. MCGEE: And the letter that was sent, you're getting a 1099.

Now, whether or not -- well, because what we do know and I think it's interesting when we get the first warrant. Oh, August 28th, he calls me nine times within eight minutes. Well, actually that's not true. He called her nine times within 13 seconds. What did Ms. Withers not tell -- and then continued to text for the next eight hours. Really?

Big picture, don't pick and choose, because that's simply not fair. Why was the warrant sworn out on December 3rd? Why was it sworn out when it was sworn out? Well, that's a fascinating question. Timeline, Judge. Look to when the order

of protection was issued.  November 14th, right?

THE COURT:  Uh-huh.

MR. MCGEE:  For my ex sex partner, not dating guy.  Every allegation in the ex parte, we find in the affidavit of complaint in case ending in 65.  The August 28th.  Every allegation in the OP.

You scratch your head.  Well, when you went and got the OP on November 14th, why didn't you get the warrants that instead you got on December 3rd.  Look at the time.  She was notified that the order of protection had been served.  Three hours later, she went down and got the first set of warrants.  Now, that's really interesting, in my opinion, because it shows, I didn't get the warrants when I got the order of protection, which is kind of what we see all the time, isn't it?  Instead, I'm just going to get the order of protection, and then I'm going to sit back and I'm going to wait until the order of protection is served, and then I'm going to run down and get more warrants, and that's exactly what happened.

So when we came to court on December 20th, that warrant -- those warrants were served the very day that the order of protection was dismissed.  You see a pattern here, Judge.

Then what happens, then what happens? More leverage, more leverage. Now, I'm going to go and get warrants a few days later, and it's going to be directed to the fact that I did, that I received the 1099s. The receipt of the 1099s sends out an oops. You know there's a great commercial I hear every day on the radio, I can't think of the lawyer's name, but he says, if you've got tax issues, you need a good tax lawyer, and he advertises on 104.5 and 102.5 sports radio, and I'm drawing a blank on the man's name. It's been going on, but it says, if you get a notice from the IRS, you got legal problems, don't ignore it.

She didn't ignore it. She ran down and got more warrants. She ran down and how she did it was pretty interesting. A couple of times, she went down to the victim's center, because I'm a, quote, unquote, victim, and I need your help and he is this terrible person.

Now, I do want to talk about the service of the 1099s. Whether or not we like the fact that the 1099s were submitted, you know, I'll be candid with the judge, with Your Honor, you know, but legally, it's an issue that has to be addressed because the law does say that money generated from

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 135 of 165 PageID #: 567

prostitution is a reportable income activity. So he whistle-blowed on her and he turned her in.

If you take the State's theory to its logical conclusion, this is the situation we're in. I need you to work with me just for a second, Judge.

THE COURT: I'm listening.

MR. MCGEE: I know you are. So under the State's theory, the issuance of the order of protection means, stop, you can have no contact with legal-related documentation, because if you do, you've violated the conditions of the OP, so what does that mean? Wife gets order of protection against husband.

THE COURT: Uh-huh.

MR. MCGEE: Husband says, phooey on this, it's time for a divorce. He goes to -- he files for a divorce and he has to have it served or he goes to a lawyer and the lawyer has to get it served or he goes to a service processor. No one would say, oh, that's a crime. You've served her with legal documents. If that was the standard, then the order of protection is the greatest sword in the world, nothing can -- nothing can happen.

Let's take another example. Wife gets an order of protection, and maybe even gets an assault

warrant conditions of bond, okay?  Husband owns the home.  It was an inheritance.  Order of protection says you can't go to your own home, right?  See this all the time.  So husband does what?  He either gets a lawyer and comes to court and says, we've got to change that condition or an eviction is filed, or some kind of legal document is filed.

Under the State's theory in these warrants, that's a violation of the order of protection and that's a violation of the conditions of bond.  And we would say, no, these are legal issues.  This is the service of legal documents.  That cannot be a violation of the OP statute or even the bond condition statute, because, otherwise, any respondent or any defendant would have no legal rights.  Does that mean I couldn't go to juvenile court and address the issue of visitation if we're not married or I can't go to circuit court and address the issue of visitation when we are married, because an order of protection is out here?

Again, that's not the law, it couldn't be the law, so all of these warrants, and all of the last three warrants, we're all talking -- the heart of them is the OP.  So I submit to the Court that the service of the order of protections, it doesn't

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 137 of 165 PageID #: 569

matter -- I'm sorry, the service of the 1099s are a legally required event under the tax statute and they have to be met by the claimant and the -- and I say this, the recipient has a way to address whether or not the 1099 should have been filed, and whether or not they meet the reporting requirements and ultimately the payment of tax requirements. That's got nothing to do with this Court. This is not the venue to address whether or not the 1099s create a legal problem because they were filed after the OP and warrants.

Well, then, Mr. McGee, aren't you saying that the 1099s had nothing to do with this? No. They are the heart of it. You're right, it is the heart of it. And the timeline tells us that. I said in my opening statement what this case is about is an attempt to completely use the system to muzzle the man who blew the whistle on the activity that Mr. Withers chose as a businesswoman to be engaged in for a period of time.

To say that it was, quote, to harass the victim, end of quote. There's no proof. We may not like it, we may not like it, but keep in mind one of the things that I think is also really important in this case. I'll say one more thing about the 1099s.

In the record in this case, Judge, in the file in this case, what you will find is that on December 30th, 2024, counsel for Mr. Scott appeared in open court with a notice of filing of the 1099s, and we announced in open court that we wanted to make certain that everybody understood that this 1099 process had started before the OP had ever been issued, and lo and behold, we wanted everybody to be aware of what was going on, and the assistant district attorney at that time said, we get it, and that's in the file.  And we did that trying to avoid the very situation that we're in.  We're not hiding anything.  We've been completely wide open.  We went ahead and came in to open court and submitted that.

I can go through each warrant in greater detail, but I'm not going to.  I don't think it's necessary.  Your Honor sees, when you take a really good look at the timeline, what this case is all about.  There is no contact, we know from Ms. Hutson's testimony, since I think it was the 13th, prior to the ex parte being filed.  Of course, he didn't know about it.  He didn't know the ex parte was filed.  There's been no contact, none, nada, nothing, from that point on.  That's the evidence.  No violence, no physical attempts at

intimidation, no evidence of witness intimidation, none, nada.

These two adults entered into a business relationship. The business relationship went sour as many business relationships do. Our position is very simple, what this case is really all about, you don't like the message, kill the messenger.

Finally, Your Honor, we had submitted a written motion to dismiss or kind of takes our position and makes it even simpler, we'd ask that it be entered -- it's not really an exhibit, but it is a pleading in the case.

MS. NAYLOR: Judge, I didn't have a chance to run downstairs to file it with the clerk's office. Your clerk indicated she couldn't file it up here, so it's not technically been filed, so when we're done here, I was going to go down and file it with the second floor.

THE COURT: Got it.

MS. NAYLOR: You should have a copy, Your Honor. And the general has a copy, Your Honor.

GENERAL SNELLING: Last word, Your Honor. Defense counsel --

THE COURT: I'm listening.

GENERAL SNELLING: Okay. Defense counsel

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 140 of 165 PageID #: 572

is speculating about intent on behalf of the victim. He's putting words in her mouth. No one ever said that Mr. Scott was a terrible person. She said that she was scared because of his behavior. He mentioned a lot about the 1099s and the orders of protection and the contact that they had in their relationship before these warrants were filed. However, he did not mention how she was harassed using pages -- a page that he took over and pretended to be her. He did mention the numbers he used that were not Mr. Scott's number, but another number he used to reach out to Mr. Withers and bother her for whatever reason.

And, Your Honor, at the order of protection hearing, Ms. Withers was represented by an attorney, so if he wanted to send a 1099 and serve her with what is not a legal document, but actually just a report for the IRS, if he wanted to serve her with the report, a 1099, he could have did so through her attorney. Just like they came into court and found the notice of filing after he sent her two 1099s against court orders. They could have done that before, and that's our point here. He was doing it to gain control, he was doing it to harass her, and that's what he did and that's what our

position still is.

Thank you, Your Honor.

THE COURT:  I'm processing, so hold tight for just a minute.  Mr. McGee, what day was he arrested?

MS. NAYLOR:  December 3rd, Your Honor.  I believe that's correct.

GENERAL SNELLING:  No.  December 20th.

THE COURT:  December 20th, the warrant was taken out December 3rd.

MR. MCGEE:  Your Honor, it was the day that we were in court.  We didn't know anything about it.  We walked in and addressed the legal issue on the OP and he was taken across the street.

THE COURT:  Correct.  That was for matters that allegedly happened December 3rd, at 3:39 after the OP was dismissed at -- or around 3:00.

MR. MCGEE:  Yes, ma'am.

THE COURT:  Then after that was done, she's alleging that on the 10th, she receives this 1099.

All right.  So GS Warrant ending in 484 where the defendant is charged with aggravated stalking against Ms. Withers, alleged date -- GS Warrant ending is 484 where defendant is charged

with aggravated assault, the Court dismisses that case. And GS Warrant ending in 866 where Mr. Scott -- did I say Mr. Martin earlier? I'm not sure. But it's Mr. Scott or I may have said defendant. I don't know. We're three hours into this. Actually four.

Where he is charged with stalking, the Court will dismiss that case, as well, and in case ending in 865 where defendant is charged with harassment, repetitive phone calls, the Court will also dismiss that case.

And GS Warrant 823, 824, and 179, where defendant is charged with order of protection violation, harassment and no contact violation, I will find just enough probable cause to bind those three matters over to the grand jury. So three cases dismissed and three over to the grand jury.

WHEREUPON THE PROCEEDINGS WERE CONCLUDED

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 143 of 165 PageID #: 575

REPORTER'S CERTIFICATION

STATE OF TENNESSEE     )
COUNTY OF DAVIDSON     )

I, Janie W. Garland, LCR#111, licensed court reporter, in and for the State of Tennessee do hereby certify that the above hearing was reported by me and that the foregoing pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number following my name below.

_____

Janie W. Garland, LCR#111

## $

**$1,000** 47:15

**$100** 47:14

**$160,000** 49:18

**$200** 44:11

**$200,000** 35:18

**$40,000** 53:4

**$75,000** 53:1

**$80,000** 7:20 47:16,17

**$82,000** 7:16

## 1

**1** 20:3,9 128:24

**1/16/25** 105:21 106:5

**10** 30:5 31:9 35:11 129:19

**100** 117:11

**102.5** 135:10

**104.5** 135:10

**1054865** 11:10

**1059484** 11:11

**108** 121:11

**1099** 7:17 8:1 24:5 25:7 28:18 29:4,14,20 31:10,11,13,14,17 34:2,6,7 35:5,7 40:25 41:11 48:5, 9 49:17,23,25 50:8,10,12 51:19 54:21 55:2 66:17 89:8 90:11 129:3,5,6,7 131:16,20 132:16 133:13 138:5 139:7 141:16,19 142:21

**1099s** 7:13 8:19 10:6,7 39:14 55:10 89:11 135:5,21,22 138:1,9, 13,25 139:4 141:5,22

**10:56** 113:7 115:8

**10th** 30:7,10 31:14 131:16 142:20

**11** 107:17 109:17 110:10

**11/27/2024** 128:1

**11:20** 114:19 115:4

**11:28** 114:20 117:9

**12** 116:13,14

**12/3** 130:18

**121** 121:11

**122,000** 45:4 70:24

**12th** 83:17

**13** 107:17 109:18 110:4 133:18

**13th** 67:20,24 68:3 69:15,17,20, 25 133:11 139:21

**14** 28:1 29:15 35:8 66:15,24 67:9

**14th** 15:2 32:16 66:20 67:14,18 68:3 131:9,11 133:8 134:1,8

**15th** 18:10,16 20:16

**16** 104:14 106:1

**179** 143:12

**1996** 93:14

**1:56** 113:7

**1st** 105:10,12

## 2

**2** 26:14,20 95:10,15 97:15 129:1

**2/26/2024** 109:2

**2/26/24** 109:4

**20** 42:5

**200** 113:8 115:7

**2023** 7:6 40:2 81:16,18

**2024** 7:10,12 12:18,19,25 28:1 30:22 31:9 52:7 57:14 60:18 66:15,25 73:7 85:4 108:2 109:24 111:12 112:22 118:16 119:4 139:3

