# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARTIN SCOTT** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **3:25-cv-01393** |
| | ) | **JUDGE TRAUGER** |
| **METRO. GOV'T. OF NASHVILLE** | ) | **JURY DEMAND** |
| **AND DAVIDSON COUNTY,** | ) | |
| | ) | |
| **TRACKING SOLUTIONS, INC.,** | ) | |
| | ) | |
| **MALLORY WITHERS,** | ) | |
| *in her individual capacity* | ) | |
| | ) | |
| **BRIAN CAVALIERE,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| **TYLER LEWIS,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, by and through undersigned counsel, for his Complaint against Defendants states as follows:

## INTRODUCTION

1. Plaintiff brings this action under 42 U.S.C. § 1983 to redress violations of his rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution,

1

and to obtain declaratory, injunctive, and monetary relief. He also asserts related supplemental state-law claims under Tennessee law.

2.      After Plaintiff's and Defendant Mallory Withers's arrangement ended in late August 2024, Defendant Withers began submitting criminal complaints to the Metropolitan Nashville Police Department alleging harassment, stalking, and violations arising from Plaintiff's mailing of IRS Form 1099-NEC tax documents reporting payments made to her. Based on those complaints and in collaboration with Withers, officers obtained six warrants against Plaintiff between December 2024 and January 2025. Plaintiff was arrested twice, detained for approximately four hours following the first arrest and twelve hours following the second, and placed on GPS monitoring as a condition of release after his January 29, 2025 arrest. Two of the charges were later returned by the grand jury; the remaining charges were dismissed or no true billed, and on September 23, 2025, the assigned Assistant District Attorney wrote that if Plaintiff withdrew his "1099 and tax claims," the State would dismiss the criminal cases.

3.      Plaintiff never withdrew the IRS Forms 1099. On the date Defendant Mallory Withers was scheduled to appear in state criminal court to show cause for her refusal to comply with a subpoena issued in connection with an earlier motion hearing, the State dismissed all charges against Plaintiff.

## PARTIES AND JURISDICTION

4.      Plaintiff, Martin Scott, is an adult male who is a resident of Tennessee and a United States citizen.

5.      Defendant Metropolitan Government of Nashville and Davidson County ("Metro") is a political subdivision of the State of Tennessee, subject to suit under 42 U.S.C. §

1983 for its customs, policies, and practices and operates the Metropolitan Nashville Police Department ("MNPD"), the Davidson County Night Court, and related pretrial services.

6. Defendant Tracking Solutions, Inc. is a private corporation that conducts business in Tennessee and administers GPS monitoring for pretrial defendants under color of state law and at all relevant times provided GPS monitoring services for Metro and Davidson County criminal courts.

7. Defendant Mallory Withers is an individual who, acting jointly with law enforcement personnel, initiated and sustained malicious prosecutions against Plaintiff.

8. Defendant Brian Cavaliere is a sworn law enforcement officer employed by the Metropolitan Nashville Police Department and is sued in his individual capacity for acts taken under color of law.

9. Defendant Tyler Lewis is a sworn law enforcement officer employed by the Metropolitan Nashville Police Department and is sued in his individual capacity for acts taken under color of law.

10. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil-rights enforcement).

11. Supplemental jurisdiction exists over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

12. This Court also has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202.

13. Venue lies in this District under 28 U.S.C. § 1391(b), because the events giving rise to these claims occurred in Nashville, Davidson County, Tennessee.

3

14. Plaintiff and Defendant Mallory Withers were involved in a paid sexual arrangement beginning late 2023 and lasting into late 2024 in which Plaintiff compensated Withers for sexual encounters. (Exs. A, C–F). At the March 27, 2025 preliminary hearing, Withers testified that the parties had an "arrangement" lasting approximately nine months. (Ex. K - Preliminary Hearing Transcript, P. 12, L. 14-15). Plaintiff and Withers benefited from this arrangement until around August of 2024 when the temperament of the arrangement took a turn. As the arrangement was coming to an end for Plaintiff, Plaintiff issued IRS Forms 1099 reflecting payments made during the arrangement. (Exs. I–J).

15. On August 28, 2024, Plaintiff and Withers had an argument over text messages. During that exchange, Withers stated that she would "call the police." (Ex. L - August 28th Text). The argument ended that day. The same day, as a reaction to Withers's threat to call the police, Plaintiff called Withers multiple times; Plaintiff's calls lasted mere seconds. (Ex. M - August 28th Call Log). The resulting repetitive calls later formed the basis of the warrant assigned case number GS1054865. (Ex. N - Criminal Warrants, P. 1-2).

16. The arrangement did not end on August 28, 2024. During the roughly two months following that argument, Withers did not report criminal conduct. During part of that same period, Plaintiff and Withers exchanged more than 200 text messages and continued their paid arrangement. (Ex. K - Preliminary Hearing Transcript, P. 115, L. 7-12). At the preliminary hearing, Withers acknowledged that the parties continued communicating after August 28, 2024 and that they were still cordial and speaking into September 2024. (*Id.* at P. 67, L. 17-18) Messages introduced during the hearing showed that on September 13 and 14, 2024, Withers initiated contact asking why Plaintiff was ignoring her. (*Id.* at P. 68, L. 3-8).

4

17. In October 2024, Plaintiff notified Withers in writing that IRS Forms 1099 for tax years 2023 and 2024 would be issued reflecting compensation paid during the arrangement. (Ex. G - October Letter, P. 1). United States Postal Service tracking records reflect that the certified mailing was delivered and picked up by the recipient at the Nashville post office on October 18, 2024. (Ex. S - USPS Records October Letter, P. 2). At the preliminary hearing, Withers admitted she received a letter in October stating Plaintiff would be sending her a 1099 and a W-9. (Ex. K - Preliminary Hearing Transcript, P. 25, L. 1-8). She further acknowledged that the October correspondence included itemized attachments describing the payments. (*Id.* at P. 51, L. 1-5).

18. Messages between Plaintiff and Withers further confirm that Withers understood the arrangement to involve ongoing financial payments from Plaintiff. In one exchange, Withers wrote: "We had an arrangement. You gave me money with each meet and I spent it. I work on the go, airports, layovers, necessities, food, etc. $1k a week is not much for someone who has my lifestyle." (Ex. O - Mallory's Lifestyle Text). In other communications, Withers referenced the parties' "arrangement" and discussed the terms of their sexual encounters and financial compensation. (Exs. A, C-F).

19. In response to the October 2024 notice, Withers sent messages stating that the 1099 filings were a "power move" and that the tax reporting would affect her livelihood. (Ex. P - "Power Move" Text).

20. Internal police records obtained through public records requests reflect that investigators understood the parties' dispute to involve money, gifts, and tax reporting rather than merely unwanted communications. Police reports referenced "pictures of gifts and money that the defendant sent the victim himself." (Ex. Q - Combined Docs at 5). Another report

5

described the alleged harassment as the suspect "send[ing] her mail to have her pay taxes on items he bought her." (Ex. Q - Combined Docs at 8).

21.     Other records reveal that Withers expressed concern she could face legal consequences for prostitution and that an officer reassured her that authorities were not prosecuting her and that she would instead be treated as a victim of a crime. (Ex. R - Promise Not to Prosecute, P. 2).

22.     On December 3, 2024, Withers swore out affidavits that resulted in warrants numbered GS1054865 and GS1054866. (Ex. N - Criminal Warrants, P. 1-2). One charged harassment by repetitive calls and the other charged stalking. *Id.* The calls referenced in those affidavits, as stated previously, occurred during the August 28 argument and lasted only seconds as part of a single exchange. See (Ex. M - August 28th Call Log). The affidavits did not state that Withers initiated the argument by threatening to call the police, nor did they disclose that the parties continued communicating and transacting voluntarily for months after that date.

23.     On November 27, 2024, a third-party IRS vendor, Tax1099, mailed a Form 1099-NEC for tax year 2023 to Withers. (Ex. J - Proof 1099s were sent by Tax1099). The mailing envelope identified the sender as INFOSEND which was acting through Tax1099.com. (Ex. I - Mallory's Pics of 2023 1099 Received). Records from the vendor show that the form was submitted for mailing on November 22, 2024, and mailed on November 27, 2024. (Ex. J - Proof 1099s were sent by Tax1099). The mailing envelope bore the marking "Presorted First-Class Mail – U.S. Postage Paid – INFOSEND" and included a United States Postal Service Intelligent Mail barcode identifying the item as bulk vendor-generated mail rather than a personally mailed communication. (Ex. I - Mallory's Pics of 2023 1099 Received).

24. On November 14, 2024, Withers sought an ex parte order of protection. (Ex. T - Order of Protection). The allegations in the order of protection largely mirrored the allegations in her initial warrants for harassment and stalking. See (Ex. T - Order of Protection) and (Ex. N - Criminal Warrants). Both the order of protection and the harassment and stalking warrants shared the same fate; they were all dismissed.

25. On December 20, 2024, Plaintiff was arrested on the December 3 warrants and incarcerated for a matter of hours before release.

26. On December 10 and December 23, 2024, Withers reported to MNPD that receipt of the Form 1099 constituted unlawful "contact" and a violation of the ex parte order of protection. On December 23, 2024, Withers swore out two additional affidavits based on the first 1099 mailing. (Ex. N - Criminal Warrants, P. 3-4). One charged violation of an order of protection and the other charged harassment causing emotional distress. *Id.* Both affidavits alleged that Withers had received a 1099 form and treated that mailing as impermissible contact. *Id.*

27. The December 23rd affidavits did not disclose that the form was mailed by a third-party vendor, that Plaintiff had notified Withers in October 2024 that the forms would be issued, or that the notice included itemized documentation of payments. The affidavits instead characterized the mailing itself as unlawful contact and as a source of emotional distress. The envelope itself plainly identified the mailing as vendor-generated bulk mail through the marking "Presorted First-Class Mail – Postage Paid – INFOSEND" and the presence of a United States Postal Service Intelligent Mail barcode, both of which were readily observable and capable of verification.

28. On December 17, 2024, a second Form 1099-NEC for tax year 2024 was mailed through the same third-party vendor. Vendor records reflect the mailing occurred on December 17, 2024 (Ex. J - Proof 1099s were sent by Tax1099), and United States Postal Service records show a Nashville-area scan on December 24, 2024. The form was delivered to Withers on December 26, 2024.

29. Withers did not report the December 26 delivery as a bond-condition violation upon receipt. On January 17, 2025, Defendant Tyler Lewis swore out an affidavit alleging violation of a no-contact domestic-violence bond condition. (Ex. N - Criminal Warrants, P. 5). The affidavit relied on the second 1099 mailing and alleged that Plaintiff had made threats to report money spent during the arrangement. *Id.* The affidavit did not state that the form had been mailed on December 17, 2024, before Plaintiff's December 20 arrest and before bond conditions were imposed. It also did not disclose that the mailing was generated and sent by a third-party vendor rather than personally mailed by Plaintiff.

30. The affidavit also referenced a letter sent by Plaintiff in October 2024 concerning the potential future issuance of IRS Forms 1099. *Id.* Postal records reflect that the letter was delivered in October 2024—more than two months before Plaintiff's arrest and before any bond conditions or no-contact restrictions existed. (Ex. H - Proof of Delivery of October Letter). Nevertheless, Defendant Lewis characterized the letter as a threatening communication and relied on it as a basis for alleging that Plaintiff caused Withers significant emotional distress. (Ex. N - Criminal Warrants, P. 5). The affidavit further stated that receipt of the 1099 form caused Withers "significant emotional distress," but it did not identify any bond provision making emotional distress an element of a no-contact violation. *Id.*

31. The timing and source of the mailing were objectively capable of verification through inspection of the envelope itself—which bore the INFOSEND bulk-mail designation and postal barcode—and through routine inquiry to the third-party vendor identified on the envelope. (Ex. I - Mallory's Pics of 2023 1099 Received). The affidavit did not indicate that any inquiry was made to determine whether the mailing predated the imposition of bond conditions. (Ex. N - Criminal Warrants, P. 5).

