# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARTIN SCOTT,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:25-cv-01393 |
| | ) | JUDGE TRAUGER |
| **METRO. GOV'T. OF NASHVILLE** | ) | **JURY DEMAND** |
| **AND DAVIDSON COUNTY,** | ) | |
| | ) | |
| **TRACKING SOLUTIONS, INC.,** | ) | |
| | ) | |
| **MALLORY WITHERS,** | ) | |
| *in her individual capacity* | ) | |
| | ) | |
| **BRIAN CAVALIERE,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| **TYLER LEWIS,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO METRO'S MOTION TO DISMISS

---

Plaintiff Martin Scott responds in opposition to Defendant Metropolitan Government of Nashville and Davidson County's Motion to Dismiss the First Amended Complaint and Memorandum of Law. Doc. 39. Metro's motion should be denied.

1

**INTRODUCTION**

Metro's motion rests on a false premise. Plaintiff does not seek to impose municipal liability merely because a judicial commissioner imposed GPS monitoring. Plaintiff challenges Metro's own pretrial-release system: the administrative procedures through which arrested persons appear before commissioners; the booking-and-release process that conditions release on enrollment with a private GPS vendor; the use of standardized forms and practices that result in GPS monitoring without individualized findings, defined restrictions, or counsel participation; the delegation of liberty-restricting authority to private vendors; and Metro's failure to train, supervise, contract with, or control the private monitoring vendors operating within that system.

Metro attempts to collapse those allegations into a single judicial act. But the Amended Complaint alleges more. It alleges that Plaintiff could not secure release unless a private monitoring vendor attached a GPS device; that Tracking Solutions operated as a gateway to release from custody; that Tracking Solutions imposed contractual and operational terms not contained in the judicial order; that the order did not identify exclusion zones; that Metro's records revealed approximately 1,300 similar GPS-monitoring orders, only 35 of which identified exclusion zones; and that Metro had no recorded contract with Tracking Solutions despite Tennessee's statutory framework for GPS monitoring vendors.[1]

Those allegations do not depend solely on attributing a commissioner's judicial decision to Metro. They plausibly allege that Metro's own policies, customs, and failures to train were the moving force behind Plaintiff's Fourth, Sixth, and Fourteenth Amendment injuries. Metro's motion should therefore be denied.

---

[1] See First Am. Compl., Doc. 33 ¶¶ 35–43, 144–72, 176–97, 200–17.

**FACTUAL BACKGROUND**

Following Plaintiff's January 29, 2025 arrest, a judicial commissioner imposed GPS monitoring by checking a box on a standardized Order Granting Bail for Abuse Cases form. The order contained no individualized findings supporting GPS monitoring and did not identify any exclusion zones or geographic restrictions.[2] Plaintiff's actual order likewise contained no findings of fact supporting any determination that he posed a threat to Withers; instead, the commissioner merely checked a box stating that Plaintiff was "a threat to the alleged victim."[3] The order also contained no factual findings supporting GPS monitoring, no indication that Plaintiff's ability to pay was assessed, no indication that Withers was consulted, and no identification or disclosure of any exclusion zones.[4]

Plaintiff could not secure release unless a private monitoring vendor attached a GPS device. At the time of release, Tracking Solutions and Nationwide Electronic Monitoring were the only advertised GPS vendors inside the booking facility, and Tracking Solutions was the vendor that responded to Plaintiff's request for monitoring services.[5] Tracking Solutions then required Plaintiff to sign a "GPS Monitoring Agreement and Release" imposing undefined exclusion zones, additional restrictions, and liability waivers that were not ordered by any court.[6] Plaintiff never violated GPS monitoring conditions, and no violation was ever alleged.[7]

The undefined nature of Plaintiff's monitoring conditions became apparent at the March 27, 2025 preliminary hearing. During that hearing, Withers testified that Plaintiff was prohibited from being in two locations, including her residence, under the GPS monitoring system.[8] But

---

[2] First Am. Compl., Doc. 33 ¶ 35.

