# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARTIN SCOTT** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **3:25-cv-01393** |
| | ) | **JUDGE TRAUGER** |
| **METRO. GOV'T. OF NASHVILLE** | ) | **JURY DEMAND** |
| **AND DAVIDSON COUNTY,** | ) | |
| | ) | |
| **TRACKING SOLUTIONS, INC.,** | ) | |
| | ) | |
| **MALLORY WITHERS,** | ) | |
| *in her individual capacity* | ) | |
| | ) | |
| **BRIAN CAVALIERE,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| **TYLER LEWIS,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| **ERIC CUNNINGHAM,** | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| Defendants. | ) | |

---

## SECOND AMENDED COMPLAINT

---

Plaintiff, by and through undersigned counsel, for his Complaint against Defendants states as follows:

## **INTRODUCTION**

1. Plaintiff brings this action under 42 U.S.C. § 1983 to redress violations of his rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution,

1

and to obtain declaratory, injunctive, and monetary relief. He also asserts related supplemental state-law claims under Tennessee law.

2.     After Plaintiff's and Defendant Mallory Withers's arrangement ended in late August 2024, Defendant Withers began submitting criminal complaints to the Metropolitan Nashville Police Department alleging harassment, stalking, and violations arising from Plaintiff's issuance of IRS Forms 1099-NEC and Defendant Withers's receipt of tax documents mailed by a third-party reporting vendor. Based on those complaints and in collaboration with Withers, officers obtained six warrants against Plaintiff between December 2024 and January 2025. Plaintiff was arrested twice, detained for approximately four hours following the first arrest and twelve hours following the second, and placed on GPS monitoring as a condition of release after his January 29, 2025 arrest. Two of the charges were later returned by the grand jury; on September 23, 2025, the assigned Assistant District Attorney wrote that if Plaintiff withdrew his "1099 and tax claims," the State would dismiss the criminal cases.

3.     Plaintiff never withdrew the IRS Forms 1099. On the date Defendant Mallory Withers was scheduled to appear in state criminal court to show cause for her refusal to comply with a subpoena issued in connection with an earlier motion hearing, the State dismissed all charges against Plaintiff.

## PARTIES AND JURISDICTION

4.     Plaintiff, Martin Scott, is an adult male who is a resident of Tennessee and a United States citizen.

5.     Defendant Metropolitan Government of Nashville and Davidson County ("Metro") is a political subdivision of the State of Tennessee, subject to suit under 42 U.S.C. §

2

1983 for its customs, policies, and practices and operates the Metropolitan Nashville Police Department ("MNPD"), the Davidson County Night Court, and related pretrial services.

6. Defendant Tracking Solutions, Inc. is a private corporation that conducts business in Tennessee and administers GPS monitoring for pretrial defendants under color of state law and at all relevant times provided GPS monitoring services for Metro and Davidson County criminal courts.

7. Defendant Mallory Withers is an individual who, acting jointly with law enforcement personnel, initiated and sustained malicious prosecutions against Plaintiff.

8. Defendant Brian Cavaliere is a sworn law enforcement officer employed by the Metropolitan Nashville Police Department and is sued in his individual capacity for acts taken under color of law.

9. Defendant Tyler Lewis is a sworn law enforcement officer employed by the Metropolitan Nashville Police Department and is sued in his individual capacity for acts taken under color of law.

10. Defendant Eric Cunningham is a sworn law enforcement officer employed by the Metropolitan Nashville Police Department and is sued in his individual capacity for acts taken under color of state law.

11. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil-rights enforcement).

12. Supplemental jurisdiction exists over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

13. This Court also has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202.

3

14. Venue lies in this District under 28 U.S.C. § 1391(b), because the events giving rise to these claims occurred in Nashville, Davidson County, Tennessee.

**<u>STATEMENT OF FACTS</u>**

15. Plaintiff and Defendant Mallory Withers were not involved in a traditional dating relationship. Beginning in late 2023 and continuing into late 2024, Plaintiff and Withers interacted through a paid arrangement in which Plaintiff compensated Withers for her time, companionship, and sexual encounters. Withers treated the arrangement as income-producing activity. In communications with Plaintiff, Withers discussed payment expectations, referred to the parties' relationship as an "arrangement," and expanded the commercial arrangement by promoting other women to Plaintiff for additional paid sexual encounters. At the March 27, 2025 preliminary hearing, Withers testified that Plaintiff and Withers had an "arrangement" lasting approximately nine months.

16. By late August 2024, the arrangement had begun to deteriorate. On August 28, 2024, Plaintiff and Withers exchanged text messages during a dispute over the arrangement. During that exchange, Withers threatened to "call the police." Plaintiff immediately attempted to call Withers because her threat introduced law enforcement into what had been a private dispute between the parties, and Plaintiff sought to address the accusation before it escalated. The calls occurred the same day, during the same exchange, and lasted only seconds. Those brief calls later formed the basis of the harassment warrant assigned case number GS1054865.

17. The parties' contact did not end on August 28, 2024. During the following months, Plaintiff and Withers continued communicating. They exchanged approximately 200 text messages that same day, approximately 490 text messages after August 28th (in essence

4

remaining cordial into September 2024), and continued their arrangement for a period of time after the August 28 dispute. Messages introduced at the preliminary hearing showed that on September 13 and 14, 2024, Withers initiated contact with Plaintiff and asked why he was ignoring her.

18.     In October 2024, Plaintiff sent Withers written notice that IRS Forms 1099 for tax years 2023 and 2024 would be issued reflecting compensation paid during the arrangement. United States Postal Service records reflect that the certified mailing was picked up by the recipient at the Nashville post office on October 18, 2024. At the preliminary hearing, Withers admitted that she received the October letter and that it stated Plaintiff would be sending her a 1099 and a W-9. She also acknowledged that the letter included itemized attachments describing the payments.

19.     Withers's own messages described the parties' relationship as an "arrangement" involving money. In one exchange, Withers wrote: "We had an arrangement. You gave me money with each meet and I spent it. I work on the go, airports, layovers, necessities, food, etc. $1k a week is not much for someone who has my lifestyle." In other communications, Withers referred to the arrangement and discussed the terms of the parties' sexual encounters and the compensation Plaintiff provided, including cash payments, luxury merchandise, and other transfers of value.

20.     On December 10, 2023, Withers clarified that she was seeking "No relationship or dating. Just an arrangement." Plaintiff responded that the proposal "works for me," asked "What sort of terms are we talking about?," and then proposed "a weekly/monthly thing or per meetup" with the amount to be negotiated. When Withers stated, "In the past I've just given blow jobs," and later added, "In the past I've done more for 1k," Plaintiff responded, "1k is fair I think," after

which the parties discussed whether the arrangement would be "weekly or bi weekly," with Plaintiff answering, "Weekly probably depending on my schedule." The parties later continued to discuss payment in direct relation to access and frequency, including Plaintiff 's statement that Withers was "gonna break me if I pay you every time I see you," the parties' discussion of paying "half" for a second meeting in the same week, and Withers's later demand that the "next time you see me is $600," followed by her clarification that "if you see me twice a week it's 500," "next week would be back to 1k," and, most plainly, "I just never have hung for free."

21.     Withers also distinguished her documented employment from the paid arrangement with Plaintiff. Withers identified Delta Air Lines as her employer, and in a February 10, 2024 text exchange concerning dinner, hotel arrangements, and the parties' schedule, she wrote: "I have to work for $ on paper remember." In the same exchange, Withers suggested that Plaintiff seek a hotel refund or "take someone else out on Tuesday and do the hotel w them so you don't waste your $," while assuring Plaintiff that she still wanted to see him "at least once a week" and could see him "whenever" in March. These communications further show that Withers understood the arrangement as a continuing compensated arrangement, separate from ordinary employment and inconsistent with her later characterization of the relationship as traditional dating.

22.     After receiving the October 2024 notice, Withers described the tax filings as a "power move" intended to "cost her money" and acknowledged that they could have implications for her livelihood.

23.     Police records later obtained through public records requests described that investigators understood the dispute in terms of money, gifts, and tax reporting. One report referenced "pictures of gifts and money that the defendant sent the victim himself." Another

6

report described the alleged harassment as the suspect "send[ing] her mail to have her pay taxes on items he bought her."

24. District Attorney victim-witness records also reflect that Withers expressed concern that she could face legal consequences for prostitution and was reassured that she was not being prosecuted and would instead be treated as a victim of a crime.

25. On November 14, 2024, Withers sought an ex parte order of protection. The allegations in the order of protection largely mirrored allegations that later appeared in the December 3 harassment and stalking warrants. The order of protection and the December 3 harassment and stalking charges were later dismissed.

26. On November 22, 2024, Plaintiff submitted a Form 1099-NEC for tax year 2023 through Tax1099, a third-party tax-reporting vendor. Tax1099/INFOSEND mailed the form to Withers on November 27, 2024. The envelope identified the sender as INFOSEND, bore the marking "Presorted First-Class Mail – U.S. Postage Paid – INFOSEND," and included a United States Postal Service Intelligent Mail barcode identifying the item as bulk vendor-generated mail rather than a personally mailed communication. The Form 1099-NEC did not include any threat, demand, request for payment, personal message, or instruction that Withers take any action in relation to Plaintiff; it was a tax-reporting document generated through a third-party vendor.

27. On December 3, 2024, Withers swore out two affidavits that resulted in warrants numbered GS1054865 and GS1054866. One warrant charged harassment based on repetitive phone calls, and the other charged stalking. The phone calls referenced in those affidavits were the brief calls from the August 28 text-message dispute. The affidavits did not state that Withers had threatened to call the police during that exchange, and they did not disclose that the parties continued communicating afterward.

7

28. In a December 10, 2024 email to Detective Eric Cunningham, Withers described the December 3 warrant process by writing: "I was with you last Tuesday when we created the warrants against Martin Scott and were notified he was served." The statement identifies Cunningham as the detective with whom Withers had coordinated during the December 3 warrant process. Withers sent the email on December 10, approximately four hours before calling police again to report receipt of a Form 1099, even though she had known since October 18, 2024 that Plaintiff intended to issue Forms 1099.

29. Later on December 10, 2024, after receiving the first Form 1099, Withers contacted MNPD and reported the mailing as unlawful contact from Plaintiff. During the body-camera recording, Withers characterized the 1099 as a violation of the ex parte order of protection and explained the circumstances of receiving it. In the same encounter, while discussing Plaintiff and the 1099, Withers stated: "But yea, I want him to be taken down." Withers did not identify any separate message, threat, or direct communication accompanying the 1099; instead, her report treated the tax form itself as the prohibited contact and as the basis for alleged criminal or order-of-protection consequences.