**2025** 104:15 106:1

**20th** 90:7 131:19,20 134:22 142:8,9

**21** 42:4 111:4

**22** 42:4

**23** 30:22 42:4 82:25

**23rd** 29:18,21,25 30:11

**24** 50:20 59:8,9 81:19 82:5 130:19

**24th** 14:16

**25** 82:2,17 83:1

**26th** 69:1 131:20

**27** 11:14

**27th** 14:17 132:8

**28** 110:16 131:3

**28th** 67:18 69:1 112:21 114:17 130:18,22 133:16 134:6

**29,000** 11:2

**2:00** 37:19

**2:21:01** 109:4

**2K** 115:3,11

**2nd** 57:18

## 3

**3** 32:5,9,10,12 95:10,15 97:15 102:14,15 129:3,4

**3/30** 109:24

**3/31/2024** 120:16

**3/31/24** 65:23

**300** 29:6

**30th** 139:3

**31** 68:24 120:13,14,16 121:2,3

**3:00** 142:17

**3:39** 142:16

**3K** 115:3

**3rd** 35:8 90:6 105:10,12 131:14 133:23 134:10 142:6,10,16

## 4

**4** 34:24 35:2 102:17,18,21 103:3 129:5

**4/13/24** 65:23

**4/22/24** 65:24

**484** 142:22,25

**4C** 11:15

**4th** 72:17

**5**

**5** 84:18,23 104:12 106:13 118:8 129:8,9,11

**50** 38:2

**53** 112:20 114:9 115:20

**54** 113:5,19

**6**

**6** 88:12,15 129:12

**60** 66:18

**616** 41:24

**65** 134:6

**6th** 69:1,5

**7**

**7** 89:3 90:4 129:13,14

**70,000** 55:2

**8**

**8** 90:1 107:6,17 109:10 121:18,21 129:15

**8/28** 115:14 128:25 130:14,17

**80,000** 55:2

**80-plus** 48:21 49:9

**823** 25:25 143:12

**824** 11:10 143:12

**865** 14:12 25:22,25 99:25 143:9

**866** 11:10 14:12 25:22,25 95:16 99:25 143:2

**8:26** 113:8 115:8 117:10

**8:30** 128:3

**8th** 69:15

**9**

**9** 108:21 128:19 129:17,20

**9/12** 119:4

**9/13** 118:16 120:1

**9/14** 120:1

**9/14/2024** 120:16

**90** 93:5

**931** 108:18 109:7

**9:00** 11:14

**9:42:29** 110:16

**A**

**a.m.** 37:19 110:17 113:7 114:20 115:4,8

**abandoned** 24:19

**absolutely** 101:25 107:23

**accept** 64:4 113:15

**access** 15:8 96:24 111:25 112:14

**account** 21:15 24:10,18,19 28:5 91:15 95:22 97:17,22,23,24 98:1, 12,13,14,16,20,22 99:16,19,20,23 100:3,13 101:22 102:3,19,24 103:3,8,10,20,21 104:1,6,7,8 108:15,17 110:1 123:19,22,24 126:23 127:5,14,15,17 132:1

**accountant** 49:14

**accounts** 20:23

**accredit** 64:5

**accurate** 93:18 95:16

**accurately** 12:9 101:24

**accuse** 71:6

**accused** 13:12

**accusing** 12:24

**acknowledged** 81:2

**actions** 60:12 74:10 76:19 83:9 133:6

**activities** 43:14

**activity** 7:14 40:25 42:4 43:19 71:7 136:1 138:18

**actual** 29:2 35:5 45:24 50:19 56:25 108:23 113:23 117:22 120:19 129:5

**add** 108:13

**addition** 8:18

**additional** 8:21 35:21 120:21

**additionally** 99:5

**address** 5:7 39:15 107:21 137:17,19 138:4,9

**addressed** 135:24 142:13

**addressing** 47:23,24

**admit** 15:17 20:2 32:5 33:10 34:24 51:19 61:6 63:25 88:20

**admitted** 15:16 46:16 68:1

**adults** 133:1 140:3

**advertises** 135:10

**advisor** 93:12

**affidavit** 61:19 62:22 134:5

**afford** 114:3

**afraid** 35:20,23 60:22

**aggravated** 142:23 143:1

**aggressive** 83:2

**agree** 30:12 43:11 60:11 64:21 71:21 72:1 77:17 98:1,5

**agreed** 62:23 115:10

**ahead** 6:21 7:4 13:25 21:10 77:1 84:13 89:4 131:13 139:14

**Airlines** 22:17,19

**allegation** 23:8 95:11 103:14 104:14 107:18 112:21 134:4,6

**allegations** 6:17 8:16,17 98:11

**alleged** 7:11 112:22 142:24

**allegedly** 142:16

**alleging** 142:20

**Allegra** 11:11

**Amazon** 112:5

**amount** 55:17

**amounts** 54:13,17

**analogue** 111:20

**analysis** 93:16

**analytics** 93:16 101:1

**analyzing** 104:17

**anger** 115:2

**announced** 139:5

**annoyance** 131:2

**anonymous** 21:12

**anxiety** 35:15 69:6

**anymore** 119:15

**apartment** 17:23 35:20 36:6,9 37:19 82:4,7,10,14 109:22

**apologize** 91:6 120:9

**app** 37:2,6,7,9,17,18 40:5,7,11,23 41:15 43:22,24 44:2 95:24 100:16,22 101:17 105:1,11,19,22, 23 106:19 107:2 111:17,21 112:1, 2,9 123:2,11,12 124:19 125:6

**apparent** 111:6

**appeared** 139:3

**appears** 101:23

**Apple** 110:1

**applies** 95:15

**appointment** 117:14

**approach** 44:17 50:16

**approximately** 8:4 66:16 85:2 117:5

**apps** 105:4

**April** 62:14 68:24 73:7 105:10,12 110:16 130:22

**apt** 41:1

**area** 83:7 97:1,2,5,8 107:3 124:21,22

**argue** 56:5 114:5

**argued** 55:17

**argument** 59:25 84:2 114:4,15, 22 115:5 133:11

**arguments** 12:23 130:6

**arrangement** 6:2 7:7,9,18,21 9:19 10:4 12:14 25:7 44:14 47:18, 19 48:3,6,8,16,23 77:5 78:18,19 79:17 80:15 81:4 82:14

**arrangements** 40:13

**arrest** 22:22 60:7 89:25 90:5

**arrested** 8:15 57:18 59:17 60:4

89:14,17,24 90:7,14 131:18,19 132:18 142:5

**asleep** 14:22

**assault** 22:22,23 57:19 58:24 59:1 136:25 143:1

**asserted** 21:5 52:25 54:3,16

**asset** 93:15,17

**assigning** 122:10

**assist** 93:1

**assistance** 5:23

**assistant** 139:9

**associate** 126:20,23

**assuming** 18:14 42:20 43:23

**attached** 51:3

**attachment** 54:12,13 56:6,15

**attack** 77:11

**attempt** 34:13 56:17 119:12 138:17

**attempted** 115:7,21 116:7 117:7, 8 130:11

**attempting** 23:16

**attempts** 114:19 139:25

**attest** 33:5

**attorney** 5:17 20:19 33:13 45:12 64:1,5 67:4 75:4 84:4 139:10 141:16,20

**attorney's** 32:2 34:21 64:4 67:7

**attorneys** 12:6

**auditing** 35:17

**August** 14:6,10,14,16,17 18:7 60:17 61:3 67:18 68:25 69:1 73:8 75:22 112:21 114:16 117:18 130:9,18,22 131:3 133:16 134:6

**authentication** 112:4

**authorized** 108:13

**avoid** 139:11

**aware** 28:22 132:20,21 139:9

---

**B**

**back** 15:4,10 28:15 45:2,6 47:4

50:20 56:3 63:9 64:20,24 70:19 77:25 78:1,6,7 83:8 90:17 115:9 117:25 134:18

**backed** 45:16

**background** 13:20 41:14 77:21, 22 85:7 93:8

**bag** 55:3 88:1,2,4,5 129:12

**bait** 101:2

**Bartlett** 9:21

**base** 55:5

**based** 6:17,24 7:18 42:20 43:5

**basically** 8:17 12:21 24:5 25:11 45:5 61:9 62:2 94:5 103:15 106:12 110:10 111:16,19 112:15

**basis** 47:2 60:1 125:19

**bedroom** 14:21 15:7,10 16:14 18:2

**began** 24:3

**beginning** 6:11 60:2 95:10 119:16

**behalf** 8:6 132:12 141:1

**behavior** 74:16 113:12 141:4

**behold** 74:17 139:8

**belabor** 24:20

**belongings** 87:4,5

**big** 42:19 130:19 133:21

**bind** 132:23 143:15

**Birkin** 55:3

**birthday** 14:15 98:25

**bit** 9:16 93:7 96:10 97:19 100:21 111:10,11

**blank** 135:11

**blasted** 14:24

**blew** 138:18

**block** 68:18 69:21 71:17 78:2 117:24 120:18,20

**blocked** 66:11 67:1 75:20 119:13

**blocking** 66:8 68:17 69:7,19 72:8,9 92:13 117:24 120:17,18,25

**blocks** 121:11

**blonde** 90:20

**blows** 81:4

**board** 129:20

**body** 59:16,20,23

**bond** 57:25 58:14,19 89:23 130:1 131:21 132:18 137:1,11,14

**bother** 141:13

**bought** 47:15 111:13 112:11

**boulder** 42:11

**boundaries** 61:24 63:9 78:24

**boyfriend** 61:16 63:1,2,5,7,11 64:12,21,22 79:20,22

**break** 55:24 56:2

**breaking** 70:15,17 72:8 104:17 125:2

**bring** 77:9

**bringing** 52:11

**broad** 93:20

**broke** 13:13 114:10

**brought** 11:3 23:9 111:7,16 132:13

**burden** 6:7

**business** 6:2 9:19 33:22 42:23, 24 43:2,15 45:25 140:3,4,5

**businesswoman** 40:12 138:19

**businesswoman's** 45:20

**butt** 69:18,19

**buy** 112:5

---

## C

**call** 15:1 20:24 32:22 40:13 74:4, 5 78:20 79:3 92:9 107:2 108:7 109:14 113:11,14,15 114:8,19 117:8,12,14 130:18

**called** 15:20,24 16:5 25:2 40:5 57:24 58:18 78:21 93:11 102:6 103:7 104:25 112:4,23 115:16 130:10,11 132:15 133:18

**calling** 113:17,21 114:23 115:5, 25 125:18

**calls** 19:8,10,23 20:11,14 27:3

115:6,21 116:8,14 117:1,7 128:25 130:23 133:16 143:10

**cam** 59:16,20,23

**cameras** 35:21

**cancel** 114:3

**candid** 135:22

**candidly** 6:16 7:7 51:25

**candor** 74:11

**card** 108:2,3,5,6,12,13,15,18,20, 23 109:12,20,22,25 110:1,3,7,13, 19 115:11

**cards** 107:24

**care** 9:21 58:11 74:5 81:9 88:3

**carry** 87:24

**carrying** 87:12,18

**case** 5:9,14,19,22 6:1,6,7,9,15 7:12 9:1,14,15 11:6 41:8 43:7,8 59:3 93:4 94:2,20,22 95:13 132:25 134:5 138:16,25 139:1,2, 18 140:6,12 143:2,8,11