32. On January 20, 2025, Withers reported to MNPD that Plaintiff had created a "fake Instagram account" to harass her and that a dating application showed Plaintiff as approximately "one mile away" from her residence. (Ex. N - Criminal Warrants, P. 6). Withers did not disclose that she located the Instagram account herself and had not received any message, notification, or interaction from the account.

33. Defendant Cavaliere swore to allegations regarding the Instagram account and the dating-application proximity without proof identifying Plaintiff as the account holder and without proof that Plaintiff's bond conditions imposed geographic restrictions. *Id.*

34. On January 29, 2025, Plaintiff was arrested on the additional charges procured by Defendant Lewis and Defendant Cavaliere.

35. At Plaintiff's initial appearance following the January 29 arrest, a judicial commissioner imposed GPS monitoring as a condition of release by checking a box on a standardized form. (Ex. U - Order Granting Bail). The commissioner made no individualized findings supporting GPS monitoring and did not identify any exclusion zones or geographic restrictions in the order. *Id.*

36. Plaintiff could not secure release unless a qualified private monitoring vendor attached a GPS device. At the time of Plaintiff's arrest, Tracking Solutions, Inc. and Nationwide

Electronic Monitoring were the only two advertised vendors inside the booking facility. Between those two vendors, Tracking Solutions responded to Plaintiff's request for monitoring services. Therefore, Plaintiff enrolled with that vendor.

37.     Tracking Solutions required Plaintiff to sign a "GPS Monitoring Agreement and Release" imposing undefined exclusion zones, additional restrictions, and liability waivers not ordered by any court. (Ex. V - Tracking Solutions Agreement).

38.     Plaintiff never violated GPS monitoring conditions, and no violation was ever alleged against him.

39.     On March 27, 2025, the Davidson County General Sessions Court conducted a preliminary hearing covering all six pending cases. During that hearing, Withers testified that Plaintiff was prohibited from being in two locations, including her residence, under the GPS monitoring system. (Ex. K - Preliminary Hearing Transcript, P. 37, L. 7-14).  The written bond order contained no exclusion zones. (Ex. U - Order Granting Bail). This testimony was Plaintiff's first notice that geographic restrictions had allegedly been imposed in connection with his monitoring. Following the hearing, the court ordered that the GPS monitor be removed the same day.

40.     Plaintiff's Order Granting Bail for Abuse Cases contains no findings of fact supporting any determination that he posed a threat to the alleged victim, Defendant Withers. (Ex. U – Order Granting Bail). Instead, the commissioner merely checked a box on the form stating that "[Plaintiff] is a threat to the alleged victim…." Id.

41.     The order likewise contains no findings of fact supporting the imposition of GPS monitoring, no indication that Plaintiff's ability to pay was assessed, no indication that Defendant Withers was consulted, and no identification or disclosure of any exclusion zones. Id.

10

42. Through a public records request, Plaintiff obtained copies of the forms titled Order Granting Bail for Abuse Cases issued in Davidson County between July 2024 and September 2025. Of the approximately 1,300 forms produced, only 35 contained any information identifying exclusion zones. In the remaining orders, the sections designated for exclusion-zone information were left blank. Additionally, the vast majority of the forms contained no individualized findings of fact supporting either the imposition of GPS monitoring or the setting of bail.

43. After the removal of the monitor, Plaintiff began attempting to present affidavits alleging that Withers had fabricated evidence and made false reports to law enforcement.

44. On April 7, 2025, Plaintiff met with Detective Brian Cavaliere at the Family Safety Center and presented affidavits alleging false reporting and fabrication of evidence. Supporting documents were emailed to Cavaliere later that day.

45. On April 23, 2025, Cavaliere informed Plaintiff that the District Attorney's Office would not pursue charges against Withers while Plaintiff's criminal charges remained pending. (Ex. W - Cavaliere Emails, P. 2).

46. On April 26, 2025, Plaintiff attempted to present a sworn affidavit to Night Court Commissioner Carolyn Phipus and was directed to speak with the District Attorney's Office instead. Later that day, Plaintiff spoke with MNPD officers Taylor and Hutcheson, who declined to assist him in presenting the affidavit to a magistrate. Plaintiff then appeared before Night Court Commissioner Umeka Foreman, who did not review the affidavit for probable cause and instead directed Plaintiff to contact court administration.

47. Still on April 26, 2025, Detective Cavaliere emailed Assistant District Attorney Erin Snelling regarding Plaintiff's attempts to obtain warrants, stating that Plaintiff had been

placed "on [the Night Court's] radar … to ensure that no warrants [would] be obtained on Ms. Withers." (Ex. X - Snelling & Cavaliere Emails). Snelling responded that her office would not prosecute Withers and asked Cavaliere to continue documenting Plaintiff's attempts. *Id.* Snelling further indicated that if Plaintiff did not stop attempting to seek warrants against Withers, the State would "see about pursuing more warrants" against Plaintiff. *Id.*

48. Between April 30 and May 1, 2025, Plaintiff contacted General Sessions administration and Metro Law seeking guidance on how to present a Rule 3 affidavit to a magistrate. On May 5, 2025, Plaintiff submitted a written complaint to Metro Law regarding the refusal to present his affidavit for judicial review. On May 20, 2025, Plaintiff contacted the Criminal Court Clerk's Office regarding access to judicial magistrates and was not provided any procedure for doing so.

49. In May 2025, Plaintiff contacted Tracking Solutions seeking information regarding the exclusion zones that had allegedly applied during his monitoring period. Tracking Solutions responded that the information constituted "victim information" and could only be obtained by subpoena. On May 21, 2025, Tracking Solutions' owner further stated that the company would not provide exclusion-zone information to defendants absent a court order.

50. In response to public records requests, the Metropolitan Clerk's Office reported that it had searched its contract database and found no recorded contract with Tracking Solutions. (Ex. Z - Metro Clerk's Office - No Agreement, P. 2).

51. A bonding company involved in Plaintiff's release later confirmed that bonding companies are not notified of GPS exclusion zones and had received no documentation identifying any such zones in Plaintiff's case. (Ex. Y - Grumpy's Bail Bonds Email, P. 2).

52. On May 23, 2025, Plaintiff submitted a claim to Metro Law regarding the GPS exclusion-zone issue and requested a copy of Metro's contract with Tracking Solutions covering the period during which he was monitored. The claim was assigned number C-46537 on May 30, 2025.

53. On May 28, 2025, General Sessions Administrator Kyle Sowell stated that Metro Procurement was still in the process of awarding the monitoring contract and that there was no written agreement to provide. (Ex. AA - Metro Procurement Email, P. 1).

54. On July 9, 2025, the Davidson County Grand Jury acted on the remaining charges. Three charges had already been dismissed in General Sessions Court, one charge received a no true bill, and two charges—harassment and violation of a protective order arising from the 1099 mailings—were returned as indictments.

55. On September 23, 2025, the assigned Assistant District Attorney wrote to Plaintiff's criminal counsel stating that if Plaintiff withdrew his "1099 and tax claims" the State would dismiss the criminal cases. (Ex. BB - Atnip Email, P. 1).

56. On October 29, 2025, at a hearing where Withers failed to appear pursuant to subpoena, the State dismissed all criminal charges against Plaintiff.

57. Also on October 29, 2025, Plaintiff observed testimony in another criminal matter involving Tracking Solutions in which a case manager for Tracking Solutions explained that exclusion zones are programmed by the vendor and generate automated alerts. In that same proceeding, the alleged victim testified that Tracking Solutions asked her what locations she wanted designated as exclusion zones.

58. On November 14, 2025, Plaintiff again attempted to present affidavits alleging false reporting. The responding officer generated an incident report as a matter of record but did not present the affidavit to a magistrate.

59. On November 29, 2025, Plaintiff petitioned the Davidson County Grand Jury foreperson requesting an opportunity to present evidence of false reporting and fabrication of evidence. In a written response dated December 11, 2025, the foreperson denied the request and stated that the dismissal of Plaintiff's charges did not constitute a full adjudication or confirmation that the allegations against Plaintiff were baseless.

60. Plaintiff's criminal prosecutions caused two arrests, brief periods of incarceration, attorney's fees, bond-related expenses, GPS monitoring fees, loss of firearm possession during the pendency of the charges, reputational harm, and emotional distress.

## <u>COUNT I – MALICIOUS PROSECUTION</u>
### (42 U.S.C. § 1983 – Fourth Amendment)
**DEFENDANTS MALLORY WITHERS, BRIAN CAVALIERE, AND TYLER LEWIS**

61. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

62. This claim challenges the initiation and continuation of six criminal prosecutions based on materially false and incomplete information supplied by Defendant Withers and incorporated into formal criminal process by Defendants Cavaliere and Lewis despite obvious inconsistencies and the absence of facts necessary to establish probable cause, resulting in Plaintiff's unlawful seizures in violation of the Fourth Amendment.

63. Defendants Cavaliere and Lewis were, at all relevant times, officers of the Metropolitan Nashville Police Department acting under color of state law in swearing affidavits,

seeking warrants, and causing Plaintiff's arrests. Defendant Withers, a private individual, acted jointly with them by knowingly supplying false and materially incomplete information that was incorporated into sworn affidavits and charging documents. Defendants Lewis and Cavaliere did not merely rely on prior accusations but expanded and perpetuated the criminal proceedings by swearing additional affidavits that incorporated and built upon Defendant Withers's earlier allegations.

64.     A Fourth Amendment malicious prosecution claim arises when a defendant (1) initiates or influences criminal proceedings, (2) without probable cause, (3) causes a deprivation of liberty pursuant to those proceedings, and (4) the prosecution terminates in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010). A defendant "influences" a prosecution under § 1983 when he knowingly or recklessly includes falsehoods or omits material exculpatory information from a warrant affidavit, or when he launders a complainant's fabricated narrative into formal criminal process. See *King v. Harwood*, 852 F.3d 568, 582–83 (6th Cir. 2017).

## STATE ACTION

65.     Defendant Withers acted under color of state law because she was a willful participant in joint activity with Defendants Cavaliere and Lewis in initiating and sustaining criminal proceedings against Plaintiff. A private party acts under color of law when she conspires with or engages in concerted action with state officials to deprive another of constitutional rights. *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980).

66.     Defendant Withers did more than report alleged misconduct. She repeatedly supplied allegations that were incorporated into sworn affidavits and charging instruments, and the officer Defendants adopted and advanced her version of events in initiating criminal process.

15

67.     The IRS Forms 1099 became the central factual predicate across multiple affidavits. Defendant Withers swore warrants on December 23, 2024, characterizing receipt of a Form 1099 as unlawful "contact." Thereafter, Defendant Lewis swore a bond-violation affidavit on January 17, 2025, and Defendant Cavaliere swore an aggravated stalking affidavit on January 20, 2025, each incorporating the same 1099-based narrative. Although federal tax reporting is not an element of harassment, stalking, or bond violations, the 1099 allegations became the common thread running through each charging instrument.

68.     The joint activity continued beyond initiation of charges. Following the March 27, 2025 preliminary hearing, Plaintiff attempted to present affidavits alleging false reporting and fabrication of evidence by Withers. Those efforts were repeatedly redirected away from neutral judicial review. During this same period, Detective Cavaliere communicated with the District Attorney's Office stating that Plaintiff had been "put on [Night Court's] radar … to ensure that no warrants [would] be obtained on Ms. Withers."