[3] *Id*. ¶ 40.

[4] *Id*. ¶ 41.

[5] *Id*. ¶ 36.

[6] *Id*. ¶ 37.

[7] *Id*. ¶ 38.

[8] *Id*. ¶ 39.

Plaintiff's written bond order contained no exclusion zones, and this testimony was Plaintiff's first notice that geographic restrictions had allegedly been imposed in connection with his monitoring.[9] The court ordered the GPS monitor removed that same day.[10]

The First Amended Complaint alleges this was not an isolated error. Through public-records requests, Plaintiff obtained approximately 1,300 Orders Granting Bail for Abuse Cases issued in Davidson County between July 2024 and September 2025.[11] Approximately 35 of those orders contained any information identifying exclusion zones.[12] In the remaining orders, the exclusion-zone sections were left blank, and the vast majority of forms contained no individualized findings of fact supporting either GPS monitoring or bail.[13] The First Amended Complaint alleges that this pattern reflects a widespread practice in which GPS monitoring is routinely imposed through checkbox forms without individualized findings, statutory compliance, or defined monitoring parameters.[14]

The First Amended Complaint also alleges that Metro's GPS-monitoring system delegated practical liberty-restricting authority to private vendors. Tracking Solutions later refused to provide Plaintiff the exclusion-zone information that allegedly governed his monitoring, stating that the information constituted "victim information" and could be obtained only by subpoena.[15] A bonding company involved in Plaintiff's release confirmed that bonding companies are not notified of GPS exclusion zones and had received no documentation identifying any such zones in Plaintiff's case.[16] Meanwhile, Metro's own records did not reveal a

---

[9] *Id.*
[10] *Id.*
[11] *Id.* ¶ 42.
[12] *Id.*
[13] *Id.*
[14] *Id.* ¶¶ 166–71.
[15] *Id.* ¶ 49.
[16] *Id.* ¶ 51.

written contract with Tracking Solutions.[17] The Metropolitan Clerk's Office reported that it had searched its contract database and found no recorded contract with Tracking Solutions, and General Sessions Administrator Kyle Sowell later stated that Metro Procurement was still in the process of awarding the monitoring contract and that there was no written agreement to provide.[18]

Count IV alleges that the GPS monitoring imposed on Plaintiff was an unreasonable search and seizure because it was imposed without individualized judicial findings, without compliance with statutory requirements governing pretrial conditions, and through a system that effectively delegated implementation of liberty-restricting conditions to a private vendor acting jointly with Metro.[19] The First Amended Complaint alleges that Plaintiff was subjected to approximately two months of continuous monitoring through a device physically attached to his body, enforcement of movement restrictions defined by a private vendor rather than a court, and creation of long-term location history retained and accessible to law enforcement.[20]

The First Amended Complaint further alleges that Tracking Solutions functioned as a state actor within Metro's pretrial-release system. Plaintiff could not regain liberty unless a monitoring vendor physically attached a device to his body inside the Davidson County booking facility.[21] Tracking Solutions operated inside the jail as the practical gateway to release, attached the device, imposed movement restrictions and exclusion zones, continuously monitored Plaintiff's location data, and possessed authority to report alleged violations to law enforcement as grounds for arrest or detention.[22]

---

[17] *Id*. ¶¶ 50, 52–53.
[18] *Id*.
[19] *Id*. ¶¶ 144–56.
[20] *Id*. ¶¶ 153–55.
[21] *Id*. ¶ 36.
[22] *Id*. ¶¶ 158–62.