30. MNPD communications from December 10 show that Withers and Cunningham discussed the tax-related mailing before the later January warrants. Withers stated that she was unsure whether the tax paperwork had been mailed before Plaintiff was served and did not know whether it constituted a violation. She also acknowledged that certain digital activity was anonymous and that she could not prove Plaintiff was responsible except by assumption.

31. Later that day, Withers told Cunningham that responding officers had said they did not know when the mail had been sent and that the issue "may not hold up in court as breaching the OP." Cunningham asked whether the letter was dated. When Withers responded

8

that there was no date, Cunningham told her: "You might want to reach out to a private tax attorney. Not really sure if we can do anything about this one."

32. Body-worn-camera footage from the December 10 response shows that Withers told responding officers she had received a Form 1099 in the mail and believed Plaintiff was responsible. She could not provide proof that Plaintiff personally sent the mailing and could not establish when the mailing had been placed in the mail. The responding officers declined to pursue charges or seek a warrant based on the 1099 mailing at that time.

33. During a body-worn-camera-recorded police interaction on November 5th, Withers also asked responding officers to confirm that her issue with Plaintiff was domestic even though she could not state that she and Plaintiff had ever been dating. One officer advised her that the matter could be treated as a domestic dispute based on the parties' sexual relationship, but further stated that such a classification might not apply if the relationship involved the exchange of money. Withers did not disclose that Plaintiff paid her for her time and sexual encounters or that the parties' interactions occurred as part of a paid business arrangement.

34. On December 20, 2024, Plaintiff was arrested on the December 3 warrants and incarcerated for several hours before release. After that arrest, no-contact domestic-violence bond conditions were imposed.

35. On December 23, 2024, Withers swore out two additional affidavits based on the first Form 1099. One charged violation of an order of protection, and the other charged harassment causing emotional distress. Both affidavits alleged that Withers had received a Form 1099 and treated that mailing as impermissible contact.

36. The December 23 affidavits did not disclose that the form was mailed by Tax1099/INFOSEND, that Plaintiff had notified Withers in October 2024 that the forms would

issue, or that the October notice included itemized documentation of payments. The affidavits characterized the mailing itself as unlawful contact and as a source of emotional distress.

37. On December 17, 2024, before Plaintiff's December 20 arrest and before bond conditions were imposed, Tax1099/INFOSEND mailed a second Form 1099-NEC for tax year 2024. United States Postal Service records show a Nashville-area scan on December 24, 2024. Withers reported receiving the form on December 26, 2024.

38. On December 26, 2024, Withers emailed Cunningham that she had received another Form 1099 and stated that she was "not sure" whether a no-contact order was in place. She assumed that receipt of the form "means" Plaintiff "would have sent it during the temporary OP or after court," but she did not identify any facts establishing when the 2024 Form 1099 had been generated or mailed. The Form 1099-NEC did not include any threat, demand, request for payment, personal message, or instruction that Withers take any action in relation to Plaintiff; it was a tax-reporting document generated through a third-party vendor.

39. On December 27, 2024, Cunningham responded that, because bond conditions were then in place, Plaintiff would "at minimum" be in violation for mailing the 2024 Form 1099 and that another warrant could be taken out. Cunningham did not identify any new information establishing when the 2024 Form 1099 had been generated, mailed, or placed into the mail stream. Nor did he indicate that he had contacted Tax1099, INFOSEND, USPS, or any other source to determine whether the mailing occurred before Plaintiff's bond conditions were imposed.

40. On January 16, 2025, Withers again emailed Cunningham and stated that she wanted to pursue a warrant "for receiving another 1099 while he has the pending charges." Cunningham responded that the matter sounded like it might involve "[two] Warrants," stated

10

that he would "give [the assisting detective] a heads up," and on January 17 identified Defendant Tyler Lewis as the detective who would help Withers.

41. On information and belief, consistent with Cunningham's statement that he would give the assisting detective a "heads up," Cunningham informed Lewis before Withers met with Lewis on January 17, 2025 that Withers was seeking warrant assistance based on receipt of another 1099 while Plaintiff's charges and bond conditions were pending.

42. On January 17, 2025, Lewis swore out an affidavit alleging violation of a no-contact domestic-violence bond condition. The affidavit relied on Withers's receipt of the second Form 1099, described Plaintiff as having been "in a dating relationship" with Withers, and alleged that Plaintiff had made threats to report money he spent with her during their "dating relationship."

43. Lewis's affidavit did not state that the second Form 1099 had been mailed by Tax1099/INFOSEND on December 17, 2024, before Plaintiff's December 20 arrest and before bond conditions were imposed. It also did not state that the mailing was generated and sent by a third-party vendor rather than personally mailed by Plaintiff.

44. Body-worn-camera footage confirms that Withers discussed Plaintiff's October 2024 letter concerning the future issuance of IRS Forms 1099 with law enforcement. The affidavits themselves did not disclose that Plaintiff had sent that letter in October 2024, more than two months before his arrest and before any bond conditions or no-contact restrictions existed. Lewis nevertheless relied on Withers's receipt of the 1099s and her claimed distress from that receipt as part of the basis for the bond-violation charge, without disclosing Plaintiff's earlier written notice or the pre-bond context of the tax reporting.

45. The mailing date and source were capable of verification through the envelope, postal records, and the third-party vendor. The affidavit did not indicate that any inquiry was made to determine whether the mailing predated Plaintiff's bond conditions.

46. On January 20, 2025, Withers reported to MNPD that Plaintiff had created a "fake Instagram account" to harass her, that a dating application showed Plaintiff approximately "one mile away" from her residence, and that she had received the 2024 Form 1099 on December 26, 2024. Defendant Cavaliere incorporated those allegations into an aggravated-stalking affidavit as the alleged course of conduct.

47. The affidavit did not state that Withers had located the Instagram account herself, that she had received no message, notification, tag, threat, or other interaction from the account, or that there was no identified proof linking Plaintiff to the account's creation or operation.

48. The affidavit also relied on the dating-application proximity allegation without identifying any bond condition that prohibited Plaintiff from being within one mile of Withers or any other distance-based restriction. The written bond order contained no such restriction.

49. On January 29, 2025, Plaintiff was arrested on four additional warrants: the two December 23 warrants obtained by Withers, Lewis's January 17 no-contact bond-condition warrant, and Cavaliere's January 20 aggravated-stalking warrant. Those warrants caused Plaintiff's second arrest, detention, initial appearance, GPS monitoring, and related liberty restraints.

50. At Plaintiff's initial appearance following the January 29 arrest, a judicial commissioner imposed GPS monitoring as a condition of release by checking a box on a standardized form. The order did not contain narrative findings explaining why GPS monitoring

was necessary and did not identify any exclusion zones, minimum distances, or other geographic restrictions.

51. The form used in Plaintiff's case consisted primarily of preprinted checkboxes and contained no narrative factual findings. Although the form checked conclusory boxes indicating that Plaintiff was a threat to the alleged victim and that GPS monitoring would deter future threats, it did not state any facts supporting those conclusions. The checkbox corresponding to exclusion zones was not marked, and the order did not identify any locations Plaintiff was required to avoid, any minimum distances he was required to maintain, or any geographic restrictions beyond the generic stay-away language. The form also left unchecked the boxes addressing whether Plaintiff was able or unable to pay the costs associated with GPS monitoring, whether Plaintiff was indigent, whether community service should be substituted for payment, and whether the court discussed GPS monitoring with the alleged victim. As a result, the order did not provide Plaintiff, his counsel, the bonding company, or the monitoring vendor with written notice of any court-imposed exclusion zones, did not document any ability-to-pay determination, and did not include factual findings supporting the imposition of continuous GPS monitoring.

52. Plaintiff could not secure release unless a private monitoring vendor attached a GPS device. At the time of Plaintiff's arrest, Tracking Solutions, Inc. and Nationwide Electronic Monitoring were the two advertised monitoring vendors inside the booking facility. Plaintiff called Nationwide twice, but got no answer. Tracking Solutions responded to Plaintiff's call, and Plaintiff enrolled with Tracking Solutions.

53. Tracking Solutions required Plaintiff to sign a preprinted "GPS Monitoring Agreement and Release" and related payment paperwork before it would provide the device

13

necessary for his release. Plaintiff was in custody when the paperwork was presented, had no practical ability to negotiate its terms, and could not obtain release without signing the paperwork and submitting to the device. The agreement stated that all of Plaintiff's movements would be tracked by GPS and stored as an official court record; required Plaintiff not to enter areas defined as "off-limits" or "exclusion zones"; and required Plaintiff to follow monitoring rules and communicate with Tracking Solutions. The agreement itself did not identify any actual exclusion zones, off-limits areas, minimum distances, victim-application terms, or operational restrictions imposed by the court.

54. The Tracking Solutions paperwork also included broad release, hold-harmless, indemnity, and covenant-not-to-sue language. Those provisions purported to require Plaintiff to release Tracking Solutions and its employees from claims, indemnify them for damages, costs, attorney's fees, and expenses, and waive claims arising from Tracking Solutions' acts, omissions, negligence, instructions, warnings, equipment, or monitoring services. Plaintiff had no meaningful ability to reject those terms because the device was necessary for his release from custody.

55. The payment paperwork charged or obligated Plaintiff to pay monitoring-related amounts, including a jail or after-hours installation charge, a charger deposit, daily GPS monitoring fees, and daily "Victim App Monitoring" fees. The judicial order did not identify any victim-application condition, did not document victim consent to victim-application monitoring, did not prescribe any proximity threshold, did not identify any exclusion zone to be enforced through such an application, and did not contain an individualized finding that Plaintiff was able to pay those charges.

56. The payment paperwork further stated that accounts 45 days or more out of compliance with the agreement would be reported to the Court and that overdue balances could result in termination from the electronic-monitoring program without prior notice. As a result, Tracking Solutions' private payment and compliance terms exposed Plaintiff to court reporting, monitoring termination, and possible release-condition consequences based on paperwork terms that were not imposed by any judicial officer.

57. On March 27, 2025, the Davidson County General Sessions Court conducted a preliminary hearing covering all six pending cases. During that hearing, Withers testified that Plaintiff had been prohibited from being in two locations, including her residence, under the GPS monitoring system. This testimony was Plaintiff's first notice that specific geographic restrictions had allegedly been imposed in connection with his monitoring. Following the hearing, the court ordered that the GPS monitor be removed the same day.

58. Although the General Sessions Court ordered the GPS monitor removed on March 27, 2025, Tracking Solutions did not remove Plaintiff's device until March 31, 2025. During that period, Tracking Solutions did not immediately comply with the court's removal order and instead took the position that the device would remain in place until an issue relating to the order-of-protection-violation charge was resolved. Plaintiff remained subject to continuous GPS tracking while his counsel addressed Tracking Solutions' refusal to remove the device notwithstanding the court's order.