**cases** 76:5 132:23 143:17

**cash** 47:16

**caught** 14:25

**causing** 12:23

**cell** 85:8 94:10 118:24

**cellular** 16:24 17:1,7

**center** 27:18 31:6,12 135:17

**certified** 25:4 34:14 89:23

**chance** 140:13

**Chanel** 129:12

**change** 98:6,7 137:6

**characterization** 24:16

**charge** 58:7,11 59:2

**charged** 132:23 142:23,25 143:7,9,13

**charges** 5:14 9:15 23:13 65:17

**check** 122:25

**checked** 106:7

**Chicago** 105:9,13

**chiming** 80:17,20

**choose** 96:20 133:21

**chose** 62:24 138:19

**Christmas** 85:6,11 87:11

**circuit** 137:18

**city** 97:12 105:18

**claim** 43:2 81:11

**claimant** 138:3

**claimed** 27:3

**claiming** 58:13 73:10

**claims** 9:3

**clap** 90:17

**clarify** 60:3 96:10

**clarifying** 107:5

**clear** 30:13 97:22 104:2 113:18 115:20 121:8 128:23

**clerk** 140:15

**clerk's** 140:14

**click** 101:1,2,3

**client** 42:17 43:13

**close** 90:22 106:14

**closed** 103:20

**closer** 79:15

**club** 97:3,13

**clubs** 86:22

**clue** 27:17

**Coco** 129:12

**code** 43:4 90:19 112:6,8

**coffee** 44:9,11,13

**coincidental** 67:19

**collective** 84:19,22 92:14 118:7 121:17 129:15 130:2

**collectively** 107:16

**combined** 94:18

**comment** 78:16

**commercial** 135:6

**common** 114:24

Case 3:25-cv-01393   Document 30-11   Filed 04/03/26   Page 148 of 165 PageID #: 580

**communicate** 125:14 127:21

**communicated** 18:9 38:13 45:6 127:20

**communication** 10:11,14 18:11,21 20:12 21:24 23:8 35:14 75:13 77:6 94:7 125:10,21 126:9 128:2 132:8

**communications** 21:7 39:9,11

**company** 93:11

**complaint** 22:15 134:5

**completely** 138:17 139:13

**completion** 5:15,19 9:13 51:15

**computers** 101:10

**conceded** 115:2

**conclude** 100:8

**CONCLUDED** 143:18

**conclusion** 136:4

**conclusions** 103:18

**condition** 137:6,14

**conditions** 89:16,23 130:1 131:21 132:18 136:11 137:1,10

**conduct** 9:6 22:17 41:16 42:1,12 43:6 74:14 87:11

**conducting** 46:2

**confirmation** 112:8

**confused** 30:12 116:3

**confusing** 106:19

**connect** 16:15,23 111:17

**connected** 15:11 111:13 123:8 127:16

**connecting** 122:22

**connects** 122:20

**consent** 35:16

**constantly** 45:6

**constitution** 99:1

**contact** 13:13 16:4 20:18 24:6,9 38:5 47:8 76:12 84:3,4,10 89:17, 20 90:9 116:16 127:25 128:3,6 136:9 139:19,23 141:6 143:14

**contacted** 21:11,16 25:12 38:14, 19,25 39:1,13 75:20 87:17

**contacting** 20:21

**contacts** 38:16

**contents** 52:3,6 56:20,22

**context** 55:23 57:17 62:2 77:9, 10,18 78:8,23 82:21 115:23

**contextual** 76:12

**continue** 12:25 115:11 116:9

**continued** 7:9 73:23 117:9 131:8 133:20

**continues** 117:15

**contract** 25:13

**contractor** 93:12

**control** 10:8 111:15,19,21 112:9 141:24

**conversation** 52:20 108:2,4 109:11 110:11

**copies** 95:12

**cops** 113:17 115:6

**copy** 5:17 33:9 50:19 73:14 96:16 140:20,21

**cordial** 67:17 83:25 84:4,11 131:4

**correct** 17:13 19:21 23:19 40:2, 10,14 43:3 44:10,15 48:20 51:4,5 54:5 57:14,15 58:1,15,20 59:24 60:15 61:5,22 63:8,11 64:23 68:8 71:12,19,20 72:10 82:11,16,18, 19,23 83:20 91:24 93:3 99:12 104:4 106:15 109:9 110:14,18,25 115:22 116:18,21 117:4,17,18 123:9 125:12 127:10,18 142:7,15

**correspondence** 26:22 125:10

**cost** 44:11

**couch** 115:10

**counsel** 41:4 45:13 53:9 57:22 74:7 130:20 139:3 140:23,25

**Counselor** 76:9

**country** 97:12

**county** 32:22 39:10,15

**couple** 78:14 94:23 135:16

**court** 5:4,5,8,20,23,24 6:12,20 7:4,17 8:13,22 9:20,24 10:17 11:3,7 12:11 13:18,22,25 16:8

17:16,20,24 18:5 19:3,6 20:6 21:3,10,20 22:12 23:18,21 24:22 25:17,21 26:1,17 27:7,10,13,25 28:4 29:21,25 30:12 32:6,12 33:13 34:12 35:3 36:2,4,10,14,22 38:11,20 39:4,18,23 40:18,21 41:9 42:22 43:10,21 44:2,18 46:6, 23 47:1,25 48:13 49:5 50:1,17 51:8 52:5,14 53:23 54:1,20 56:1, 3,10 57:3,9,16 58:4,9,16,24 59:5, 7,9 62:10 64:14 65:14,19,22 66:1 67:8 68:21 70:6 73:3 74:8 75:5 76:3,18 77:1,17,19 78:9 80:17,20 84:15,18 85:22 86:4,7,10 87:20 88:14,25 89:4,25 91:7 92:6,10,14 93:6 94:4,17,25 95:18 108:24 113:4 114:9,14 115:13,15,21 116:11,23 117:18 118:9,14 119:7 120:6 121:8,17 125:24 128:10,23 129:7 130:2,5 131:13 133:11 134:2,22 136:6,14 137:5,17,18,24 138:8 139:4,5,14 140:19,24 141:21,22 142:3,9,12,15,19 143:1,8,10

**Court's** 5:11,18 125:17

**courtroom** 11:15 12:1

**covered** 10:25 117:22

**covert** 11:1 93:11 129:15

**crack** 52:10

**cracked** 52:9

**create** 46:9 55:7 64:2 138:9

**created** 98:13 123:13 132:2,4,5

**creates** 115:1

**creating** 131:24

**creator** 123:11,12

**credibility** 87:6

**credit** 107:24 108:3,12,13,14 109:12,25 115:11

**crew** 22:3

**crime** 136:20

**criminal** 9:2,6 23:12 41:1,16 42:1,12 43:14 58:7 66:21

**critical** 41:24 113:16

**cross** 39:23 61:23 63:9 78:23

**CROSS-EXAMINATION** 39:25 121:22

**crossed** 101:9

**cumulatively** 117:10

**cup** 44:11,13

**cut** 33:24

**cutting** 17:17

**cyber** 103:16,19,24

---

**D**

**D-I-A-N-A** 92:24

**DA** 76:10

**DA's** 26:9

**data** 93:21,23

**date** 13:5 14:18 27:19 29:4,5,14, 22 34:5 36:2 37:22 46:20 59:5 64:3 66:19 67:8,19 79:13 83:15 84:5 85:8 104:20 105:13 106:16 115:13 119:3 124:23 127:24 142:24

**dated** 64:2

**dates** 27:8 28:22 29:1,2,7 62:3 64:8,10 68:20 72:16,24,25 73:3,7 75:8 79:14 90:13 132:12,14

**dating** 12:14 37:18 60:22 61:10, 12,17,23 62:2,3,7,14 63:3,12,13, 14,16 64:11,20,24 74:4 78:25 79:2,6,9,12,16,18 80:15,23 134:4

**Davidson** 39:10,15

**day** 8:1,20 14:19,20,22 15:18 28:5,6 29:20 32:23 33:6 52:21 61:10 71:1,2 79:15 83:18 84:10, 11 104:23 105:20 106:8 108:24 114:14 117:16 134:24 135:7 142:4,11

**days** 66:18 93:5 108:11 130:8 135:3

**dealing** 43:6

**death** 99:3

**December** 7:6 28:16 29:18,21,25 30:5,7,10,11,22 31:6,9,14 35:8,11 37:21 52:7 59:13 75:22,23,24 81:14,16,18,25 82:5 90:6,7 131:14,16,20 133:23 134:10,22 139:3 142:6,8,9,10,16

**decided** 131:9

**decision** 76:4

**defendant** 12:10 56:17 137:15 142:23,25 143:5,9,13

**defense** 11:14 33:13 79:25 81:1 93:1 129:22 140:23,25

**defense's** 47:2

**Delta** 20:25 21:11 22:16,19,21 23:3,6

**demonstrates** 54:13

**depends** 124:19

**depicted** 102:17

**describe** 12:3 99:13 109:7 111:10

**detail** 139:16

**detective** 32:22 62:5,21

**determine** 45:21 97:20 100:1 119:12

**determined** 62:21

**device** 16:24 17:2,7 36:13,17 37:16 93:22 98:7 111:20,21

**dial** 116:15

**dialing** 112:24

**Diana** 92:9,19

**Diana's** 98:4,8

**Diane** 10:25

**difference** 71:14 95:19 130:19

**difficult** 28:25 103:19

**digital** 93:15,17,24 94:9 111:20 122:22

**digitally** 93:22 98:2

**dinners** 50:8

**direct** 11:18 39:19 51:24 73:22 74:2,19 76:13 92:21 96:1 106:3 118:12

**directed** 99:4 135:4

**directly** 20:23 25:13 38:3 92:1 102:20 122:6

**dis** 59:2

**disagree** 55:21 66:11

**disagreement** 113:10

**disappears** 125:6

**disconnecting** 15:23

**discussed** 44:13 51:24 119:25

**discussion** 9:23

**dismiss** 5:13 140:9 143:8,11

**dismissal** 9:14

**dismissed** 8:5,14 134:24 142:17 143:17

**dismisses** 143:1

**dispute** 59:12

**disrespect** 115:4

**distress** 88:7

**district** 5:16 32:2 34:20 64:4,5 67:4,6 75:3 139:10

**divorce** 136:16,17

**docket** 11:14 73:8

**document** 20:8 26:19 30:25 31:2,3 32:8 33:6,21 34:12,13,17, 18 35:1 53:2 67:3,12,21,22 88:11 89:2 90:3 118:1 121:20 128:17 133:7 137:7 141:17

**documentation** 116:23 136:10

**documented** 115:19 121:3

**documenting** 113:6

**documents** 45:16 65:5 71:5,17 84:21 94:24 97:16 104:20 136:21 137:12

**dollars'** 48:22 49:10

**domain** 91:3,12,23 126:18

**domestic** 22:22 57:18 59:1

**door** 22:19 52:8 54:11 81:5

**doors** 76:14

**dot** 106:8

**double** 21:18

**download** 94:14 112:1 118:13

**downloaded** 110:15

**downstairs** 140:14

**dozen** 60:19 61:4

**dozens** 63:5

**draw** 103:17

**drawing** 135:11

**drinking** 28:12

**dropped** 42:11

**drug** 43:6

**duly** 11:17 92:20

**durable** 99:2

**E**

**e-class** 90:18

**e-mail** 21:12,13 126:20,22 132:1

**e-mails** 22:2

**earlier** 19:9 111:16 143:3

**early** 7:10 57:13 68:10,23 70:12

**east** 106:7,18

**edification** 5:18

**eff** 20:18 128:5

**efforts** 9:1

**Eiffel** 102:5

**eight-minute** 130:24

**eight-month** 44:25

**elaborate** 50:7

**Elaine** 102:22

**else's** 99:23

**embarrass** 77:11

**embarrassing** 24:5

**emotional** 85:14 88:6

**emphasis** 55:1

**employer** 22:20

**enabled** 41:16

**enables** 51:15

**end** 14:9 60:17 61:2,3 77:15,25 78:25 115:9 119:17 132:25 138:22

**ended** 84:2

**ending** 25:22,24 77:7 99:25 134:5 142:22,25 143:2,9

**enforcement** 41:13

**engage** 41:16 74:13

**engaged** 43:13 74:16 87:10 133:1 138:19

**engaging** 71:6

**ensure** 51:15

**enter** 26:13

**entered** 7:6 48:16 129:18 140:3, 11

**enterprise** 42:23,25

**entire** 31:4 82:24 95:23 101:13 102:11 104:22 118:14

**entities** 41:2

**entitled** 51:22 87:24

**Erin** 11:12

**essentially** 115:19

**establish** 70:11 73:1

**established** 43:17 45:25 46:1 48:17 54:7 63:20,23 77:19 80:9, 10 99:1

**establishing** 33:3 76:15

**estimate** 70:23

**evasion** 9:8 41:22

**evening** 14:17

**event** 86:21 87:11 113:16 118:14 138:2

**events** 6:18 94:20

**eviction** 137:6

**evidence** 20:3 24:14,17 51:21,23 54:9 88:21 99:13 100:3 104:3 139:25 140:1

**evil** 86:23 87:10,15

**ex-boyfriend** 9:17 12:20 59:4

**ex-girlfriend** 9:17

**exact** 13:5 14:18 37:22 85:8 90:13 104:20

**exaggerate** 46:8

**EXAMINATION** 11:18 88:18 92:21

**examinations** 93:19

**examined** 106:23

**exception** 52:23

**excess** 7:20

**exchange** 71:22 119:3

**exchanged** 56:24

**Excuse** 44:21 81:17

**exhibit** 20:9 26:13,20 32:5,9,10, 12 34:24 35:2 51:7,17 56:7 68:1 84:14,15,18,22 88:8,12,14,24 89:3 90:1,4 92:12,13,14 95:4 117:22 118:5,8 120:2 121:7,13, 17,21 128:14,18 130:3 140:11