69.     At the same time, communications involving prosecuting attorneys reflected that dismissal of the pending criminal charges was conditioned on Plaintiff withdrawing the IRS Forms 1099. The alignment between (1) the affidavits' repeated reliance on the 1099 forms, (2) the continuation of prosecution based on those allegations, and (3) the effort to condition dismissal on withdrawal of those filings supports a reasonable inference of coordinated action to sustain the prosecution.

70.     These facts support a plausible inference that Defendant Withers and the officer Defendants engaged in concerted action to initiate and maintain criminal proceedings against Plaintiff.

**INITIATES OR INFLUENCES CRIMINAL PROCEEDINGS**

16

71. Defendants Withers, Lewis, and Cavaliere initiated and influenced criminal proceedings against Plaintiff by supplying and swearing to affidavits that were incorporated into warrant applications and charging instruments.

72. On December 3, 2024, Defendant Withers swore affidavits alleging harassment and stalking based on nine phone calls during an August 28, 2024 argument. Based on those sworn allegations, warrants were issued, and Plaintiff was arrested on December 20, 2024.

73. On December 23, 2024, Defendant Withers swore additional complaints alleging that Plaintiff violated an order of protection by "sending" her a Form 1099.

74. On January 17, 2025, Defendant Lewis swore an affidavit alleging a violation of bond conditions based on Defendant Withers's receipt of a Form 1099.

75. On January 20, 2025, Defendant Cavaliere swore an affidavit charging Plaintiff with aggravated stalking based on allegations concerning an Instagram account and a dating-application proximity display.

76. These affidavits directly resulted in Plaintiff's arrests and the continuation of criminal proceedings against him.

**LACK OF PROBABLE CAUSE**

77. The charges against Plaintiff arose from four primary categories of alleged conduct: (1) nine phone calls during an August 28, 2024 argument; (2) receipt of IRS Forms 1099 mailed by a third-party vendor; (3) an alleged bond-condition violation based on delivery of a Form 1099 on December 26, 2024; and (4) the existence of an Instagram account and a dating-application proximity display.

78. The charges against Plaintiff were not supported by probable cause because the affidavits omitted material facts, relied on conduct that did not satisfy the elements of the

17

charged offenses, and were based on allegations that could not establish criminal liability as a matter of law.

**August 28 Phone Calls**

79. The sworn complaints did not disclose that the calls occurred during a single heated exchange initiated by Defendant Withers, or that the parties continued communicating voluntarily afterward, exchanging more than 200 messages and maintaining contact for weeks. That omitted context was material to whether the calls could constitute harassment under Tennessee law.

**IRS Forms 1099**

80. The warrant materials characterized receipt of IRS Forms 1099 as intentional prohibited "contact." They did not disclose that the forms were mailed by a third-party vendor, INFOSEND; that Plaintiff provided advance written notice that the forms would issue; or that the December 17, 2024 mailing preceded Plaintiff's December 20, 2024 arrest and execution of bond conditions.

81. The existence of probable cause for the alleged bond violation depended on a dispositive fact: whether the mailing occurred after December 20, 2024. If the mailing occurred before that date, then the conduct could not constitute a violation of bond conditions. The mailing date was readily ascertainable through postal records, yet Defendant Lewis did not verify it before swearing to criminal conduct.

**Instagram and Dating Application Allegations**

82. The aggravated stalking affidavit did not allege that the Instagram account contacted Defendant Withers, sent her messages, or otherwise engaged in conduct directed

toward her. It did not identify any evidence linking Plaintiff to the creation or operation of the account. Nor did it verify the accuracy or reliability of the dating application's proximity display.

83.     The affidavit also did not identify any enforceable geographic restriction in Plaintiff's bond conditions. In fact, the bond order imposed no distance-based limitation other than a requirement that Plaintiff stay away from Defendant Withers's residence. The existence of a geographic restriction was a necessary predicate to treating proximity as criminal conduct, yet Defendant Cavaliere did not verify whether such a restriction existed.

**Omission of Readily Verifiable Facts**

84.     The affidavits omitted material contextual facts known to Defendant Withers that were readily verifiable by the officers through basic investigative steps. The absence of direct communication, verified authorship, and any enforceable geographic restriction was apparent from the face of the allegations at the time the affidavits were sworn.

**Procedural History**

85.     Three of the six charges brought against Plaintiff were dismissed in General Sessions Court prior to grand jury review—case numbers GS1054865, GS1054866, and GS1059484. Of the remaining three charges presented to the Davidson County Grand Jury, one charge—GS1056823—resulted in a no true bill, while the other two charges—GS1056824 and GS1059179—resulted in true bills of indictment. Both of the charges returned by the grand jury were based on the allegations concerning the mailing or receipt of IRS Forms 1099. As alleged above, the warrant affidavits and supporting materials for those charges omitted material contextual facts relevant to probable cause.

**Conclusion**

86. The omitted facts, if included in the warrant materials, would have negated probable cause for harassment, stalking, or violation of bond conditions.

**DEPRIVATION OF LIBERTY**

87. As a direct result of these actions, Plaintiff was arrested twice, detained, subjected to continuous GPS monitoring at his own expense, stripped of his right to possess firearms, required to abstain from alcohol, and publicly labeled a felony defendant. He incurred monitoring fees, attorney's fees, and substantial reputational and employment harm. He also suffered humiliation, emotional distress, and ongoing privacy invasion resulting from electronic tracking. These consequences amount to a prolonged seizure under the Fourth Amendment. *Grady v. North Carolina*, 575 U.S. 306, 310 (2015).

**TERMINATION IN PLAINTIFF'S FAVOR**

88. On October 29, 2025, the Davidson County Criminal Court dismissed all remaining charges at the State's request, terminating the prosecution in Plaintiff's favor.

**RELIEF REQUESTED**

89. Defendants' conduct directly and proximately caused Plaintiff's unlawful seizure and all resulting damages. Plaintiff seeks compensatory damages for economic losses, emotional distress, reputational injury, and liberty restraints; punitive damages for Defendants' reckless disregard of constitutional rights; and attorney's fees under 42 U.S.C. § 1988.

**COUNT II – FABRICATION OF EVIDENCE**
**(42 U.S.C. § 1983 – Fourth and Fourteenth Amendments)**
**DEFENDANTS MALLORY WITHERS, BRIAN CAVALIERE, AND TYLER LEWIS**

90. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

20

91.     The warrants leading to Plaintiff's arrests were issued based on affidavits that omitted material facts and presented misleading information to the issuing magistrate. Had those facts been disclosed, probable cause would not have existed.

92.     It has long been clearly established in the Sixth Circuit that a police officer violates the Constitution when he knowingly or recklessly includes false statements, omits material exculpatory facts, or relies on fabricated evidence to initiate or continue a criminal prosecution. *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006); *Spurlock v. Satterfield*, 167 F.3d 995, 1005–07 (6th Cir. 1999). A seizure based on deliberately falsified information violates the Fourth Amendment, and the use of fabricated evidence to deprive a person of liberty also violates the Due Process Clause of the Fourteenth Amendment. Id. A seizure based on deliberately falsified or materially misleading information violates the Fourth Amendment. *Gregory*, 444 F.3d at 737.

93.     Defendant Brian Cavaliere was, at all relevant times, a law enforcement officer acting under color of state law. Defendant Tyler Lewis was, at all relevant times, a law enforcement officer acting under color of state law. Defendant Mallory Withers acted jointly with, and knowingly induced, Defendants Brian Cavaliere and Tyler Lewis to submit false or materially misleading information to judicial officers to initiate and sustain criminal proceedings against Plaintiff.

**FABRICATIONS SUPPLIED BY DEFENDANT WITHERS**

94.     The affidavits and supplemental statements submitted by Defendants contained multiple falsehoods or material omissions attributable to Defendant Withers, including but not limited to:

(1) <u>False claim that Plaintiff personally mailed IRS Forms 1099</u>: Defendant Withers represented that Plaintiff intentionally mailed her 1099 forms in violation of an order of protection or bond conditions. She omitted that the forms were mailed by a third-party IRS vendor and that the envelopes plainly indicated the mail was sent "Presorted First Class Mail – Postage Paid – INFOSEND." Defendant Withers knew these facts when she reported the mailings as "unlawful contact." The envelopes also contained a United States Postal Service Intelligent Mail barcode identifying the item as vendor-processed bulk mail, providing an additional objective indicator that the mailing originated from a third-party processing service rather than from Plaintiff personally.

(2) <u>False claim that receipt of tax documents constituted "harassment" or "illegal communication"</u>: The tax documents at issue were mailed before any bond conditions existed. Postal records reflect that Plaintiff mailed the October letter on October 17, 2024, and that it was delivered on October 18, 2024. The subsequent Forms 1099 were likewise mailed before Plaintiff's arrest and before any court had imposed bond conditions or communication restrictions. Under the common-law mailbox rule, a document is deemed communicated when it is properly mailed. Accordingly, the tax-related mailings occurred before any judicial order existed that could have restricted such communications.

(3) <u>Fabrication regarding an alleged "fake Instagram account"</u>: Defendant Withers told officers that Plaintiff created a fictitious Instagram account "containing information only he would know." She had no message from that account, no proof of authorship, and she located the profile herself. There was no evidence the

account had any connection to Plaintiff. These assertions were speculative and knowingly misleading.

(4) <u>Misrepresentation of dating-app proximity as evidence of "stalking"</u>: Defendant Withers claimed a dating application showed Plaintiff approximately "one mile away" from her home. At the time, she lived in downtown Nashville—a densely populated area where thousands of people routinely fall within the same one-mile radius. She omitted that dating-app proximity readings are algorithmic estimates, frequently inaccurate, and often reflect nothing more than a general geographic radius rather than movement or intent. She further omitted that Plaintiff's bond conditions imposed no geographic restrictions whatsoever, meaning even an accurate proximity reading could not constitute prohibited conduct. Taken together, her allegation could not reasonably support any inference of "contact," pursuit, or stalking.

95. These false statements and omissions were material: without them, no magistrate could reasonably have found probable cause for any of the six warrants issued between December 2024 and January 2025.

**RECKLESS USE OF FABRICATED EVIDENCE BY CAVALIERE AND LEWIS**

96. Despite obvious inconsistencies in Defendant Withers's allegations, Defendants Cavaliere and Lewis incorporated those accusations into sworn affidavits without verifying facts that were essential to the existence of probable cause. Rather than determining whether the conduct alleged actually satisfied the elements of the charged offenses, they swore to criminal significance while disregarding readily available information that would have clarified whether any crime had occurred at all.

23

97. The Sixth Circuit has made clear that an officer determining probable cause may not "look only at the evidence of guilt while ignoring all exculpatory evidence," but must consider the totality of the circumstances, including both inculpatory and exculpatory information. *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). Although officers are not required to investigate every claim of innocence, they cannot avoid readily available facts that are directly material to whether probable cause exists. Id.

98. Here, the allegations against Plaintiff depended on several threshold factual predicates that had to be established before probable cause could exist. Defendants nevertheless swore to criminal conduct without determining whether those predicate facts were true.

99. First, Defendant Lewis swore that Plaintiff violated bond conditions by mailing Forms 1099 to Defendant Withers. The existence of probable cause for that alleged violation depended on a single dispositive fact: whether the mailings occurred after December 20, 2024, when Plaintiff was arrested and bond conditions first attached. If the mailings occurred before that date, then the alleged conduct could not constitute a violation of bond conditions as a matter of law.

100. The timing of mailed communications was already known within the investigative file to be relevant. In the earlier warrant issued in case GS1056824, the affidavit discussed the timing of mailed correspondence and noted that, according to the United States Postal Service, an average in-state letter delivery occurs within two to three business days. Although Lewis did not swear that warrant, the document demonstrates that investigators had already recognized the significance of mailing and delivery timing in evaluating the allegations.