Metro's Monell liability allegations are not limited to the commissioner's individual ruling. The First Amended Complaint alleges that the unconstitutional GPS monitoring resulted from Metro's policies and longstanding customs governing initial appearances and pretrial supervision in Davidson County[23]. It alleges that Metro routinely imposes GPS monitoring through standardized bail procedures that do not require or document individualized findings; that commissioners rely on preprinted forms and Metro's internal bond checklist; that those materials omit statutory prerequisites such as victim consultation, ability-to-pay consideration, evaluation of less restrictive alternatives, and on-the-record findings; and that the predictable result is the routine imposition of GPS monitoring without individualized judicial findings.[24]

The First Amended Complaint also alleges that the absence of exclusion zones in written orders has predictable consequences: private vendors administering the devices subsequently define or enforce operational restrictions themselves. In Plaintiff's case, the monitoring vendor created and enforced exclusion zones never ordered by any judicial officer.[25] The First Amended Complaint alleges that this practice reflects a broader custom in which Metro permits private monitoring vendors to administer surveillance programs and impose operational restrictions not specified in judicial orders.[26]

Finally, the First Amended Complaint alleges policymaker knowledge and deliberate indifference. It pleads that standardized forms used in thousands of cases show that GPS monitoring is routinely imposed through checkbox procedures without individualized findings, statutory compliance, or defined monitoring parameters; that Metro has failed to implement training, supervision, or corrective policies to ensure GPS monitoring is imposed only after

---

[23] *Id.* ¶¶ 164–71.
[24] *Id.* ¶¶ 164–66.
[25] *Id.* ¶¶ 151–52, 155, 168.
[26] *Id.* ¶¶ 167–68.

required findings; and that Plaintiff requested Metro's training materials governing bail determinations and electronic monitoring, but Metro did not produce those materials or provide a date for production.[27] These policies, customs, and failures to train are alleged to be the moving force behind the unconstitutional GPS search imposed on Plaintiff.[28]

Counts V and VI arise from the same pretrial-release system, but challenge different constitutional injuries. Count V alleges that Metro's procedures denied Plaintiff counsel at the proceeding where GPS monitoring and liberty-restricting conditions were imposed.[29] Count VI alleges that Metro and Tracking Solutions deprived Plaintiff of procedural due process by imposing and enforcing GPS monitoring without meaningful procedural safeguards, individualized findings, disclosure of monitoring terms, or a meaningful opportunity to challenge the restrictions before they were enforced.[30]

## ARGUMENT

### I. Metro's motion attacks a straw man.

Metro frames the Amended Complaint as challenging only "judicial determinations made under state law."[31] That is not what the Amended Complaint alleges. Plaintiff challenges a broader municipal system. The Amended Complaint alleges that Metro administers the procedures through which arrested persons appear before judicial commissioners and through which enhanced bail conditions, including GPS monitoring, are imposed.[32] It alleges that Metro uses standardized procedures and forms through which GPS monitoring is imposed without

---

[27] *Id*. ¶¶ 169–71.
[28] *Id*. ¶ 171.
[29] *Id*. ¶¶ 176–97.
[30] *Id*. ¶¶ 200–17.
[31] Doc. 39 at 9, PageID 812.
[32] First Am. Compl., Doc. 33 ¶¶ 166, 187, 200–16.

individualized factual findings, without defined exclusion zones, without ability-to-pay determinations, and without meaningful counsel participation.[33] It further alleges that Metro's release system required Plaintiff to enroll with a private monitoring vendor before he could obtain release from custody and that the vendor then imposed additional restrictions not ordered by the court.[34] That is not a claim based solely on vicarious liability for a commissioner's ruling. It is a *Monell* claim based on Metro's own customs, practices, and failures to train or supervise in the administration of pretrial monitoring.

Metro's argument also ignores the allegations concerning vendor delegation. Plaintiff alleges that Tracking Solutions operated inside the Davidson County release process as the practical gateway to release; that it required Plaintiff to sign a GPS Monitoring Agreement and Release; that it imposed operational restrictions and exclusion zones not contained in the court order; and that Metro's records reflected no written contract with Tracking Solutions.[35] Those allegations concern nonjudicial administrative implementation of GPS monitoring, not merely the commissioner's judicial decision. Metro may dispute those facts later. But it cannot erase them at Rule 12.