59. During the monitoring period, Plaintiff limited his travel to Nashville and went there only a handful of times because he feared that Tracking Solutions, Withers, or law enforcement would treat his location as a violation of an undisclosed geographic restriction. That concern was based on the absence of any proximity distance in the written bond order, the

15

Tracking Solutions paperwork requiring compliance with undefined "off-limits" areas or "exclusion zones," and the fact that Withers had already alleged stalking based on a dating-application proximity display even though the written bond order contained no one-mile restriction. Plaintiff therefore experienced ongoing anxiety and uncertainty while wearing the device, including fear that he could be accused of violating monitoring terms that were not identified in any judicial order.

60. At the same preliminary hearing, the court bound over the January 17, 2025 no-contact bond-condition charge sworn by Lewis, case number GS1059179. That charge rested on the 1099 narrative contained in Lewis's affidavit: that Withers received a Form 1099 after Plaintiff's bond conditions were imposed and that receipt constituted prohibited contact or a bond-condition violation.

61. Immediately before the March 27, 2025 preliminary hearing, while Plaintiff and the State were discussing a potential resolution, Defendant Withers presented the General Sessions prosecutor with a screenshot from Plaintiff's WhatsApp account and represented that Plaintiff had "sent" it to her. Plaintiff had not sent the screenshot to Withers. Rather, Withers had accessed Plaintiff's WhatsApp profile or account page and taken the screenshot herself. The screenshot also showed that Plaintiff's telephone number remained associated with a contact in Withers's phone, indicating that the number had not been blocked in a manner consistent with her claim that Plaintiff was engaging in unwanted contact. By presenting the screenshot as new contact from Plaintiff, Withers supplied another materially false or misleading assertion to influence the prosecution immediately before the preliminary hearing, at a time when the criminal cases were subject to resolution.

62. After the preliminary hearing, Plaintiff began pursuing corrective action. On April 7, 2025, Plaintiff met with Cavaliere at the Family Safety Center and presented a formal complaint alleging that Withers had filed false reports and fabricated evidence.

63. Plaintiff later emailed Cavaliere the materials discussed during that meeting. Those materials included a chronological explanation of the 1099 dispute, documentation that Withers had advance notice of the tax filings, Tax1099/INFOSEND submission and mailing information, proof bearing on authorized-user credit-card allegations, communications showing continued voluntary contact after August 28, 2024, and materials supporting Plaintiff's position that Withers had characterized lawful tax reporting and prior consensual or transactional conduct as criminal contact.

64. On April 23, 2025, Cavaliere informed Plaintiff that the District Attorney's Office would not pursue charges against Withers while Plaintiff's criminal charges remained pending.

65. Cavaliere also advised Plaintiff that he could generate an MNPD incident report documenting the April 7 complaint because Plaintiff had already spoken with him at the Family Safety Center. Later that day, Cavaliere informed Plaintiff that he had generated false-report incident number 2025-0256164 and that the report documented their April 7 conversation.

66. In later email correspondence, Cavaliere explained that he did not seek a warrant against Withers because Plaintiff's criminal case remained pending, the charges had been bound over, and he would not "overstep" the judge's ruling in the still-active criminal case. Cavaliere further stated that he brought the matter to ADA Snelling and ADA Christina Johnson and that the District Attorney had agreed that no warrants should be obtained while some of Plaintiff's charges were pending criminal trial.

67. On April 26, 2025, Plaintiff attempted to present a sworn affidavit to Night Court Commissioner Carolyn Phipus and was directed to speak with the District Attorney's Office instead. Later that day, Plaintiff spoke with MNPD officers Taylor and Hutcheson, who declined to assist him in presenting the affidavit to a magistrate. Plaintiff then appeared before Night Court Commissioner Umeka Foreman, who did not review the affidavit for probable cause and instead directed Plaintiff to contact court administration.

68. Still on April 26, 2025, Cavaliere emailed Assistant District Attorney Erin Snelling regarding Plaintiff's attempts to obtain warrants. Cavaliere wrote that Plaintiff had been placed "on [the Night Court's] radar … to ensure that no warrants [would] be obtained on Ms. Withers." Snelling responded that her office would not prosecute Withers, asked Cavaliere to continue documenting Plaintiff's attempts, and indicated that if Plaintiff did not stop attempting to seek warrants against Withers, the State would "see about pursuing more warrants" against Plaintiff.

69. Between April 30 and May 20, 2025, Plaintiff contacted General Sessions administration, Metro Law, and the Criminal Court Clerk's Office seeking guidance on how to present a Rule 3 affidavit to a magistrate. He was not provided a procedure for doing so.

70. Plaintiff also began seeking information about the GPS monitoring that had been imposed on him. Through a public-records request, Plaintiff obtained copies of Orders Granting Bail for Abuse Cases issued in Davidson County (only where GPS was ordered) between July 2024 and September 2025. Of the approximately 1,300 forms produced, approximately 35 contained information identifying exclusion zones. In the remaining orders, the sections designated for exclusion-zone information were left blank. The vast majority of the forms also contained no individualized factual findings supporting GPS monitoring or bail.

18

71. In response to another public-records request, Patti Goodman of the Criminal Court Clerk's Office, General Sessions Courts Director, stated that none of the bond-condition forms maintained by the Clerk's Office include inclusion or exclusion zones and that "[a]ll of that information is housed with the tracking companies."

72. The bonding company involved in Plaintiff's release likewise confirmed that bonding companies are not provided GPS exclusion-zone information and had no documentation identifying any such zones in Plaintiff's case.

73. In May 2025, Plaintiff contacted Tracking Solutions seeking information about the exclusion zones that allegedly applied during his GPS monitoring period. Plaintiff explained that Tracking Solutions' paperwork required him not to enter areas defined as "off-limits," but no court order identified those areas. Tracking Solutions responded that the exclusion-zone information constituted "victim information," including the victim's personal addresses and exclusion zones, and that the information could be obtained only through a judicial subpoena or court order.

74. Tracking Solutions then communicated directly with the District Attorney's Office about Plaintiff's request. On May 21, 2025, Tracking Solutions owner Kristen Zachary emailed ADA Christina Johnson and Brittany LaDuke (believed to be a victim witness coordinator). Zachary stated that Plaintiff had completed GPS monitoring, was no longer supervised by Tracking Solutions, had "no issues" while monitored, and was requesting "victim information," specifically exclusion zones.

75. On May 22, 2025, ADA Christina Johnson responded to Tracking Solutions and District Attorney's Office personnel: "Do not give him any information. I would also ask him not to contact you about this woman again. If he does, please immediately report it to the police!"

19

76. Plaintiff also sought information about the contractual basis for Tracking Solutions' monitoring services. In response to public-records requests, the Metropolitan Clerk's Office reported that it searched its contract database and found no recorded contract with Tracking Solutions.

77. On May 23, 2025, Plaintiff submitted a claim to Metro Law regarding the GPS exclusion-zone issue and requested a copy of Metro's contract with Tracking Solutions covering the period during which he was monitored. The claim was assigned number C-46537 on May 30, 2025.

78. Plaintiff's May 23, 2025 Metro Law claim notified Metro that Plaintiff was challenging more than the existence of a contract. Plaintiff reported that Metro's pretrial GPS system operated without clearly defined, court-ordered exclusion zones, without disclosure of those zones to the monitored defendant, and without a written governmental agreement with Tracking Solutions covering the monitoring services at issue. Plaintiff also reported that Tracking Solutions' paperwork required compliance with undefined "off-limits" areas or "exclusion zones" not identified in the judicial order.

79. Metro Law acknowledged the claim on May 30, 2025, assigned claim number C-46537, and stated that Metro would collect information to investigate the claim. Metro did not provide Plaintiff with a written agreement with Tracking Solutions, identify any corrective action, or disclose any policy change requiring exclusion zones to be included in written judicial orders and provided to monitored defendants.

80. After Metro received Plaintiff's claim, later Davidson County proceedings showed the same GPS-monitoring structure continuing in another criminal case. In that proceeding, a Tracking Solutions representative testified that Tracking Solutions maintained and

20

enforced exclusion zones, received alerts when the defendant entered those zones, and that GPS scatter in downtown Nashville made it difficult to determine the defendant's precise location. The alleged victim also testified that Tracking Solutions contacted her about GPS bond conditions and asked what areas she wanted the defendant excluded from.

81. That later proceeding reflected the same practice challenged here: exclusion-zone information was operationally gathered, maintained, and enforced through Tracking Solutions and victim communications, while the defendant's liberty depended on compliance with GPS restrictions not clearly set out in the original written judicial order.

82. On May 28, 2025, General Sessions Administrator Kyle Sowell stated that Metro Procurement was still in the process of awarding the electronic-monitoring contract and that there was no written agreement to provide. During the period when Plaintiff was required to enroll with Tracking Solutions and submit to GPS monitoring, Metro/Davidson County had not executed a written governmental agreement with Tracking Solutions.

83. On July 9, 2025, the Davidson County Grand Jury acted on the remaining charges. Three charges had already been dismissed in General Sessions Court. Of the remaining charges, only two—GS1056824 and GS1059179—were returned as true bills. Both returned counts were based on the 1099 narrative.

84. The July 9, 2025 true-bill packet identified Lewis as the prosecuting witness for the two returned 1099-based counts. The packet states that the identified witness appeared, was sworn, and gave testimony before the grand jury. The packet does not identify Withers, Cunningham, or Cavaliere as grand-jury witnesses. Those proceedings occurred after Lewis swore the January 17, 2025 affidavit concerning Withers's receipt of the 2024 Form 1099 and after Plaintiff provided Cavaliere with the April 7, 2025 complaint and supporting materials

21

challenging the 1099 narrative. By that time, Cavaliere had advised Plaintiff that the matter had been submitted to DA Johnson and ADA Snelling, and MNPD had generated an incident report documenting Plaintiff's complaint.

85. Before the July 9, 2025 grand-jury proceedings, MNPD possessed information materially undermining the 1099-based probable-cause narrative. Through Plaintiff's April 7 complaint and subsequent materials provided to Cavaliere, MNPD had documentation showing that Withers had advance written notice that Forms 1099 would issue, that the forms were generated and mailed by Tax1099/INFOSEND, that the 2024 Form 1099 had been mailed before Plaintiff's bond conditions attached, that the tax filings arose from a paid arrangement rather than a traditional dating relationship, and that Withers had characterized lawful tax reporting and consensual or transactional conduct as criminal contact. Despite that information, the materially incomplete 1099 narrative used in Lewis's January 17 affidavit remained uncorrected when the two 1099-based charges were presented to and returned by the grand jury.

86. On September 23, 2025, ADA Atnip wrote to Plaintiff's criminal counsel stating that if Plaintiff withdrew his "1099 and tax claims," the State would dismiss the criminal cases.