**exhibits** 51:19

**exist** 97:24

**exists** 97:23 98:1

**expect** 50:9 54:11

**expensive** 90:21

**expert** 10:24 24:21

**expired** 126:18

**explain** 13:7 16:18 18:13 53:4,5, 6,7 94:4 95:18 97:19 98:10 100:20 104:16 109:18 114:9 118:4

**explained** 103:17

**exposed** 41:25 42:12

**expound** 36:23

**expression** 9:10 83:8

**extent** 47:12 56:16,23

**extra** 120:3

**extremely** 35:18

**F**

**face** 127:6

**face-to-face** 81:15,21

**Facebook** 100:19,20,21,23 122:25 123:10

**facing** 9:3

**fact** 10:10 33:5 40:24 43:20 50:13,23 51:16 53:19 54:3 56:13 57:4 58:21 71:9 76:21 106:6 118:5 135:4,21

**fair** 86:15 133:22

**fake** 20:23 24:10 26:24,25 28:5,7 34:4 38:1 39:13 97:22,23 126:15 127:15

**fall** 7:10

**false** 24:16,18 64:2

**familiar** 11:24 41:8 93:6 94:25 100:19

**Family** 27:17 31:6,12

**fascinating** 133:24

**faster** 119:23

**fear** 28:14 53:12 57:12 70:22 131:1,4

**fearful** 68:13

**feature** 127:6

**February** 82:2,17 108:2

**feel** 16:4 35:14

**feels** 55:8

**felt** 16:6 35:17 75:17

**fence** 97:2,10

**fences** 122:19

**field** 100:15

**figure** 38:24 113:13 116:4

**file** 27:6,24 28:8 139:1,11 140:14, 15,17

**filed** 8:1 32:16 37:25 49:2,25 65:17 130:9 132:9 133:8 137:6,7 138:5,10 139:21,23 140:16 141:7

**files** 136:16

**filing** 7:13,17 24:4 139:4 141:21

**filled** 62:22

**finally** 131:9 140:8

**find** 44:4 93:21,22,23 100:5 102:1 103:23 123:23 124:14 134:5 139:2 143:15

**fine** 44:5 54:1 56:1 57:9 60:6 64:16 88:23 129:10

**finish** 41:4 53:9 57:21 74:7,8 76:8 80:4

**finishing** 39:19

**fish** 74:24

**fleshed** 77:4,8,21 80:11

**fleshing** 76:6

**floating** 109:15

**floor** 140:18

**flowers** 50:8,11 55:3

**flushed** 73:14,16

**focal** 104:22

**focus** 130:8

**focused** 46:22

**follow** 10:14 38:21 91:15

**followers** 122:15

**fool** 48:5

**footprint** 122:22

**forensic** 93:16

**formally** 5:19

**forum** 99:10

**forward** 15:2 79:11

**found** 8:17 42:19 76:22 91:12 123:16 124:5,7,12 141:21

**foundation** 79:8 125:19

**fourth** 51:2

**France** 102:4,8

**fraud** 9:9 41:23 107:24

**freedom** 61:8

**frequently** 33:10,14

**Friday** 114:2

**friend** 96:15 97:4 100:10 101:4

**friend's** 14:15

**friends** 20:21 21:15 38:6,24 91:15 96:12 99:17 101:8 103:4 122:23 123:3 124:5,18

**front** 34:17 107:11 118:1,6 132:24

---
**G**
---

**gain** 141:24

**game** 27:1

**gave** 18:20 85:18 87:12 113:22

**gears** 111:3 112:19 117:21

**general** 5:8,10 6:3 7:5 9:24 10:1, 21 11:8,18 12:8,12 13:18,20,24 14:1,11 16:13 17:14,18,22 18:6 19:4,7 20:1,10 21:4,21,23 23:7, 20,22,23 24:23,25 25:17,19,23 26:3,12,16,21 29:3 30:3,13,14,16, 19 31:1 32:4,14 33:7,18,25 34:1, 16,23 35:6 36:11,16,24 37:5 38:12,18,23 39:5,7,17,18,21 40:17,19 41:3 42:13 43:1,12,16 45:23 46:15 47:20 49:1,19,24 51:9,18 52:2,12,22 53:8,21 54:6, 15 55:15,24 56:8,19 57:20 58:6 62:8 63:19 64:7 65:13,15,25 72:19,23 73:6,11,16 74:6 75:6,7 76:6 77:1,3,13 80:3,7,14 84:16 85:21,25 86:2,18,24 87:7,13 88:13,18,20 89:4,5,22 90:1,5,8,24 91:4,8 92:4,7,17 121:15,22 125:20,25 128:8,11 129:6,24 130:4,7,13,21 131:14 140:21,22, 25 142:8

**generated** 43:5 135:25

**geo** 97:2,10 102:6 103:7,11 122:18

**gifts** 48:9 49:13 86:8 87:21

**girl** 72:18 79:3

**give** 6:14 15:5 19:4 24:23 27:19 34:12 37:23 65:19 66:4 68:20,21 70:23 76:10 84:13 107:1 119:24

**giving** 13:20

**Glad** 11:3

**gmail.com.** 21:14

**good** 11:19 14:5 16:16 49:16 80:24,25 96:8 109:21 121:24,25 122:1 135:9 139:18

**goodbye** 69:17 120:21,25

**goodbyes** 121:11

**Google** 93:16 105:25 106:3,9,23 107:9

**Gotcha** 125:8

**GPS** 36:10,12

**grand** 143:16,17

**Gray** 12:5

**great** 79:24 95:9 104:22 135:6

Case 3:25-cv-01393    Document 30-11    Filed 04/03/26    Page 152 of 165 PageID #: 584

**greater** 139:15

**greatest** 136:22

**grounds** 23:17

**group** 96:20

**GS** 11:9,10 142:22,24 143:2,12

**GS1054865** 95:16

**GS1056823** 11:10

**GS1059179** 11:10

**GS1059484** 107:18

**GS1509484** 107:10

**guarantee** 123:4,7 124:4

**guess** 13:16 15:10 23:18 33:1 34:14 46:23 47:5 62:14 71:24 76:22 84:7 86:22

**guessing** 123:15,17

**guesswork** 123:18

**guest** 14:21 15:10 16:14 18:1

**gulp** 53:4

**guy** 42:8 71:3 80:24,25 82:13 134:4

**guy's** 70:24

**guys** 45:2,5 59:12 112:4

**H**

**H-U-T-S-O-N** 92:24

**hack** 111:24

**hacking** 100:3 104:3

**hair** 114:2,6,21 117:13

**half** 65:8

**hallway** 122:24

**hand** 6:4 19:9 28:11 83:14 94:21 119:20

**handed** 19:17 129:25

**handing** 50:19

**handle** 69:8

**handling** 5:9

**hands** 83:1

**happen** 82:15 123:5 136:23

**happened** 8:23 12:19 13:7,10 14:14 18:8 20:14,15 23:24 44:12 65:16 75:16 76:1 131:3 133:9 134:21 142:16

**happening** 113:16

**happy** 65:21 98:25

**harass** 132:3,6,19 138:21 141:24

**harassed** 42:17 43:20 46:5,21 75:17 76:22 141:8

**harassing** 66:22

**harassment** 28:10 65:18 130:10, 25 131:2 143:10,14

**hard** 64:18 102:6

**hat** 45:20

**head** 41:20,21 42:11 119:15 134:7

**heading** 25:25 109:21

**hear** 29:23 135:6

**heard** 10:3 47:1 70:4 131:24

**hearing** 5:12 23:24 54:21 141:15

**hearsay** 21:2,18 22:14 23:14,19, 21 38:8 51:10 52:12,15,22 56:9 57:6

**heart** 137:23 138:14,15

**held** 9:23

**hey** 84:8 97:6 100:18 101:11 105:5,12 107:1 123:2

**hide** 101:6

**hiding** 139:12

**highlights** 120:8

**hire** 84:3

**hired** 92:25

**history** 132:21

**hitting** 116:19

**hold** 28:4 142:3

**hole** 48:2,14 49:3 55:9

**home** 37:11,12 104:16 112:15 137:2,3

**honestly** 48:17

**Honor** 5:25 6:3 7:3 8:5,8 9:15 10:1,23 13:21,24 14:11 17:15

18:3 19:1,5 20:1,5 21:1,4,9,21 22:14,20 23:7,20 25:20,23 26:13, 15 28:21 30:19 32:4,10,25 33:1,7, 18 34:11 36:8,11,16 37:4 38:8 39:3,6,21 40:17 41:3,7 42:13 43:2,17 44:17 45:23 46:7,15,25 47:11,20,23 49:1,20 50:16 51:6,9, 18 52:3,13,23 53:8,21 54:7,11,16 55:15 56:4,8,19 57:7,20 62:8 63:19 64:7 65:13 68:1 72:19 73:12 74:6 75:2,5,7 80:3 83:10 84:17 85:21,25 86:18,24 87:13 88:7,17,22 89:22 90:25 91:4 92:5, 11 114:12,17 119:5 120:8 125:20 128:9,12,14 129:23,24 130:7,21 131:23 132:22,24 135:23 139:17 140:8,21,22 141:14 142:2,6,11

**Honorable** 11:11

**hook** 74:23

**hookup** 40:9

**hotels** 50:8 55:3 86:22

**hotspot** 98:4,6

**hours** 8:11 118:25 133:20 134:12 143:5

**house** 111:25

**HR** 20:25 21:11

**Hudson** 10:25

**human** 42:8

**hundreds** 71:21 72:1

**hung** 116:15

**hurt** 69:19

**husband** 136:13,15 137:1,4

**husband's** 87:21

**Hutson** 92:9,19,25 119:9 121:15 128:21

**Hutson's** 139:20

**I**

**idea** 45:1 64:2 70:18

**identification** 57:8

**identified** 12:9 50:15

**ignore** 135:13,14

**ignoring** 68:4 83:19,22 84:8

**illegal** 43:1,2,6 90:20 104:5,7 133:2

**image** 106:12

**images** 94:14

**imagine** 121:15

**immediately** 20:20

**implemented** 7:22

**important** 7:24 28:23 41:6,9 47:12 53:10 54:12 56:15,21,23 58:12 130:8 133:5 138:24

**importantly** 24:15

**impossible** 124:8

**inadmissible** 33:6

**inappropriate** 80:8

**inaudible** 59:2 75:5

**incentive** 46:8,9

**incident** 6:4 18:7 45:24 56:25 65:17

**include** 125:13

**included** 7:16,19 38:1 50:12 73:24,25 90:4

**includes** 9:6,7 74:18

**including** 43:6

**income** 43:5 48:19 49:12 50:6 80:18 136:1

**inconsistent** 74:1

**incorrect** 83:25 130:17

**increased** 110:8

**incredibly** 103:19

**independent** 93:12

**indirect** 18:24 24:5

**indirectly** 20:23

**individual** 22:23 75:19

**individuals** 10:4 119:11

**inference** 107:24

**information** 5:12 6:8 23:2 51:16 52:17 53:3 93:25 94:5,19 96:7,14 99:15 101:22 106:23 107:12 118:10 119:10 120:11 124:12,13 125:13