101. Despite this, Lewis did not determine when the Forms 1099 were actually mailed. That information was readily ascertainable through postal records. Instead, Lewis swore to

24

criminal significance without verifying the very fact that determined whether the alleged conduct could violate bond conditions at all. A reasonable officer would have understood that establishing the mailing date was necessary before treating a mailed tax document as a post-bond criminal communication.

102. Second, Defendant Cavaliere swore to criminal significance based on an allegation that Plaintiff had been "within one mile" of Defendant Withers's residence without first determining whether any judicial order prohibited Plaintiff from being within a specified distance of that location. The legal significance of the allegation depended entirely on the existence of such a restriction. If the court had not imposed a distance-based exclusion zone, then proximity to the residence would not constitute a violation of bond conditions. Yet Cavaliere did not verify the contents of the bail order before swearing to an allegation whose criminal significance depended entirely on the existence of such a restriction.

103. Third, Cavaliere attributed an Instagram account to Plaintiff without determining how Defendant Withers claimed to have discovered the account or whether the account had engaged in any conduct that could satisfy the elements of stalking or harassment. For such an allegation to support probable cause, there would need to be evidence of conduct such as communication, monitoring, following, surveillance, or threats directed toward Defendant Withers. How Defendant Withers became aware of the account was therefore highly relevant to the probable-cause determination. Yet Cavaliere did not ascertain the basis for linking the account to Plaintiff before incorporating the allegation into sworn reports.

104. Under clearly established Sixth Circuit law, constitutional recklessness is established where an officer knowingly or recklessly includes false statements or omits material facts necessary to the probable cause determination. *Gregory v. City of Louisville*, 444 F.3d 725,

25

758 (6th Cir. 2006); *Spurlock v. Satterfield*, 167 F.3d 995, 1005–06 (6th Cir. 1999). By swearing to criminal allegations while disregarding readily available facts that were necessary to determine whether any crime had occurred, Defendants Cavaliere and Lewis acted with at least reckless disregard for the truth and caused Plaintiff to be arrested and prosecuted on materially misleading affidavits.

**CAUSATION**

105.    The fabricated and misleading statements described above were the but-for and proximate cause of Plaintiff's seizures. The arrest warrants issued in December 2024 and January 2025 relied on the allegations that Plaintiff unlawfully mailed IRS Forms 1099, created a fictitious Instagram account to harass Defendant Withers, and appeared within a one-mile proximity of her residence through a dating application. Each of those allegations depended on the false statements and material omissions supplied by Defendant Withers and incorporated into sworn affidavits by Defendants Cavaliere and Lewis. Without those fabricated or materially misleading assertions, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), no magistrate could reasonably have found probable cause to issue the warrants that led to Plaintiff's arrests on December 20, 2024, and January 29, 2025, to the imposition of bail conditions, and to his placement on continuous GPS monitoring.

106.    Under *Sykes v. Anderson*, *Gregory*, and *King v. Harwood*, officers and private individuals acting jointly can be held liable under § 1983 where fabricated or materially false evidence causes the initiation or continuation of criminal process.

**TERMINATION IN PLAINTIFF'S FAVOR**

107.    On October 29, 2025, all criminal charges were dismissed in Plaintiff's favor, not inconsistent with Plaintiff's innocence.

**INJURY**

108.	As a direct and proximate result of Defendants' fabrication of evidence, Plaintiff suffered:

    A.	unlawful arrests and loss of liberty;

    B.	months of electronic monitoring at his expense;

    C.	deprivation of his Second Amendment rights during the pendency of charges;

    D.	attorney's fees and litigation costs;

    E.	reputational harm; and

    F.	emotional distress, humiliation, and stigma.

**RELIEF REQUESTED**

109.	Plaintiff seeks compensatory and punitive damages, together with attorney's fees and costs under 42 U.S.C. § 1988.

### COUNT III – MALICIOUS PROSECUTION
**(Tennessee Common Law – Supplemental Jurisdiction, 28 U.S.C. § 1367)**
**DEFENDANT MALLORY WITHERS**

110.	Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

111.	Under Tennessee law, a plaintiff must show that the defendant (1) instituted or continued a judicial proceeding, (2) without probable cause, (3) with malice, and (4) that the proceeding terminated in the plaintiff's favor. *Christian v. Lapidus*, 833 S.W.2d 71, 73 (Tenn. 1992); *Roberts v. FedEx Corp.*, 842 S.W.2d 246, 248 (Tenn. 1992).

**INSTITUTION AND CONTINUATION OF PROCEEDINGS**

112. Between December 3, 2024, and January 20, 2025, Defendant Withers personally appeared before judicial commissioners and swore to affidavits of complaint that resulted in six criminal charges against Plaintiff. Those sworn statements served as the initiating basis for the issuance of arrest warrants and the commencement of criminal proceedings. The prosecutions remained pending until October 29, 2025, when all charges were dismissed.

113. Defendant Withers therefore instituted and continued judicial proceedings against Plaintiff within the meaning of Tennessee law. Also, Defendant Withers continued to cooperate with law enforcement in maintaining the prosecution of those charges after they were initiated.

**LACK OF PROBABLE CAUSE**

114. The charges initiated by Defendant Withers fell into four categories:

A. Alleged harassment based on an August 28, 2024 argument;

B. Alleged criminal "contact" arising from receipt of IRS Forms 1099;

C. An alleged bond-condition violation based on delivery of a Form 1099 on December 26, 2024; and

D. Alleged aggravated stalking based on an Instagram profile and a dating-application proximity display.

August 28, 2024 Phone Calls

115. On December 3, 2024, Defendant Withers swore that Plaintiff committed harassment based on nine brief phone calls during an argument on August 28, 2024.

116. When presenting that allegation, Defendant Withers did not disclose that: (1) she initiated the confrontation by threatening to "call the police"; (2) the calls occurred during a single heated exchange lasting minutes; (3) immediately afterward, she and Plaintiff exchanged

more than 200 voluntary text messages; and (4) the parties continued communicating and maintaining their arrangement for weeks thereafter.

117. At the time she swore out the complaints, Defendant Withers knew that the communications following August 28 were mutual and ongoing. The omitted context bore directly on whether the conduct could reasonably be characterized as "harassment."

IRS Forms 1099

118. On October 18, 2024, Defendant Withers received notification in writing that IRS Forms 1099 would issue reflecting payments made to her.

119. On November 27, 2024, and December 17, 2024, Forms 1099 were mailed by a third-party vendor, INFOSEND. The envelopes bore the marking "Presorted First Class Mail – Postage Paid – INFOSEND."

120. Defendant Withers thereafter swore out complaints alleging that receipt of the 1099 forms constituted criminal "contact" and violations of protective or bond orders.

121. At the time she made those sworn statements, Defendant Withers knew: (1) Plaintiff had provided advance notice that the forms would issue, and (2) the forms were mailed by a third-party IRS vendor rather than personally delivered by Plaintiff.

122. Despite that knowledge, Defendant Withers characterized receipt of the forms as intentional prohibited contact.

Alleged Bond Violation (December 26, 2024 Delivery)

123. Defendant Withers received the second Form 1099 on December 26, 2024. She did not immediately report the mailing as a bond violation. More than three weeks elapsed before a warrant was sought based on that delivery.

124. When she reported the delivery as a bond violation, she did not disclose that: (1) The form had been mailed on December 17, 2024; (2) The mailing predated service of any bond order imposing restrictions; and (3) The mailing was performed by a third-party vendor.

125. These facts were material to whether receipt of the form could constitute prohibited contact.

Instagram Profile and Dating Application

126. On January 20, 2025, Defendant Withers reported that Plaintiff had created a "fake" Instagram account and that a dating application showed Plaintiff "within one mile" of her residence.

127. At the time she made those sworn allegations: (1) She had received no message from the Instagram account; (2) She had independently searched for and located the profile; (3) She possessed no documentation linking Plaintiff to the account's creation or operation; (4) She resided in downtown Nashville, a densely populated area where a one-mile radius encompasses extensive residential and commercial space; and (5) She knew Plaintiff's bond order imposed no geographic distance limitation other than to stay away from her residence.

128. These facts were not disclosed in her sworn complaints.

**GRAND JURY ACTION**

129. Of the six criminal charges initiated through Defendant Withers's sworn complaints, three were dismissed in General Sessions Court prior to grand jury review. Of the remaining three charges presented to the Davidson County Grand Jury, one charge resulted in a no true bill and two charges resulted in indictments. Both indictments arose from allegations that Plaintiff's issuance of IRS Forms 1099 constituted criminal contact or a violation of court-imposed conditions.

130. Under Tennessee law, a grand jury indictment creates a rebuttable presumption of probable cause as to the specific charges returned. See *Christmas v. Kington*, No. E2022-00699-COA-R3-CV, 2023 Tenn. App. LEXIS 346, at *22 (Ct. App. Aug. 25, 2023).

131. The remaining charges—including: the December 3, 2024 harassment charge based on the August 28, 2024 phone calls; the December 3, 2024 stalking charge arising from the same incident; and the January 20, 2025 aggravated stalking charge based on the alleged Instagram profile and dating-application proximity—were dismissed in General Sessions Court and were not presented to or returned by the grand jury. No presumption of probable cause attaches to those dismissed charges.

132. As to the two charges that resulted in indictments, the presumption of probable cause is rebutted because the indictments were procured through materially incomplete and misleading sworn allegations. Defendant Withers failed to disclose that the Forms 1099 were generated and mailed by a third-party IRS vendor and that Plaintiff had provided advance written notice that the forms would be issued. Those omitted facts bear directly on whether receipt of the forms could constitute intentional prohibited contact. Under Tennessee law, the presumption of probable cause created by an indictment may be overcome where the indictment was procured through fraud, perjury, or other corrupt means, including materially misleading or incomplete information presented to the grand jury. *Hendrix v. James S. Cox & Assocs.*, Appeal No. 02A01-9510-CV-00233, 1997 Tenn. App. LEXIS 803, at *13 (Ct. App. Nov. 14, 1997).

133. Accordingly, while indictments were returned on two charges, the presumption of probable cause applies only to those specific counts and is rebutted by Defendant Withers's material omissions and misrepresentations. No such presumption applies to the remaining charges, which were dismissed prior to indictment.

**MALICE**

134. Malice may be inferred from a lack of probable cause. *Roberts v. Federal Express Corp.*, 842 S.W.2d 246, 248 (Tenn. 1992).

135. The sequence and timing of Defendant Withers's complaints support an inference of improper purpose. Her initial criminal complaints were filed after Plaintiff notified her IRS Forms 1099 would issue reflecting payments made during their arrangement. Additional complaints followed after the forms were mailed, and new allegations were supplied in January 2025 as earlier charges weakened or were challenged.

136. This progression supports a reasonable inference that the criminal process was used not to vindicate legitimate law-enforcement interests but to retaliate against Plaintiff and to neutralize the financial consequences of the tax filings.

137. That inference is reinforced by communications from the prosecuting authorities indicating that dismissal of the criminal charges was conditioned on Plaintiff withdrawing the IRS Forms 1099. The conditioning of dismissal on reversal of the tax filings—rather than on the merits of the charges—supports a reasonable inference that the prosecution was being used as leverage in connection with those filings.

138. The asymmetrical handling of competing complaints—advancing allegations initiated by Defendant Withers while preventing Plaintiff's allegations against her from being presented to a neutral magistrate—further supports an inference of improper motive.

139. From these circumstances, malice may be inferred.

**FAVORABLE TERMINATION**

140. On October 29, 2025, all criminal charges against Plaintiff were dismissed. The proceedings therefore terminated in Plaintiff's favor.