## II. *Johnson* and *D'Ambrosio* do not require dismissal.

Metro relies principally on *Johnson v. Turner*, 125 F.3d 324 (6th Cir. 1997), and *D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014). Those cases do not bar Plaintiff's claims. *Johnson* involved an attempt to hold Shelby County liable for decisions of a juvenile court judge interpreting and applying state law. The Sixth Circuit held that the county could not be liable because the challenged conduct was the judge's judicial decision, made pursuant to state

---

[33] *Id*. ¶¶ 151–57, 166–72, 187–97, 204–17.
[34] *Id*. ¶¶ 35–38, 153–55, 209–12.
[35] First Am. Compl., Doc. 33 ¶¶ 36–43, 153–55, 159–72, 208–17.

authority and reviewable through the state appellate process.[36] *D'Ambrosio* likewise involved prosecutorial conduct attributable to the State, not the county.[37]

This case is different. Plaintiff does not allege only that a commissioner reached the wrong bail decision. He alleges that Metro's own administrative system caused the deprivation: Metro's booking and release process, its standardized initial-appearance procedures, its vendor-access and monitoring practices, its failure to ensure written vendor authorization, its failure to require defined exclusion zones before monitoring, and its failure to train or supervise officials involved in imposing and administering GPS monitoring.[38]

Even if a judicial commissioner exercises state judicial authority when deciding whether to impose bail conditions, Metro remains liable for its own policies and customs that independently cause constitutional injury. A municipality cannot avoid *Monell* liability merely by pointing to a state-law framework when the complaint plausibly alleges that local administrative practices and customs were the moving force behind the deprivation. The distinction matters. *Johnson* would bar a claim that says: "The commissioner made a bad judicial decision, therefore Metro is liable." But Plaintiff's claim is entirely different: Metro's pretrial monitoring system made the unconstitutional search and deprivation possible, predictable, and systemic. That is enough at the pleading stage.

### III.   Metro's reliance on the AOC form does not defeat the Amended Complaint.

Metro argues that the form "shows otherwise" because the commissioner checked boxes reflecting that Plaintiff was a threat to the victim and that GPS monitoring would deter future

---

[36] *Johnson*, 125 F.3d at 335–36.
[37] *D'Ambrosio*, 747 F.3d at 386–87.
[38] First Am. Compl., Doc. 33 ¶¶ 144–72, 176–97, 200–17.

threats.[39] That argument fails for several reasons. First, the exhibit Metro attaches is a blank Administrative Office of the Courts form revised June 25, 2025—months after Plaintiff's January 29, 2025 GPS order.[40] A later blank form does not establish what occurred in Plaintiff's case, what findings were made, what procedures were provided, what counsel access existed, or how Tracking Solutions implemented monitoring.

Second, a checked box is not the same thing as an individualized factual finding. The form Metro relies on confirms the distinction. The form asks the commissioner to check conclusory statutory determinations—such as whether the defendant "is a threat to the alleged victim," whether the defendant "is reasonably likely to appear in court," and whether GPS monitoring "will deter the defendant from seeking to kill, physically injure, stalk, or otherwise threaten the alleged victim before trial."[41] Those are legal conclusions or ultimate statutory determinations; they are not the underlying facts supporting those conclusions.

The structure of the form underscores the point. The form contemplates an explanation when GPS monitoring is waived, but it does not provide any comparable space for the judicial officer to state why GPS monitoring is necessary in the first instance.[42] The form therefore permits the most intrusive pretrial condition at issue here—body-attached, continuous location tracking—to be imposed through checked legal conclusions, while leaving no written explanation of the facts supporting necessity, proportionality, ability to pay, less restrictive alternatives, or the reasons ordinary no-contact conditions would be inadequate. Metro's reliance on the form therefore cuts against dismissal. The issue is not whether judicial commissioners used an AOC form; the issue is whether Metro's system implemented GPS monitoring through a

---

[39] Doc. 39 at 4–5, PageID 807–08.
[40] Doc. 39-1, PageID 814–15.
[41] Doc. 39-1, PageID 814.
[42] See Doc. 39-1, PageID 814–15.