87. Plaintiff did not withdraw the Forms 1099.

88. On October 29, 2025, Withers was scheduled to appear in state criminal court to show cause for her refusal to comply with a subpoena issued in connection with an earlier motion hearing. Withers failed to appear. That same day, the State dismissed all criminal charges against Plaintiff.

89. Plaintiff's criminal prosecutions caused two arrests, brief periods of incarceration, attorney's fees, bond-related expenses, loss of firearm possession during the pendency of the charges, reputational harm, humiliation, and emotional distress. Separately, the GPS-monitoring

practices challenged in this Complaint caused Plaintiff to incur monitoring-related charges and obligations, submit to continuous location tracking, sign private monitoring paperwork as a condition of release, and face alleged violation or reporting consequences based on restrictions not identified in any judicial order.

### COUNT I – MALICIOUS PROSECUTION
**(42 U.S.C. § 1983 – Fourth Amendment)**
**DEFENDANTS MALLORY WITHERS, ERIC CUNNINGHAM, BRIAN CAVALIERE, AND TYLER LEWIS**

90.     Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

91.     This claim challenges the initiation and continuation of six criminal charges and related criminal proceedings based on materially false and incomplete information supplied by Defendant Withers and incorporated into formal criminal process by Defendants Cunningham, Cavaliere, and Lewis. Defendants Cunningham, Cavaliere, and Lewis were, at all relevant times, MNPD officers acting under color of state law. Defendant Cunningham initiated or influenced criminal process by participating in the December 3 warrant process with Withers, communicating with Withers about whether the Forms 1099 could be treated as violations, advising that Plaintiff would "at minimum" be in violation for sending the second Form 1099, and communicating with Lewis before Lewis swore the January 17, 2025 bond-violation affidavit. Defendants Lewis and Cavaliere further expanded and perpetuated the criminal proceedings by swearing additional affidavits that incorporated and built upon Withers's earlier allegations and the materially incomplete 1099 narrative. Defendant Withers, although a private individual, acted jointly with law enforcement and prosecution officials by knowingly supplying

false and materially incomplete information that was incorporated into sworn affidavits and charging documents.

92.     A Fourth Amendment malicious-prosecution claim arises when a defendant (1) initiates or influences criminal proceedings, (2) without probable cause, (3) causes a deprivation of liberty pursuant to those proceedings, and (4) the prosecution terminates in the plaintiff's favor.[1] Where multiple charges are brought, probable cause must be evaluated charge by charge; probable cause for one charge does not categorically defeat a Fourth Amendment malicious-prosecution claim relating to another charge unsupported by probable cause.[2] A defendant "influences" a prosecution under § 1983 when he knowingly or recklessly includes falsehoods or omits material exculpatory information from reports or warrant affidavits used to secure legal process, or otherwise sets the prosecution in motion through materially misleading investigative materials.[3]

93.     Withers acted under color of state law by jointly participating with law enforcement and prosecution officials in initiating, shaping, and sustaining criminal proceedings against Plaintiff. She did more than make isolated reports: she coordinated with Cunningham during the December 3 warrant process, later describing that process as one in which she was "with" Cunningham when they "created the warrants" against Plaintiff and were notified that Plaintiff had been served. That coordination was significant because later tax-related charges depended on service, timing, and whether Plaintiff knowingly violated an existing order or bond condition. Withers then continued communicating with Cunningham about whether receipt of the Forms 1099 could be treated as a violation, even though she could not establish when the tax

---

[1] *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010).
[2] *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562–64 (2024).
[3] See *King v. Harwood*, 852 F.3d 568, 582–83, 587–89 (6th Cir. 2017).

documents had been mailed or whether they were personally sent by Plaintiff. Her 1099 narrative was then adopted by Lewis and Cavaliere in sworn affidavits.

94. Cunningham independently initiated or influenced criminal proceedings against Plaintiff. Before Lewis swore the January 17, 2025 affidavit, Cunningham had communicated with Withers about the 1099 allegations, knew that Withers was unsure whether the tax paperwork had been mailed before Plaintiff was served, knew that responding officers had questioned whether the first 1099 mailing would "hold up in court as breaching the OP," and knew that the relevant mailing date had not been verified. Cunningham nevertheless told Withers that Plaintiff would "at minimum" be violated for the second Form 1099, stated that he would give the assisting detective a "heads up," identified Lewis as the detective who would help Withers, and communicated with Lewis before Withers met with Lewis. Lewis then swore the January 17 bond-violation affidavit based on Withers's receipt of the second Form 1099 without disclosing the December 17 mailing date, the third-party vendor source, or the absence of any verified post-bond act by Plaintiff.

95. After the preliminary hearing, Plaintiff's corrective evidence entered MNPD and prosecution channels through Cavaliere, yet the prosecution continued on the same materially incomplete 1099 theory. The prosecution later remained pending while dismissal was conditioned on Plaintiff withdrawing his "1099 and tax claims," relief that would have benefited Withers personally rather than served any ordinary public purpose of criminal prosecution. ADA Atnip's later communication that Plaintiff's criminal case was dismissed because Withers no longer wished to prosecute further supports the inference that Withers had practical influence over the continuation and termination of the prosecution. Taken together, those facts plausibly

show that Withers was a willful participant in joint activity with state officials and that her private tax-related objective was laundered into formal criminal process.

96. The charges against Plaintiff arose from four categories of alleged conduct: (1) brief phone calls during an August 28, 2024 argument; (2) receipt of IRS Forms 1099 mailed by a third-party vendor; (3) an alleged bond-condition violation based on Withers's December 26, 2024 receipt of a Form 1099; and (4) an Instagram account and dating-application proximity display. Those charges lacked probable cause because the affidavits omitted material facts, relied on conduct that did not satisfy the elements of the charged offenses, and were based on allegations that could not establish criminal liability as a matter of law.

97. The phone-call allegations omitted that the calls occurred during a single heated exchange initiated by Withers, that Withers had threatened to call police during that exchange, and that the parties continued communicating voluntarily afterward, exchanging more than 200 messages and maintaining contact for weeks. That omitted context was material to whether the calls could constitute harassment under Tennessee law.

98. The 1099-based warrant materials treated receipt of federal tax forms as intentional prohibited contact while omitting that the forms were sent by Tax1099/INFOSEND, that Plaintiff gave advance written notice, that the Forms 1099 were tax-reporting documents containing no separate threat, demand, personal message, or direct communication, and that the December 17 mailing occurred before Plaintiff's December 20 arrest and bond conditions. Before the later affidavits were sworn, MNPD officers had already identified mailing date, sender identity, and the paid or transactional nature of the parties' relationship as issues bearing on whether the allegations could be treated as criminal domestic contact. The later warrant narratives nevertheless treated the tax documents as criminal contact arising from a "dating

relationship." Those omissions were material because Tennessee stalking law excludes conduct serving a legitimate purpose, and Tennessee harassment law likewise requires absence of a lawful or legitimate purpose for relevant forms of communication.[4] Courts likewise do not treat IRS information returns as objectively coercive or harassing merely because the recipient disputes the tax consequences or experiences distress.[5]

99. Corrected for the omitted facts, the 1099 theory routed through Cunningham and sworn by Lewis in the January 17, 2025 affidavit would not establish probable cause. The corrected affidavit would state that the 2024 Form 1099-NEC was generated and mailed by Tax1099/INFOSEND on December 17, 2024; that the mailing occurred before Plaintiff's December 20 arrest and before any no-contact bond condition existed; that Withers received the already-mailed tax document on December 26, 2024; that the form contained no threat, demand, personal message, or direct communication; and that Cunningham and Lewis had no verified facts showing that Plaintiff knowingly initiated any post-bond communication. Those corrected facts would not establish probable cause for a knowing violation of a no-contact bond condition.

100. Corrected for the omitted facts, Cavaliere's January 20, 2025 aggravated-stalking affidavit would not establish probable cause. The corrected affidavit would state that the 2024 Form 1099-NEC had already been mailed by a third-party tax-reporting vendor before Plaintiff's bond conditions attached; that the Instagram account had not contacted, messaged, tagged, threatened, or otherwise communicated with Withers; that no facts linked Plaintiff to the creation or operation of the Instagram account; that the dating-application proximity display had not been

---

[4] See *Long v. City of Clarksville*, No. 3:22-cv-00267, 2022 WL 17875858, at *8–9 (M.D. Tenn. Dec. 22, 2022); *Negron v. Roach*, No. M2024-00299-COA-R3-CV (Tenn. Ct. App. Feb. 3, 2025).
[5] See *Bates v. CitiMortgage, Inc.*, 844 F.3d 300, 306–08 (1st Cir. 2016) (treating IRS information returns as informational rather than objectively coercive where they made no demand and threatened no action).

27

verified; and that Plaintiff's written bond order imposed no one-mile exclusion zone or comparable geographic restriction. Those corrected facts would show, at most, receipt of a pre-bond vendor-mailed tax document, an unattributed online profile, and an unverified dating-app proximity display untethered to any court-imposed restriction—not probable cause for aggravated stalking.

101. Three charges were dismissed in General Sessions Court before grand-jury review. The two charges later returned as true bills were both 1099-based and rested on the same materially incomplete narrative used in Lewis's January 17 affidavit. The preliminary-hearing bind-over and later true bills did not cure the lack of probable cause because the omitted facts remained material at every stage: the Forms 1099 were tax-reporting documents generated and mailed by a third-party vendor; the 2024 Form 1099 was mailed before Plaintiff's bond conditions attached; the forms contained no threat, demand, personal message, or direct communication; and Defendants had no facts showing that Plaintiff knowingly initiated any post-bond communication. Corrected for those facts, the 1099s did not constitute harassment, stalking, prohibited contact, or knowing violations of any no-contact bond condition. Nor did the later proceedings cure the taint from the April 7 corrective materials, which placed MNPD on notice that the 1099 narrative was materially incomplete before the grand-jury presentation.[6]

102. As a direct result of Defendants' actions, Plaintiff was arrested twice, detained, subjected to continuous GPS monitoring at his own expense, stripped of his right to possess firearms, required to abstain from alcohol, and publicly labeled a felony defendant. He incurred monitoring fees, attorney's fees, and substantial reputational and employment harm. He also

---

[6] See *King v. Harwood*, 852 F.3d 568, 587–89 (6th Cir. 2017).

suffered humiliation, emotional distress, and ongoing privacy invasion resulting from electronic tracking. These consequences amount to a prolonged seizure under the Fourth Amendment.[7]

103. On October 29, 2025, the Davidson County Criminal Court dismissed all remaining charges at the State's request, terminating the prosecution in Plaintiff's favor.

104. Defendants' conduct directly and proximately caused Plaintiff's unlawful seizure and resulting damages. Plaintiff seeks compensatory damages, punitive damages, attorney's fees under 42 U.S.C. § 1988, costs, and all other relief allowed by law.