**informed** 7:11 8:8 10:6

**inheritance** 137:2

**initially** 77:23

**insecure** 12:23 60:5

**inside** 17:23

**Instagram** 13:8 21:15 24:10,16, 18 28:5 34:4 90:12,16 92:2 94:11 97:17 100:21 101:8,13 103:4,9 122:4 126:14,15,16

**instance** 98:3

**instant** 94:11

**insurmountable** 124:3

**intended** 7:12

**intent** 141:1

**intercourse** 22:2

**interesting** 53:14 61:12,15 133:15 134:13 135:16

**interject** 9:20

**internet** 45:7

**interrupt** 91:19 130:14,19

**intimidation** 140:1

**introduce** 23:16 33:2 74:25 88:8

**introduced** 51:14,21 54:8 56:6, 11 117:23

**introducing** 24:17

**invading** 59:22

**investigate** 12:22 107:13,21

**investigated** 41:1

**investigating** 41:14

**investigation** 22:4,21 98:11 109:19 118:11 119:11

**investigations** 93:15

**investigator** 10:25 68:19 93:1, 11,13 131:24 132:6

**invite** 122:11

**involved** 7:15 20:19 41:13 42:1 64:9 100:13

**irrelevant** 6:4,8 10:10 56:25 58:7 62:9 65:15 80:11 86:25 88:1

**IRS** 35:17 41:2,12 42:4 43:4

47:14 48:19,24 49:12 50:6 81:5,7 135:12 141:18

**issuance** 136:8

**issue** 5:18 12:20 14:3 33:17 43:8 50:6 56:14,25 57:5 86:25 88:6 101:13 135:24 137:17,19 142:14

**issued** 52:21 130:14,17 134:1 139:8

**issues** 6:6 22:19 55:20 60:4 80:1 135:9 137:12

**itemizations** 51:2

## J

**jail** 8:22

**Jan** 106:1

**January** 37:21 75:23,24 82:2,17 104:14

**Jimmy** 21:13,14

**job** 21:25 22:1 23:10,11,24 28:13

**judge** 6:15 11:5,11 21:18 22:10 30:24 38:15 39:24 65:1 66:5 67:5, 9 68:16 69:14 70:11 72:6,20 73:13,19 76:9,13 82:20 85:14 91:5 92:16 125:16 128:13 133:25 134:25 135:23 136:5 139:1 140:13

**July** 72:17 73:9 75:16

**jumped** 61:15

**jury** 143:16,17

**juvenile** 137:16

## K

**Kay** 100:11,13 101:8,21 102:3,9, 11,19

**Kay's** 103:3

**Kelce** 21:13,14

**key** 73:20

**kill** 42:9 140:7

**kind** 14:8 26:22 27:12 42:1 43:11 48:6 60:14 74:1,14 83:4 85:23 86:1,21 120:24 124:22 134:15 137:7 140:9

**knew** 8:13 28:11 71:10 74:23

**knowledge** 33:8

## L

**L-O-L** 108:8

**labeled** 9:2

**lady** 41:12 74:21

**language** 120:25

**lasted** 116:14

**late** 28:5 85:10

**laundering** 9:9 41:22

**law** 41:13 135:25 137:21,22

**lawyer** 58:22 135:9 136:18 137:5

**lawyer's** 135:8

**leasing** 25:2

**leave** 16:2 18:15,16 24:8 37:24 46:16,21 57:3 65:2,12 66:3,9 69:5 70:16,17 74:19,22 76:20 78:1 105:16 106:21 115:10 120:4 124:22 129:1

**led** 10:15 114:22

**left** 20:17 75:18,21 81:7 87:17 106:12,13 126:18 131:7,8

**legal** 7:13 41:20 133:7 135:13 136:20 137:7,11,12,15 138:10 141:17 142:13

**legal-related** 136:10

**legally** 135:24 138:2

**legitimate** 98:6

**legs** 54:22

**let all** 105:11

**letter** 7:25 25:6 34:14 41:11 50:14,20,21,24 51:3,11,12,15,20, 22 52:1,3,6,7,11 54:2,4,9,10 56:6, 10,13,20,21 57:4,5,6 66:17 67:8 129:5 133:12

**letting** 69:19

**leverage** 135:2

**lie** 14:25 55:7

**lied** 87:7

**lifestyle** 9:4 46:13

**light** 46:10 56:17

**likewise** 48:21

**limit** 115:12 122:4

**Lisa** 11:13

**listening** 136:6 140:24

**literally** 63:5 112:23 116:24

**live** 105:9

**lived** 45:5

**living** 15:7 28:14

**lo** 74:16 139:8

**locate** 103:11 119:22

**located** 102:2,8

**locating** 103:7

**location** 17:10 37:1,8 59:4 102:6 104:25 105:6,7,8 124:25 125:1

**locations** 36:17

**Lody** 44:16

**log** 98:18 112:17

**logical** 136:4

**long** 12:13 18:12 32:16 40:15,22 42:3,14,15 43:22 44:4 64:4 93:4 99:23 116:13

**long-term** 79:23

**looked** 91:24 123:19

**loss** 16:10 93:14

**lot** 12:23 18:12,14,24 27:2 72:5 119:9,10,22 120:7,11 124:20 141:5

**loud** 31:3,8

**louder** 60:12 74:11 83:9 133:6

**Louisiana** 39:12

**love** 79:19 90:20 105:13 108:19

**loved** 79:15

**loves** 79:2

**lunch** 11:3

**lying** 12:24 13:12 14:23 18:14 132:12

## M

**mad** 14:19 114:18 115:2

**made** 10:3 23:6 33:3,5,8,9 43:18 51:7 78:16 88:6 115:21 116:8 117:7,8

**mail** 25:4 28:17 30:8,10 34:8

**maintaining** 74:17

**major** 35:15

**make** 5:21 9:24 13:22 16:4 29:1 32:22 35:14 92:17,18 94:19 97:22 98:2 110:7 121:7,8,12 122:13,17 126:19 139:6

**makes** 33:16 140:10

**making** 6:23 75:1 114:1

**Mal** 98:24 126:24 127:4,8,12,14, 19 131:25

**Mallory** 11:16,21 22:21 24:12 69:17 100:12 102:12,22,25 114:18,20,24 115:4,7 118:16 125:15 128:3

**Mallory's** 115:10

**man** 58:12 73:10 74:21 86:23 87:9 138:18

**man's** 135:11

**manipulation** 10:8 93:24

**manner** 83:2

**Map** 106:3 107:9

**Maps** 100:11 101:8,21,23 102:9, 12 103:1,22

**Maps'** 100:13 101:14 102:3,19,23 103:8

**March** 11:14 12:18,19,25 57:13, 18 59:6,14 60:2,6,11,16 61:2 66:2 68:10,22,24 70:12,21 73:7,22 74:2,13 77:24 78:17 79:7,10,11 82:2,17 83:1 111:7,12 119:16 120:23

**marked** 20:9 26:20 32:9 35:2 57:8 84:22 88:12 89:3 95:3 118:6, 7 121:21 128:14,18

**married** 137:18,19

**Martin** 11:9,24 12:21 13:1,4,8 14:3 21:16 22:5,6 25:6,10 26:7

34:3 37:7,24 38:5 68:4 69:4,20 81:14 82:13 85:19 93:2 105:2,3 126:23,25 127:8 128:4 143:3

**material** 82:9

**matter** 5:6 21:5 52:25 53:1 54:3, 16 57:2 58:8 62:9 75:14 76:2 101:15 106:6 130:9 138:1

**matters** 6:5 53:1 142:15 143:16

**Mcgee** 5:6,11,21,25 6:14 7:3,19 10:3,19,22 11:4,13 14:13 18:3 19:1 20:5 21:1,8,18 22:10,13 23:14 24:13 26:15 28:21 29:16, 19,23 30:9,24 32:10,13,25 33:23 34:11 35:4 36:8,15 37:4 38:8,15 39:3,24,25 40:22,24 41:4 42:24 43:3,25 44:5,6,20 46:6,7,25 47:11,23 48:1,12,15 49:8,21 50:4, 16,18 51:6,13,21 52:16,24 53:9, 15,25 54:5,8,17 55:11,21 56:4,12 57:7,10,21,23 58:10,11,17,25 59:1,6,8,10 62:11,12,19 63:25 64:16,17 65:19,21,23 66:4,7 67:4, 9,11,25 68:2,16,23 69:3,14,16 70:6,7 72:20 73:4,5,9,13,18 74:7, 10 76:3,8 77:12,22 78:10,11,13 80:4,5,13,17,19,22 83:10,13 84:24 85:22,23 86:5,9,11,13,19 87:6,9 88:3,14,16,22 91:1,5,9 117:23 128:22 129:23 130:13 132:24 133:12 134:3 136:7,15 138:12 142:4,11,18

**meaning** 112:23 122:19

**means** 36:20,21 76:21 132:22 136:9

**media** 66:12 91:15 94:10,13 95:21 122:24 123:13

**meet** 40:8 44:8,9 107:1 138:6

**meeting** 45:19

**members** 22:3

**memory** 27:20 29:10 30:21

**men** 40:13

**mental** 60:23 68:13

**mention** 8:19 141:8,10

**mentioned** 55:14 78:14 99:25 101:20 107:8 141:5

**mentioning** 75:9

**merchandise** 7:20 47:17 49:10

53:6 54:14,18 73:24 74:18 80:25 81:3 114:25

**merchandises** 48:22

**message** 9:11 20:22 24:7 25:16, 17 66:24 67:10,14 83:19 91:10 94:8,9 96:1 116:9 117:15 118:22, 23 119:1 129:1 140:7

**messaged** 14:20

**messages** 11:2 18:12 21:16 22:7 26:9,25 27:2 45:1 61:22 63:6 68:4 70:10,18 74:21 79:21 92:12 94:11,15 110:11 113:9,20,23 117:5,11 119:10 126:5,6 129:18

**messaging** 94:12

**messenger** 9:11 42:9 140:7

**met** 40:1 43:24 44:2 61:7 138:3

**metal** 108:18

**method** 94:7

**metric** 100:25 122:9

**metrics** 100:16 101:7 122:8 123:1,2,4,14,16,25 124:2,5

**Mickey** 87:25

**middle** 59:13,14 61:2 70:12 103:2 113:20 115:5

**mile** 36:18 37:19 104:15 106:20

**mind** 10:16 21:6 49:22,25 66:19 138:23

**mine** 93:21 96:15

**minute** 9:20 48:3,8 64:25 119:6 142:4

**minutes** 56:1 113:1 133:17

**misleading** 107:25

**misspoke** 130:16,20

**mode** 105:3,4,15,17,22,23 106:22 124:16,24 125:4,5

**modes** 105:4

**moment** 15:2 16:9 39:6 75:15 88:7 92:16 99:9 102:12 104:23,24 128:8

**moments** 69:7 117:23

**money** 7:8 9:8 22:3,5 41:22 45:22 49:15 56:24 60:18 61:4,8,9 63:18 64:3 69:9 74:18 78:3 80:24

114:25 118:19 135:25

**monitor** 36:12

**month** 13:14,15 25:18 35:22 66:16 81:14 114:21 115:12

**months** 7:23 12:15 24:2 28:13 35:24 60:18 72:5 74:14 76:1,20, 23,24 77:6

**morning** 11:19 109:21

**motion** 5:13,17 8:6 43:21 140:9

**motivation** 41:24 46:18

**motive** 42:7,18,20 46:24 55:7 56:16 73:1 87:2

**Mouse** 87:25

**mouth** 76:25 87:14,16 141:2

**move** 21:22 23:22 33:25 35:22 44:7 50:2 63:24 78:11 104:12

**movements** 105:25

**movie** 112:5,6

**multiple** 63:22 65:2 94:10 97:21 103:11

**Murfreesboro** 106:14,17

**muzzle** 138:17

---

### N

**nada** 82:24 139:24 140:2

**nails** 109:23 115:10

**naked** 115:1

**named** 100:10

**names** 21:15

**Nashville** 39:10 104:16 105:9 106:4,6,7,9,13,20,24 107:2 125:4, 5

**nature** 41:1

**Naylor** 11:13 20:4 92:9,11,15,21 108:25 109:3 114:16 115:18 117:19,20 119:5,8 120:10 121:14 125:16 128:13,20 129:18 140:13, 20 142:6