**DAMAGES**

141. As a direct and proximate result of Defendant Withers's institution and continuation of criminal proceedings without probable cause and with malice, Plaintiff suffered:

A. Arrest and detention;

B. Months of GPS monitoring;

C. Financial losses including attorney's fees and monitoring costs;

D. Reputational harm; and

E. Emotional distress.

**RELIEF REQUESTED**

142. Plaintiff seeks compensatory damages, punitive damages, prejudgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT IV – UNREASONABLE SEARCH & SEIZURE**
**(42 U.S.C. § 1983 - Fourth Amendment)**
**DEFENDANTS METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY (*Monell*)**
**AND TRACKING SOLUTIONS, INC. (State Actor Under Color of Law)**

143. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

144. This claim challenges the imposition and enforcement of continuous, 24-hour GPS monitoring as a condition of Plaintiff's pretrial release where the monitoring was imposed without individualized judicial findings, without compliance with statutory requirements governing pretrial conditions, and through a system that effectively delegated the implementation of liberty-restricting conditions to a private vendor acting jointly with Metro.

145. To state a claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment, a plaintiff must plausibly allege that (1) the defendant acted under color of state law; (2) the

defendant's conduct constituted a search or seizure within the meaning of the Fourth Amendment; (3) the search or seizure was unreasonable; and (4) the constitutional violation was caused by the defendant's actions. See *West v. Atkins*, 487 U.S. 42, 48 (1988) (state action requirement for § 1983); *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (Fourth Amendment analysis proceeds by determining whether government conduct constitutes a search or seizure and whether it is reasonable); *Manuel v. City of Joliet*, 580 U.S. 357, 367–69 (2017) (Fourth Amendment governs pretrial restraints on liberty).

## GPS MONITORING IS A SEARCH

146. The Fourth Amendment prohibits unreasonable searches and seizures. Attaching a GPS monitoring device to a person—thereby tracking his movements 24 hours a day—constitutes a search. *Grady v. North Carolina*, 575 U.S. 306, 310 (2015). A GPS search is reasonable only if it is supported by individualized findings and imposed through constitutionally adequate procedures. Id.; see also *United States v. Jones*, 565 U.S. 400, 404–05 (2012) (physical intrusion for purpose of tracking constitutes a search); *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (long-term electronic monitoring invades a reasonable expectation of privacy).

147. Here, Defendants Metro and Tracking Solutions conducted and enforced a continuous 24/7 GPS search of Plaintiff's person without probable cause, without individualized judicial findings, and without the procedural safeguards required by the Fourth Amendment and Tennessee law where Plaintiff was ordered to wear a GPS monitoring device as a condition of pre-trial release.

## SEARCH WAS UNREASONABLE

148. The GPS monitoring imposed on Plaintiff was unreasonable under the Fourth Amendment for three independent reasons: it was ordered without individualized judicial findings, it permitted a private vendor to impose liberty-restricting conditions not ordered by a court, and it subjected Plaintiff to prolonged location surveillance with retained data accessible to law enforcement.

149. On January 29, 2025—only hours after Plaintiff's arrest—he appeared by video before a Night Court commissioner. During that brief proceeding, the commissioner read the warrants aloud at Plaintiff's request. When Plaintiff pointed out that one warrant placed him "within one mile" of Defendant Withers at a time when he was verifiably outside Davidson County—a fact later proven in open court—the commissioner responded, "Well, nobody believes you," and added, "You should get a good attorney." These remarks were made before any evidence had been tested and reflected no effort to evaluate the accuracy of the allegations or whether it was reasonable to impose GPS monitoring.

150. The commissioner imposed GPS monitoring without conducting a meaningful hearing, without allowing Plaintiff an opportunity to be heard, and without making the individualized findings required by Tenn. Code Ann. § 40-11-150(b) and (c), including findings regarding threat assessment, the adequacy of less restrictive alternatives, victim consultation, and ability to pay. The order consisted of a standardized form containing no individualized factual analysis.

151. The commissioner also failed to comply with Tenn. Code Ann. § 40-11-152(c), which requires consultation with the alleged victim and the establishment of exclusion zones before GPS monitoring may be ordered. The judicial order identified no exclusion zones, geographic limitations, or operational restrictions governing the monitoring.

152.    Because the court imposed GPS monitoring without defining any geographic restrictions, the private monitoring vendor later created its own unilateral "exclusion areas," a practice that occurred with the apparent acquiescence of judicial and municipal authorities but without notice to Plaintiff. These zones were neither ordered by a court nor disclosed to Plaintiff and were later used by the prosecution to suggest violations of conditions that had never been judicially imposed.

153.    The monitoring regime also created a long-term repository of Plaintiff's location data. Tennessee law requires monitoring vendors to retain such data for three years, during which law enforcement may access it through "general inquiries" without a warrant. Tenn. Code Ann. § 40-11-155(d)(2)(C). As a result, the monitoring extended beyond real-time tracking and created an ongoing record of Plaintiff's movements available to law enforcement long after the monitoring period ended.

154.    Continuous GPS monitoring constitutes a Fourth Amendment search. *Grady v. North Carolina*, 575 U.S. 306, 310 (2015); *United States v. Jones*, 565 U.S. 400, 404–05 (2012). Long-term location tracking is particularly intrusive because it enables the government to reconstruct "the privacies of life." *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

155.    Here, Plaintiff was subjected to approximately two months of continuous monitoring through a device physically attached to his body, enforcement of movement restrictions defined by a private vendor rather than a court, and the creation of a long-term location history retained and accessible to law enforcement. He was not informed of the existence or location of exclusion zones and remained exposed to potential violations based on undisclosed restrictions. These features rendered the monitoring a highly intrusive surveillance

36

regime imposed without individualized findings, defined parameters, or constitutionally adequate safeguards.

156.    The warrantless, suspicionless, and procedurally defective imposition of this continuous GPS surveillance constituted an unreasonable search under the Fourth Amendment.

**TRACKING SOLUTIONS AS A STATE ACTOR**

157.    Tracking Solutions acted under color of state law within the meaning of *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937–39 (1982). Under *Lugar*, conduct constitutes state action where (1) the deprivation is caused by the exercise of a state-created right or rule of conduct, and (2) the party charged with the deprivation may fairly be treated as a state actor because it exercised authority made possible only by state law or acted jointly with state officials.

158.    Both conditions are satisfied here. First, the deprivation of Plaintiff's liberty arose directly from Tennessee's statutory pretrial-release framework. Tennessee law authorizes courts to impose electronic monitoring as a condition of release and contemplates that private vendors may implement such monitoring pursuant to governmental authorization. See Tenn. Code Ann. § 40-11-152. Acting within this statutory framework, Metro conditioned Plaintiff's release from custody on electronic GPS monitoring. Plaintiff could not regain his liberty unless a monitoring vendor physically attached a device to his body inside the Davidson County booking facility. The restraint on Plaintiff's liberty therefore arose from a state-created rule of conduct governing pretrial detention and release, satisfying the first prong of *Lugar*.

159.    Second, Tracking Solutions may fairly be treated as a state actor because it exercised coercive authority over Plaintiff's liberty that existed only by virtue of the State's custodial power. Tracking Solutions operated inside the Davidson County jail and functioned as the mandatory gateway to Plaintiff's release from custody, serving as a de facto "qualified

contract service provider" despite lacking a written agreement with Metro at the time, as required by Tenn. Code Ann. § 40-11-152(a)(2), (k). A Tracking Solutions employee physically attached a GPS monitoring device to Plaintiff's ankle, imposed movement restrictions and exclusion zones, continuously monitored his location data, and possessed the authority to report alleged violations directly to law enforcement as grounds for arrest or detention. Plaintiff could not refuse this authority, negotiate its terms, or secure release through any alternative means, other than nominally selecting a different "qualified contract service provider," such as Nationwide.

160.    Through this arrangement, Tracking Solutions functioned as Metro's de facto pretrial-supervision arm, exercising operational control over Plaintiff's movements and bodily restraint in a custodial setting. These activities—monitoring accused persons, enforcing pretrial release conditions, and reporting violations triggering arrest—are functions historically and exclusively associated with the State's administration of criminal justice.

161.    The State cannot avoid constitutional accountability by delegating coercive supervisory authority to a private vendor while retaining the benefits of that authority. See *West v. Atkins*, 487 U.S. 42, 55–57 (1988) (holding that a private party acts under color of state law when the State delegates a constitutional duty and the private actor exercises authority within the state system). As in *West*, it is the function performed within the state system, not the private status of the actor, that determines whether the conduct is attributable to the State.

162.    Moreover, Tennessee law expressly integrates electronic-monitoring providers into the enforcement of pretrial liberty restrictions and contemplates formal contractual relationships between governmental entities and monitoring vendors. See Tenn. Code Ann. § 40-11-152(k). Tracking Solutions nonetheless exercised this authority without the written governmental contract required by statute, effectively assuming the role of Metro's

pretrial-supervision provider outside the statutory safeguards designed to regulate such delegation.

163. In short, Tracking Solutions exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941). Its conduct therefore constitutes state action for purposes of 42 U.S.C. § 1983.

**MONELL LIABILITY (METRO)**

164. A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy, practice, or custom of the municipality. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Municipal liability may arise from formal policies, widespread practices so permanent and well-settled as to constitute a custom, or the failure to train and supervise employees where such failure reflects deliberate indifference to constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989).

165. The unconstitutional GPS monitoring imposed on Plaintiff resulted from Metro's policies and longstanding customs governing initial appearances and pretrial supervision in Davidson County.

166. Metro routinely imposes GPS monitoring through standardized bail procedures that do not require or document the individualized findings mandated by Tennessee law. At initial appearances, judicial commissioners rely on preprinted forms and checklists supplied through Metro's bail-processing system, including Metro's internal "bond checklist," which guides commissioners through bond determinations. These materials omit several statutory prerequisites for electronic monitoring under Tenn. Code Ann. §§ 40-11-150 and 40-11-152, including victim consultation, consideration of ability to pay, evaluation of less restrictive

alternatives, and on-the-record findings regarding the necessity of GPS monitoring. The absence of these required considerations in the very forms and checklists used to impose bail conditions predictably results in the routine imposition of electronic monitoring without the individualized judicial findings required by state law and the Fourth Amendment.

167. Public records obtained by Plaintiff confirm that this practice is widespread and systemic rather than isolated. Through a public-records request, Plaintiff obtained approximately 1,300 Orders Granting Bail for Abuse Cases entered in Davidson County between July 2024 and September 2025 where GPS monitoring was ordered. These orders utilize standardized forms through which commissioners impose GPS monitoring by checking preprinted boxes. Of those approximately 1,300 orders, only 35 contained any delineation of exclusion zones, while the remaining orders left the exclusion-zone sections blank. This overwhelming pattern demonstrates that GPS monitoring is routinely imposed without defining geographic restrictions, operational rules, or individualized findings in the judicial order itself.

168. The absence of exclusion zones in the orders has predictable consequences. Because the orders fail to specify the terms governing the monitoring, private vendors administering the devices subsequently define or enforce operational restrictions themselves. In Plaintiff's case, the monitoring vendor created and enforced exclusion zones that were never ordered by any judicial officer. This practice reflects a broader custom in which Metro permits private monitoring vendors to administer surveillance programs and impose operational restrictions not specified in judicial orders.

169. Metro's policymakers have long been aware of these practices. The standardized forms used in thousands of cases demonstrate that GPS monitoring is routinely imposed through checkbox procedures without individualized findings, statutory compliance, or defined

monitoring parameters. Despite this widespread and obvious pattern, Metro has failed to implement training, supervision, or corrective policies to ensure that GPS monitoring is imposed only after the findings required by Tenn. Code Ann. §§ 40-11-150 and 40-11-152.

170. Plaintiff has requested Metro's training materials governing bail determinations and electronic monitoring through public-records requests and discovery. To date, Metro has not produced those materials or provided a date for their production. The absence of training documentation further supports the inference that Metro lacks adequate training protocols governing the constitutional and statutory requirements for imposing electronic monitoring.