10

form-and-release process that routinely failed to require or document individualized factual findings before imposing continuous electronic surveillance.

The form does not require the commissioner to identify what evidence was reviewed, what facts showed Plaintiff posed a threat, why GPS monitoring was necessary, what less restrictive alternatives were considered, whether Plaintiff's ability to pay was assessed, whether counsel was permitted to participate, or why continuous location tracking was reasonable under the circumstances. Nor does a checked box identify the geographic restrictions governing the monitoring. To the contrary, the form contains a separate section for specific locations the defendant must avoid, including locations requested by the alleged victim.[43] The First Amended Complaint alleges that Plaintiff's actual order did not identify any exclusion zones or geographic restrictions, that no individualized findings supported GPS monitoring, that no ability-to-pay assessment was made, and that Tracking Solutions imposed or enforced restrictions not contained in the judicial order.[44]

Third, Metro's motion admits that Plaintiff's order "does not identify additional places where the victim would likely be."[45] That admission supports, rather than defeats, Plaintiff's theory. The generic command to stay away from "any other location where the victim is likely to be" does not define an exclusion zone, identify a prohibited address, state a minimum distance, or give Plaintiff meaningful notice of where he could and could not go.[46] As applied to continuous GPS monitoring of a presumptively innocent pretrial defendant, such an open-ended restriction is constitutionally problematic because it leaves liberty to turn on speculation,

---

[43] Doc. 39-1, PageID 815.
[44] First Am. Compl., Doc. 33 ¶¶ 35–42.
[45] Doc. 39 at 5, PageID 808.
[46] See Doc. 39-1, PageID 815.

appearance, and vendor or victim interpretation rather than judicially found facts and definite court-ordered limits.[47]

That is precisely why individualized factual findings and defined restrictions matter. Without findings explaining why GPS monitoring was necessary and without specific locations or distances identified in the order, Plaintiff's liberty could be restricted based on perception rather than substance—on where someone believed Withers might be, or on zones later created or enforced outside the judicial order, rather than on facts found by a neutral judicial officer. The First Amended Complaint alleges that Plaintiff's actual order contained no individualized findings supporting GPS monitoring, no ability-to-pay assessment, no victim-consultation indication, and no identification or disclosure of exclusion zones.[48] At most, Metro's argument creates a factual dispute about what the order meant, what restrictions actually governed Plaintiff, and how Metro's monitoring system implemented those restrictions. That dispute cannot be resolved on a Rule 12 record.

## IV.   <u>State law does not immunize Metro's implementation and administration of GPS monitoring.</u>

Metro repeatedly emphasizes that Tennessee statutes govern bail and GPS monitoring. That point does not warrant dismissal. Plaintiff does not dispute that Tennessee law supplies the framework for pretrial release. But state law does not authorize Metro to administer that framework in a manner that violates the Constitution. Nor does the existence of state law defeat *Monell* liability where the complaint alleges that Metro's own customs, procedures, and failures to train caused the constitutional violation.

---

[47] See *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *City of Chicago v. Morales*, 527 U.S. 41, 56–60 (1999).
[48] First Am. Compl., Doc. 33 ¶¶ 35, 40–42.

12

Indeed, the statutory framework underscores why Metro's motion fails. Tennessee law contemplates that GPS monitoring will be imposed through written orders, defined conditions, and governmental oversight of monitoring providers.[49] Section 40-11-152 requires the magistrate to "specifically describe the locations that the defendant has been ordered to refrain from going to or near and the minimum distances, if any, that the defendant must maintain from those locations."[50] It also contemplates written agreements with qualified contract service providers.[51]