**COUNT II – FABRICATION OF EVIDENCE / MANUFACTURED PROBABLE CAUSE**
**(42 U.S.C. § 1983 – Fourth Amendment)**
**DEFENDANTS MALLORY WITHERS, ERIC CUNNINGHAM, BRIAN CAVALIERE, AND TYLER LEWIS**

105. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

106. This count challenges the manufacture and use of materially misleading probable-cause narratives that resulted in Plaintiff's January 29, 2025 arrest, continued prosecution, GPS monitoring, and related liberty restraints. Plaintiff does not base this claim on grand-jury testimony. Plaintiff bases this claim on Defendants' pre-grand-jury conduct, including the creation, adoption, transmission, and use of materially false or incomplete factual narratives in warrant-related communications, investigative materials, and sworn affidavits.

107. It was clearly established that an officer violates the Fourth Amendment when he knowingly or recklessly includes false statements, omits material facts, or uses materially misleading information to obtain legal process.[8] A defendant need not personally swear the final

---

[7] See generally, *Grady v. North Carolina*, 575 U.S. 306, 310 (2015).
[8] See *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006); *King v. Harwood*, 852 F.3d 568, 582–83, 587–89 (6th Cir. 2017).

affidavit if he sets the prosecution in motion through materially misleading investigative materials or communications that are later used to secure legal process.[9]

108. Defendant Cunningham, Defendant Lewis, and Defendant Cavaliere were, at all relevant times, MNPD officers acting under color of state law. Defendant Withers acted jointly with law enforcement by supplying materially false or incomplete information that was incorporated into warrant-related communications and sworn affidavits. Cunningham did not swear the January 17 affidavit, but he communicated with Withers about the 1099 allegations, sat with her in December of 2024 to help Withers create warrants against Plaintiff, advised that Plaintiff would "at minimum" be violated for the second Form 1099, stated that he would give the assisting detective a "heads up," identified Lewis as the detective who would help Withers, and communicated with Lewis before Lewis swore the January 17 affidavit.

109. The materially misleading narratives included: (1) treating vendor-mailed Forms 1099 as personal criminal contact by Plaintiff; (2) treating a tax document mailed before bond conditions attached as post-bond prohibited contact; (3) describing the parties' paid arrangement as a "dating relationship" while omitting the transactional facts giving rise to the tax reporting; (4) attributing an Instagram account to Plaintiff without proof of authorship, contact, threat, tag, message, or communication; and (5) treating dating-app proximity in downtown Nashville as stalking despite the absence of any enforceable one-mile restriction in Plaintiff's bond order.

110. Cunningham participated in the manufacture of probable cause for the January 17 bond-violation warrant. Before Lewis swore the affidavit, Cunningham had been told that Withers was unsure whether the tax paperwork had been mailed before Plaintiff was served; had been told that responding officers questioned whether the first Form 1099 would "hold up in court as breaching the OP"; had asked whether the mailing was dated; and had stated that he was

[9] See *King*, 852 F.3d at 587–89.

"not really sure" police could do anything about the first 1099 mailing. Despite those facts, Cunningham later advised Withers that Plaintiff would "at minimum" be violated for the second Form 1099 and routed the matter to Lewis without verifying the mailing date, vendor source, or existence of any post-bond act by Plaintiff.

111. Lewis then swore the January 17, 2025 bond-violation affidavit based on Withers's receipt of the second Form 1099. The affidavit did not disclose that Tax1099/INFOSEND mailed the form on December 17, 2024, before Plaintiff's December 20 arrest and before any no-contact bond condition existed. It did not disclose that the form was generated and mailed by a third-party tax-reporting vendor rather than personally mailed by Plaintiff. It did not disclose Plaintiff's October advance notice, the absence of any threat, demand, personal message, or direct communication, or the paid arrangement that gave rise to the tax reporting.

112. Corrected for those omitted facts, the January 17 affidavit would not establish probable cause. The corrected affidavit would state that the 2024 Form 1099-NEC was generated and mailed by Tax1099/INFOSEND before bond conditions attached; that Withers received an already-mailed tax document on December 26, 2024; that the form contained no threat, demand, personal message, or direct communication; and that Cunningham and Lewis had no verified facts showing that Plaintiff knowingly initiated any post-bond communication. Those corrected facts would not establish probable cause for a knowing violation of a no-contact bond condition.

113. Cavaliere separately manufactured probable cause for the January 20, 2025 aggravated-stalking warrant by adopting Withers's allegations concerning the Instagram account, dating-app proximity, and receipt of the 2024 Form 1099 without verifying facts necessary to probable cause. Cavaliere's affidavit did not disclose that Withers located the Instagram account

herself; that she had received no message, tag, threat, notification, or other communication from the account; that no facts linked Plaintiff to the account's creation or operation; that the dating-app proximity display had not been verified; or that Plaintiff's written bond order imposed no one-mile exclusion zone or comparable geographic restriction.

114. Corrected for those omitted facts, Cavaliere's January 20 affidavit would not establish probable cause for aggravated stalking. The corrected affidavit would show, at most, receipt of a pre-bond vendor-mailed tax document, an unattributed online profile that had not communicated with Withers, and an unverified dating-app proximity display untethered to any court-imposed geographic restriction.

115. The omitted facts were material because the challenged warrants depended on treating lawful or facially noncriminal facts as criminal conduct: receipt of tax-reporting documents as prohibited contact, a pre-bond vendor mailing as a post-bond communication, an unattributed social-media profile as stalking, and unverified proximity as a violation of a nonexistent one-mile restriction. Had those facts been disclosed, the January 17 and January 20 affidavits would not have supplied probable cause.

116. Defendants' materially false and incomplete narratives caused Plaintiff's seizure and the continuation of criminal process. The January 17 and January 20 warrants were part of the four-warrant set on which Plaintiff was arrested on January 29, 2025. Those warrants caused Plaintiff's second arrest, detention, initial appearance, GPS monitoring, firearm restriction, alcohol restriction, monitoring expenses, attorney's fees, reputational harm, humiliation, emotional distress, and related liberty restraints.

117. The later preliminary-hearing bind-over and grand-jury proceedings did not cure the constitutional violation because Plaintiff's claim rests on Defendants' pre-grand-jury

32

conduct, including the materially misleading 1099 narrative routed through Cunningham and sworn by Lewis and the materially misleading aggravated-stalking narrative sworn by Cavaliere. Plaintiff does not seek to impose liability for any witness's grand-jury testimony.

118. On October 29, 2025, all criminal charges were dismissed in Plaintiff's favor. Plaintiff seeks compensatory damages, punitive damages, attorney's fees and costs under 42 U.S.C. § 1988, and all other relief allowed by law.

## COUNT III – MALICIOUS PROSECUTION
### (Tennessee Common Law – Supplemental Jurisdiction, 28 U.S.C. § 1367)
### DEFENDANT MALLORY WITHERS

119. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

120. Under Tennessee law, a plaintiff must show that the defendant (1) instituted or continued a judicial proceeding, (2) without probable cause, (3) with malice, and (4) that the proceeding terminated in the plaintiff's favor.[10]

121. Defendant Withers instituted or caused the institution of six criminal proceedings against Plaintiff. She personally swore the December 3, 2024 harassment and stalking affidavits and the December 23, 2024 affidavits based on receipt of the first Form 1099. She also supplied the factual narratives used in the January 17, 2025 bond-violation affidavit sworn by Lewis and the January 20, 2025 aggravated-stalking affidavit sworn by Cavaliere. Those proceedings remained pending until October 29, 2025, when all remaining charges were dismissed.

122. The August 28 phone-call allegations lacked probable cause because Withers omitted the surrounding context: the calls occurred during a single dispute in which Withers

---

[10] *Christian v. Lapidus*, 833 S.W.2d 71, 73 (Tenn. 1992); *Roberts v. FedEx Corp.*, 842 S.W.2d 246, 248 (Tenn. 1992).

threatened to call police, the calls lasted only seconds, and the parties continued voluntary communications and maintained their arrangement afterward, including more than 200 messages and later contacts initiated by Withers.

123. The 1099-based allegations lacked probable cause because Withers knew facts showing that receipt of the Forms 1099 was not criminal harassment, stalking, prohibited contact, or a knowing bond-condition violation. Withers had advance written notice that Forms 1099 would issue; the forms were generated and mailed by Tax1099/INFOSEND, a third-party tax-reporting vendor; the forms contained no threat, demand, request for payment, personal message, or instruction; and the second Form 1099 was mailed on December 17, 2024, before Plaintiff's December 20 arrest and before any bond condition existed. Withers nevertheless characterized receipt of the tax documents as criminal contact and did not disclose the paid arrangement that gave rise to the tax reporting.

124. Those omissions were material because Tennessee stalking law excludes conduct serving a legitimate purpose, and Tennessee harassment law likewise requires absence of a lawful or legitimate purpose for relevant forms of communication.[11]

125. The January 20 aggravated-stalking allegations also lacked probable cause. Withers reported a "fake" Instagram account, a dating-application proximity display, and receipt of the 2024 Form 1099. At the time, Withers had received no message, tag, threat, notification, or communication from the Instagram account; she had located the account herself; she possessed no proof linking Plaintiff to the account's creation or operation; she lived in downtown Nashville, where a one-mile radius encompasses substantial residential and commercial space;

---

[11] See *Long v. City of Clarksville*, No. 3:22-cv-00267, 2022 WL 17875858, at *8–9 (M.D. Tenn. Dec. 22, 2022); *Negron v. Roach*, No. M2024-00299-COA-R3-CV (Tenn. Ct. App. Feb. 3, 2025); *Bates v. CitiMortgage, Inc.*, 844 F.3d 300, 306–08 (1st Cir. 2016).

and Plaintiff's written bond order imposed no one-mile exclusion zone or comparable geographic restriction.

126.    Withers's own communications with Cunningham confirm that the digital allegations were speculative. On December 10, 2024, she told Cunningham that the TikTok, fake-account, and Cash App issues were "done anonymously" and that she could not prove Plaintiff was responsible except by assumption. On January 16, 2025, she again raised the fake-Instagram allegation in speculative terms. Those facts were not disclosed in the January 20 aggravated-stalking narrative.