**necessarily** 17:20 124:1

**needed** 28:14 53:13

**negative** 37:19

neglected 10:14

nice 81:1 110:21

nicely 128:5

night 27:1 36:4

nine-minute 130:12,23

nonsense 69:8

north 106:6,18

note 56:23 69:4 118:20 129:10

noted 44:24 54:19 116:22

notice 22:16 33:19 40:25 56:14 135:12 139:4 141:21

notification 23:11 36:12 37:13 89:6

notifications 36:1

notified 32:19 36:5 37:16 89:13, 16 124:18 134:10

notifying 7:25

November 7:5 26:23 27:5 28:1 29:15 32:16 40:2 44:9 45:19 52:20 62:16 81:23 82:5,25 85:4, 10 131:9,10,11 132:8 133:8 134:1,8

nude 72:13 73:25

number 18:23 20:9 26:20,25 27:4 32:9 35:2,16 39:13 51:13 68:19 84:23 88:12,15,24 89:3 90:4 96:15,17,18 107:20,25 108:9 109:13 110:23 116:15 118:5,8 119:19 121:18,21 125:18,22,23 126:7,10,20 128:18,24 129:1,3,5, 8,9,11,12,13,14,15,17 132:1 141:11,12

numbers 11:9 21:13 27:2,3 28:7 38:1 67:2 90:18 125:14 126:1,3, 13 132:6 141:10

## O

object 18:4 19:1 21:2,19 22:13 23:3,5,16 24:13 36:9 80:7 125:16

objection 6:3,22 20:4 21:8 22:18 26:15 32:6 35:4 37:4 38:9 39:3,4 40:17,18 45:23 47:20 49:1 51:8 52:14 53:22,24 54:1 56:9 57:20 58:4,5,16 62:8 63:16,19 65:13,14 72:19,23 80:3 84:15,16 85:21,25

86:18,24 88:13

objections 36:14 88:23

objects 33:14,15,16

observed 56:2

obvious 102:3

occasion 8:23

occasions 8:20 60:19 61:4 65:2

occurred 6:18

October 7:12,24 25:1,3,19 26:22 41:10 50:14,20 52:18 81:21 82:5

off-the-record 9:23

offer 18:19

offered 52:16,24

offhand 119:19

office 25:2,5 26:9 31:20 32:2 34:21 67:7 140:15

officer 10:21,23 59:17

officers 19:14,20

official 93:10

officially 93:8

oftentimes 60:12

one-dollar 118:21,22

one-night 40:9

oops 135:6

OP 134:6,8 136:11 137:13,24 138:10 139:7 142:14,17

open 5:4 20:20 22:18 54:11 90:21 96:21 99:11,19 103:8,25 111:18 139:4,5,13,14

opened 22:21 52:8,9,10,17 108:15

opening 6:22,23,25 7:1 9:25 47:2 52:10 76:14 138:16

operate 17:1,8

operator 98:14

opinion 134:14

opportunity 94:1 95:12,22 97:15 113:1

opposed 59:19

option 75:18

order 8:2,3,4,10,11,14,18 27:9, 12,14,15,24 28:2,8,20 32:15 33:2, 10 41:6 46:11 52:21 53:11,17,19 55:16 61:13,18 62:16 66:18,20 88:19,21 89:7 90:6,10 129:13,25 131:10,11,15,17,18 132:8,17 133:8,10,25 134:11,15,17,19,24 136:8,12,21,25 137:2,9,20,25 141:14 143:13

orders 141:5,22

organizations 41:13

original 110:5 126:10

originally 89:14

outgoing 126:12

overrule 6:21 58:16

overview 6:15

owner 95:22 98:13

owns 137:1

## P

p.m. 109:4 113:8 115:8 117:10 128:3

pages 61:15 71:10,13 95:15 98:9 121:4,6 141:9

paid 46:3,8,19 47:14,15 58:21 63:22 70:2 79:4

paint 42:8 56:17

paints 46:10

paper 32:1 90:13

paragraph 29:12 31:7

parameter 96:6

parameters 96:25

paraphrasing 114:13

pardon 95:25 100:12 102:21,25 105:1 108:10 109:24 118:23 128:5

park 84:14

part 7:20 8:10 10:8 18:4 21:19 43:11,12 47:2,17 48:8,22 55:7,14 57:16 64:18 81:3 118:11 120:2

parte 8:2,18 33:2 61:13,18 62:16

66:20 134:4 139:21,23

**participating** 40:15,23 42:15

**parties** 6:1,19 7:6 41:6 78:6 94:8

**parties'** 11:2

**partner** 61:21 62:13,17 134:3

**passed** 106:17

**passengers** 22:3

**passing** 25:18

**paths** 101:10

**pattern** 66:6 68:17 70:11,15 134:25

**pay** 70:8 110:1 114:2,5,21 115:10,24 117:13

**paying** 62:7 63:18 81:3

**payment** 7:14 138:7

**people** 35:21 71:10 72:3 77:20 82:8 96:25 100:18,25 104:8 105:11,16,17 106:21 122:13,14, 17 124:10,20

**period** 130:12,24 138:20

**permission** 15:5,20 17:12 107:20 112:16 113:22 132:16

**person** 10:11 33:4,11 36:18,20 51:11,12 68:9 96:1,15,17,19 97:7 100:17 101:3,5,12 105:5 122:5,6, 10 123:3 135:19 141:3

**person's** 99:19 123:22,24

**personal** 33:8 103:9

**pertaining** 107:24

**pertains** 107:9

**phone** 15:25 27:2 36:5 85:9 98:3 99:14 106:1,4,24 111:13,14,18 112:6,8,23,24 115:6 116:1,6,8,14 117:7,8,15 118:12,24 122:20 123:1,20 125:3,11,21,22 126:6, 12,20,22 128:24 130:23 132:1 143:10

**phones** 94:10 97:6 101:10 122:21 123:8

**phonetic** 21:13

**phooey** 136:15

**photo** 115:1

**photograph** 83:11,14,16,21,24 84:1,7,25 86:14,15 108:23

**photographs** 71:22 72:3,4,12,17 73:25 74:18,25 94:15

**photos** 24:5 71:25 75:6

**physical** 60:23 68:14 82:22 83:5 97:9 139:25

**physically** 103:15 112:16

**pick** 25:5 116:6 133:21

**picture** 19:9,11,16,19,22 22:8 27:19 29:8 31:16,17,19,23 32:1 85:6 87:3 99:7 102:7,9,11,21 109:6 110:4,9,15,19 118:15,17 119:2 133:21

**pictures** 20:21 99:5 100:11

**piece** 30:8,9

**pings** 106:9

**pink** 108:19 109:8

**pinpoint** 107:14

**pinpointed** 107:15

**place** 63:10 77:20

**places** 37:10

**platform** 91:16 95:25 96:22 97:11 100:17 123:13

**platforms** 67:1 94:10,13,18 95:21

**play** 48:10

**played** 118:11

**pleading** 140:12

**point** 17:4 20:17 25:15 26:12 27:18 43:18 61:9,11 74:10,12 75:1 77:10 81:6 88:5 96:24 101:9, 13 102:8 104:22 105:18 117:10 139:24 141:23

**pointed** 54:12

**pointing** 76:16 106:11,12

**points** 103:11

**police** 37:25 59:16 84:3 113:11, 22 114:9,23 115:25 117:12

**pop** 123:24 124:1

**pops** 101:18

**portion** 110:11

**position** 5:15 10:7,13 33:4 56:20 81:5 140:5,10 142:1

**positions** 8:25

**possess** 87:24

**possibility** 123:18 125:3

**possibly** 124:9

**post** 13:9,10 25:5 57:25 58:14 90:19 92:2 95:19,20,23 96:3,4,11, 18,20,23 98:25 100:24 101:16 102:4 122:10,11,17

**posted** 28:12 58:19 91:3,11 96:16 99:18,21 102:25 122:12

**posting** 24:3 40:4 96:2 132:2

**posts** 99:15 100:1,13 101:9,13, 14 127:7

**potentially** 9:7

**power** 28:15

**POWERS** 11:5 44:17

**prepared** 22:24

**preparing** 94:5

**presence** 38:19

**present** 6:6 82:25

**presented** 77:18 124:13

**preservation** 46:13

**presiding** 11:12

**pretended** 141:10

**pretending** 132:2

**pretty** 93:19 135:16

**prevention** 93:15

**previous** 22:19 109:10

**previously** 5:16 18:11 76:9 88:19

**previously-mentioned** 20:8 26:19 32:8 35:1 84:21 88:11 89:2 90:3 121:20 128:17

**price** 46:20 115:3

**prices** 115:2

**print** 94:16

**prior** 5:12 76:1 77:6 139:21

**privacy** 59:22

**private** 71:22 93:1,10 95:19 96:3, 4,6,20 99:9,15 100:3 101:16,21 103:21 122:3,9,17

**privately** 99:21 103:1 122:11

**probable** 43:13 143:15

**problem** 13:4 33:16 138:10

**problems** 135:13

**proceeded** 15:1

**proceedings** 5:3 143:18

**process** 41:20 139:7

**processing** 142:3

**processor** 136:19

**product** 24:15

**profile** 99:5 104:1 126:16,17 127:9,12

**profiles** 126:15 131:24

**program** 104:25

**programs** 123:6

**promise** 99:2

**promoting** 9:8 41:18,21 90:19

**proof** 5:16 6:6,7,10 7:2 10:5 23:10 38:10 52:16 57:2 73:1 75:15 86:3 87:1 92:8 112:11 128:22 132:11 138:22

**proper** 55:23 76:5,11

**proposing** 44:14

**prosecuting** 47:9

**prosecutor's** 31:20

**prostitution** 9:7,8 41:17,18,21, 22 43:7,10 79:5 90:19 136:1

**protect** 46:11

**protection** 8:2,3,5,10,11,14,18 27:14,16 28:9,20 52:21 53:12,17, 20 55:16 61:14,18 62:16 66:19,21 90:6,10 129:13,25 131:10,12,15, 17,19 132:9,17 133:8,10 134:1, 11,15,17,19,24 136:9,12,22,25 137:2,10,20 141:6,15 143:13

**protections** 33:11 137:25

**provide** 31:19 34:20

**provided** 26:9 31:23 33:9,19 57:4 78:8

**providing** 110:23

**proximity** 97:9

**psychiatrist** 35:19

**public** 71:10,13,18,19,22 91:3, 12,16,23 95:20 96:5,17,24 98:14, 16 99:9,10,20,23 100:1,9,14 101:9,14,16,23 103:3,9 104:1,6,7 122:3,8 123:22

**publicly** 96:21 103:1

**published** 80:16

**pull** 94:19 99:15 110:6 118:3,10, 13

**pulled** 118:13

**purchase** 111:4

**pure** 87:6,9

**purpose** 33:3 104:8 118:21

**purposes** 48:4 57:8

**purse** 85:16,20,23 86:1,22 87:12, 18

**purses** 53:5

**pursuing** 9:5

**put** 6:10 7:22 22:3 37:16 40:25 55:22 56:13 62:13,15 63:9 76:4, 11 83:1 90:17,18 98:15 103:22 112:6,9 117:25 119:18

**putting** 6:8 35:15 41:17 54:25 87:14 122:7 141:2

---

**Q**

**question** 22:24 24:22 28:24 30:13 36:22 38:21 39:8 42:14 47:21 49:7,16 50:1,3 51:23 57:21 60:25 62:6,10 63:15 68:17 78:10 80:8 86:6,12 91:10,20 96:8 111:15 118:19 123:12 124:3,11 133:25