171. These policies, customs, and failures to train and supervise constitute deliberate indifference to the constitutional rights of pretrial defendants. Where municipal officials knowingly permit a widespread practice that predictably results in constitutional violations, municipal liability attaches under *Monell* and *City of Canton*. Metro's bail procedures, standardized forms, and delegation of monitoring authority to private vendors were the moving force behind the unconstitutional search imposed on Plaintiff.

## STANDING FOR DECLARATORY AND INJUNCTIVE RELIEF

172. Plaintiff has standing to seek declaratory and injunctive relief because the challenged GPS-monitoring practices remain in effect and are capable of repetition yet evading review. Initial-appearance determinations occur rapidly and typically terminate before meaningful judicial review can occur. As a result, individuals subjected to these practices often complete their monitoring period before the legality of the monitoring can be litigated. Plaintiff therefore challenges an ongoing governmental practice that is capable of repetition yet evading review. See *Weinstein v. Bradford*, 423 U.S. 147 (1975). In addition, where a plaintiff faces a

credible threat of being subjected again to the same enforcement regime, prospective relief is appropriate. See *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).

**INJURY**

173.　As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered: (1) continuous involuntary GPS tracking and invasion of privacy; (2) loss of liberty through government-imposed movement restrictions; (3) reputational stigma associated with placement on a GPS-monitoring regime; (4) financial losses, including monitoring fees; (5) emotional distress and anxiety; and (6) exposure to arrest for alleged "zone violations" arising from terms never ordered by a judge.

**RELIEF REQUESTED**

174.　Plaintiff respectfully requests:

A. A declaration that Metro's and Tracking Solutions' GPS-monitoring practices violate the Fourth Amendment;

B. Injunctive relief prohibiting imposition or enforcement of GPS monitoring absent individualized judicial findings and lawful contracting;

C. Compensatory damages;

D. Punitive damages against Tracking Solutions;

E. Attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

F. All further relief the Court deems just and proper.

**COUNT V – RIGHT TO COUNSEL**
**(42 U.S.C. § 1983 - Sixth Amendment)**
**DEFENDANT METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY (*Monell*)**

175. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

176. This claim alleges that Metro deprived Plaintiff of his Sixth Amendment right to counsel at a critical stage of the criminal proceedings—his initial appearance and the imposition of pretrial GPS monitoring—when the State imposed substantial liberty restrictions and altered Plaintiff's legal relationship with the State without allowing his attorney to participate.

177. The Sixth Amendment guarantees the right to assistance of counsel at all "critical stages" of a criminal prosecution—any proceeding where "substantial rights of the accused may be affected." *Coleman v. Alabama*, 399 U.S. 1, 7–10 (1970); *Rothgery v. Gillespie County*, 554 U.S. 191, 212–13 (2008). A stage is "critical" when the defendant faces decisions or consequences that alter the legal relationship between the accused and the State. See *United States v. Wade*, 388 U.S. 218, 226–27 (1967).

**DENIAL OF COUNSEL AT A CRITICAL STAGE**

178. On January 29, 2025, immediately following Plaintiff's arrest, Plaintiff appeared by video before a Davidson County judicial commissioner for his initial appearance. During that proceeding, the commissioner determined the conditions under which Plaintiff could obtain release from custody and imposed continuous GPS monitoring as a condition of pretrial release.

179. Plaintiff had no opportunity to consult with counsel before the commissioner imposed this condition, and Metro's procedures provided no mechanism for counsel to appear, participate, or object to the imposition of monitoring. Instead, the commissioner imposed GPS monitoring by checking a box on a standardized bail form and declined to consider Plaintiff's objections, responding only, "Nobody believes you."

180.    The Sixth Amendment guarantees the right to assistance of counsel at all "critical stages" of a criminal prosecution—proceedings at which substantial rights of the accused may be affected or where the absence of counsel might derogate from the fairness of the proceeding. *United States v. Wade*, 388 U.S. 218, 226–27 (1967); *Coleman v. Alabama*, 399 U.S. 1, 7–10 (1970). The right to counsel attaches once formal judicial proceedings begin, including the defendant's first appearance before a magistrate where the State initiates adversarial judicial proceedings. *Rothgery v. Gillespie County*, 554 U.S. 191, 199–213 (2008).

181.    The decision to impose GPS monitoring constituted a critical stage of the prosecution because it materially altered Plaintiff's legal relationship with the State and imposed substantial restraints on his liberty pending trial. The monitoring condition subjected Plaintiff to continuous physical surveillance through a device attached to his body, restricted his movements under threat of detention, required ongoing participation in a private monitoring regime, exposed him to arrest for alleged violations, and imposed continuing financial obligations. These restrictions took effect immediately and governed Plaintiff's liberty throughout the pendency of the prosecution, or until modified by the General Sessions Court.

182.    In practical terms, the commissioner's decision functioned as a determination of the conditions under which Plaintiff could remain free pending trial. Just as a court at a bond hearing determines whether a defendant will remain detained or be released subject to liberty-restricting conditions, the commissioner's decision here determined whether Plaintiff could remain free only under a regime of continuous electronic surveillance. Proceedings that determine whether and under what conditions an accused may remain at liberty materially affect the accused's relationship with the State and constitute stages of the prosecution at which the

44

assistance of counsel is necessary to ensure fairness and accuracy in the decision-making process.

183. Tennessee law likewise recognizes that determinations regarding enhanced bail conditions require the exercise of judicial discretion informed by adversarial considerations. Tenn. Code Ann. § 40-11-150(e) contemplates that the court will evaluate statutory factors and determine whether enhanced conditions of release are appropriate in the particular case.

184. The assistance of counsel at this stage would have materially affected the proceeding. Counsel could have objected to the absence of the statutory findings required under Tenn. Code Ann. §§ 40-11-150 and 40-11-152, addressed Plaintiff's ability to pay monitoring fees, and ensured that any monitoring conditions imposed by the court were clearly defined and supported by the record. Without counsel, Plaintiff was required to confront a liberty-altering decision alone while facing the coercive authority of the State.

185. Because the decision to impose GPS monitoring occurred after the right to counsel had attached and involved a proceeding that determined the conditions under which Plaintiff could remain free pending trial, the proceeding constituted a critical stage of the prosecution. Metro's policies and practices preventing counsel from participating in that decision therefore deprived Plaintiff of his Sixth Amendment right to the assistance of counsel.

**MONELL LIABILITY**

186. Metro is liable under 42 U.S.C. § 1983 because the denial of Plaintiff's Sixth Amendment right to counsel resulted from Metro's official policies, customs, and practices governing initial appearances and the imposition of enhanced bail conditions in Davidson County. Municipal liability attaches where a constitutional deprivation is caused by an official policy, a widespread custom or practice, or a failure to train and supervise officials in

circumstances where the need for such training is obvious. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989).

187. Metro administers and operates the procedures through which arrested individuals appear before judicial commissioners immediately following arrest and through which bail conditions—including GPS monitoring—are imposed. Under Metro's procedures, defendants appear before commissioners through Metro's booking and video-appearance system without any mechanism allowing retained or appointed counsel to participate in the determination of bail conditions. Commissioners routinely impose GPS monitoring and other liberty-restricting conditions through standardized forms and administrative processes that provide no space, procedure, or opportunity for counsel to speak, object, or advocate regarding the statutory factors governing enhanced bail conditions.

188. Metro's booking and release procedures further require defendants to enroll with private monitoring vendors and accept monitoring conditions immediately upon release from custody, before any opportunity for counsel to review or challenge the terms imposed. These procedures effectively require defendants to accept substantial liberty restrictions—including continuous electronic monitoring—without the assistance of counsel after the right to counsel has attached.

189. The structure and operation of Metro's procedures support the inference that counsel participation is not contemplated during these proceedings. Plaintiff's own initial appearance illustrates the operation of the system: GPS monitoring was imposed through a checkbox on a standardized bail form, and the proceeding provided no mechanism through which counsel could appear or advocate on Plaintiff's behalf.

190.    Public records obtained by Plaintiff demonstrate that these practices are widespread and systemic rather than isolated. Through public-records requests, Plaintiff obtained approximately 1,300 Orders Granting Bail for Abuse Cases issued in Davidson County between July 2024 and September 2025 where GPS monitoring was ordered. These orders reflect a uniform process in which enhanced bail conditions are imposed through standardized forms containing little or no individualized factual analysis. Of those approximately 1,300 orders, only 35 contain any delineation of exclusion zones, while the remaining orders leave those sections blank.

191.    The uniform structure and content of these orders support the inference that initial appearances in Davidson County are conducted through standardized, non-adversarial procedures in which liberty-restricting conditions are imposed through checkbox forms rather than through individualized hearings. The absence of individualized findings, defined restrictions, or record-based analysis further supports the inference that these determinations are made without meaningful participation by counsel.

192.    The overwhelming uniformity of these orders supports the inference that enhanced bail determinations are made through a standardized, non-adversarial process. The overwhelming absence of individualized findings, clearly defined restrictions, or record-based analysis across approximately 1,300 orders further supports the inference that these determinations are made without meaningful participation by counsel.

193.    Metro's deliberate indifference to the risk of constitutional violations is further demonstrated by its failure to provide policies or training governing counsel participation in these liberty-determining proceedings. Plaintiff has requested Metro's policies, procedures, and training materials governing initial appearances, bail determinations, and the imposition of GPS

47

monitoring. Metro has failed to produce such policies and has repeatedly directed Plaintiff between agencies without providing the requested materials. The absence of identifiable policies governing the participation of counsel in proceedings that determine whether defendants will remain free pending trial supports the inference that Metro has failed to implement training or safeguards necessary to protect defendants' Sixth Amendment rights.

194. The need for such safeguards is obvious. Initial appearances frequently involve decisions determining whether defendants will remain detained or will be released subject to substantial liberty restrictions such as continuous GPS monitoring. Because these decisions directly determine the conditions under which criminal defendants may remain free pending trial and expose them to further detention for alleged violations, policymakers know or should know that constitutional protections—including the right to counsel—are implicated.

195. Metro's failure to establish procedures allowing counsel to participate in these liberty-determining proceedings constitutes deliberate indifference to the constitutional rights of criminal defendants. These policies, customs, and failures to train were the moving force behind the deprivation of Plaintiff's Sixth Amendment right to counsel.

**STANDING FOR DECLARATORY AND INJUNCTIVE RELIEF**

196. Plaintiff seeks declaratory and injunctive relief because Metro's initial-appearance procedures that deny counsel during the imposition of GPS monitoring remain in effect and continue to govern criminal defendants in Davidson County. The challenged practices are capable of repetition yet evading review because initial-appearance determinations occur rapidly and often terminate before meaningful judicial review can occur. Plaintiff therefore challenges an ongoing governmental procedure that continues to operate within Metro's pretrial system. See

48

*Weinstein v. Bradford*, 423 U.S. 147 (1975); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).

**INJURY**

197. As a direct and proximate result of Metro's violation of Plaintiff's Sixth Amendment rights, Plaintiff suffered:

A. significant restraints on liberty without the benefit of counsel,

B. months of invasive 24/7 monitoring,

C. financial burdens and fees,

D. exposure to arrest for undefined "zone" violations,

E. reputational harm,

F. emotional distress, and

G. deprivation of the constitutional right to counsel at a critical stage.

**RELIEF REQUESTED**

198. Plaintiff respectfully requests:

A. A declaration that Metro's practices violate the Sixth Amendment;

B. Injunctive relief requiring Metro to allow counsel participation before imposing GPS monitoring or comparable liberty restrictions;

C. Compensatory damages;

D. Attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

E. All further relief the Court deems just and proper.

**COUNT VI – PROCEDURAL DUE PROCESS & RIGHT TO A HEARING**
**(42 U.S.C. § 1983 - Fourteenth Amendment)**
**DEFENDANTS METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY (*Monell*)**
**AND TRACKING SOLUTIONS, INC. (State Actor Under Color of Law)**

49

199. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

200. This count challenges the deprivation of Plaintiff's Fourteenth Amendment right to procedural due process before substantial restraints were imposed on his liberty through continuous GPS monitoring. Plaintiff alleges that Metro and Tracking Solutions jointly subjected him to a system of pretrial monitoring that imposed significant liberty restrictions without meaningful procedural safeguards, without individualized findings, without disclosure of the monitoring terms governing his conduct, and without any meaningful opportunity to challenge the restrictions before they were enforced.