Plaintiff alleges that Metro's system failed at those exact points, and that the failure was not isolated. The order did not define exclusion zones; the vendor imposed or enforced restrictions not stated in the order; Plaintiff could not obtain release without enrolling with a monitoring provider operating through the booking-and-release process; and Metro's own records did not reveal a written agreement with Tracking Solutions.[52] These allegations do not seek to impose respondeat superior liability for a commissioner's ruling. They allege an unofficial custom: a persistent and tolerated practice by which Metro's pretrial-release system allowed GPS monitoring to be implemented through standardized forms, undefined restrictions, private vendor administration, and inadequate training or oversight.[53] Metro's own authority confirms the point: municipal liability turns on whether the challenged policy or practice is "attributable to the municipality." *D'Ambrosio*, 747 F.3d at 387. Plaintiff pleads exactly that. The state-law requirements for defined monitoring terms and structured vendor oversight make

---

[49] Tenn. Code Ann. §§ 40-11-150, 40-11-152.
[50] Tenn. Code Ann. § 40-11-152(c).
[51] Tenn. Code Ann. § 40-11-152(k).
[52] First Am. Compl., Doc. 33 ¶¶ 35–42, 49–53.
[53] *Id*. ¶¶ 144, 148–56, 158–62, 164–71. See *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507–08 (6th Cir. 1996) (municipal liability may arise from "the toleration of a custom" that causes a constitutional deprivation).

Metro's alleged custom, acquiescence, and failure to train more plausible, not less, because they show the safeguards Metro's system routinely failed to implement.[54]

### V.  Count IV plausibly alleges a Fourth Amendment *Monell* claim.

Count IV alleges that Plaintiff was subjected to continuous, 24-hour GPS monitoring as a condition of pretrial release. The Supreme Court has held that attaching a GPS monitoring device to a person constitutes a search.[55] The question is whether the search was reasonable. The First Amended Complaint plausibly alleges that it was not. Plaintiff alleges that GPS monitoring was imposed without individualized findings, without a meaningful hearing, without clearly defined restrictions, and through a system that delegated practical control of monitoring conditions to a private vendor.[56] Plaintiff further alleges that the monitoring involved continuous tracking of his movements, creation and retention of location data, financial costs, and exposure to alleged violations of undefined zones.[57]

Persuasive authority addressing intrusive pretrial search conditions reinforces why the absence of individualized findings matters. In *United States v. Scott*, the Ninth Circuit held that warrantless pretrial search conditions violated the Fourth Amendment where there was no evidence the conditions resulted from findings after any hearing and the conditions were instead "checked off" from a standard list.[58] The court emphasized that a pretrial releasee retains Fourth Amendment protections, that arrest alone does not justify special search conditions, and that pretrial conditions imposed to protect the community must be supported by an individualized

---

[54] First Am. Compl., Doc. 33 ¶¶ 151–52, 162, 166–71.
[55] *Grady v. North Carolina*, 575 U.S. 306, 310 (2015).
[56] Am. Compl., Doc. 33 ¶¶ 144–72.
[57] *Id*. ¶¶ 153–57, 171–72.
[58] *United States v. Scott*, 450 F.3d 863, 865, 874 (9th Cir. 2006).

14

showing that the defendant poses a heightened risk while on bail.[59] More recently, *Simon v. City & County of San Francisco* read *Scott* as leaving room for intrusive pretrial electronic monitoring only where the court makes an individualized determination, after considering the defendant's unique history and circumstances, that heightened supervision is necessary.[60]

Metro argues that the commissioner's decision cannot be attributed to Metro. But Count IV does not depend solely on the commissioner's decision. It also challenges Metro's policies and customs concerning the administration and enforcement of monitoring: the standardized release process, the lack of defined monitoring terms, the release-dependent vendor enrollment process, the vendor's imposition of conditions not ordered by the court, and Metro's failure to train or supervise the system.[61] These allegations are enough to state a *Monell* claim. Metro's motion should be denied as to Count IV.