127.    Of the six charges initiated or caused by Withers, three were dismissed in General Sessions Court before grand-jury review, and only two—GS1056824 and GS1059179—were returned as true bills. Any grand-jury presumption of probable cause applies only to the returned counts and is rebutted because the 1099-based charges were procured through materially incomplete allegations omitting the third-party vendor source, the pre-bond mailing date, Plaintiff's advance written notice, the absence of any threat or personal message, and the paid arrangement underlying the tax reporting. An indictment does not bar a Tennessee malicious-prosecution claim where it was procured by fraud, false testimony, reckless disregard for truth, or by a defendant who did not believe in the plaintiff's guilt.[12]

128.    Malice may be inferred from the absence of probable cause and is also supported by the sequence of events. Withers pursued and escalated criminal complaints after Plaintiff notified her that Forms 1099 would issue; described the tax filings as a "power move"; told police, while discussing Plaintiff and the 1099, "I want him to be taken down"; omitted the paid nature of the arrangement when officers identified money as relevant to the domestic characterization; presented a WhatsApp screenshot as if Plaintiff had sent it when she had

_____

[12] See *Kerney v. Aetna Cas. & Sur. Co.*, 648 S.W.2d 247, 252 (Tenn. Ct. App. 1982).

accessed it herself; and later benefited from a prosecution posture in which dismissal was conditioned on Plaintiff withdrawing his "1099 and tax claims."

129. On October 29, 2025, all remaining criminal charges against Plaintiff were dismissed at the State's request. Plaintiff did not plead guilty, enter diversion, pay restitution, compromise the charges, agree to withdraw the Forms 1099, admit wrongdoing, or receive any criminal conviction or continuing criminal obligation. Plaintiff never withdrew the Forms 1099. The proceedings therefore terminated in Plaintiff's favor.

130. As a direct and proximate result of Defendant Withers's institution and continuation of criminal proceedings without probable cause and with malice, Plaintiff suffered arrest, detention, pretrial liberty restraints, GPS monitoring, bond-related expenses, attorney's fees incurred in defending the criminal charges, reputational harm, humiliation, and emotional distress.

131. Defendant Withers's conduct was intentional, malicious, and undertaken with reckless disregard of Plaintiff's rights, warranting punitive damages.

132. Plaintiff seeks compensatory damages, punitive damages, prejudgment interest, costs, and all other relief allowed by law.

### COUNT IV – UNREASONABLE SEARCH & SEIZURE
**(42 U.S.C. § 1983 - Fourth Amendment)**
**DEFENDANTS METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY (*Monell*)**
**AND TRACKING SOLUTIONS, INC. (State Actor Under Color of Law)**

133. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

134. This claim challenges the imposition and enforcement of continuous, 24-hour GPS monitoring as a condition of Plaintiff's pretrial release where the monitoring was imposed

36

without individualized judicial findings, without compliance with statutory requirements governing pretrial conditions, and through a system that effectively delegated the implementation of liberty-restricting conditions to a private vendor acting jointly with Metro.

135. The Fourth Amendment prohibits unreasonable searches and seizures. To state a claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment, a plaintiff must plausibly allege that (1) the defendant acted under color of state law; (2) the defendant's conduct constituted a search or seizure within the meaning of the Fourth Amendment; (3) the search or seizure was unreasonable; and (4) the constitutional violation was caused by the defendant's actions.[13] Attaching a GPS monitoring device to a person—thereby tracking his movements 24 hours a day—constitutes a search.[14] A GPS search is reasonable only if it is supported by individualized findings and imposed through constitutionally adequate procedures.[15]

136. Tracking Solutions acted under color of state law in administering Plaintiff's GPS monitoring. Plaintiff could not secure release from custody unless a court-connected monitoring vendor attached a GPS device and enrolled him in the monitoring system. Tracking Solutions performed that function inside Metro's pretrial-release system by attaching the device required for release, collecting and retaining Plaintiff's location data for law-enforcement access, administering monitoring rules tied to the judicial release order, and enforcing alleged exclusion-zone restrictions that affected Plaintiff's liberty. Tracking Solutions was not merely

---

[13] See *West v. Atkins*, 487 U.S. 42, 48 (1988) (state action requirement for § 1983); *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (Fourth Amendment analysis proceeds by determining whether government conduct constitutes a search or seizure and whether it is reasonable); *Manuel v. City of Joliet*, 580 U.S. 357, 367–69 (2017) (Fourth Amendment governs pretrial restraints on liberty).
[14] *Grady v. North Carolina*, 575 U.S. 306, 310 (2015).
[15] See *Id.*; see also *United States v. Jones*, 565 U.S. 400, 404–05 (2012) (physical intrusion for purpose of tracking constitutes a search); *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (long-term electronic monitoring invades a reasonable expectation of privacy).

selling a private service; it jointly participated with Metro in implementing and enforcing court-connected pretrial release conditions.

137. The GPS monitoring imposed on Plaintiff was unreasonable because it resulted from Metro's own initial-appearance, bail, pretrial-supervision, and vendor-delegation policies and customs, not merely from an isolated judicial act. Metro maintained and used standardized procedures and checkbox forms that did not require or document individualized findings, less restrictive alternatives, ability to pay, victim consultation, defined exclusion zones, or minimum distances before continuous GPS monitoring was implemented. Metro then allowed that incomplete order to be operationalized through private vendors, including Tracking Solutions, which attached the device, collected and retained Plaintiff's location data for law-enforcement access, and enforced monitoring rules and alleged "zone" restrictions not defined in the written judicial order. As a result of Metro's policy-level procedures and vendor-delegation practices, Plaintiff was subjected to approximately two months of continuous 24/7 location tracking, monitoring-related fees and expenses, stigma, privacy invasion, and exposure to alleged violation consequences based on restrictions never disclosed in any written court order.

138. A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy, practice, or custom of the municipality.[16] Municipal liability may arise from formal policies, widespread practices so permanent and well-settled as to constitute a custom, or the failure to train and supervise employees where such failure reflects deliberate indifference to constitutional rights.[17]

139. The unconstitutional GPS monitoring imposed on Plaintiff resulted from Metro's systemic policies and longstanding customs governing initial appearances and pretrial

---

[16] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).
[17] *City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989).

supervision in Davidson County. Metro uses standardized bail procedures and forms that do not require or document the individualized findings required by Tenn. Code Ann. §§ 40-11-150 and 40-11-152, including victim consultation, ability to pay, less restrictive alternatives, and defined exclusion zones. Public records obtained by Plaintiff show approximately 1,300 Orders Granting Bail for Abuse Cases between July 2024 and September 2025 where GPS monitoring was ordered, but only approximately 35 identified exclusion zones. Because the orders usually leave monitoring terms undefined, private vendors are left to define or enforce operational restrictions themselves. Metro's standardized forms, training failures, and delegation of monitoring authority to private vendors were the moving force behind the unconstitutional search imposed on Plaintiff.

140. Metro also had actual notice that the challenged GPS-monitoring practice was not an isolated error. Plaintiff's May 23, 2025 Metro Law claim identified the same defects alleged in this count: GPS monitoring imposed through orders that did not identify exclusion zones, private-vendor enforcement of undisclosed restrictions, lack of defendant notice, and the absence of a written governmental agreement with Tracking Solutions. Metro's failure to require and maintain written agreements with GPS-monitoring vendors before allowing them to administer court-connected pretrial monitoring was part of the same unconstitutional custom, delegation, and failure to supervise. Without the written-agreement safeguard required by Tennessee law, Metro permitted private vendors to attach GPS devices, collect location data, enforce alleged exclusion zones, and administer liberty-restricting monitoring terms without adequate governmental oversight or judicially defined limits. Later proceedings in another Davidson County GPS-monitoring case showed the same structure continuing after Metro received notice. Metro's failure to correct the practice supports the inference that the unconstitutional

GPS-monitoring system resulted from a municipal custom, delegation, or failure to train and supervise amounting to deliberate indifference.

141.    Plaintiff has standing to seek declaratory and injunctive relief because the challenged GPS-monitoring practices remain in effect and are capable of repetition yet evading review. Initial-appearance determinations occur rapidly and typically terminate before meaningful judicial review can occur. As a result, individuals subjected to these practices often complete their monitoring period before the legality of the monitoring can be litigated. Plaintiff therefore challenges an ongoing governmental practice that is capable of repetition yet evading review.[18] In addition, where a plaintiff faces a credible threat of being subjected again to the same enforcement regime, prospective relief is appropriate.[19]

142.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered: (1) continuous involuntary GPS tracking and invasion of privacy; (2) loss of liberty through government-imposed movement restrictions; (3) reputational stigma associated with placement on a GPS-monitoring regime; (4) financial losses, including monitoring fees; (5) emotional distress and anxiety; and (6) exposure to arrest for alleged "zone violations" arising from terms never ordered by a judge.

143.    Plaintiff respectfully requests a declaration that Metro's and Tracking Solutions' GPS-monitoring practices violate the Fourth Amendment; injunctive relief prohibiting the imposition or enforcement of GPS monitoring absent individualized judicial findings and lawful contracting; compensatory damages; punitive damages against Tracking Solutions; attorney's fees and costs pursuant to 42 U.S.C. § 1988; and all further relief the Court deems just and proper.

---

[18] See *Weinstein v. Bradford*, 423 U.S. 147 (1975).
[19] See *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).

144. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

145. This claim alleges that Metro deprived Plaintiff of his Sixth Amendment right to counsel at a critical stage of the criminal proceedings—his initial appearance and the imposition of pretrial GPS monitoring—when the State imposed substantial liberty restrictions and altered Plaintiff's legal relationship with the State without allowing his attorney to participate.

146. The Sixth Amendment guarantees the right to assistance of counsel at all "critical stages" of a criminal prosecution—any proceeding where "substantial rights of the accused may be affected."[20] A stage is "critical" when the defendant faces decisions or consequences that alter the legal relationship between the accused and the State.[21]

147. On January 29, 2025, immediately following Plaintiff's arrest, Plaintiff was processed through Metro's video-initial-appearance system for Davidson County arrestees. Under that system, Plaintiff appeared from custody before a judicial commissioner for a release-determination proceeding at which substantial pretrial liberty restrictions could be imposed, including continuous GPS monitoring, financial monitoring obligations, movement restrictions, and violation consequences.

148. Metro's procedures provided no meaningful mechanism for Plaintiff's counsel to appear, consult with Plaintiff, present evidence, object, request statutory findings, address ability to pay, or require any GPS conditions to be defined before monitoring was imposed. Instead,

---

[20] *Coleman v. Alabama*, 399 U.S. 1, 7–10 (1970); *Rothgery v. Gillespie County*, 554 U.S. 191, 212–13 (2008).
[21] See *United States v. Wade*, 388 U.S. 218, 226–27 (1967).

Metro's system routed Plaintiff through an uncounseled video proceeding in which GPS monitoring was imposed through a standardized checkbox bail form. Plaintiff attempted to object, but the process afforded him no counsel-assisted opportunity to challenge the condition before it became a restraint on his liberty.

149. The decision to impose GPS monitoring was a critical stage. It occurred after adversarial proceedings had begun and determined the conditions under which Plaintiff could remain free pending trial. The monitoring condition subjected Plaintiff to continuous physical surveillance, movement restrictions, financial obligations, and possible detention for alleged violations. Counsel could have objected to the absence of findings required by Tenn. Code Ann. §§ 40-11-150 and 40-11-152, addressed Plaintiff's ability to pay, and ensured that any monitoring conditions were clearly defined. Metro's procedures provided no meaningful opportunity for counsel to participate.