**questioning** 29:22

**questions** 48:1,11 63:22 88:16 94:23 121:14,16 122:2 128:20

**quote** 7:6 24:16 60:1,9,17 61:1 62:7,14,17 63:13,14,16 64:20,24 65:2 67:15 68:10 70:22 71:3

74:15 88:6 99:4 135:17 138:21,22

---

**R**

**rabbit** 48:2,14 49:3 55:9

**radio** 135:7,10

**raising** 5:18

**ran** 135:14,15

**range** 36:18

**reach** 67:2 105:18 107:2 141:12

**reached** 12:21 14:4 58:12

**reactivate** 90:12

**reactivated** 34:4

**reacts** 115:25

**read** 31:2,3,4,8 114:13

**reading** 30:24 62:11

**ready** 5:5 90:17 120:12

**real** 42:7 57:17 98:13 105:5

**reality** 74:24

**realtime** 106:25

**reason** 22:17 63:13 79:18 115:1 133:1 141:13

**reasonable** 36:20

**reasons** 9:13

**recall** 29:5,7

**receipt** 135:5

**receive** 21:24 25:3 26:23 27:6 28:7,17 29:4,14,20 31:10 34:3 35:7 36:3 50:9,24 57:5 89:8 90:9

**received** 8:21 18:22 19:9,10 20:14 21:6,12 22:5,16 23:10,13 27:1 30:7,18,20 31:14,17 32:15 34:2,5 39:9,14 50:13,14,20 51:3, 12,14 52:4,7,18 53:2,20 54:4 55:19,20 56:13,22 66:16 105:2 130:22 131:16 135:4

**receives** 41:10 142:20

**receiving** 35:13

**recipient** 138:4

**recognizable** 127:6

**recognize** 26:4 34:18 50:21

54:24 67:12,21 83:15 84:25 95:1

**recollection** 30:25 69:13 72:22

**record** 11:8,20 12:4,8 43:4 56:3 106:11 113:18 116:13 121:8 139:1

**records** 88:4

**recovery** 93:15,16,23

**RECROSS-EXAMINATION** 91:1

**redial** 116:19,20

**REDIRECT** 88:18

**reference** 99:6

**references** 97:21

**referencing** 130:18

**referring** 72:24 102:13 108:21 110:3

**reflect** 12:8

**refresh** 27:20 29:9 30:16,20 72:21

**refreshes** 69:12

**refreshing** 30:25

**registered** 34:14

**related** 42:1

**relates** 5:13 23:2 24:18 41:25 51:17 98:9 99:24 101:19 103:13

**relation** 23:9 103:16

**relations** 61:3

**relationship** 6:18 10:9 12:16 13:1 40:20 43:14,15,17,19 44:3 45:1 46:1 47:12 54:25 59:13 60:22 61:11 63:17,20,23 73:14, 17,21,23 74:17 76:15 77:4,8,15 78:9,17 79:17,19 80:11 82:21 100:16 121:10 131:5 132:13,20, 21 133:2 140:4 141:7

**relationships** 40:12 41:6 77:18 140:5

**released** 131:21

**relevancy** 42:16

**relevant** 40:19,22 43:7,11,12,20, 23 44:4 45:24 46:4,6,20 49:3 76:2 86:7,10 88:2 98:10

**relish** 87:24

**remember** 13:5,6,15 14:18 27:8 61:17,19 69:10,21,24 72:17 85:5 89:20

**remembering** 28:25

**remind** 78:24

**reminding** 77:14

**remote** 111:15,19

**remotely** 17:17

**rent** 114:21

**repeatedly** 117:16

**repetitive** 47:8 143:10

**Rephrase** 36:22

**replay** 110:20

**reply** 118:18

**report** 37:25 94:6 107:15 115:20 119:18,20 120:6 125:9 129:16 141:18,19

**reportable** 136:1

**reported** 23:11 42:3 48:19,24 49:11

**reporter** 121:9

**reporting** 48:4 138:6

**represent** 11:6

**represented** 141:15

**request** 10:15 69:9 94:2 118:19, 21,22

**requested** 108:19

**requesting** 10:18

**require** 55:22 131:1

**required** 138:2

**requirement** 43:4

**requirements** 7:13 138:6,7

**requires** 131:2

**residence** 111:23

**respect** 16:12

**respond** 55:22 74:9 77:2

**responded** 67:1

**respondent** 137:15

**responding** 69:18

**response** 6:13 22:15 23:5,19 58:9 69:8,24 75:6 110:22

**rest** 73:19 122:14

**Restate** 30:13

**restroom** 55:25

**result** 9:4 40:4

**resulted** 133:3

**results** 93:12 129:15

**review** 113:1 119:12

**Revolute** 108:18

**Reynolds** 41:5,8 73:13,15,18 76:4

**Rich** 11:13

**rights** 137:16

**road** 80:1

**rocks** 99:5,7

**rocky** 14:8

**roof** 86:21

**room** 15:7 17:2,4

**root** 120:20,21

**roughly** 115:3

**rude** 91:18

**rule** 6:21 10:18,22,25 51:15 64:14 88:1

**ruled** 47:25 53:22,23 125:17

**run** 134:20 140:14

**runaround** 18:20

**running** 54:22

---

**S**

**Safety** 27:18 31:6,12

**salon** 115:24

**Samsung** 16:20

**sat** 82:6

**save** 64:19

**savvy** 16:9

**scared** 16:7 35:24 57:13 58:13

60:1,9,17 61:2 68:10 71:4 73:22
74:2,12 75:10,11 76:17 77:24
78:16 131:1,6 141:4

**scenario** 13:6,7 46:9

**scope** 75:9

**Scott** 7:11 8:6,8,21 10:5 11:9,24
12:13 18:22 23:25 26:23 28:17,20
32:17 36:1,25 37:7 40:1 44:8
45:13,22 46:10 48:17 49:11 52:20
57:13,24 58:18 65:11,17 81:14
82:13 89:13 90:10 93:2 100:1
103:15 104:15,24 105:3,21,25
106:5 107:18 108:5,10 109:24
110:18 111:7,12 112:11,22 113:6,
11 114:1,18,19,20,23 115:1,7,9
116:8 117:6 118:17 119:13
120:24 124:5 126:22,23 127:1,20,
25 139:3 141:3 143:3,4

**Scott's** 24:15 99:14 106:4 109:25
125:11 141:11

**scratch** 134:7

**screen** 19:11,14,20 26:4,6 29:6
38:10 39:1 105:2,20,22 106:3

**search** 24:11 120:17,19 124:10

**searches** 93:23

**seated** 12:4

**seconds** 116:13,14 117:1 133:19

**seconds'** 103:24

**section** 121:10

**sector** 122:3

**secured** 8:12 49:11

**security** 35:16 107:20,25 108:9
109:13 110:23

**seek** 8:9 27:12,15 40:12 53:16

**seeking** 9:14

**sees** 139:17

**self-preservation** 46:12

**semantics** 127:13

**send** 18:12 105:6 117:6 118:20,
22 122:6 126:9 141:16

**sending** 10:6,7 20:21 25:7 67:10
72:12 73:25 118:21

**sends** 69:4 135:5

**sense** 60:23 63:16

**September** 15:2 18:10,16 20:16
53:16 66:15,20,22,24 67:9,14,18,
20,24 68:3 69:1,5,15,17,20,25
70:13,22 81:13 82:4 83:17 120:24
131:5

**serve** 28:3 32:17 34:14 141:17,19

**served** 8:3,12 28:6,20 32:19,23
33:20,22 34:15 89:7,9 90:6,10
131:15,17 132:10,17 134:11,19,
23 136:17,18,20

**service** 33:3,5,8,9 55:18 135:20
136:19 137:12,25 138:1

**services** 54:18

**set** 8:7 47:15 98:4 105:10,15
134:12

**sets** 52:18 97:11

**sex** 7:8 47:16 48:7,9 60:18 61:8,
21 62:7,13,17 63:18,22 64:3 70:2,
8 73:24 74:18 78:4 79:4 81:3
134:3

**sexual** 7:18 61:3 79:17

**share** 95:23 96:16,23 99:18,21
102:18 104:10 112:2

**shared** 67:6 97:4 100:8 101:16,
23 102:3,9,19,24 103:1

**shares** 99:10 101:15 102:10

**sharing** 100:11,12

**she'd** 62:13

**shoes** 47:15

**shoot** 9:10

**short** 10:2 116:24

**shortly** 117:6

**shot** 19:11,14,20 26:4,6 38:10
105:2,21,23 106:3

**shots** 29:6 39:2

**show** 19:14 22:8 25:15 31:16
56:16 83:11 89:21 101:17 124:25
125:5

**showed** 19:20 29:8 32:2 127:8

**showing** 23:10 33:21 34:11
125:4

**shown** 75:3 97:1

**shows** 36:17 134:14

**shut** 119:14

**side** 106:13

**sides** 76:24

**signature** 33:21

**signed** 33:11

**significance** 109:18

**signing** 131:21 132:18

**silence** 9:2

**similar** 40:8

**simple** 87:9 140:6

**simpler** 140:10

**simplify** 106:2

**simply** 7:8 8:25 133:22

**sir** 40:3,6 45:18 48:20 50:22,25
58:3 59:18,21

**sister** 13:9

**sister's** 13:8

**sit** 32:21 73:21 134:18

**site** 98:18,20

**situation** 6:16 9:12 10:9 12:22
16:10 48:18 54:22 80:18 133:3
136:4 139:12

**sixth** 51:2

**skip** 102:1

**sleep** 15:9 35:20 74:3

**smallest** 125:3

**smart** 16:21 74:23

**Smartly** 109:16

**Snapchat** 123:11

**Snelling** 5:10 6:3 7:5 10:1,21
11:8,12,18 12:8,12 13:20,24 14:1,
11 16:13 17:14,18,22 18:6 19:4,7
20:1,10 21:4,21,23 23:7,20,22,23
24:23,25 25:19,23 26:3,12,16,21
29:3 30:3,14,16,19 31:1 32:4,14
33:7,18,25 34:1,16,23 35:6 36:11,
16,24 37:5 38:12,18,23 39:5,7,17,
21 40:17,19 41:3 42:13 43:1,16
45:23 46:15 47:20 49:1,19,24
51:9,18 52:2,12,22 53:8,21 54:6,
15 55:15,24 56:8,19 57:20 58:6

62:8 63:19 64:7 65:13,15,25 72:19,23 73:6,11,16 74:6 75:7 76:6 77:3,13 80:3,7,14 84:16 85:21,25 86:2,18,24 87:7,13 88:13,18,20 89:5,22 90:1,5,8,24 91:4,8 92:4,7 121:22 125:20,25 128:8,11 129:6,24 130:4,7,21 131:14 140:22,25 142:8

**social** 35:16 66:12 91:15 94:13 107:19,25 108:6,9 109:13 110:23 122:24 123:13

**somebody's** 102:18 103:25

**sort** 100:15

**sought** 8:20 27:9 53:19

**sour** 12:17 131:6 140:4

**south** 9:19

**space** 15:3 18:10

**speak** 6:9 49:14 60:12 74:11 83:9 101:2 133:6

**speaks** 34:13

**specialty** 93:19

**specific** 24:14,17 28:22 29:7 72:16 79:13 94:23 95:25 107:12 108:3

**specifically** 91:11 97:14,16 98:21 108:17

**specification** 28:23,24

**specifics** 66:5

**speculating** 141:1

**speculation** 18:4,5 19:2,3 49:19, 21

**spell** 11:22 92:22

**spend** 14:16,19

**spent** 22:6

**spoiling** 79:7

**spoofed** 126:7,13

**spoofing** 125:14,23 126:1,7

**sports** 135:10

**spot** 104:22

**spy** 15:9 17:21

**stalk-ish** 74:16

**stalker** 74:15

**stalker-ish** 113:12

**stalking** 13:8 65:18 71:7 72:7 103:15,16,19,25 114:23 142:24 143:7

**standard** 136:21

**stands** 56:9

**start** 9:22 11:5 68:23 81:13 84:5 95:9,20

**started** 14:8 15:3 20:21 41:20 66:2 77:5 84:2 113:6,24,25 114:4, 22 139:7

**starters** 41:23

**starting** 104:22

**starts** 116:1

**state** 6:24 10:20 11:9,12,19 13:11 20:2 21:3,6 22:18,24 23:1 26:13 33:2 34:23 49:22,24 51:13,25 56:12 59:2 68:14 76:16 92:22 93:13 97:12