**NATURE OF THE FOURTEENTH AMENDMENT VIOLATION**

201. The Fourteenth Amendment prohibits the government from depriving any person of liberty without due process of law. The Due Process Clause requires constitutionally adequate procedures before the State may impose substantial restraints on an individual's freedom. *Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 557–58 (1974); *Vitek v. Jones*, 445 U.S. 480, 491–92 (1980).

202. Pretrial liberty is a fundamental interest protected by the Constitution. *United States v. Salerno*, 481 U.S. 739, 750 (1987). Conditions of release that significantly restrain a defendant's freedom—such as continuous electronic monitoring, geographic restrictions, and movement limitations—implicate the Due Process Clause because they alter the conditions under which the accused may remain free pending trial. See generally, *United States v. Salerno*, 481 U.S. 739 (1987); Stack v. Boyle, 342 U.S. 1, 4 (1951); *Hill v. Hall*, 191 F. Supp. 3d 862 (M.D. Tenn. 2016).

203. Determining what process is constitutionally required involves balancing three factors: (1) the private liberty interest affected, (2) the risk of erroneous deprivation under the existing procedures and the probable value of additional safeguards, and (3) the government's interest and administrative burdens associated with additional procedures. *Mathews*, 424 U.S. at 335.

**IMPOSITION OF GPS MONITORING WITHOUT REQUIRED PROCESS**

204. On January 29, 2025, a Davidson County judicial commissioner imposed continuous GPS monitoring as a condition of Plaintiff's pretrial release.

205. The monitoring condition was imposed through a standardized bail form without any meaningful hearing, without allowing Plaintiff to present evidence or argument, and without making individualized findings required under Tennessee law governing enhanced bail conditions. The order contained no factual explanation of why monitoring was necessary and did not identify the geographic restrictions or operational rules that would govern Plaintiff's conduct while subject to monitoring.

206. As a result, Plaintiff was subjected to continuous electronic surveillance and movement restrictions without first receiving notice of the actual terms governing his liberty or an opportunity to challenge their necessity before they were imposed.

207. Because the conditions of monitoring were not defined in the court's order, Plaintiff could not know the restrictions governing his movements or the conduct that could expose him to further detention for alleged violations.

**DELEGATION OF LIBERTY-RESTRICTING AUTHORITY TO A PRIVATE VENDOR**

208. The deprivation of due process was compounded by Metro's delegation of authority to a private monitoring vendor.

209. Plaintiff could not secure release from custody unless a monitoring vendor attached a GPS device to his body and enrolled him in the vendor's monitoring system. Tracking Solutions operated inside the Davidson County jail facility and served as the mandatory gateway through which detainees were required to obtain monitoring devices as a condition of release.

210. Before Plaintiff could obtain release, Tracking Solutions required him to sign its "Monitoring Agreement and Release." That agreement imposed additional restrictions and obligations not contained in the judicial order, including exclusion zones and operational monitoring rules created by the vendor itself. The agreement also required Plaintiff to accept financial obligations, indemnification provisions, and compliance terms enforced through the threat of violation reports to law enforcement.

211. Through this process, the actual terms governing Plaintiff's liberty were established not by a judicial officer but by a private company operating within the jail facility. Plaintiff's freedom from custody therefore depended on accepting a private contract that dictated the practical restrictions on his movement without prior judicial review.

212. By creating and enforcing the operational rules governing Plaintiff's liberty and conditioning release on acceptance of those terms, Tracking Solutions directly participated in the deprivation of liberty without adequate procedural safeguards.

213. Tracking Solutions acted under color of state law because its authority over Plaintiff's liberty arose from the State's pretrial-release system and from its joint operation with Metro officials. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937–39 (1982); *Brentwood Academy v. TSSAA*, 531 U.S. 288, 295–96 (2001).

**MONELL LIABILITY**

214. Metro is liable under 42 U.S.C. § 1983 because the procedural due process violations described above resulted from Metro's policies, customs, and failures to train governing pretrial monitoring and initial appearances.

215. Metro administers the procedures through which arrested individuals appear before judicial commissioners and through which enhanced bail conditions—including GPS monitoring—are imposed. Under Metro's system, defendants appear before commissioners through Metro's booking and video-appearance process without procedures that allow meaningful adversarial consideration of monitoring conditions or the operational terms governing those conditions.

216. Public records obtained by Plaintiff demonstrate that this practice is widespread and systemic. Through public-records requests, Plaintiff obtained approximately 1,300 Orders Granting Bail for Abuse Cases issued in Davidson County between July 2024 and September 2025 where GPS monitoring was orderd. These orders reflect a uniform process in which enhanced bail conditions are imposed through standardized forms containing little or no individualized factual analysis.

217. Of those approximately 1,300 orders, only 35 contained any delineation of exclusion zones, while the remaining orders left those sections blank. The absence of defined restrictions in the vast majority of these orders demonstrates a system in which the operational terms governing defendants' liberty are not determined through individualized judicial findings but are instead left undefined or delegated to monitoring vendors.

218. Metro's deliberate indifference to the risk of constitutional violations is further demonstrated by its failure to implement policies, training, or safeguards governing the imposition of electronic monitoring and the procedural protections required when liberty

53

restrictions are imposed. Plaintiff has requested Metro's policies and training materials governing pretrial monitoring and bail procedures, but Metro has failed to produce such materials and has directed Plaintiff between agencies without providing the requested policies.

219. Because officials routinely impose monitoring conditions affecting defendants' liberty, the need for training and procedural safeguards is obvious. Metro's failure to establish procedures ensuring that monitoring conditions are imposed through meaningful hearings and with clearly defined terms constitutes deliberate indifference to the constitutional rights of pretrial defendants.

220. These policies, customs, and failures to train were the moving force behind the deprivation of Plaintiff's procedural due process rights.

## **INJURY**

221. As a direct and proximate result of the actions of Metro and Tracking Solutions, Plaintiff was:

    A. deprived of pretrial liberty without due process;

    B. forced to sign a coercive adhesion contract to obtain release;

    C. subjected to undefined and unauthorized exclusion zones;

    D. compelled to pay monitoring fees without an ability-to-pay determination;

    E. exposed to potential "violations" of terms he was never told existed; and

    F. stigmatized and publicly treated as dangerous despite the absence of judicial findings.

## **STANDING FOR DECLARATORY AND INJUNCTIVE RELIEF**

222. Plaintiff has standing to seek declaratory and injunctive relief because Metro's pretrial-monitoring practices remain in effect and continue to govern the initial-appearance

process for criminal defendants in Davidson County. The challenged practices—including the imposition of GPS monitoring without individualized findings, hearings, or disclosure of monitoring terms—are capable of repetition yet evading review because monitoring conditions are imposed rapidly at initial appearance and often terminate before meaningful judicial review can occur. Plaintiff therefore challenges an ongoing governmental procedure that continues to operate within Metro's pretrial system.

## RELIEF REQUESTED

223.    Plaintiff requests:

    A. A declaratory judgment that Defendants' GPS-monitoring practices violate the Fourteenth Amendment and Tenn. Code Ann. §§ 40-11-150 and -152;

    B. Injunctive relief requiring Metro to:

        1. execute written agreements with monitoring vendors;

        2. ensure exclusion zones are specified in written orders;

        3. make statutory findings on the record;

        4. determine ability to pay before imposing monitoring; and

        5. prohibit the use of private vendor contracts that add unauthorized terms;

    C. Compensatory damages against Metro;

    D. Compensatory and punitive damages against Tracking Solutions;

    E. Attorney's fees and costs under 42 U.S.C. § 1988; and

    F. All other relief the Court deems just and proper.

**COUNT VII – ABUSE OF PROCESS**
**(Tennessee Common Law – Supplemental Jurisdiction, 28 U.S.C. § 1367)**
**DEFENDANT MALLORY WITHERS**

224. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

225. Under Tennessee law, abuse of process requires: (1) an ulterior motive; and (2) a willful act in the use of legal process, after its issuance, that is not proper in the regular conduct of the proceeding. *Givens v. Mullikin*, 75 S.W.3d 383, 400 (Tenn. 2002); *Bell v. Icard*, 986 S.W.2d 550, 555 (Tenn. 1999).

226. This claim arises from Defendant Withers's retaliatory use of criminal process to coerce Plaintiff into withdrawing federal tax filings that exposed her to substantial tax liability. Specifically, Defendant Withers used the pending criminal prosecution to pressure Plaintiff to withdraw IRS Forms 1099 that reported payments made to her and exposed her to potential federal tax liability.

**ULTERIOR MOTIVE**

227. The evidence demonstrates that Defendant Withers did not initiate criminal proceedings to redress criminal conduct. Instead, she invoked and escalated criminal process in retaliation for Plaintiff's issuance of federal tax reporting forms that exposed her to substantial tax liability.

228. Defendant Withers and Plaintiff were not in a traditional romantic relationship. From the outset, the parties understood that their interactions occurred pursuant to a paid sexual arrangement in which Plaintiff provided substantial financial support to Defendant Withers. Defendant Withers acknowledged the transactional nature of the arrangement in contemporaneous communications.

56

229. Consistent with that arrangement, Defendant Withers voluntarily provided Plaintiff with her Social Security number so that Plaintiff could add her as an authorized user on one of his credit cards, allowing her to make purchases at Plaintiff's expense.

230. Defendant Withers later testified at the preliminary hearing that she and Plaintiff were "dating." That testimony was knowingly misleading as Defendant Withers had repeatedly acknowledged in text messages with Plaintiff that the parties were not in a romantic relationship but were participating in a financial arrangement whereby Plaintiff paid Defendant Withers for sexual encounters.

231. The relationship deteriorated in late 2024 after Plaintiff notified Defendant Withers that he would issue IRS Forms 1099 reporting more than $200,000 in payments made during the arrangement. Only after receiving that October 18, 2024 notice did Defendant Withers begin accusing Plaintiff of criminal conduct. Before that notice, Defendant Withers had not sought criminal charges, had not pursued an order of protection, and had not reported the alleged conduct to law enforcement.

232. After learning that the tax filings would expose her to potential federal tax liability, Defendant Withers reacted with hostility and accused Plaintiff of using the tax filings as leverage against her. During a November 13, 2024 text exchange, Defendant Withers accused Plaintiff of "blackmailing" her over the tax filings and referred to the reporting of her income as a retaliatory "power move."

233. Defendant Withers' accusations of criminal conduct followed immediately thereafter. On December 3, 2024—more than two months after an August 28 argument—Defendant Withers swore harassment and stalking warrants against Plaintiff. On

December 10, 2024, Defendant Withers received the first IRS Form 1099 reporting payments made to her.

234. After receiving that form, Defendant Withers escalated the criminal allegations. On December 23, 2024, she swore additional warrants claiming that the mailing of the 1099 constituted unlawful contact and violated court orders. On December 26, 2024, Defendant Withers received a second Form 1099 mailed by the same third-party reporting vendor.

235. The envelopes containing both forms were plainly marked as bulk mail generated by a third-party IRS reporting service rather than personally delivered by Plaintiff. Despite this, Defendant Withers characterized the federally required tax reporting as intentional harassment.

236. Shortly thereafter, additional criminal process issued. On January 17, 2025, Defendant Lewis swore out a warrant alleging violation of bond conditions based on Defendant Withers's receipt of a 1099. On January 20, 2025, Defendant Cavaliere swore out a warrant charging aggravated stalking.