## VI. Count V plausibly alleges a Sixth Amendment *Monell* claim.

Metro's motion also seeks dismissal of Count V by characterizing it as another challenge to a commissioner's judicial decision. Again, that misstates the claim. Count V alleges that Metro's initial-appearance and release procedures denied Plaintiff the assistance of counsel at a critical stage: the proceeding at which substantial liberty restrictions were imposed as conditions of release.[62] The right to counsel attaches at the first appearance before a judicial officer where the defendant is informed of the accusation and liberty restrictions may be imposed.[63] Proceedings affecting substantial rights of the accused constitute critical stages.[64]

---

[59] *Id*. at 868, 874.
[60] *Simon v. City & Cnty. of S.F.,* 135 F.4th 784, 809–11 (9th Cir. 2025).
[61] *Id*. ¶¶ 159–72.
[62] Am. Compl., Doc. 33 ¶¶ 176–97.
[63] *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 199–213 (2008).
[64] *Coleman v. Alabama*, 399 U.S. 1, 7–10 (1970).

The First Amended Complaint alleges that Metro's procedures provided no mechanism for counsel to appear, participate, object, address statutory prerequisites, challenge the lack of individualized findings, address Plaintiff's ability to pay, or ensure that any monitoring conditions were clearly defined.[65] Those allegations concern Metro's procedures for initial appearances and bail-condition determinations—not merely the commissioner's ultimate ruling. Metro may later dispute whether the proceeding was a critical stage or whether its procedures caused the deprivation, but the First Amended Complaint plausibly alleges that Metro maintained a standardized, non-adversarial initial-appearance system through which substantial liberty restrictions were imposed without counsel participation. [66]That is sufficient to withstand Rule 12 dismissal.

Furthermore, Plaintiff does not rely on the proposition that every Tennessee Rule 5 initial appearance is categorically a critical stage requiring counsel. Rather, Plaintiff alleges that the right to counsel had attached by the time of his initial appearance, and that the proceeding became a critical stage when the commissioner determined the conditions under which Plaintiff could obtain release from custody and imposed continuous GPS monitoring, financial obligations, movement restrictions, and exposure to arrest for alleged violations.

That is what Plaintiff alleges here. The commissioner's decision did not merely advise Plaintiff of rights or schedule a later hearing. It immediately determined whether Plaintiff could remain free only under a regime of continuous electronic surveillance. Counsel could have objected to the absence of individualized findings, the lack of any defined exclusion zones, the absence of an ability-to-pay determination, and the use of a GPS condition based in part on an alleged geographic theory not contained in the written bond order. The absence of counsel

---

[65] Am. Compl., Doc. 33 ¶¶ 176–97.
[66] *Id*. ¶¶ 187–97.

therefore plausibly affected Plaintiff's substantial liberty interests and the fairness of the release determination.

At minimum, Count V states a plausible claim at the pleading stage. If the Court concludes that the Sixth Amendment does not independently require counsel at this type of bail/GPS proceeding, the same allegations remain relevant to Plaintiff's Fourteenth Amendment procedural-due-process claim.

## VII. Count VI plausibly alleges a Fourteenth Amendment procedural-due-process *Monell* claim.

Count VI alleges that Plaintiff was deprived of liberty without adequate process when GPS monitoring and related restrictions were imposed and enforced without a meaningful hearing, individualized findings, clear notice of the governing restrictions, or a meaningful opportunity to challenge the restrictions.[67] This claim is distinct from Count IV. Count IV challenges the unreasonable search itself. Count VI challenges the absence of constitutionally adequate process before and during the imposition, definition, and enforcement of monitoring conditions. Due process requires consideration of the private interest affected, the risk of erroneous deprivation, the value of additional safeguards, and the government's interest.[68]

Plaintiff's private liberty interest was substantial. He was subjected to continuous location tracking, movement restrictions, monitoring fees, and the threat of violation reports.[69] The risk of erroneous deprivation was high because the order allegedly contained no defined exclusion zones, no individualized findings, and no meaningful procedure for counsel or Plaintiff

---

[67] Am. Compl., Doc. 33 ¶¶ 200–17.
[68] *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).
[69] Am. Compl., Doc. 33 ¶¶ 204–12.