150. Metro's denial of counsel resulted from its policies, customs, and practices governing initial appearances and enhanced bail conditions. Metro administers a video-appearance and booking process in which defendants appear before commissioners immediately after arrest, GPS monitoring and other liberty-restricting conditions are imposed through standardized forms, and no mechanism exists for counsel to appear, object, or address the statutory factors governing enhanced conditions. Public records showing approximately 1,300 GPS-monitoring orders, most lacking individualized findings or defined exclusion zones, support the inference that this is a systemic practice. Metro's failure to establish procedures allowing counsel to participate in these liberty-determining proceedings was the moving force behind the Sixth Amendment violation.

151. As a direct and proximate result of Metro's violation of Plaintiff's Sixth Amendment rights, Plaintiff suffered significant restraints on liberty without the benefit of counsel to challenge their reasonableness, months of invasive 24/7 monitoring, financial burdens and fees, exposure to arrest for undefined "zone" violations, reputational harm, emotional distress, and deprivation of the constitutional right to counsel at a critical stage.

152. Plaintiff respectfully requests a declaration that Metro's practices violate the Sixth Amendment; injunctive relief requiring Metro to allow counsel participation before imposing GPS monitoring or comparable liberty restrictions; compensatory damages; attorney's fees and costs pursuant to 42 U.S.C. § 1988; and all further relief the Court deems just and proper.

### COUNT VI – PROCEDURAL DUE PROCESS & RIGHT TO A HEARING
**(42 U.S.C. § 1983 - Fourteenth Amendment)**
**DEFENDANTS METRO. GOV'T. OF NASHVILLE AND DAVIDSON COUNTY (*Monell*)**
**AND TRACKING SOLUTIONS, INC. (State Actor Under Color of Law)**

153. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

154. This count challenges the deprivation of Plaintiff's Fourteenth Amendment right to procedural due process before substantial restraints were imposed on his liberty through continuous GPS monitoring. Plaintiff alleges that Metro and Tracking Solutions jointly subjected him to a system of pretrial monitoring that imposed significant liberty restrictions without meaningful procedural safeguards, without individualized findings, without disclosure of the monitoring terms governing his conduct, and without any meaningful opportunity to challenge the restrictions before they were enforced.

155. The Fourteenth Amendment prohibits the State from depriving a pretrial defendant of a protected liberty interest without constitutionally adequate process. The process

43

required depends on the private liberty interest affected, the risk of erroneous deprivation under the procedures used, the probable value of additional safeguards, and the government's interest.[22] In the pretrial-release context, significant liberty restraints require procedures sufficient to ensure that restrictions are imposed by a judicial officer based on individualized facts rather than by conclusory forms or private-vendor implementation.[23] This count does not duplicate Plaintiff's Fourth Amendment claim challenging the reasonableness of GPS tracking as a search or seizure. It challenges the separate procedural deprivation caused by imposing and enforcing substantial pretrial liberty restrictions without notice of the actual monitoring terms, without individualized findings, without disclosure of the exclusion zones or operational rules governing Plaintiff's conduct, and without a meaningful opportunity to contest those restrictions before they were enforced.

156.    On January 29, 2025, a Davidson County judicial commissioner imposed GPS monitoring through a standardized bail form without a meaningful hearing, without allowing Plaintiff to present evidence or argument, without making individualized findings, and without identifying the geographic restrictions or operational rules governing Plaintiff's conduct. As a result, Plaintiff was subjected to continuous electronic surveillance and possible violation consequences without notice of the actual terms governing his liberty or a meaningful opportunity to challenge them before they were imposed or enforced.

157.    Metro's delegation of monitoring authority compounded the due process violation. Plaintiff could not secure release unless a monitoring vendor attached a GPS device

---

[22] *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).
[23] See *United States v. Salerno*, 481 U.S. 739, 751–52 (1987) (upholding pretrial detention procedures that included an adversary hearing, counsel, testimony, evidence, proffer, and cross-examination); see *Simon v. City & Cnty. of San Francisco*, 135 F.4th 784, 793–94, 807–09, 811–14 (9th Cir. 2025) (discussing individualized judicial determination, counsel-assisted consent, signed court orders, and the need for a record of electronic-monitoring conditions).

44

and enrolled him in a private monitoring system. Tracking Solutions operated inside the Davidson County jail, required Plaintiff to sign its Monitoring Agreement before release, and imposed practical monitoring rules and exclusion zones not contained in the judicial order. Through that process, the actual terms governing Plaintiff's liberty were established by a private company rather than by a judicial officer. Tracking Solutions therefore directly participated in the deprivation of liberty under color of state law.

158. Metro's procedural due process violation resulted from the same policies, customs, and failures to train alleged above: standardized initial-appearance procedures, checkbox bail forms, routine imposition of GPS monitoring without individualized findings, and the widespread failure to define exclusion zones in written orders. Public records showing approximately 1,300 GPS-monitoring orders, only approximately 35 of which identified exclusion zones, support the inference that the violation resulted from a systemic practice rather than an isolated error. Those policies, customs, and failures to train were the moving force behind the deprivation of Plaintiff's procedural due process rights.

159. As a direct and proximate result of the actions of Metro and Tracking Solutions, Plaintiff was: deprived of pretrial liberty without due process; forced to sign a coercive adhesion contract to obtain release; subjected to undefined and unauthorized exclusion zones; compelled to pay monitoring fees without an ability-to-pay determination; exposed to potential "violations" of terms he was never told existed; and stigmatized and publicly treated as dangerous despite the absence of judicial findings.

160. Plaintiff has standing to seek declaratory and injunctive relief because Metro's pretrial-monitoring practices remain in effect and continue to govern the initial-appearance process for criminal defendants in Davidson County. The challenged practices—including the

45

imposition of GPS monitoring without individualized findings, hearings, or disclosure of monitoring terms—are capable of repetition yet evading review because monitoring conditions are imposed rapidly at initial appearance and often terminate before meaningful judicial review can occur. Plaintiff therefore challenges an ongoing governmental procedure that continues to operate within Metro's pretrial system.

161. Plaintiff requests a declaratory judgment that Defendants' GPS-monitoring practices violate the Fourteenth Amendment and Tenn. Code Ann. §§ 40-11-150 and -152; injunctive relief requiring Metro to execute written agreements with monitoring vendors, ensure exclusion zones are specified in written orders, make statutory findings on the record, determine ability to pay before imposing monitoring, and prohibit the use of private vendor contracts that add unauthorized terms; compensatory damages against Metro; compensatory and punitive damages against Tracking Solutions; attorney's fees and costs under 42 U.S.C. § 1988; and all other relief the Court deems just and proper.

## COUNT VII – ABUSE OF PROCESS
**(Tennessee Common Law – Supplemental Jurisdiction, 28 U.S.C. § 1367)**
**DEFENDANT MALLORY WITHERS**

162. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

163. Under Tennessee law, abuse of process requires: (1) an ulterior motive; and (2) a willful act in the use of legal process, after its issuance, that is not proper in the regular conduct of the proceeding.[24]

---

[24] *Givens v. Mullikin*, 75 S.W.3d 383, 400 (Tenn. 2002); *Bell v. Icard*, 986 S.W.2d 550, 555 (Tenn. 1999).

164. This claim arises from Defendant Withers's retaliatory use of criminal process to coerce Plaintiff into withdrawing federal tax filings that exposed her to substantial tax liability and to penalize him for making those filings. Specifically, Defendant Withers used the pending criminal prosecution to pressure Plaintiff to withdraw IRS Forms 1099 that reported payments made to her and exposed her to potential federal tax liability.

165. Withers's ulterior motive is shown by the nature and timing of the parties' dispute. Plaintiff and Withers were not in a traditional romantic relationship; their interactions occurred pursuant to a paid business arrangement, which Withers acknowledged in contemporaneous communications. Despite that context, Withers later characterized the relationship as "dating," a description that omitted the financial arrangement underlying the Forms 1099 and the tax-reporting dispute.

166. The November 5 and December 10, 2024 body-worn-camera footage further supports ulterior motive. On November 5, when an officer caveated the domestic characterization if money was involved, Withers did not disclose that Plaintiff's time with her and their sexual encounters were part of a paid arrangement. That omission allowed the criminal process to proceed on a materially incomplete domestic/dating narrative. On December 10, after Withers received the first Form 1099 and reported it as unlawful contact, she told officers in so many words that she wanted Plaintiff to be taken down. Together, those statements and omissions support the inference that Withers was using the domestic-violence and criminal process to punish Plaintiff for the tax-reporting dispute rather than to report ordinary domestic misconduct.

167. The chronology further supports Withers's ulterior motive. After Plaintiff's October 2024 certified letter notified Withers that Forms 1099 would issue, Withers filed her first

47

police report within eleven days, relying on the August 28 calls while omitting the parties' continued friendly communications afterward. On November 13, 2024, Withers texted about being harmed by "the tax stuff," and she later described her resort to legal action as something she had to do to take her power back. The next day, she sought the ex parte order of protection. After that order of protection was dismissed on December 20, 2024, Withers returned to police three days later and obtained new warrants treating receipt of the first Form 1099 as unlawful contact, even though she had earlier expressed uncertainty about whether the 1099 mailing could be prosecuted. After Withers received the second vendor-mailed Form 1099 on December 26, 2024, the later January warrant narratives again recast tax reporting and related allegations as criminal conduct.

168. After criminal process issued, Defendant Withers used the pending charges for collateral purposes unrelated to the ordinary prosecution of harassment, stalking, or bond-condition offenses. On March 27, 2025, immediately before the preliminary hearing and while Plaintiff and the State were discussing a potential resolution, Withers presented the prosecutor with a screenshot from Plaintiff's WhatsApp profile and represented that Plaintiff had "sent" it to her. That statement was false or materially misleading because Withers had obtained the screenshot herself by accessing Plaintiff's WhatsApp profile or account page. By injecting a false claim of new contact at the moment the cases were subject to resolution, Withers used the pending criminal process to derail resolution, continue the prosecution, and preserve leverage over Plaintiff.

169. While the charges remained pending, the assigned prosecutor communicated to Plaintiff's counsel that if Plaintiff withdrew his "1099 and tax claims," the State would dismiss the criminal cases. That proposed condition tracked Defendant Withers's private financial

interest in avoiding the tax consequences of the Forms 1099 and rested on factual assertions about the parties' payment arrangement that were uniquely within Withers's knowledge. The condition did not require Plaintiff to plead guilty, compensate an alleged victim, comply with protective conditions, or accept any ordinary criminal-case resolution. Instead, dismissal was conditioned on Plaintiff undoing tax reporting that exposed Defendant Withers to potential tax liability.