**State's** 5:19 9:14 23:16 92:7 136:3,8 137:8

**stated** 25:13 64:7,10,12 68:12 75:8,10 78:22 79:6

**statement** 5:22 6:22,25 9:25 23:15 64:4 86:16 93:20 108:1 138:16

**statements** 6:23 7:1 10:2 41:25

**stating** 22:2 25:6 61:23

**statute** 137:13,14 138:2

**statutory** 8:7

**stay** 50:9

**stayed** 16:14 55:4 111:14

**staying** 18:1

**Steve** 37:3

**sticky** 129:10

**stole** 107:19

**stop** 10:11,14 16:8 47:7 63:15 75:20 136:9

**stopped** 24:6,7 75:12 79:9

**stories** 24:3,4

**story** 13:10 41:7 65:8 73:19 74:20 102:18,24 122:5,7,12,13

**stream** 100:24

**street** 142:14

**stressful** 35:18

**stretch** 42:19

**stuff** 28:13 55:7 103:21 109:22 117:25

**subject** 80:10

**submit** 42:7 89:23 137:24

**submitted** 5:12 135:22 139:14 140:8

**suggest** 74:1 78:6 97:6

**suggested** 7:21

**suit** 12:5

**summer** 7:10

**supplied** 5:16

**supposed** 37:9,10

**Supreme** 76:3

**surprise** 30:5

**surprised** 51:25

**sustain** 43:21

**Sustained** 18:5 19:3 21:20 38:11 39:4 85:22

**switch** 111:3 112:19 117:21

**sword** 42:10 136:22

**sworn** 11:17 29:9 92:20 133:23, 24

**system** 138:17

**T**

**tag** 122:16

**takes** 93:24 140:9

**taking** 54:22 103:23

**talk** 22:25 39:19 44:23 52:2,5,6 57:11 62:25 68:7 71:1,4 72:2 81:11 83:7 86:8 111:4 112:20 116:2,5 117:15 119:14 125:8 135:20

**talked** 19:8 56:12 61:13 66:17

70:11 88:19 122:3,18 124:16 126:14

**talking** 14:9 36:10 41:17 47:13, 16 50:11 61:10 66:3 67:18 72:1 73:3,6 75:25 76:24 79:15 84:12 99:8 108:24 113:14,19 114:14 130:15 137:23

**tampered** 19:23

**tax** 9:8,9 41:22 80:18 81:1 129:3 135:8,9 138:2,7

**taxes** 7:14 43:2 49:2,4 55:13 99:3

**tech** 16:9

**technically** 140:16

**Telegram** 24:1,3 25:11 94:12 126:4,5,11 132:6

**telephone** 33:20

**television** 16:10 18:8 112:3,12

**telling** 47:3 65:8 72:6 79:1 85:13 91:19 113:17

**tells** 113:11 128:5 138:15

**tempts** 114:25

**ten** 38:4

**Tender** 40:8 105:1 124:20

**Tennessee** 11:9,13 76:3 125:4,5

**term** 62:23,24

**terms** 44:14

**terrible** 42:8 87:10 135:19 141:3

**testified** 11:17 50:14,23 57:11,12 92:20

**testify** 36:19 68:19 131:25

**testifying** 11:1 47:22 67:6

**testimony** 24:21 51:14 57:4 74:2 139:20

**text** 18:12 20:22 21:16 22:6 26:24 27:2 45:8 61:22 71:1 92:12 94:8, 9,15 113:9,19,25 114:22,24 115:5 117:11 118:17,25 129:1,18 133:20

**texted** 64:8 113:8 115:7,9

**texting** 38:3 61:10 112:24 113:7 117:9

**texts** 26:7 28:7 45:9 62:1 66:25

67:15 78:22 79:1 110:5 116:4

**Thanksgiving** 39:12

**Theoretically** 124:2

**theories** 47:9

**theory** 6:24 46:24 47:3,5 136:3,8 137:8

**thing** 31:4 41:11 43:23 64:25 67:20,24 76:17 97:23 105:7 108:12 112:7 138:25

**things** 14:5 18:24 24:4 29:6 33:17 45:21 47:4 50:10 69:20 72:16 75:16 77:18 78:5 98:23 102:1 104:19 132:2 138:24

**thinking** 108:9,11

**thought** 48:23 49:9,17,22 50:5 91:5

**thousand** 48:22 49:10 70:25

**thread** 114:24

**threaten** 47:14

**threatened** 83:4 117:12

**tight** 142:3

**time** 7:2 10:5 13:3 14:2 15:6,12, 24 16:6 20:2 21:6 24:9 28:25 32:5 35:22 37:15 38:4 40:2 56:14 59:12 60:21,24 62:13 63:24 64:9 65:16 71:6 72:11 75:14 82:24,25 87:22 90:15 103:11,24 104:21 106:7,8 115:8 118:15 124:22 127:20 131:23 132:22 134:10,16 136:16 137:4 138:20 139:10

**timeframe** 8:7 24:2 66:2 68:21

**timeframes** 65:19

**timeline** 41:10 94:19 133:6,25 138:15 139:18

**times** 14:24 15:1,13,14,21 18:17 22:4 24:9 27:18 37:23 38:2,4 63:22 65:11 75:25 78:14 112:25 113:8,15 114:19 115:7,16 119:12 120:13,14,16 121:1,3 130:11 132:15 133:17,18 135:16

**timing** 53:10 56:21

**title** 93:10 98:6,24

**titled** 121:10 126:25 127:4

**today** 10:15 11:3,14 12:1 73:8

75:6 94:17

**told** 13:11 14:22,23 20:19 22:1 38:17 45:12 47:7 65:1 73:19 89:19 132:24

**top** 27:22 61:18 102:21 113:25 119:15

**total** 116:14

**Tower** 102:5

**town** 97:12

**tracing** 102:1

**track** 129:11

**tracker** 36:5

**tracking** 36:13,17 37:16 93:17 106:4

**Trader** 108:18 109:7

**transcript** 22:5

**transmissions** 94:9

**trauma** 85:14

**traumatized** 86:12,15

**travel** 105:3,15,17,21,23 106:22 124:16,24 125:3,5

**tree** 85:7

**trees** 85:11

**triggered** 133:9

**triggers** 60:8

**trip** 20:12 115:24

**true** 63:17 64:1 75:12 133:18

**truth** 47:3 52:25 54:3,16 60:14 62:15 81:2

**tryer** 51:16

**tune** 7:16

**turn** 124:15,17,18,20,24

**turned** 14:21,24 15:13 95:6 136:2

**turning** 15:4 17:18

**turns** 111:19

**TV** 14:21,24 15:5,7,13,19 16:15, 19,21,23 17:1,8,17 20:14 111:4,7, 13,17,21,24 112:7,8,10

**TVS** 15:23 111:24 112:15

**two's** 96:17

**two-factor** 112:3

**type** 16:19 40:7 98:16

**typical** 6:1,15

**typically** 6:23

### U

**ugly** 133:3

**Uh-huh** 7:4 15:22 16:25 19:6 22:12 34:9 60:10 71:8 128:10 130:2 134:2 136:14

**ultimately** 8:5 100:8 138:7

**unblock** 69:9 71:17

**unblocked** 66:12

**uncomfortable** 78:15

**underneath** 100:24

**underscore** 102:23

**understand** 16:11 41:7,9 43:18 45:17 46:2,4,17 55:11 81:8 96:8 102:7

**understanding** 45:3

**understands** 57:16 82:20 114:10 125:6

**understood** 139:6

**unintentionally** 130:16

**unique** 132:25

**universal** 60:14

**unknown** 125:18

**unlock** 71:18

**unquote** 62:7 71:4 135:18

**unrelated** 22:23

**unreported** 50:6

**unused** 126:18

**upset** 14:16 114:1 115:24

**user** 95:21 108:13

**user's** 96:2

### V

**vacation** 20:24

**variation** 96:22

**variety** 93:17 94:12

**Venmo** 69:9,20 94:15 115:3 117:25 118:19,20,21,23 119:1,25

**Venmo'ing** 112:25

**venue** 138:9

**verbatim** 69:11

**verify** 118:4

**versus** 11:9 99:9 122:3

**victim** 7:11 42:10 59:3 77:11 130:9,22 132:19 135:18 138:22 141:1

**victim's** 132:16 135:17

**video** 15:22

**view** 91:17 122:5

**viewed** 100:1

**viewing** 24:6,7

**violated** 136:11

**violating** 131:18

**violation** 137:9,10,13 143:14

**violence** 82:22 83:5 139:25

**Virginia** 93:14

**Visa** 109:6

**visitation** 137:17,19

**volume** 14:25 17:18

### W

**W-9** 25:8

**W-I-T-H-E-R-S** 11:23

**wait** 6:5 86:5 134:18

**waive** 7:1

**walk** 97:5 122:24 123:8

**walked** 31:6 142:13

**Walker** 11:11

**walking** 97:1

**wanted** 14:4,16,19 23:4 47:6 59:15 64:25 68:7 75:17 87:17 98:17 110:7 114:20 122:12 139:5, 8 141:16,18

**warrant** 13:21 16:12 29:8 30:4 66:21 72:25 73:8 75:19 107:10, 14,18 130:10,14,15,16,17 133:16, 22 134:23 137:1 139:15 142:9,22, 25 143:2,12

**warrants** 6:17 8:12,21,24 13:18, 23 25:22,24,25 39:20 54:24 55:12,13,22,23 73:12 75:9,11,13, 21 77:7 93:24 95:13,16 98:11 99:24 101:19 103:14 107:8,11,12 132:14 134:9,13,14,20,23 135:3, 15 137:9,22,23 138:11 141:7

**waste** 124:22

**watermelon** 98:4,5,8

**wear** 87:22

**wearing** 12:3 28:12 45:20

**website** 42:14,15,22

**weeks** 8:4 28:3 30:18 32:18 34:6

**Whatsapp** 24:7

**Whatsyourprice** 40:5,7,11,16 41:15 44:8

**whistle** 138:18

**whistle-blowed** 136:2

**wide** 139:13

**Wife** 136:12,24

**Wifi** 112:10

**Wilson** 27:4

**wind** 48:18

**wishing** 69:17

**withdraw** 21:8

**withdrew** 22:18

**Withers** 7:11,15,22,25 8:9 9:1 10:10 11:6,16,21 23:9 40:1 41:5 44:7 57:11 65:9 98:24 100:2,10, 12 101:20 102:4,12,25 108:1,7,10 109:25 111:7,14 112:12 113:6,10, 21 114:1 116:8 117:6 119:13 126:2,10,24 127:4,14,19,21,25 131:25 133:19 138:19 141:12,15

142:24

**Withers'**  99:16 101:22 104:16
107:19 110:13,20 123:16 124:5
127:9,12

**witness's**  87:14

**witnesses**  10:20

**word**  36:15 46:13 61:12,17
120:21,22 140:22

**words**  36:9 60:12 74:11 81:4
83:9 87:14 96:19 100:2 120:18,20
133:7 141:2

**work**  14:23 15:5 28:13 35:23
93:8,11 94:22 95:5 136:5

**worked**  15:19 93:4,13

**working**  101:1

**works**  111:16

**world**  81:1 95:24 99:2 102:11
136:22

**worms**  20:20 90:21

**worried**  81:6,7

**worry**  42:5

**worst**  46:10 56:17

**worth**  48:22 49:10 85:20

**write**  123:6

**writing**  103:3

**written**  5:13 22:14 23:5,15 140:9

**Wrong**  72:15

---

### Y

**y'all**  45:5

**yards**  37:8

**year**  42:4 43:9 59:7 77:25 110:16
111:8 114:17 119:17 120:23,24

**years**  9:5 103:12

**you-all's**  47:5

---

### Z

**zeroed**  110:12