237. Each of those January warrants referenced Plaintiff's issuance or Defendant Withers's receipt of IRS Forms 1099. The sequence of events makes Defendant Withers's motive clear. Defendant Withers did not begin pursuing criminal remedies until after Plaintiff's tax reporting exposed her to substantial financial liability. Once the tax reporting occurred, she repeatedly invoked criminal process in an effort to pressure Plaintiff to undo the tax filings.

238. This pattern demonstrates that Defendant Withers's objective was not the legitimate prosecution of criminal offenses but the use of criminal charges as leverage to eliminate or mitigate the tax consequences created by Plaintiff's lawful federal reporting obligations.

**<u>MISUSE OF PROCESS AFTER ISSUANCE</u>**

239. After the criminal charges were issued, Defendant Withers used the pending prosecution to attempt to force Plaintiff to withdraw federally required IRS Forms 1099 that reported payments made to her. While the charges remained pending—including the January 17 and January 20, 2025 warrants—the assigned prosecutor communicated to Plaintiff's counsel that the criminal cases could be resolved if Plaintiff withdrew the tax filings reporting income paid to Defendant Withers.

240. Specifically, the prosecutor stated that:

A. "People do not send W2 or 1099s, businesses do."

B. "The victim will claim any items purchased for her as gifts."

C. "She was not an employee of a business operated by your client."

D. "Your client now can be investigated for tax fraud."

241. The prosecutor further stated that: "If [Plaintiff] is able to withdraw his 1099 and tax claims, I will dismiss the cases against him."

242. This condition did not require Plaintiff to plead guilty to any offense, compensate an alleged victim, or comply with lawful protective conditions. Instead, dismissal of the criminal charges was conditioned upon Plaintiff undoing federal tax reporting that exposed Defendant Withers to potential tax liability.

243. The factual assertions underlying the prosecutor's proposal—such as whether the payments were "gifts," whether Defendant Withers was an independent contractor, and whether the tax filings were proper—were matters uniquely within Defendant Withers's knowledge and directly aligned with her financial interests.

244. The proposal to dismiss the criminal charges if Plaintiff withdrew the tax filings reasonably reflects positions advanced by Defendant Withers and directly aligned with her

59

financial interests. Defendant Withers was the complaining witness and alleged victim in each of the charges and supplied the factual narrative upon which the prosecution relied. At the time this demand was communicated, the criminal charges remained pending and the criminal process was actively being used against Plaintiff.

245. Defendant Withers's motive to eliminate the tax consequences of Plaintiff's reporting is further confirmed by her own contemporaneous statements. In text communications with Plaintiff, Defendant Withers accused him of "blackmailing" her with the tax filings and described the reporting of her income as a "power move" designed to cost her money.

246. By attempting to use pending criminal charges to compel Plaintiff to withdraw federally required IRS reporting, Defendant Withers sought a collateral economic advantage unrelated to the legitimate purposes of the criminal process. Criminal harassment and stalking statutes are designed to address unlawful contact and threats. They are not mechanisms to adjudicate tax disputes or to pressure an opposing party to reverse federal income reporting.

247. The attempt to leverage pending criminal charges to force withdrawal of IRS Forms 1099 therefore constituted a willful misuse of process for an improper collateral objective. See *Bell*, 986 S.W.2d at 555.

## **INJURY**

248. As a direct and proximate result of Defendant Withers's abuse of legal process, Plaintiff suffered:

A. Loss of liberty, including multiple arrests and months of GPS monitoring;

B. Emotional distress, humiliation, fear, and anxiety;

C. Financial losses, including bond costs, attorney's fees, and monitoring fees; and

D. Reputational harm, including being publicly portrayed as a stalker, harasser, and violent offender.

249. Defendant Withers's conduct was intentional, malicious, and undertaken with reckless disregard of Plaintiff's rights, warranting punitive damages. *See* Tenn. Code Ann. § 29-39-104(a)(1).

**RELIEF REQUESTED**

250. Plaintiff respectfully requests:

A. Compensatory damages for economic, emotional, and reputational injury;

B. Punitive damages for willful and malicious conduct;

C. Reasonable attorney's fees and costs; and

D. All such other and further relief as the Court deems just and proper.

**COUNT VIII – NEGLIGENCE AND NEGLIGENCE PER SE**
**(Tennessee Common Law – Supplemental Jurisdiction, 28 U.S.C. § 1367)**
**DEFENDANT TRACKING SOLUTIONS, INC.**

251. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

252. This count alleges that Tracking Solutions breached statutory and common-law duties—including operating without the contract required by Tennessee law and imposing unauthorized liberty restrictions—causing foreseeable harm to Plaintiff as a monitored pretrial defendant.

253. Under Tennessee law, a negligence claim requires proof of (1) a duty of care owed by the defendant; (2) breach of that duty; (3) causation in fact; (4) proximate causation; and (5) damages. *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998).

61

254. Negligence per se applies when: (1) a statute prescribes a standard of conduct, (2) the plaintiff is within the class the statute is intended to protect, and (3) the injury is of the type the statute seeks to prevent. *Whaley v. Perkins*, 197 S.W.3d 665, 672–73 (Tenn. 2006).

**STATUTORY AND COMMON LAW DUTIES**

255. Tennessee law divides responsibility for GPS monitoring between the judiciary and the monitoring vendor. Under Tenn. Code Ann. § 40-11-150(c)(1)–(2), a magistrate must issue a written order specifying exclusion zones, notice requirements, and any required findings before electronic monitoring may be imposed. Separately, Tenn. Code Ann. § 40-11-152(k) provides that any private entity providing GPS monitoring services "shall have a written agreement with the county or municipality." The statutory framework reflects the legislature's intent that private monitoring vendors operate only under governmental authorization and supervision.

256. In addition to these statutory obligations, Tracking Solutions owed Plaintiff a common-law duty to exercise reasonable care in administering court-ordered electronic monitoring and to refrain from imposing restraints on liberty not authorized by judicial order or statute. Tennessee law recognizes that a duty of reasonable care arises when a party undertakes to perform services affecting the rights or safety of another and fails to exercise reasonable care in performing that undertaking. *Biscan v. Brown*, 160 S.W.3d 462, 478–79 (Tenn. 2005); Restatement (Second) of Torts § 323 (1965). By accepting responsibility for administering Plaintiff's electronic monitoring and conditioning his release from custody on compliance with its terms, Tracking Solutions assumed responsibility to implement the court's order accurately and to refrain from creating additional restrictions or conditions beyond those lawfully imposed by the judiciary.

62

<u>**STATUTORY AND COMMON LAW BREACHES**</u>

257.    Tracking Solutions breached its statutory and common-law duties in several ways. First, at the time it equipped Plaintiff with a GPS device on January 29, 2025, Tracking Solutions had no written agreement with Metro Government or Davidson County as required by Tenn. Code Ann. § 40-11-152(k). The statute conditions a private entity's authority to provide monitoring services on the existence of such a written agreement with the local government. By providing monitoring services without that authorization, Tracking Solutions operated outside the statutory framework governing electronic monitoring programs.

258.    Second, the judicial order required no exclusion zones, contained no ability-to-pay findings, and did not authorize the imposition of any additional conditions.

259.    Despite this, before permitting Plaintiff to obtain the monitoring device required for release from custody, Tracking Solutions compelled him to sign a "GPS Monitoring Agreement and Release" that:

A. Imposed undisclosed and undefined "exclusion zones" that were not contained in the magistrate's order and were never communicated to Plaintiff in any official capacity;

B. Shifted all operational, legal, and financial liability to Plaintiff, including indemnification for Tracking Solutions' own mistakes, malfunctions, or errors;

C. Contained sweeping release, waiver, and covenant-not-to-sue provisions extending to Plaintiff's family members, heirs, and representatives;

D. Shortened the statute of limitations for any claim against the company to one year; and

E. Conditioned Plaintiff's release from custody on execution of this adhesion contract, despite the lack of any statutory or judicial authorization for such terms.

260. Third, Plaintiff encountered Tracking Solutions while in DCSO booking, where only two GPS monitoring vendors—Tracking Solutions and Nationwide—were represented. While Plaintiff was taking the necessary steps to secure his release, Tracking Solutions was the only vendor that responded to his call. Because Plaintiff could not obtain release from custody without securing a monitoring device from one of the vendors operating inside the facility, he had no practical ability to avoid contracting with a monitoring company. Tracking Solutions required execution of its "Monitoring Agreement and Release" as a prerequisite to providing the device necessary for Plaintiff's release.

261. These facts plausibly allege that Plaintiff was coerced into signing the "Monitoring Agreement and Release" in order to secure his liberty, and that Tracking Solutions imposed restraints and obligations beyond those ordered by any judicial officer.

262. The unauthorized and undefined "exclusion zones" created a risk that Plaintiff would be perceived as violating conditions he did not know existed. By imposing obligations not present in the court's order, and by operating absent statutory authorization, Tracking Solutions created the appearance of violations out of conditions that did not lawfully exist.

**NEGLIGENCE PER SE UNDER TENN. CODE ANN. § 40-11-152(k)**

263. Tracking Solutions' operation without the written governmental agreement required by Tenn. Code Ann. § 40-11-152(k) constitutes negligence per se. The statute establishes a mandatory condition for private monitoring vendors to operate within a county or municipality and is designed to ensure governmental oversight, accountability, and lawful supervision of individuals subjected to electronic monitoring. Pretrial defendants who are

64

required to submit to monitoring are within the class of persons the statute is intended to protect. The injuries alleged here—including unauthorized liberty restrictions, compelled contractual obligations as a condition of release, lack of governmental oversight, and exposure to alleged monitoring violations—are the types of harms the statutory framework is designed to prevent.

## CAUSATION

264. Tracking Solutions did not create the underlying requirement that Plaintiff be monitored, but it independently caused and exacerbated Plaintiff's injuries through its own conduct in administering that monitoring. By operating without the written governmental agreement required by Tenn. Code Ann. § 40-11-152(k), imposing exclusion zones and contractual obligations not contained in any judicial order, and conditioning Plaintiff's release on execution of its monitoring agreement, Tracking Solutions introduced additional restraints and risks beyond those imposed by the court.

265. These actions foreseeably caused additional loss of liberty, compelled financial payments, emotional distress, reputational harm, and the ongoing risk that Plaintiff would appear to be violating restrictions of which he had no notice.

## INJURY

266. As a direct and proximate result of Tracking Solutions' statutory violations and negligent conduct, Plaintiff suffered:

   A. Economic losses, including monitoring fees and associated costs;

   B. Emotional distress, anxiety, and reputational injury arising from unauthorized liberty restrictions;

   C. Heightened exposure to accusations of "zone violations" and related legal jeopardy; and

D. Loss of liberty through coercive adherence to conditions never imposed by the judiciary.

**RELIEF REQUESTED**

267. Plaintiff requests:

A. Compensatory damages for economic, emotional, and liberty-based injuries;

B. Punitive damages for reckless disregard of statutory duties;

C. A declaratory judgment that Tracking Solutions' practices and contract violations contravene Tennessee law;

D. Reasonable attorney's fees and litigation costs; and

E. All other relief the Court deems just and proper.

## PRAYER FOR RELIEF FOR ALL COUNTS

**WHEREFORE,** the Plaintiff respectfully requests that this Court:

1. Grant the relief requested in each count above;

2. Award compensatory damages in an amount to be determined at trial;

3. Award punitive damages where permitted by law;

4. Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

5. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

_____
MARTIN SCOTT

s/Cody Johnson/
TURKLAY LAW, PLLC
CODY JOHNSON, #037568
Attorney for Plaintiff
102 East Main St., Suite A
Lebanon, TN 37087
(629) 200-7774
cody@turklaylaw.com

67