17

to contest the monitoring.[70] Additional safeguards—notice, counsel participation, defined restrictions, ability-to-pay review, and a meaningful hearing—would have had obvious value.[71]

Metro again argues that the conduct was judicial, not municipal. But Count VI also targets Metro's administrative system and delegation of authority to a private vendor. The First Amended Complaint alleges that Metro's system required Plaintiff to enroll with a vendor before release, that the vendor required Plaintiff to sign an agreement imposing restrictions not contained in the judicial order, and that the practical terms governing Plaintiff's liberty were established through the vendor-release process rather than through a judicially defined order.[72] That is enough to plausibly allege that Metro's customs and failures to train were the moving force behind the due-process violation.

## VIII.     VIII. Plaintiff has plausibly alleged municipal liability under Monell.

Metro's conclusion states that Plaintiff "identifies no Metro decisionmaker, no Metro rule, and no Metro practice."[73] That is incorrect. Plaintiff identifies several Metro practices and customs: (1) Metro's administration of initial appearances through standardized, non-adversarial procedures; (2) Metro's use of standardized bail-processing forms and checklists that resulted in GPS monitoring without individualized findings; (3) Metro's booking and release process that required defendants to secure a private GPS vendor before release; (4) Metro's practice of allowing private vendors to implement, administer, or enforce monitoring terms not defined by judicial order; (5) Metro's failure to ensure that exclusion zones were identified in written orders before monitoring was imposed; (6) Metro's failure to maintain or produce written contracts and

---

[70] *Id*. ¶¶ 204–07.
[71] *Id*. ¶¶ 204–17.
[72] *Id*. ¶¶ 208–17.
[73] Doc. 39 at 9, PageID 812.

policies governing Tracking Solutions' role; (7) Metro's failure to train or supervise officials involved in imposing and administering GPS monitoring; and (8) A widespread pattern reflected by approximately 1,300 GPS-monitoring orders, only 35 of which contained any information identifying exclusion zones.[74] Those allegations are not conclusory. They identify a systemic practice and tie that practice to Plaintiff's injuries. That is all Rule 12 requires.

## IX.     __Alternatively, Plaintiff should be granted leave to amend.__

Plaintiff maintains that the First Amended Complaint states claims against Metro. However, in light of the Court's Order directing Plaintiff to file a motion to amend with the proposed Second Amended Complaint attached and reflecting the position of all defendants, Plaintiff is filing a separate Motion for Leave to File Second Amended Complaint.[75]

The proposed Second Amended Complaint is targeted to the pleading-specificity issues raised in the pending motions and preserves the same core claims, parties, and factual theory. To the extent the Court concludes that additional specificity is required as to Metro's administrative policies, vendor-delegation practices, lack of written vendor agreement, training failures, or causation, Plaintiff respectfully requests that the Court grant leave to amend rather than dismiss any claim with prejudice.

Because the Court has recognized that the filing of a proposed Second Amended Complaint may moot or narrow the pending motions to dismiss, Plaintiff respectfully requests that Metro's motion be denied or, alternatively, denied without prejudice to renewal after the Court resolves Plaintiff's motion for leave to amend.

---

[74] See Am. Compl., Doc. 33 ¶¶ 35–43, 144–72, 176–97, 200–17.
[75] See Order, Doc. 42, PageID 865.

**CONCLUSION**

Metro's motion should be denied. The First Amended Complaint does not seek to hold Metro liable merely for a judicial commissioner's bail decision. It plausibly alleges that Metro's own policies, customs, booking-and-release procedures, vendor-delegation practices, and failures to train or supervise caused Plaintiff to be subjected to unconstitutional GPS monitoring, denied counsel at a liberty-determining proceeding, and deprived of liberty without due process.

For these reasons, Plaintiff respectfully requests that the Court deny Metro Nashville's Motion to Dismiss. In the alternative, Plaintiff requests leave to amend before dismissal with prejudice.

Date filed: May 18, 2026.

Respectfully submitted,

s/Cody Johnson/
Cody Johnson, Esq.
BPR No. 037568
Turklay Law, PLLC
Attorney for Plaintiff
102 E Main Street Suite A
Lebanon, TN 37087
P: (629) 200-7774
Cody@TurklayLaw.com