170. Whether the payments were gifts, compensation, or otherwise reportable was a tax-classification dispute, not a proper objective of criminal harassment, stalking, or bond-condition proceedings. If Withers disputed the Forms 1099 or believed they were fraudulent, the proper remedies were tax-law remedies, correction procedures, IRS processes, or a civil action for fraudulent information returns under 26 U.S.C. § 7434—not the use of pending criminal charges to force Plaintiff to withdraw tax filings.

171. The State's later dismissal of the charges at or near the time Defendant Withers no longer wished to proceed further supports the inference that the criminal process had become tied to Defendant Withers's private objectives rather than the ordinary purposes of criminal prosecution.

172. Withers did not merely initiate false charges. After process issued, she continued to misuse the pending criminal cases by supplying false or misleading information to prevent resolution, preserve pressure on Plaintiff, and advance her tax-related objective. Her March 27 false WhatsApp representation was an overt misuse of already-issued process; the September 23 dismissal-for-withdrawal proposal later confirmed the same collateral objective—that the pending charges were being used to pressure Plaintiff to withdraw the Forms 1099.

49

173. As a direct and proximate result of Defendant Withers's abuse of legal process, Plaintiff suffered damages distinct from, and in addition to, the injuries caused by the initial issuance of the warrants, including continued criminal-case burdens after March 27, 2025; attorney's fees and litigation expenses incurred because the pending charges were used as leverage rather than resolved on their merits; continued reputational stigma and criminal-case restraints; emotional distress, humiliation, fear, and anxiety; and the loss of time, resources, and peace of mind associated with resisting pressure to withdraw lawful tax filings.

174. Defendant Withers's conduct was intentional, malicious, and undertaken with reckless disregard of Plaintiff's rights, warranting punitive damages. See Tenn. Code Ann. § 29-39-104(a)(1).

175. Plaintiff respectfully requests compensatory damages for economic, emotional, and reputational injury, including attorney's fees, costs, and litigation expenses incurred in the underlying criminal proceedings as a result of Defendant Withers's abuse of process; punitive damages for willful and malicious conduct; costs; and all such other and further relief as the Court deems just and proper.

### COUNT VIII – NEGLIGENCE AND NEGLIGENCE PER SE
**(Tennessee Common Law – Supplemental Jurisdiction, 28 U.S.C. § 1367)**
**DEFENDANT TRACKING SOLUTIONS, INC.**

176. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

177. This count is asserted against Defendant Tracking Solutions, Inc. for its negligent and statutorily noncompliant administration of Plaintiff's pretrial GPS monitoring. Plaintiff does not allege that Tracking Solutions alone caused every injury arising from the criminal

50

prosecutions or the initial judicial decision to impose GPS monitoring. Rather, Tracking Solutions caused separate and distinct injuries by administering monitoring without the statutory written-agreement safeguard, imposing private monitoring terms not contained in any judicial order, charging or obligating Plaintiff to pay unauthorized monitoring-related fees, and conditioning the device necessary for release on Plaintiff's execution of coercive preprinted paperwork.

178. Under Tennessee law, a negligence claim requires proof of duty, breach, injury or loss, causation in fact, and proximate causation.[25] Reasonable care is measured in relation to the circumstances and risks created by the defendant's conduct.[26] Negligence per se applies when a statute prescribes a standard of conduct, the plaintiff belongs to the class of persons the statute was designed to protect, and the injury is of the type the statute was designed to prevent.[27]

179. Tennessee law establishes specific requirements for GPS monitoring imposed as a condition of pretrial release. Tenn. Code Ann. § 40-11-150 requires the magistrate to impose release conditions by written order and authorizes GPS-related costs only where the defendant is able to pay. Tenn. Code Ann. § 40-11-152 requires judicial consideration of victim-requested exclusion areas, victim consent for victim-device or victim-application participation, and GPS monitoring provided by the county or municipality through a written agreement with a qualified contract service provider.

180. Plaintiff was within the class of persons protected by those statutory safeguards because he was a pretrial defendant subjected to GPS monitoring as a condition of release. The statutory scheme was designed to prevent the type of injuries alleged here: private enforcement of undefined monitoring terms, GPS restrictions not imposed by a judicial officer, payment

---

[25] *King v. Anderson County*, 419 S.W.3d 232, 246 (Tenn. 2013).
[26] See *Payne v. Tipton County*, 448 S.W.3d 891, 899–900 (Tenn. Ct. App. 2014).
[27] *Whaley v. Perkins*, 197 S.W.3d 665, 672–73 (Tenn. 2006).

obligations not supported by an ability-to-pay finding, victim-application charges not authorized by the order, and electronic-monitoring services administered without governmental contractual oversight.

181. Tracking Solutions owed Plaintiff a statutory and common-law duty to administer any court-ordered monitoring with reasonable care; to conform its monitoring practices to the written judicial order; to refrain from imposing, enforcing, or charging for restrictions not ordered by a court; and to refrain from using Plaintiff's custodial status and need for release to obtain waivers, indemnity obligations, promissory-note obligations, and payment terms beyond those authorized by statute or judicial order.

182. Tracking Solutions breached those duties by enrolling Plaintiff in court-connected GPS monitoring even though no written governmental agreement existed between Metro/Davidson County and Tracking Solutions as required by Tenn. Code Ann. § 40-11-152(k). The absence of a written governmental agreement did not make Tracking Solutions' role private or disconnected from Metro's pretrial-release system. Tracking Solutions still acted within and through that system by providing the GPS device required for Plaintiff's release, collecting and administering monitoring data for law-enforcement and court-connected purposes, and enforcing monitoring terms and alleged exclusion-zone restrictions not identified in Plaintiff's written judicial order.

183. Tracking Solutions further breached its duties by requiring Plaintiff to sign its preprinted "GPS Monitoring Agreement and Release" and related payment paperwork before it would provide the device necessary for his release from custody. Plaintiff was incarcerated when the paperwork was presented, could not secure release unless a private vendor attached a GPS

device, had no meaningful opportunity to negotiate the terms, and had no practical alternative vendor because Nationwide Electronic Monitoring did not respond to his calls.

184. The Tracking Solutions paperwork imposed terms and charges beyond the judicial order. Although the order did not identify exclusion zones, minimum distances, victim-application conditions, operational restrictions, or any ability-to-pay finding, Tracking Solutions required Plaintiff to acknowledge and comply with undefined "off-limits" areas, exclusion zones, monitoring rules, communication rules, equipment rules, reporting obligations, installation charges, GPS monitoring charges, charger-deposit obligations, and daily "Victim App Monitoring" charges.

185. Tracking Solutions' paperwork also contained broad release, hold-harmless, indemnity, and covenant-not-to-sue language purporting to shield Tracking Solutions from liability for claims arising from its monitoring services, including claims involving its acts, omissions, negligence, instructions, warnings, equipment, or monitoring conduct. To the extent Tracking Solutions relies on those provisions, they are unenforceable as applied because they were presented to an incarcerated pretrial defendant on a take-it-or-leave-it basis, involved a statutorily regulated public pretrial-release function, and were imposed as a condition of obtaining the device necessary for release.

186. Tracking Solutions' conduct was negligent and constitutes negligence per se. A reasonably careful monitoring provider would not administer court-connected pretrial monitoring without the written governmental agreement required by statute, even if Metro permitted or acquiesced in that practice; require payment for terms not imposed by a court; charge for victim-application monitoring not identified in the order; or bind an incarcerated defendant to broad private waivers and obligations as a condition of release.

187. Tracking Solutions' conduct caused Plaintiff concrete economic, liberty-based, and statutory injury. Plaintiff paid or became obligated to pay unauthorized monitoring-related charges; was subjected to private monitoring rules, undefined "off-limits" areas, and alleged exclusion zones not imposed by a judge; was exposed to court reporting, law-enforcement involvement, alleged violations, continued restraint, or renewed detention based on undisclosed restrictions; and suffered distress, uncertainty, time, and expense from being continuously tracked under private rules and from Tracking Solutions' refusal to disclose the alleged zones without a subpoena or court order.

188. To the extent Tracking Solutions invokes Tenn. Code Ann. § 40-11-152(m), that immunity does not apply. Tracking Solutions did not act "in accordance with" § 40-11-152 because Metro/Davidson County had not executed the written governmental agreement required by § 40-11-152(k), the judicial order did not identify exclusion zones or victim-application conditions, and the monitoring terms and charges imposed through Tracking Solutions' paperwork exceeded the written order. Tracking Solutions also did not act in good faith and acted with at least gross negligence or malice by requiring an incarcerated pretrial defendant to sign coercive private paperwork, imposing or charging for terms not contained in the judicial order, and exposing Plaintiff to alleged violation consequences based on undisclosed restrictions.

189. Tracking Solutions' conduct also supports punitive damages. Tracking Solutions was aware that Plaintiff was an incarcerated pretrial defendant whose release depended on signing its paperwork and accepting its GPS device, yet required him to accept private release, indemnity, payment, victim-application, and undefined exclusion-zone terms not contained in the judicial order. Tracking Solutions consciously disregarded the substantial and unjustifiable risk that Plaintiff would be charged for unauthorized monitoring terms, subjected to private

54

restrictions not imposed by a court, and exposed to alleged violation consequences based on undisclosed conditions.

190.	Plaintiff respectfully requests compensatory damages for unauthorized charges, coerced payment obligations, loss of statutory safeguards, liberty-based injury, distress, time, and expense caused by Tracking Solutions' conduct; restitution or refund of all unauthorized installation charges, monitoring charges, victim-application charges, deposits, and other amounts paid under Tracking Solutions' paperwork; a declaratory judgment that Tracking Solutions' monitoring practices, agreement, release provisions, hold-harmless provisions, indemnity provisions, promissory note, unpaid payment obligations, and fee practices were unlawful, unenforceable, unconscionable, contrary to public policy, or in violation of Tennessee law as applied to Plaintiff; punitive damages for reckless disregard of Plaintiff's statutory and common-law rights; costs and such recoverable fees as allowed by law; and all other relief the Court deems just and proper.

## **PRAYER FOR RELIEF FOR ALL COUNTS**

**WHEREFORE,** the Plaintiff respectfully requests that this Court:

191.	Grant the relief requested in each count above;

192.	Award compensatory damages in an amount to be determined at trial;

193.	Award punitive damages where permitted by law;

194.	Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

195.	Grant such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

_____
MARTIN SCOTT

s/Cody Johnson/
TURKLAY LAW, PLLC
CODY JOHNSON, #037568
Attorney for Plaintiff
102 East Main St., Suite A
Lebanon, TN 37087
(629) 200-7774
cody@turklaylaw.com